| | |
|---|---|
| ARLENE D. GUMM, PAUL J. PONTIER, CYNTHIA PONTIER, DANNY HIGH, and MICHAEL F. HOLZHAUER, on behalf of themselves and all other similarly situated stockholders of JOHNSON CONTROLS, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>ALEX A. MOLINAROLI, BRIAN J. STIEF, GREG GUYETT, DAVID P. ABNEY, NATALIE A. BLACK, JULIE L. BUSHMAN, RAYMOND L. CONNER, RICHARD GOODMAN,  JEFFREY A. JOERRES, WILLIAM H. LACY, JUAN PABLO DEL VALLE PEROCHENA, MARK P. VERGNANO, JOHNSON CONTROLS, INC., JAGARA MERGER SUB LLC, and TYCO INTERNATIONAL PLC,<br><br>Defendants. | Case No. 16-cv-1093<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

**WAGNER LAW GROUP, S.C.**
839 N Jefferson St, Suite 400
Milwaukee, Wisconsin 53202

**LOCKRIDGE GRINDAL NAUEN, PLLP**
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota  55401-2159

*Counsel for Plaintiffs and the Putative Class*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................... 1

JURISDICTION AND VENUE ..................................................................... 7

THE PARTIES .............................................................................................. 8

I. PLAINTIFFS ............................................................................................. 8

II. DEFENDANTS .......................................................................................... 8

III. OTHER ENTITIES .................................................................................. 10

THE INJURIES AND THE INJURED ....................................................... 11

CLASS ACTION ALLEGATIONS ............................................................ 14

FACTUAL ALLEGATIONS ...................................................................... 16

I. THE PROPOSED MERGER AND ITS BENEFITS FOR DEFENDANTS ............................. 16

    A. The Benefits to JCI and JCplc .................................................... 16

    B. The Benefits to the Individual Defendants and Tyco Officers and Directors ................................................................................. 19

II. THE INVERSION BENEFITS DEFENDANTS AND PENALIZES JCI PUBLIC SHAREHOLDERS. ................................................................. 25

    A. JCI's Anticipated Tax Savings, which Are the Sole Purpose of the Inversion, Come at the Expense of Minority Taxpaying JCI Shareholders. ............................................................................... 25

    B. Defendants Limit JCI Shareholders' Equity Interest in JCplc to under 60% to Protect Themselves from the Code's Anti-Inversion Tax Consequences Otherwise Applicable to Them. ............................................. 27

III. THE NOTORIETY OF INVERSIONS .......................................................... 31

IV. THE JCI/TYCO PROXY/REGISTRATION STATEMENT CONCEALS MATERIAL FACTS REGARDING THE INVERSION'S TAX CONSEQUENCES. ............................. 34

    A. The IRC § 367(a)/(b) Dichotomy: Who Is to Pay the Inversion-Imposed Taxes—JCI or Minority JCI Taxpaying Shareholders? .................... 34

    B. Defendants Are Concealing Material Facts Regarding JCI Shareholders' Liability for Taxes and JCplc's Avoidance of Taxes. .................... 42

    C. The JCI Defendants and Their Advisors Have Ignored the Material Inversion-Driven Costs to JCI shareholders Alleged Herein in Determining the Fairness of the Inversion to JCI Public Shareholders. .................... 49

    D. Defendants and Their Advisors Are Concealing the Dilution of JCI Public Shareholders' Equity Interest in JCplc Attributable to the Inversion. ........ 57

Case 2:16-cv-01093-PP   Filed 08/16/16   Page 2 of 130   Document 1

V.     ADDITIONAL MATERIAL OMISSIONS ....................................................... 87

VI.    THE INDIVIDUAL DEFENDANTS' FIDUCIARY RESPONSIBILITIES ............................ 89

     A.     The Individual Defendants Have Interests that Differ from JCI Public Shareholders' Interests. ................................................ 89

     B.     The Individual Defendants' Perception of Their Fiduciary Responsibilities and Corporate Governance. ........................ 91

     C.     The Individual Defendants Owe Fiduciary Duties to Persons with Conflicting Interests. ................................................ 92

VII.   IRREPARABLE HARM ...................................................................... 98

CLAIMS…….. ................................................................................. 99

COUNT I: CLAIM AGAINST THE JCI DEFENDANTS PURSUANT TO THE SECURITIES EXCHANGE ACT OF 1934 §§ 14(A) AND 20 ......................... 101

COUNT II: CLAIM AGAINST THE CORPORATE DEFENDANTS FOR VIOLATIONS OF THE TAXPAYER BILL OF RIGHTS II ........................................... 103

COUNT III: CLAIM AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY ............................................................................. 104

COUNT IV: CLAIM AGAINST THE CORPORATE DEFENDANTS FOR AIDING AND ABETTING THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTY ................. 112

COUNT V: CLAIM AGAINST DEFENDANTS FOR UNJUST ENRICHMENT AND RESTITUTION.. ................................................................................ 116

COUNT VI: CLAIM AGAINST THE INDIVIDUAL DEFENDANTS FOR AIDING AND ABETTING THE UNJUST ENRICHMENT OF JCI AND JCPLC .................................. 118

COUNT VII: CLAIM AGAINST ALL DEFENDANTS FOR CONVERSION ........................... 119

COUNT VIII: CLAIM AGAINST ALL DEFENDANTS FOR VIOLATION OF WIS. STAT. § 180.0601 ........................................................................ 120

COUNT IX: CLAIM AGAINST ALL DEFENDANTS FOR CONSPIRACY ............................. 121

COUNT X: CLAIM AGAINST THE JCI DEFENDANTS FOR TORTIOUS INTERFERENCE WITH CONTRACT ........................................................................ 122

COUNT XI: CLAIM AGAINST JCI FOR BREACH OF CONTRACT ...................................... 124

Plaintiffs Arlene D. Gumm, Paul J. Pontier, Cynthia Pontier, Danny High, and Michael F. Holtzhauer ("Plaintiffs"), on behalf of themselves and all other similarly situated stockholders of Johnson Controls, Inc. ("JCI," or the "Company"), bring this Class Action Complaint against certain senior executive officers ("Officers"), all members of the Board of Directors of Johnson Controls (the "Directors" or "Board"), Johnson Controls, Jagara Merger Sub LLC ("Merger Sub"), and Tyco International plc ("Tyco") for breaching their fiduciary duties or for aiding and abetting the same and other wrongful conduct in connection with JCI's proposed reincorporation in Ireland to reduce its taxes. The allegations of the Complaint are based on the knowledge of Plaintiffs as to themselves, and on information and belief, including the investigation by counsel and consultation with an expert, and review of publicly available information as to all other matters.

## INTRODUCTION

1.      Johnson Controls and Tyco, an Irish-domiciled company, have entered into an Agreement and Plan of Merger, dated as of January 24, 2016 (the "Merger Agreement"), pursuant to which JCI will be merged with a subsidiary of the smaller Tyco (the "Proposed Merger"), which will enable Defendants to reduce JCI's U.S. income taxes at the expense of JCI's minority taxpaying shareholders, as well as to the harm of all JCI public shareholders. By entering into the Proposed Merger and causing, participating in, agreeing to, or acquiescing in the filing of the S-4 filed with the Securities and Exchange Commission ("SEC") on April 4, 2016 as successively amended, most recently on July 6, 2016,[1] the Officers and Directors have breached their fiduciary duties of due care,

---

[1]      Unless otherwise indicated, all references to the JCI/Tyco joint proxy/registration statement ("S-4") are to the document as filed with the SEC on July 6, 2016. Plaintiffs' counsel have reviewed the SEC Forms 8-K/425, dated August 9, 2016, and the "Supplement to Definitive Proxy Statement" contained therein ("Supplemental Disclosures"). None of the Supplemental Disclosures addresses any of the disclosure or other issues alleged herein; nor does the settlement described in said Forms 8-K/425 provide for any of the relief sought herein.

disclosure, good faith, loyalty, and fair dealing that they owe to JCI's minority taxpaying shareholders and to all JCI public shareholders and violated federal and state statutory and common law.

2.      Although the Proposed Merger is structured as an acquisition *by* Tyco *of* JCI, JCI will pay approximately $16.5 billion for Tyco. Tyco will be renamed "Johnson Controls plc" ("JCplc"). Current JCI shareholders will own 56% of JCplc and receive aggregate cash of $3.86 billion, and current Tyco shareholders will own 44%.

3.      The combined company will maintain Tyco's Irish legal domicile with its global headquarters in Ireland, thus accomplishing the redomiciling necessary to achieve JCI's desired tax benefits, although such redomiciling is not necessary to achieve the non-tax benefits of the Tyco acquisition. JCplc will keep its primary operational headquarters in Milwaukee.

4.      The transaction will value Tyco at $34.88 per share, a 13% premium to Tyco shareholders based on 30-day volume-weighted average prices. JCI shareholders will be entitled to receive in exchange for each share of JCI common stock one ordinary share of JCplc or cash of $34.88 up to an aggregate of $3.86 billion; Tyco shareholders will receive for each ordinary share of Tyco 0.955 of an ordinary share of JCplc.

5.      The Proposed Merger is "expected to create at least $150 million in annual tax synergies" plus an additional $500 million in non-tax operational synergies. JCI expects its current tax rate on its foreign earnings will be reduced by replacing the current U.S. tax rates to which its foreign earnings are subject if repatriated to the U.S. with the much lower Irish tax rate. By reincorporating in Ireland, JCI will reduce the top marginal tax rate on its foreign earnings from the U.S.'s 35% rate on all such earnings to Ireland's 12.5% rate on only those earnings taxable by Ireland.

6.      In its January 25, 2016 announcement, JCI stated that the Proposed Merger

will be tax-free to Tyco shareholders and taxable to JCI shareholders.

7.     The Proposed Merger is to be structured to enable JCI and JCI's top executives and directors to avoid the provisions of the Internal Revenue Code ("IRC" or "Code") intended to prevent inversions, including the 15% excise tax imposed on directors' and top executives' stock compensation and the potential deprivation to JCplc of certain favorable tax attributes.  Although widely viewed as a "tax inversion," technically the Proposed Merger is not an inversion to the extent that it escapes the anti-inversion provisions found in IRC § 7874 and the anti-inversion excise tax found in IRC § 4985. However, the Proposed Merger is being structured to enable JCI to move its domicile to Ireland to take advantage of its lower corporate tax rate. As a result, JCI shareholders will be forced to recognize capital gains (and for a minority of JCI shareholders to pay taxes thereon), which are two characteristics of "inversions."

8.     Plaintiffs do not take issue with the purported business or financial merits of the Proposed Merger; Plaintiffs challenge only structuring the deal as an "inversion" (i.e., reincorporating JCI in Ireland) to achieve tax benefits for JCI at the expense of JCI's minority taxpaying shareholders and diluting the JCI public shareholders' equity interest in JCplc to avoid the inversion-related adverse tax consequences under IRC §§ 4985 and 7874.  Because it is the inversion structure that will cause the injuries to Plaintiffs and fellow class members, and not JCI's acquisition of Tyco itself, the term "Inversion" is hereinafter from time to time used to refer to the transaction.

9.     An "inversion," or a "tax inversion," is a process by which a U.S.-domiciled corporation becomes a subsidiary of a foreign parent corporation and the shareholders of the U.S. corporation become shareholders of the new foreign parent in an exchange of their U.S. corporation's stock for stock in the new foreign parent.  By changing its country of residence through an inversion, the U.S. corporation (which remains a

3

U.S. corporation subject to U.S. taxes on its U.S.-source income) is able to shield the earnings from its foreign operations from U.S. federal and state corporate income taxes; the new foreign parent is subject to a lower home country tax rate and no tax on its or its subsidiaries' foreign-source income derived from other countries. Whereas the U.S. seeks to tax all income of a U.S. corporation, regardless of its national source ("global taxation"), almost all developed countries (and all of the popular foreign domiciles, like Ireland) tax only the income earned by the locally-domiciled company in that country ("territorial taxation").

10.    JCI and its top executives and directors have conditioned the Proposed Merger on their ability to avoid an inversion's adverse tax consequences under IRC §§ 4985 and 7874, which impose such tax consequences in an effort to prevent inversions, but no tax avoidance has been arranged for JCI shareholders.  While JCI is touting the substantial tax savings it expects to realize from the Inversion, the transaction will be treated as a taxable event for JCI shareholders pursuant to IRC § 367(a), which provision is also intended to discourage inversions.  JCI's future tax savings and the JCI Defendants' avoidance of other inversion-related adverse tax consequences will come at the direct expense of its taxpaying shareholders. JCI will shift its liability for future U.S. taxes on its foreign earnings to its taxpaying shareholders by forcing them to pay capital gains taxes upon consummation of the transaction and at the direct expense of all JCI public shareholders by improperly diluting their equity interest in JCplc.

11.    This tax sleight-of-hand is accomplished by paying careful attention to the intricacies of the Internal Revenue Service's ("IRS") anti-inversion regulations.  IRC §§ 4985 and 7874 apply to inversions in which the shareholders of the inverting U.S. corporation (JCI) end up owning 60% or more of the new foreign parent corporation.  Here, the Proposed Merger is contractually conditioned on JCI shareholders owning less than 60%

of JCplc. The forced capital gains taxes imposed by IRC § 367(a) and the regulations thereunder are triggered where the shareholders of the inverting U.S. corporation end up with 50% or more of the new foreign parent corporation.

12. The under-60% ownership is to be accomplished by JCplc's cash payment of $3.86 billion to JCI shareholders in lieu of JCplc stock—i.e., JCI/JCplc is buying back $3.86 billion of JCI shares from JCI shareholders—and by manipulating the exchange ratio of JCI and Tyco shares for JCplc shares to ensure that the current JCI shareholders own significantly less than 60% of JCplc.

13. After reaping the benefits that the United States has to offer in establishing and substantially growing JCI in the United States, including the 2008 government bailout of the U.S. automobile industry from which JCI indirectly substantially benefited and grants of over $300 million from the U.S. Department of Energy and the state of Michigan for the production of hybrid batteries, JCI now seeks to skirt its obligation to pay its fair share of taxes to the United States and instead seeks tax shelter in Ireland as an Irish corporation.

14. The Inversion is conditioned on (i) no new laws or regulations being passed or implemented in the United States that would make the Inversion illegal or otherwise prevent JCI from taking advantage of Tyco's lower tax rate under Irish law and (ii) no assertion or threatened assertion by a tax authority of a tax liability against JCI "in excess of $50,000,000 in connection with an audit or other administrative or court proceeding involving Taxes of the Company or the Company Subsidiaries."[2]

15. This expected benefit of lower corporate taxes over time will most likely not offset the immediate substantial losses to a minority of JCI shareholders forced to pay the taxes that will be triggered by the Inversion, thus imposing a burden on these minority

---

[2] S-4 pp. 32, 213, A-23, A-87; *see also id.* at A-37 and A-91 with respect to Tyco.

JCI shareholders to the benefit of JCI and JCplc and a majority of JCI shareholders. The adverse tax consequences for JCI's tax-paying shareholders are incurred because the Inversion will be treated under the tax law as a sale by JCI's shareholders of their shares, rather than a tax-free exchange as is typically the case in such corporate transactions. Accordingly, JCI shareholders holding their JCI shares in a taxable account and who have held the stock for over a year will pay federal taxes at rates of 20% to 30% on their gains, in addition to state capital gains taxes. Thus, in order to enable JCI to escape U.S. taxes on its future global earnings, Defendants want to impose on JCI's taxpaying shareholders a substantial tax burden that must be satisfied now under a punitive tax provision that forces gains to be taxed to discourage inversions.

16.     All JCI public shareholders will also be harmed. While willing to impose a substantial tax burden on JCI's minority taxpaying shareholders, the Board has shown no such willingness when it comes to their exposure for taxes triggered by the Inversion. Instead, Defendants have carefully structured the transaction so that JCI shareholders will own less than 60% of JCplc to ensure that the Individual Defendants will not be subject to the 15% excise tax pursuant to IRC § 4985, even though this means causing JCI shareholders to receive a lower ownership interest in JCplc than they would if Defendants did not seek to avoid § 4985.

17.     Similarly, by keeping JCI shareholders' equity interest in JCplc under 60%, JCplc itself will avoid the adverse tax consequences of IRC § 7874. Thus, JCI/JCplc is protecting itself from adverse tax consequences, JCI's top executives are protecting themselves from adverse tax consequences, and the Board is protecting its members from adverse tax consequences; only minority tax-paying JCI shareholders are to be deliberately exposed to substantial adverse tax consequences, and JCI public shareholders' equity interest in JCplc is being substantially diluted.

6

18.     In connection with the structuring of JCI's Tyco acquisition, the JCI Defendants were faced with three choices: (1) not structure the acquisition as an inversion; (2) structure it as an inversion in a manner that imposed taxes on JCI shareholders, or (3) structure it as an inversion in a manner that imposed taxes on JCI (or JCplc) itself. The JCI Defendants adopted the second choice. If they had adopted the first or third choices, all JCI shareholders (but for the dilution) would have been equally affected by the transaction and, therefore, treated fairly, as the law requires.

19.     This lawsuit seeks to compel Defendants to comply with the Code; to determine and disclose whether JCI/JCplc or JCI shareholders are to pay the inversion-dependent taxes required by the IRC, and, if the latter, to require JCI to pay damages to those JCI shareholders forced to pay for JCI's inversion; and to disclose Defendants' scheme to protect themselves from inversion-related taxes by diluting JCI shareholders' equity interest in JCplc.

## JURISDICTION AND VENUE

20.     This action arises under the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78a et seq. ("Exchange Act") and, in particular, §§ 14(a) and 20, 15 U.S.C. §§ 78n(a) and 78t, and SEC Rule 14a-9 thereunder, 17 C.F.R. § 240.14a-9.

21.     Venue is proper in this District, pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), because more of the Defendants have their principal place of business or reside in this District than in any other venue and many of the acts complained of occurred in this District.

22.     In connection with the conduct alleged herein, the Defendants used the means and instrumentalities of interstate commerce, including the United States mails and interstate telephone, cable, internet, or other communications facilities.

## THE PARTIES

### I. PLAINTIFFS

23.    Plaintiff Arlene D. Gumm, 2245-6 Rolling River Lane, Simi Valley, California, currently holds in excess of 200 shares of JCI common stock in a taxable account and has held such shares since prior to the wrongs complained of herein.

24.    Plaintiff Paul J. Pontier, M.D., 3108 Harvesttime Crescent, Chesapeake, Virginia, currently holds in excess of 200 shares of JCI common stock in a taxable account and has held such shares since prior to the wrongs complained of herein.

25.    Plaintiff Danny High, 37386 River Dr., Soldotna, Alaska, currently holds in excess of 200 shares of JCI common stock in a taxable account and has held such shares since prior to the wrongs complained of herein.

26.    Plaintiff Cynthia Pontier, 1365 N. Mohawk St., Chicago, Illinois, currently holds in excess of 200 shares of JCI common stock in a taxable account and has held such shares since prior to the wrongs complained of herein.

27.    Plaintiff Michael F. Holzhauer, 1300 E. Lafayette Street, Suite 2206, Detroit, Michigan, currently holds in excess of 200 shares of JCI common stock in a taxable account and has held such shares since prior to the wrongs complained of herein.

28.    Plaintiffs' aggregate JCI shareholdings, as of June 1, 2016, exceeded 70,000 shares. The aggregate JCI shareholdings of Plaintiffs, together with certain Plaintiffs' family members, exceeded 100,000 shares as of June 1, 2016.

### II. DEFENDANTS

29.    Defendant Alex A. Molinaroli, c/o Johnson Controls, Inc., has been Chairman of the Board, President and Chief Executive Officer of JCI since 2013 and is to become chief executive officer and chairman of the board of JCplc.

30.    Defendant Brian J. Stief, c/o Johnson Controls, Inc., is Executive Vice

President and Chief Financial Officer of JCI.

31.     Defendant Greg Guyett, c/o Johnson Controls, Inc., is Executive Vice President, Corporate Development, of JCI.

32.     Defendant David P. Abney, c/o Johnson Controls, Inc., has been a Director of JCI since 2009 and is to become a director of JCplc.

33.     Defendant Natalie A. Black, c/o Johnson Controls, Inc., has been a Director of JCI since 1998 and is to become a director of JCplc.

34.     Defendant Julie L. Bushman, c/o Johnson Controls, Inc., has been a Director of JCI since 2012.

35.     Defendant Raymond L. Conner, c/o Johnson Controls, Inc., has been a Director of JCI since 2013.

36.     Defendant Richard Goodman, c/o Johnson Controls, Inc., has been a Director of JCI since 2008.

37.     Defendant Jeffrey A. Joerres, c/o Johnson Controls, Inc., has been a Director of JCI since 2001 and is to become a director of JCplc.

38.     Defendant William H. Lacy, c/o Johnson Controls, Inc., has been a Director of JCI since 1997.

39.     Defendant Juan Pablo del Valle Perochena, c/o Johnson Controls, Inc., has been a Director of JCI since 2015 and is to become a director of JCplc.

40.     Defendant Mark P. Vergnano, c/o Johnson Controls, Inc., has been a Director of JCI since 2011 and is to become a director of JCplc.

41.     Defendants Molinaroli, Stief, Guyett Abney, Black, Bushman, Conner, Goodman, Joerres, Lacy, del Valle Perochena, and Vergnano are collectively referred to herein as the "Individual Defendants." Defendants Molinaroli, Abney, Black, Joerres, del Valle Perochena, and Vergnano are sometimes referred to herein as the "Individual

9

JCI/JCplc Defendants." Defendants Stief, Guyett Bushman, Conner, Goodman, and Lacy are sometimes referred to herein as the "Individual JCI Defendants."

42.     Defendant JCI is a corporation organized and existing under the laws of the State of Wisconsin, with its world headquarters located at 5757 N. Green Bay Ave., Milwaukee, Wisconsin. JCI describes itself as the "global diversified technology and industrial leader serving customers in more than 150 countries." JCI common stock is publicly traded on the New York Stock Exchange under the symbol "JCI."

43.     Defendant Tyco (to be renamed "Johnson Controls plc" after the consummation of the Inversion) is incorporated and headquartered in Ireland, with its U.S. headquarters at 104 Carnegie Center, Princeton, New Jersey. Tyco common stock is publicly traded on the New York Stock Exchange under the symbol "TYC." Tyco/JCplc is the prospective controlling shareholder of JCI.

44.     Defendant Merger Sub, c/o C T Corporation System, 8020 Excelsior Drive, Suite 200, Madison, WI53717, is an Irish corporation and a direct wholly owned subsidiary of Tyco. Merger Sub was created for the purpose of effectuating the Inversion.

45.     Defendants JCI, Tyco/JCplc, and Merger Sub are collectively referred to herein as the "Corporate Defendants." The Individual Defendants and JCI are collectively referred to herein as the "JCI Defendants." The Individual Defendants and the Corporate Defendants are collectively the "Defendants."

## III.    OTHER ENTITIES

46.     Centerview Partners LLC ("Centerview"), a U.S. registered broker/dealer, is serving as lead financial advisor to JCI.

47.     Barclays Capital Inc. ("Barclays"), a U.S. registered broker/dealer, is serving as financial advisor to JCI.

48.     Wachtell, Lipton, Rosen & Katz is acting as JCI's legal advisor.

49.     A&L Goodbody is acting as JCI's legal advisor.

50.     Lazard Freres & Co. LLC, a U.S. registered broker/dealer, is serving as lead financial advisor to Tyco.

51.     Goldman Sachs is serving as financial advisor to Tyco.

52.     Simpson Thacher & Bartlett is acting as Tyco's legal advisor.

53.     Arthur Cox is acting as Tyco's legal advisor.

## THE INJURIES AND THE INJURED

54.     The injuries addressed in this action arise from Congress's and the Department of Treasury's intention to impose a price to be paid for a U.S. corporation's tax inversion; that price is to be paid by either the corporation or its shareholders.  Who pays that price, as between the corporation and its shareholders, depends in part on whether the corporation's taxes from the inversion transaction, if any, are higher than the shareholders' capital gains taxes from the inversion transaction, as determined by IRC § 367 and the regulations thereunder.  If the corporation's taxes are higher, then the corporation pays the price, and the shareholders do not have to pay capital gains taxes; however, if the shareholders' capital gains taxes exceed the corporation's taxes, the shareholders holding their shares in taxable accounts will be forced to pay the price in the form of a current tax to enable the corporation's inversion so that it may avoid future U.S. taxes on its foreign earnings.

55.     This action seeks (1) to compel JCI to disclose (A) the basis for its statements that JCI shareholders "will be" compelled to pay capital gains taxes in connection with the Inversion and (B) the total cost to JCI shareholders of the Inversion, including both the forced capital gains taxes and any dilution of JCI shareholders' equity interest in JCplc attributable to the need to limit JCI shareholders' equity interest in JCplc to under 60%; (2) to compel JCI to compute and disclose its estimate of the JCI shareholders' forced capital gains taxes pursuant to IRC § 367(a) and JCI's potential tax liability pursuant to IRC § 367(b) with reasonable certainty, rather than assume, as it seems to be doing

now, that its shareholders' capital gains will be higher, because it cannot know that for certain at this time; (3) until it is able to do so, to compel the JCI Defendants to refrain from publicly stating that its shareholders will be forced to pay capital gains taxes and to disclose the fact that JCI could choose to pay taxes itself rather than JCI shareholders in order to consummate the Inversion; (4) to compel the Individual Defendants, in light of their fiduciary duty to JCI shareholders, to direct JCI to make such choice to potentially avoid taxing JCI shareholders; and (5) if JCI shareholders' capital gains taxes are higher than JCI's taxes, to compel JCI to compensate JCI's tax paying shareholders.

56. The injuries complained of herein consist of:

(a) While stock-for-stock mergers or combinations of U.S. publicly-held corporations are almost always done in a manner that does not force their shareholders to incur any tax liability (except for any portion of such exchanges paid in cash), the minority taxpaying JCI shareholders holding their shares in taxable accounts are to be forced to pay capital gains taxes on their JCI shares for the year in which the Inversion is consummated, presumably 2016;

(b) The disparate treatment of JCI public (non-insider) shareholders as compared with that to be accorded to JCI and JCplc and JCI's directors and executive officers, who will be shielded from inversion-imposed tax consequences by arbitrarily limiting JCI shareholders' equity interest in JCplc to well under 60%;

(c) The reduction of shareholders' interest in the combined company to well under 60% causing significant dilution to JCI public shareholders' equity interest in JCplc; and

(d) Depriving JCI public shareholders of a loyal board of directors that is free

of conflicting interests or that does not favor the interests of certain of those to whom it owes a fiduciary duty of loyalty over the interests of JCI public shareholders.

57.    The persons directly injured by the injuries complained of herein consist of:

(a)    With respect to the adverse tax consequences caused by the Inversion, the minority of JCI shareholders who hold their JCI shares in taxable accounts (sometimes referred to herein as "Minority Taxpaying JCI Shareholders"); and

(b)    With respect to deliberately limiting JCI shareholders' equity interest in JCplc to well under 60% in order to enable JCI, JCplc, and JCI's executive officers and directors to avoid the IRS anti-inversion regulations, all JCI public shareholders.

58.    None of the injuries alleged herein are injuries to JCI, JCplc or to the Individual Defendants and other insider shareholders who, in the absence of the above-described dilution, would be subject to inversion-imposed tax consequences. No claim herein is made, and no allegations herein are to be deemed to make any claim, of injury to JCI or to all JCI shareholders (i.e., including insider shareholders). Whatever injuries may be perceived to be alleged herein to JCI or to all JCI shareholders are not the source of or basis for, and are separate and apart, from the injuries identified in paragraphs 54 – 57, or alleged elsewhere herein, to Taxpaying JCI Shareholders and to JCI public share-holders injured by the inversion-avoidance dilution. Specifically, no claim is based on the premium JCI proposes to pay to Tyco shareholders.

59.    Any perceived allegations of injury to JCI, JCplc, or to all JCI shareholders are made solely to provide context for the claims asserted herein, are not the basis for any claims made herein, and Plaintiffs make no claim herein based on any such allegations.

## CLASS ACTION ALLEGATIONS

60.     Plaintiffs bring this action (1) on behalf of themselves and all other similarly situated JCI shareholders who will be injured by the Inversion-inspired dilution, except the Defendants herein and any persons, firm, trust, corporation, or other entity related to or affiliated with them (the "Class") and (2) on behalf of themselves and all other similarly situated JCI shareholders who hold their JCI shares in taxable accounts and will be injured by the capital gains taxes and other taxes that they will be forced to pay as a result of the Inversion, except the Defendants herein and any persons, firm, trust, corporation, or other entity related to or affiliated with them (the "Minority Subclass" or "Minority Taxpaying JCI Shareholders"). Both the Class and the Minority Subclass will be immediately injured as a result of Defendants' actions prior to or upon consummation of the Inversion, as more fully described herein.

61.     This action is properly maintainable as a class action for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable.  As of March 12, 2015, there were more than 30,000 shareholders.  While Plaintiffs estimate that the shares held by the Minority Subclass are likely less than 17% of the total JCI shares outstanding, the Minority Subclass is also so numerous that joinder of all members is impracticable.

(b)     Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.

(c)     Plaintiffs' claims are typical of the claims of the other members of the Class and Minority Subclass, and Plaintiffs have the same interests as the other members of the Class and Minority Subclass.

(d)     Plaintiffs are adequate representatives of the Class and the Minority Sub-

14

class and will fairly and adequately protect the interests of the Class and Minority Subclass.

(e) The prosecution of separate actions by individual members of the Class and Minority Subclass would create the risk of inconsistent or varying adjudications with respect to individual members of the Class and Minority Subclass, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class and Minority Subclass that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

(f) To the extent Defendants take further steps to effectuate the Inversion, injunctive relief on behalf of the Class or the Minority Subclass as a whole is appropriate because Defendants have acted, or refused to act, on grounds generally applicable and causing injury to the Class and Minority Subclass.

62. The injuries complained of herein are common to all members of the Class and, to the extent relevant, to all members of the Minority Subclass. All Minority Subclass members are also members of the Class.

63. There are questions of law and fact that are common to the Class including the following:

(a) Whether Defendants have violated Securities Exchange Act of 1934 § 14(a) and Rule 14a-9 thereunder;

(b) Whether the Individual Defendants have breached, or will continue to breach, the fiduciary duties owed by them to Plaintiffs and the other members of the Class and Minority Subclass;

(c) Whether the Corporate Defendants have aided and abetted or will continue

to aid and abet the Individual Defendants' breach of the fiduciary duties owed by them to Plaintiffs and the other members of the Class and Minority Subclass;

(d)     Whether Defendants should be compelled to calculate, compare, and disclose JCI's inversion-related taxable income and JCI shareholders' capital gains;

(e)     Whether the Inversion is entirely fair to, and in the best interests of, the Plaintiffs and the other members of the Class and Minority Subclass;

(f)     Whether Plaintiffs and the other members of the Minority Subclass should be compensated for being forced to pay capital gains taxes to enable JCI to reduce or avoid U.S. income taxes on its foreign earnings;

(g)     Whether Defendants owe a duty of disclosure to Plaintiffs and the other members of the Class under Wisconsin law that has not been satisfied with respect to, *inter alia*, the inversion-inspired dilution;

(h)     Whether the Class should be compensated for such dilution;

(i)     Whether the disclosures sought by Plaintiffs on behalf of the Class are material; and

(j)     Whether Plaintiffs and the other members of the Class and Minority Subclass will be irreparably harmed if Defendants are not enjoined from engaging in the conduct described herein.

## FACTUAL ALLEGATIONS

I.     THE PROPOSED MERGER AND ITS BENEFITS FOR DEFENDANTS

A.     The Benefits to JCI and JCplc

64.     On January 25, 2016, JCI and Tyco announced that they had "entered into a definitive merger agreement," which their respective boards of directors had "unanimous-

ly approved," pursuant to which JCI will "combine" with Tyco.

65. Pursuant to the Merger Agreement, JCI will merge with Merger Sub, a wholly-owned subsidiary of Tyco, with JCI as the surviving corporation, resulting in JCI becoming a wholly-owned subsidiary of Tyco/JCplc. Following the transaction, JCplc will maintain its primary North American headquarters in Milwaukee, JCI's current headquarters, and its global headquarters in Ireland.

66. In connection with the Proposed Merger, JCI shareholders will own approximately 56% of the equity of JCplc and will receive aggregate cash consideration of approximately $3.86 billion. Current Tyco shareholders will own appropriately 44% of JCplc.

67. Prior to the merger, Tyco will effect a reverse stock split so that Tyco shareholders will receive a fixed exchange ratio of 0.9550 JCplc shares for each of their existing Tyco shares. JCI stockholders may elect to receive either one share of JCplc for each of their JCI shares or cash equal to $34.88 per share. Elections by JCI shareholders to receive cash are subject to proration such that an aggregate of no more than $3.86 billion cash will be paid in the merger.

68. The combination will be tax-free to Tyco shareholders, and taxable to Johnson Controls shareholders.

69. In the January 25th announcement at pp. 1-2, Defendants touted the benefits that they expect the Inversion to generate:

- "The combined company brings together best-in-class product, technology and service capabilities across controls, fire, security, HVAC, power solutions and energy storage, to serve various end-markets including large institutions, commercial buildings, retail, industrial, small business and residential. The combination of the Tyco and Johnson Controls buildings platforms creates immediate opportunities for near-term growth through cross-selling, complementary branch and channel networks, and expanded global reach for established businesses."

- "The new company will also benefit by combining innovation capabilities

and pipelines involving new products, advanced solutions for smart build-ings and cities, value-added services driven by advanced data and analytics and connectivity between buildings and energy storage through infrastruc-ture integration. As a result, the new company will be able to better partner with its customers to help improve their overall performance and opera-tions, enhancing the experience for their own customers in areas such as comfort, safety and accessibility. In addition, the combined company will have one of the largest energy storage platforms with capabilities including traditional lead acid as well as advanced lithium ion battery technology serving the global energy storage market."

- "Tyco has transformed from a diversified holding company to a streamlined operating company with a focused and leading portfolio in fire and security that will complement Johnson Controls' buildings platform. Tyco combines best-in-class products with a world-class installation and service capability delivered across a global network of branches. The company's core strengths include security and fire systems integration, commercial security monitoring, as well as fire, security and life-safety products."

- "The new company expects to deliver at least $500 million in operational synergies over the first three years after closing. These annual cost syner-gies are expected to be achieved by increasing efficiencies, eliminating re-dundancies, integrating the global branch networks, and leveraging the combined scale of an over $20 billion buildings business platform. In addi-tion, the transaction is expected to create at least $150 million in annual tax synergies."

70.     While taxable to Minority Taxpaying JCI Shareholders, the transaction will be tax-free to Tyco shareholders under U.S. tax laws, even though the transaction is deemed by Defendants as an acquisition *by* JCI *of* Tyco and even though it is *Tyco share-holders who are being paid the premium by JCI* for their Tyco shares.

71.     Based on JCI's and Tyco's respective 2015 annual revenues (Tyco's are 28% of JCI's or about 22% of JCplc), profitability of continuing operations before in-come taxes (Tyco's share of JCplc's 2015 pro forma profit is estimated to be 21%), and market capitalizations (JCI's $22.4 billion versus Tyco's $14.2 billion, rendering JCI's market capitalization at 61% of the JCI/Tyco combined market capitalization), and as-suming these three factors would be the primary determinants of the allocation of JCplc's equity between JCI and Tyco shareholders, JCI shareholders would receive over 60%

18

(61%-79%) of JCplc.

72. In order to limit JCI shareholders' equity interest in JCplc to less than 60%, JCplc will buy back $3.86 billion JCI's shares. If not enough JCI shareholders elect to accept cash in lieu of JCplc shares to reach the $3.86 billion, then all JCI shareholders will be compelled to sell shares to JCI so that the minimum of $3.86 billion worth of JCI shares are redeemed. This will result in JCI shareholders owning under 60% of JCplc. Likewise, the premium being paid to Tyco shareholders will enable JCI to limit JCI shareholders' equity interest in JCplc to under 60%.

73. JCplc's 11-person Board of Directors is expected to consist of six JCI directors and five Tyco directors. Molinaroli will be JCplc's Chairman and Chief Executive Officer. George Oliver, Tyco's chief executive officer, will be president and chief operating officer and a director of JCplc. Molinaroli will serve as chairman and CEO for a term of 18 months, after which Oliver will become CEO and Molinaroli will become executive chair for one year, after which Oliver will become chairman and CEO.

**B.** **The Benefits to the Individual Defendants and Tyco Officers and Directors**

74. In addition to the business and tax benefits that JCI and JCplc expect to realize from the Inversion, the Individual Defendants and Tyco officers and directors also will substantially benefit.

75. In connection with the Inversion, Molinaroli arranged for his compensation to be modified. For doing the deal, Molinaroli will receive at least $20.5 million and as much as $79.6 million over the next 18 months. Not only does Molinaroli receive these significant benefits, but JCI will reimburse him for any additional taxes imposed because of the accelerated payouts.

76. Molinaroli's accelerated payouts are triggered by the purported "change of control" of JCI arising from the Inversion pursuant to a provision in his employment con-

tract with JCI that the acquisition of 35% or more of JCI stock constitutes such a "change of control." This is because JCI will go from a publicly held company to being wholly owned by a Tyco/JCplc subsidiary. However, that subsidiary will be owned by JCplc, which is 56% owned by JCI shareholders, a majority of JCplc's board of directors will be present JCI directors, and Molinaroli will remain chairman and chief executive officer. Maximizing the portion of JCplc's equity allocated to Tyco shareholders benefits Molinaroli; if JCI shareholders were to be given 65.1% of JCplc's equity, his up to almost $80 million of deal-related compensation might not be triggered. *See* ¶ 71 *supra*.

77.     Although JCI's and Tyco's respective managements have proposed the merger of the two companies, neither management is willing to take the financial risk of it failing to occur. Likewise, the managements and boards of both companies have made sure that adverse tax consequences that might arise under the Inversion that would affect them directly are reimbursed. Under the terms of the Merger Agreement, JCI may determine and pay annual bonuses for the 2016 fiscal year based on actual performance in the ordinary course of business if the effective time of the merger has not occurred by October 1, 2016, disregarding the expenses and costs related to the merger.

78.     The JCI Defendants also perceive a risk that the IRS may successfully challenge the $3.86 billion JCI stock buyback, the effect and purpose of which is to help reduce JCI shareholders' equity interest in JCplc to under 60%. The Merger Agreement also permits JCI to enter into agreements with Individual Defendants and other executive officers providing for the reimbursement of any taxes that may be imposed under Section 4985 of the Code in connection with the merger. Even though the Inversion has been structured to avoid IRC § 4985, by limiting JCI shareholders' equity in JCplc to well under 60%, the Individual Defendants have obtained additional assurance from JCI that they will not be adversely affected by Inversion-imposed tax consequences.

79.     Under the terms of the Merger Agreement, Tyco also may determine and pay annual bonuses for the 2016 fiscal year based on actual performance in the ordinary course of business if the effective time of the merger has not occurred by September 30, 2016, disregarding the expenses and costs related to the merger.

80.     The Merger Agreement also permits Tyco to enter into agreements with its directors and executive officers providing for the reimbursement of any taxes that may be imposed under Section 4985 of the Code in connection with the merger.

81.     Thus, even though, with Tyco (which is already an Irish corporation) shareholders receiving 44% of JCplc's equity, Tyco's management and directors have virtually no risk of being exposed to IRC § 4985's anti-inversion tax consequences, both the Individual Defendants and Tyco's management and directors have maximally ensured that they have no risk of being adversely affected by Inversion-imposed tax consequences. This is a strong indication of their very strong aversion to the Inversion's tax consequences.

82.     The benefit of these arrangements to the Individual Defendants and senior JCI executives is significant. JCI requires its directors to hold significant amounts of JCI stock. In fiscal year 2015, JCI paid each non-employee director $265,000, of which $120,000 was paid in cash and $145,000 in shares of common stock at the then current market price, which shares were issued under the 2003 Director Stock Plan. Non-employee directors are allowed to defer all or any part of their director compensation under the Deferred Compensation Plan for Certain Directors. A director may elect to treat any amount deferred as if invested into share units. JCI pays the deferred amount to the director after the director retires or otherwise ceases service on the Board.[3]

---

[3]     JCI Proxy Statement for 2015 Annual Meeting of Shareholders, p. 62 ("2015 Proxy Statement"); S-4 p. 155.

83.     Under the merger agreement, each JCI deferred stock unit that is deemed invested in shares of JCI common stock as of immediately prior to the effective time of the merger under any of JCI Executive Deferred Compensation Plan or Deferred Compensation Plan for Certain Directors is to be deemed to be invested in JCplc's ordinary shares as of the effective time of the merger, with the number of JCplc's ordinary shares subject to the deferred stock unit in a participant's account to be equal to the number of shares of JCI common stock subject to such deferred stock unit as of immediately prior to the effective time.

84.     The following table shows the JCI stock beneficially owned by the Individual Defendants as of November 19, 2015 and "Cash-Settled Stock Units": [4]

| Individual Defendant | JCI Shares Owned by Individual Defendants | Cash-Settled Stock Units[(1)] |
|---|---|---|
| Molinaroli, Alex A. | 630,633 | 188,616 |
| Stief, Brian J. | 111,038 | 98,546 |
| Guyett, Greg | - | - |
| Abney, David P. | 6,775 | 25,859 |
| Black, Natalie A. | 15,990 | 79,713 |
| Bushman, Julie L. | 9,782 | - |
| Conner, Raymond L. | 2,515 | 3,201 |
| Goodman, Richard | 4,507 | 30,672 |
| Joerres, Jeffrey A. | 16,012 | 96,402 |
| Lacy, William H. | 52,691 | 102,352 |
| del Valle Perochena, Juan Pablo | - | - |
| Vergnano, Mark P. | 13,862 | - |
| Total | | 625,361 |

(1) Reflects common stock equivalents under JCI's deferred and equity based compensation plans. Each stock unit is intended to be the economic equivalent of one share of JCI common stock. Units are settled in the form of cash and are not settled in the form of common stock. These amounts are not included in the amounts in the "Amount and Nature of Beneficial Ownership" column.

---

[4]  2015 Proxy Statement p. 74. Ownership includes direct and indirect (beneficial) ownership as defined by SEC rules. *Id.*

85.     Plaintiffs interpret the Cash-Settled Stock Units as including "deferred stock units" that constitutes "stock-based compensation" subject to the § 4985 excise tax. Based on this interpretation, this table shows that most of the Individual Defendants (almost all of the non-employee JCI directors) hold the preponderance of their JCI stock in a form that exempts them from the capital gains taxes being imposed on Minority Taxpaying JCI Shareholders.

86.     JCI's top executives also have significant exposure to the § 4985 excise tax that is being avoided by the dilution.  The 2015 Proxy Statement lists the stock-based compensation for each of the last three fiscal years awarded to, earned by, or paid to the five most highly compensated executive officers during fiscal year 2015:[5]

| Name and Principal Position | Year ($) | Salary ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | Change in Pension Value and Nonqualified Deferred Compensation on Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Alex A. Molinaroli Chairman of the Board, President and Chief Executive Officer | 2015 | 1,575,000 | 7,921,874 | 2,635,521 | 4,572,068 | 4,513,507 | 526,059 | 21,744,029 |
| | 2014 | 1,400,000 | 6,749,937 | 2,249,997 | 5,744,000 | 3,145,751 | 250,996 | 19,540,681 |
| | 2013 | 966,333 | 4,001,741 | 1,184,040 | 3,450,000 | 0 | 270,255 | 9,872,369 |
| R. Bruce McDonald Executive Vice President and Vice Chairman | 2015 | 1,000,000 | 3,749,971 | 1,247,578 | 2,714,400 | 1,179,536 | 300,185 | 10,191,670 |
| | 2014 | 881,000 | 2,173,942 | 724,989 | 2,972,000 | 750,796 | 190,701 | 7,693,428 |
| | 2013 | 855,000 | 4,739,119 | 641,784 | 2,592,000 | 0 | 113,783 | 8,941,686 |
| Brian J. Stief Executive Vice President and Chief Financial Officer | 2015 | 700,000 | 1,499,968 | 499,034 | 1,425,060 | 0 | 159,870 | 4,283,932 |
| | 2014 | 536,000 | 631,954 | 210,989 | 1,138,000 | 0 | 138,030 | 2,654,973 |
| Beda Bolzenius Vice President Vice Chairman-Asia Pacific and President-Automotive Experience | 2015 | 881,000 | 2,217,956 | 737,563 | 1,694,229 | 469,105 | 509,377 | 6,509,230 |
| | 2014 | 855,000 | 2,153,916 | 717,992 | 2,806,000 | 1,335,524 | 422,039 | 8,290,471 |
| | 2013 | 830,000 | 2,088,319 | 641,784 | 1,579,000 | 408,757 | 90,040 | 5,637,900 |
| William C. Jackson Vice President and President, Building Efiiciency | 2015 | 800,000 | 1,930,992 | 642,750 | 1,082,730 | 0 | 248,131 | 4,704,603 |
| | 2014 | 769,000 | 1,804,927 | 601,994 | 2,304,000 | 0 | 204,339 | 5,684,260 |

87.     To the extent that the Individual Defendants and top executives hold their JCI shares in tax-deferred accounts, they will not be subject to the capital gains tax being

---

[5]  2015 Proxy Statement p. 52 (footnotes omitted).

imposed by the Inversion on Minority Taxpaying JCI Shareholders. To the extent that the Individual Defendants hold JCI stock in taxable accounts, it is likely at a significantly higher cost basis than many of JCI's public shareholders who hold their stock in a taxable account and, therefore, will not cause them to incur a tax burden in the magnitude of that to be incurred by long-time JCI shareholders who hold the stock at a low cost basis.

88.     The S-4 is materially misleading for failing to disclose the facts alleged at ¶¶ 82-87, as it conceals the extent to which the Individual Defendants and top JCI executives are (i) shielded from the capital gains taxes to be imposed on Minority Taxpaying JCI Shareholders by the Inversion and (ii) potentially exposed to the § 4985 excise tax that they are seeking to avoid. The omitted information also conceals the potential cost to JCI and JCplc of their agreement to reimburse the Individual Defendants for any such excise tax, including whether such reimbursement would, if made, be "grossed up" for the income taxes due on such reimbursement.

89.     The omitted material facts alleged at ¶¶ 82-87 render the following statements in the S-4 false and misleading for failing to disclose material facts relevant to such statements to fully inform JCI shareholders of the disparate treatment of insiders and JCI public shareholders and the true cost of the Inversion:

(a)     In addition, the Temporary Section 7874 Regulations (and certain related temporary regulations issued under other provisions of the Code) include new rules that would apply if the 60% ownership test were met, . . . in such case, Section 4985 of the Code and rules related thereto would impose an excise tax on the value of certain stock compensation held directly or indirectly by certain "disqualified individuals" at a rate equal to 15%. The merger agreement permits Johnson Controls and Tyco to enter into agreements with their directors and executive officers providing for the reimbursement of any taxes imposed under Section 4985 of the Code in connection with the merger. S-4 p. 56.

(b)     The merger agreement also permits Johnson Controls to enter into agreements with its directors and executive officers providing for the reimbursement of any taxes that may be imposed under Section 4985 of the Code in connection with the merger, though no such reimbursements are

24

currently expected to become necessary or payable. *Id.* at 157-58.

90.    These benefits are alleged solely to demonstrate the significant disparate treatment of executives and directors versus Minority Taxpaying JCI Shareholders. Plaintiffs do not contend that these benefits constitute waste or mismanagement; indeed, the benefits described in the preceding 16 paragraphs may be deemed to be a prudent expenditure by JCI in order to secure the loyalty of the Individual Defendants and to induce them to approve the Proposed Merger/Inversion. Plaintiffs make no claim regarding the benefits being provided, or potentially provided, by the merger/Inversion to the Individual Defendants, JCI, JCplc, and Tyco management and directors. Plaintiffs contend that the self-dealing implicit in these arrangements between the Individual Defendants and JCI and JCplc is wrongful and injurious to Plaintiffs and the Class by depriving them of a Board loyal to their interests.

## II.    THE INVERSION BENEFITS DEFENDANTS AND PENALIZES JCI PUBLIC SHAREHOLDERS.

### A.    JCI's Anticipated Tax Savings, which Are the Sole Purpose of the Inversion, Come at the Expense of Minority Taxpaying JCI Shareholders.

91.    JCI's purported "acquisition" of Tyco does not require that it reincorporate in Ireland, as Defendants have not disclosed that Ireland offers any significant non-tax business or governance advantages as compared with being domiciled in Wisconsin or in any other state in the U.S.  While the $500 million in business benefits that JCI touts it expects to gain from acquiring Tyco can be realized by remaining domiciled in Wisconsin, the $150 million in annual tax benefits offered by reincorporating in Ireland can only be realized by the Inversion and are, therefore, the sole reason for the Inversion and for reincorporating in Ireland.

92.    Rather than structure its acquisition of Tyco in a way that would not cause

adverse tax consequences to a minority of its shareholders, JCI is seeking to skirt its future income tax liability at the expense of its minority taxpaying shareholders by proposing the Inversion pursuant to which JCI will become a foreign entity.

93. Because of the Inversion's cost to Minority Taxpaying JCI Shareholders that is not to be shared with all JCI shareholders, the Inversion's benefits to the Minority Taxpaying JCI Shareholders must be significant and real. In commenting on the identically structured proposed Pfizer/Allergan inversion, the *Harvard Business Review* notes, "investors usually prefer to measure the benefits of a merger in terms of hard cost-savings, not future opportunities."[6]

94. While the deal's expected tax savings will, if realized, benefit JCplc and its non-taxpaying shareholders (including all of Tyco's shareholders), that benefit will not be shared by the Minority Taxpaying JCI Shareholders; in fact, because of the almost $2 billion premium being paid to Tyco shareholders, JCplc's expected $150 million in annual tax savings will all go to them. This means, in effect, that the premium JCI is paying for Tyco is being funded by the Minority Taxpaying JCI Shareholders.

95. The Minority Taxpaying JCI Shareholders face an expected capital gains tax rate of 20% of their gain (plus any state income or capital gains tax) to almost a third thereof. The top rate on capital gains is about 25 percent for shareholders subject to the limitation on itemized deductions (about 1.2 percentage points) and the Affordable Care Act's ("ACA") net investment income tax (3.8 percentage points) based on their income. In 2016, the limitation on deductions will apply to incomes over $259,400 ($311,300 for joint filers), and the ACA investment tax will apply to shareholders with income over

---

[6] Benjamin Gomes-Casseres, "Allergan Deal Shouldn't Be Just About Tax Inversion, *Harvard Business Review*, November 24, 2015, p. 9; available at: https://hbr.org/2015/11/the-pfizer-allergan-deal-shouldnt-be-just-about-tax-inversion [visited 11/24/2015].

$200,000 ($250,000 for couples). State income taxes increase the shareholders' tax burden even more, so that stockholders could owe nearly a third of their gains in involuntary taxes. Thus, a long-term JCI shareholder forced to pay up to a third in capital gains taxes on a gain that may represent as much as 90% of her JCI stock's value at the time the deal is consummated can reasonably hope to recover that cost only over an extended period of time, if ever.

96. In addition, the heirs or donees of JCI shareholders, as JCplc shareholders, will be subject to the Irish capital acquisitions tax ("CAT") (currently levied at a rate of 33% above certain tax-free thresholds) that could apply to a gift or inheritance of ordinary shares of the combined company irrespective of the place of residence, ordinary residence or domicile of the parties. This is because JCplc ordinary shares will be regarded as property situated in Ireland for CAT purposes. The person who receives the gift or inheritance has primary liability for CAT. S-4 pp. 50, 237. This future tax liability is likely not compensable in damages in this action.

B. **Defendants Limit JCI Shareholders' Equity Interest in JCplc to under 60% to Protect Themselves from the Code's Anti-Inversion Tax Consequences Otherwise Applicable to Them.**

97. While exposing JCI shareholders to the Code's forced capital gains taxes for inversions, Defendants have taken great care to structure the Proposed Merger to avoid the inversion-imposed tax consequences that JCI and the Individual Defendants would have faced if JCI shareholders were to get 60% or more of JCplc's shares. The Merger Agreement provides:

> Section 6.13 Tax Matters. From and after the execution of this Agreement until the earlier of the Effective Time or the date, if any, on which this Agreement is terminated pursuant to Section 8.1, except as may be required by Law, notwithstanding anything to the contrary in Section 5.1 or Section 5.2, none of Parent, Merger Sub or the Company shall, and they shall not permit any of their respective Subsidiaries to, take any action (or knowingly fail to take any action) that causes, or could reasonably be expected to

cause, the *ownership threshold of Section 7874(a)(2)(B)(ii) of the Code to be met* with respect to the Merger.

S-4 p. A-72 (emphasis supplied); *see also* S-4 p. 202.

98.    The "ownership threshold" of IRC § 7874(a)(2)(B)(ii) is ownership of the foreign corporation that results from an "inversion" by 60% or more of the shareholders of the inverting U.S. corporation. As such, Defendants have contractually bound themselves to prevent JCI public shareholders from getting 60% or more of JCplc's equity.

99.    Following the merger, certain procedures will be followed to ensure that the 60% obligation set forth in ¶ 97 will be satisfied:

> Tyco and Johnson Controls have also agreed that Tyco will provide Johnson Controls with a proposed acquisition structure and specific transaction steps relating to the merger and the anticipated timing for completing such transaction steps and will inform Johnson Controls of any material modifications to and material departures from such steps. If Johnson Controls disagrees with any material matters in such proposed acquisition structure or transaction steps or any such material modification to or material departure from such acquisition structure or transaction steps, Johnson Controls may raise such objection with Tyco not later than one week following receipt by Johnson Controls of such acquisition structure, transaction steps or modification, as application, and the parties will cooperate in good faith to resolve any such objections. In the event Johnson Controls does not raise any objections to such acquisition structure, transaction steps or modification within one week following receipt, then such acquisition structure, steps or modification, as applicable, will be deemed to be consistent with the terms of the merger agreement.

S-4 p. 202; *see also id.* at 223.

100.    If this transaction were to be subject to IRC § 7874, the directors and top executives would be subject to a 15% excise tax on their stock compensation pursuant to IRC § 4985.  If JCplc were to become subject to IRC § 7874, JCI and JCplc might not be able to achieve the full benefit of the Inversion's expected tax benefits, as § 7874 imposes restrictions on certain tax attributes on inverting U.S. corporations subject thereto.[7] Thus,

---

[7]  S-4 pp. 54-55, 222-23.

in order to avoid significant tax ramifications for themselves, other top corporate insiders, JCI and JCplc, and the Board, Defendants have manipulated JCI shareholders' prospective ownership interest in JCplc for their personal benefit and that of JCI and JCplc, the prospective controlling shareholder of JCI.

101.    Giving Tyco shareholders over 40% of JCplc is intended to enable Defendants to avoid the IRS anti-inversion rules that would otherwise apply to them if JCI shareholders were given 60% or more of JCplc's equity and enable JCplc to achieve and protect substantial tax savings.

102.    To avoid the Inversion's adverse tax consequences on Defendants, JCI shareholders' equity interest in JCplc is limited to less than 60%, a level of equity interest in JCplc that is less than it would have been in the absence of the need to avoid §§ 7874 and 4985. *See* ¶ 71 *supra*. At the same time, Defendants make no effort to avoid the tax consequences on Minority Taxpaying JCI Shareholders or to compensate them for the capital gains taxes they are being forced to pay.

103.    The Treasury Department's anti-inversion rules provide strong counter-intuitive incentives to the management and boards of inverting corporations whose inversions take the form of acquiring, or being acquired by, a foreign corporation in a transaction such as the Proposed Merger.  Instead of seeking to *maximize* JCI shareholders' equity interest in JCplc, the conventional objective of an acquiring corporation's management and board and an objective they are duty-bound to pursue in connection with a merger, the JCI Defendants were strongly motivated to *reduce* JCI shareholders' interest to under 60% to avoid JCplc being subject to § 7874.  This is to be accomplished by, *inter alia*, the share buyback and by paying Tyco shareholders a premium.  Both the premium to Tyco shareholders and the share buyback operate to reduce JCI shareholders' equity interest in the combined company.

104.    The JCI Defendants are motivated to pursue something less than the best deal possible for all JCI shareholders. Instead of pursuing a deal that would maximize JCI shareholders' equity interest in JCplc, the JCI Defendants have agreed to a deal that *requires* JCI shareholders' equity interest to be under 60%, in order to avoid the potential adverse tax consequences that would be imposed on JCplc and the Individual Defendants if JCI shareholders' equity interest in JCplc is 60% or more.

105.    That the under-60% dilution is largely for the benefit of JCplc is apparent from the source of the money to be used for the buyback, which is Tyco/JCplc. It is essential for the scheme to be successful that JCI not be the source of this money. Accordingly, Tyco (or an affiliate of Tyco) must obtain a loan to fund the buyback, and this obligation is an integral part of the deal. S-4 pp. 38, 55, 133, 177.

106.    These perverse incentives are even more anomalous given that the Proposed Merger is to be structured as an acquisition *of* JCI *by* Tyco, yet it is the Tyco shareholders who are being paid the premium *by JCI* (the nominal target). Notwithstanding that JCI is being acquired by JCplc, no premium is to be paid to JCI shareholders.

107.    "Every tax saving stunt that's known to man is going to be available to them as long as they stay below 60%," said Robert Willens, an independent tax expert, in commenting on the identically structured but now abandoned Pfizer/Allergan inversion.[8]

108.    The allocation of JCplc's equity between JCI shareholders and Tyco shareholders based on factors other than the normally relevant financial metrics of two companies negotiating a combination, along with the above-described perverse incentives, expose the divergent interests between JCI, its management and directors, on the one hand, and the interests of JCI public shareholders, and especially the Minority Taxpaying JCI

---

[8]    Stephen Gandel, "Why New Tax Inversion Rules Won't Stop Pfizer-Allergan Deal," November 20, 2015, available at: http://fortune.com/2015/11/20/why-new-tax-inversion-rules-wont-stop-pfizer-allergan-deal/

Shareholders, on the other.

## III.    THE NOTORIETY OF INVERSIONS

109.    JCI is engaging in the Inversion solely for tax avoidance purposes, as demonstrated by the terms of its own Merger Agreement.  If not, JCI would be proposing to acquire Tyco in a conventional transaction that would be tax-free to all JCI shareholders and that would not require reincorporating in Ireland.

110.    As these types of tax-avoidance inversion transactions have increased in popularity among corporate America in recent years, and by all reports will continue to do so, they have increased in notoriety.

111.    Concerned about the drain this corporate exodus could have on the U.S. tax base, Congress has sought to crack down on corporations seeking to evade their U.S. taxes.  On July 27, 2014, U.S. Treasury Secretary Jacob Lew asked Congress to pass legislation blocking inversions in an editorial published in the *Washington Post*.[9]  Lew noted that:

> Many of these transactions have been motivated by — and even expressly justified by — the tax savings. In touting these transactions, individual firms have projected saving as much as $1 billion per year. . . . By moving their tax homes overseas, these companies are making the decision to reduce their taxes, forcing a greater share of the responsibility of maintaining core public functions on small businesses and hardworking Americans. That includes paying for the things all of us, particularly U.S. businesses, depend on: our national defense, education, medical research, courts and vital infrastructure such as roads, bridges and airports.  In addition, by allowing these transactions to continue, we run the risk of eroding our corporate tax base and undoing the progress we have made to reduce our budget deficit.

*Id.*

---

[9] Jacob J. Lew, *Close the Loophole on Tax Inversions*, *Washington Post*, July 27, 2014; available at: http://www.washingtonpost.com/ opinions/jacob-lew-close-the-tax-loophole-on-inversions/2014/07/27/2ea50966-141d-11e4-98ee-daea85133bc9 _story.html.

112.    President Obama has also weighed in on the debate.  On July 28, 2014, *The New York Times* reported that President Obama had criticized inversions, calling the companies seeking to avoid U.S. taxes to be "corporate deserters."[10] More recently, the President called tax inversions, "one of the most insidious tax loopholes out there, fleeing the country just to get out of paying their taxes."[11] Both major parties' Presidential candidates have strongly criticized inversions and advocated their prohibition.

113.    Boston College Law School Professor Brian JM Quinn has noted there is no fiduciary obligation to avoid paying U.S. taxes.[12]  Companies such as JCI may seek to justify the Inversion because "the inversion is the only way for US firms to access all that tax free capital they have stored overseas."  *Id*.  Professor Quinn responded to that bogus justification as follows:

> There is no fiduciary duty to avoid paying taxes.  There simply isn't.  Now, boards may not like paying taxes...who does?  But, I've heard more directors than I care to admit saying things like they have fiduciary duties to their shareholders to do inversions because their fiduciary duties somehow preclude them from repatriating profits sitting in Ireland.  Hmm.  These board members need better lawyers.  A director is not required by his fiduciary duties to pursue the most tax efficient strategies out there.

*Id*.

114.    The capital gains tax facing JCI shareholders is due to IRC § 367 (28 U.S.C. §367) and Treas. Reg. §1.367(a)-3, which require shareholders to recognize a gain

---

[10] Andrew Ross Sorkin, *Banks Cash in on Inversion Deals to Elude Taxes*, N.Y. Times, July 28, 2014, at: http://dealbook.nytimes.com/2014/07/28/banks-cash-in-on-mergers-intended-to-eludetaxes/?php=true&_type=blogs&_r=0.

[11]  Michael J. De La Merced and Leslie Picker, "Pfizer, Allergan to call off merger in wake of new rules, source says," *New York Times*, April 5, 2016, at http://www.startribune.com/will-new-u-s-rules-derail-pfizer-s-inversion-deal/374694711/

[12]    Brian JM Quinn, *Summer of the Inversion, cont'd.*, M&A Law Professor Blog: http://lawprofessors.typepad.com/mergers/2014/07/summer-of-the-inversion-contd.html# (July 29, 2014).

on the exchange of stock for tax purposes in connection with inversion transactions. While the Minority Taxpaying JCI Shareholders face enormous immediate tax ramifications, JCI and the Individual Defendants do not. *See* ¶¶ 82-87 *supra*.

115.   The practice of reimbursing directors of inverting corporations for inversion-related taxes imposed on directors and senior officers has also been widely criticized. One such critic is *Washington Post* columnist Allan Sloan, who said the following about the identically structured Pfizer/Allergan inversion before it was proposed: [13]

> Under current tax law, shareholders of an inverting company have to pay capital gains tax if the company's stock price on Inversion Day is above their cost. (If the stock price is below their cost, they don't get a deduction.)
>
> This means that investors who have owned Pfizer stock for a long time in a taxable account will have a whopping tax bill should Pfizer Inc. become Pfizer plc. That tax comes out of those investors' pockets — and long-time retail investors might have to sell some of their stock to come up with the cash to pay the bill. If they're using Pfizer dividends to supplement retirement income, they will have to learn to get by with less.
>
> Compare that with the deal Pfizer will almost certainly give its board members and top executives should it desert.
>
> Under a special provision of the tax code, directors and top executives of an inverting company are subject to a 15 percent excise tax on the value of their stock options, restricted shares, stock appreciation rights and other stock-based holdings other than common stock itself. (They owe the same capital-gains payment on their stock that other holders do — but stock held outright is typically a relatively small part of their overall Pfizer stake.)

Columnist Allan Sloan's comments are equally applicable to JCI's contingent reimbursement scheme for the Individual Defendants in the event that they should be exposed to the § 4985 excise tax.

116.   The JCI Defendants chose to finesse this controversial aspect of inversions by ensuring the equity interest JCI shareholders will receive in JCplc will be significantly

---

[13]   Available at: https://www.washingtonpost.com/...tives-wont--if-pfizer-moves-to-ireland/2015/11/09/8d5dc24-871f-11e5-be39-0034bb576eee_story.html[11/25/ 2015]

below 60%. By doing so, Defendants seek to avoid the punitive anti-inversion tax provisions Congress directed at a corporation's top officers and its directors to discourage them from approving inversions, while doing nothing to protect Minority Taxpaying JCI Shareholders from suffering the unmitigated full impact of the punitive provisions Congress imposed on the shareholders of inverting corporations.

IV.  **THE JCI/TYCO PROXY/REGISTRATION STATEMENT CONCEALS MATERIAL FACTS REGARDING THE INVERSION'S TAX CONSEQUENCES.**

A.  **The IRC § 367(a)/(b) Dichotomy: Who Is to Pay the Inversion-Imposed Taxes—JCI or Minority JCI Taxpaying Shareholders?**

117.   The tax law requires shareholders of inverting U.S. corporations to recognize capital gain and pay taxes if applicable, in part to offset some of those corporations' future lost income taxes.  IRC § 367(a); Treas. Reg. §1.367(a)-3.[14]  In addition, there is a separate rule under IRC § 367(b) and Treas. Reg. §1.367(b)-10 [15] that imposes a tax on an inverting corporation to the extent that corporation uses the inversion as an opportunity to distribute earnings as part of the transaction.  When both rules apply to a particular inversion, a special tiebreaker rule imposes only the rule resulting in the greater amount

---

[14]   Treas. Reg. § 1.367(a)-3 (sometimes referred to as the "anti-Helen of Troy regulations") was promulgated in 1996. The result of these regulations was to make the exchange of stock in an inversion no longer eligible for the tax-free reorganization rules and thus a taxable exchange to the shareholders.

[15]   Treas. Reg. § 1.367(b)-10 (sometimes referred to as the "anti-Killer B" regulations) was promulgated in 2008. Under IRC § 367(b), Treasury and the IRS have the authority to enact rules involving foreign transactions that are not otherwise covered by IRC § 367(a) but that can have a similar effect.  Treas. Reg. § 1.367(b)-10 provides that the acquisition of the stock of the U.S. parent by its foreign subsidiary should be treated as a "deemed dividend" for U.S. tax purposes, notwithstanding that it may otherwise be a tax-free reorganization, and, therefore, taxable to the extent of its unrepatriated foreign earnings. Treas. Reg. § 1.367(b)-10 prevents all U.S. corporations, not only inverting corporations, from accessing their unrepatriated foreign earnings without paying U.S. tax on that income. Essentially, § 1.367(a)-3 addresses the future foreign earnings of an inverting U.S. corporation while § 1.367(b)-10 addresses the current unrepatriated foreign earnings of a U.S. corporation, regardless of whether it is seeking to invert.

of income subject to tax. If the income subject to tax under the 367(b) rule at the company level is greater than the gains subject to the tax on the inverting corporation's shareholders under the 367(a) rule, the taxation of the shareholders' capital gains is "turned off."[16] Thus, in the circumstance when both rules apply, the larger of the inverting corporation's income subject to tax under § 367(b) or the shareholders' built-in gain under § 367(a) takes priority in determining whether the corporation or the shareholders are to be taxed on the inversion.

118.    The IRS has made clear that inverting corporations may structure their inversion so as to "turn off" the taxes to be imposed on the shareholders under § 367(a) by subjecting the corporation to tax on the larger 367(b) income.[17] In effect, the taxes that Congress pre-emptively seeks to capture and that the inverting corporation seeks to avoid may be imposed on the inverting corporation if the inversion is appropriately structured to accomplish that purpose.

119.    The imposition of taxes on the inverting corporation or its shareholders is an "exit toll" for escaping U.S. corporate income taxation.[18] The § 367(a) and § 367(b)

---

[16]  The amount of gain to compare is (1) the amount of gain shareholders of the inverting corporation would recognize under the § 1.367(a)-3 and (2) the deemed dividend to the U.S. parent corporation under § 1.367(b)-10.

[17]  *See* IRS Notice 2014-32 (describing the "367 priority rules"). While the anti-Helen of Troy regulations make an inversion taxable to shareholders, the anti-Killer B regulation imposes a tax liability on the corporation. Because the anti-inversion rules under § 1.367(a)-3 and the deemed dividend rules under § 1.367(b)-10 were intended to address different aspects of the foreign earnings tax avoidance issue, Treasury decided that only one of the two rules should apply to any transaction.

[18]  TaxFoundation.org, at: http://taxfoundation.org/article/corporate-inversions-introduction-issue-and-faq (visited 9/28/14); Donald J. Marples, Cong. Research Serv., RL31444, *Firms That Incorporate Abroad for Tax Purposes: Corporate "Inversions" and "Expatriation"* 1, 6-7 (March 11, 2008), available at http://www.policyarchive.org/handle/10207/bitstreams/1433.pdf ("CRS Report") ("The purpose of [IRC § 367 (a)] is to prevent capital gains from flowing out of U.S. tax jurisdiction without being subject to U.S. tax at some point.").

regulations make clear that JCI is proposing to shift the U.S. income tax burden of the Inversion to its minority taxpaying shareholders and away from JCI by making them pay the "exit toll" for its fleeing the U.S. for more favorable tax climates.

120.    The inversion-imposed tax consequences cause a significant divergence of interests between the inverting corporation and the inverting corporation's non-taxable shareholders, on the one hand, and the inverting corporation's taxable shareholders, on the other. The inverting corporation's non-taxable shareholders include pension funds, non-profit organizations, institutional investors, and those individual shareholders who hold their JCI shares in IRAs, 401(k), 403(b), or other tax-deferred accounts, for whom taxable gain realized by shareholders under the 367(a) rule are not subject to tax and thus not a relevant consideration.[19]

121.    The Inversion-imposed tax consequences on Minority Taxpaying JCI Shareholders would be avoided if the Tyco acquisition were not to involve reincorporating JCI in Ireland.  Reincorporating JCI in Ireland is not essential to JCI's ability to realize the non-tax purposes of the Proposed Merger.

122.    The application of the § 367(a)/(b) priority rules depends upon the manner in which JCI structures the inversion and the comparison between JCI's § 367(b) taxable income and JCI shareholders' § 367(a) built-in gain at the time the transaction is closed. JCI expects the Proposed Merger to close by September 2, 2016.

123.    During the pendency of the Proposed Merger, the JCI shareholders' built-in gain continued to be affected by changes in JCI's stock price, trading activity in JCI's

---

[19]  Simpson, *Analyzing Corporate Inversions and Proposed Changes to the Repatriation Rule*, NYU Annual Survey of American Law, p. 684 (Nov. 2013); CRS Report at 7. Commentators advise that there is there is no tax effect for stock of an inverting corporation held in an IRA, 401(k), or other qualified retirement plan. JAS Financial Services, LLC (Aug. 3, 2014), available at http://jasfinancialllc.com/do-you-know-if-you-will-owe-tax-as-a-shareholder-of-a-company-that-completes-an-inversion/(last visited 4/11/2016).

common stock, and the tax basis of U.S. holders of JCI common stock on the closing date, none of which could have been predicted on April 4, 2016 (when the S-4 was first issued) with certainty as to what they would be five months later.

124.    Moreover, because JCI is a public company, information as to the tax basis of its U.S. shareholders' common stock is not practicably obtainable and is subject to change based on trading activity in the shares.  At a minimum, JCI U.S. shareholders' § 367(a) built-in gain cannot be known with certainty until after the closing of the merger, if it can be known at all. JCI acknowledges as much.[20]

125.    JCI's § 367(b) income could depend, in part, on JCI's earnings and profits (as determined for U.S. income tax purposes) for the taxable year that includes the Inversion's closing date (on or before September 30, 2016). Such earnings and profits cannot be determined until the end of the fiscal year in which the merger is completed. Thus, since JCI's fiscal year end is September 30 (and its audited financial statements are not issued until up to 60 days thereafter), whether JCI shareholders' § 367(a) built-in gain will exceed or will be exceeded by JCI's § 367(b) income necessarily cannot be determined with certainty until long after the transaction is voted upon by the shareholders and closed.

---

[20]  "The market prices of Johnson Controls common stock and Tyco ordinary shares are subject to general price fluctuations in the market for publicly traded equity securities and have experienced volatility in the past. Stock price changes may result from a variety of factors, including general market and economic conditions, changes in the respective businesses, operations and prospects of Johnson Controls and Tyco, and an evolving regulatory landscape. Market assessments of the benefits of the merger and the likelihood that the merger will be consummated, as well as general and industry specific market and economic conditions, may also impact market prices of Johnson Controls common stock and Tyco ordinary shares. Many of these factors are beyond Johnson Controls' and Tyco's control. You should obtain current market price quotations for Johnson Controls common stock and for Tyco ordinary shares; but as indicated above, the prices at the effective time of the merger may be greater than, the same as or less than such price quotations." S-4 p. 42.

126.   JCI's current market capitalization on January 4, 2016 was $22.7 billion (648 million shares times $35 per share as of January 4, 2016).  Its stock has approximately tripled in market value during the past seven years.

127.   Over 80% of JCI's almost 650 million outstanding shares is owned by shareholders who are not taxable, pass through taxable income and gains to their shareholders, or are otherwise not concerned about being forced to incur taxable gains. Less than 20% of JCI shareholders appear to be Taxpaying JCI Shareholders.

128.   According to Fidelity.com, approximately 4.0 to 4.5 million JCI shares on average have traded daily during the period January 4, 2016 through August 4, 2016.[21] There are 189 trading days between January 1, 2016 and September 30, 2016. Based on the average trading volume as projected through September 30, 2016, approximately 756 to 851 million JCI shares will have traded during this period, or approximately 116% to 131% of JCI's outstanding shares.  While not all of JCI's outstanding shares will have traded during this period, a large number will, substantially reducing JCI shareholders' aggregate § 367(a) gain on whatever is the date on which the Inversion is to close.

129.   Because JCI's share value has significantly increased since January 2016, JCI shareholders' § 367(a) taxable gain on the closing date will decrease, as many shareholders will have purchased during this period and will have the higher cost basis and a resulting smaller gain. Likewise, the higher the trading volume during the period preceding the closing date, the lower will be JCI shareholders' § 367(a) gain.  The more JCI shareholders' § 367(a) gain is reduced on the closing date, the greater the likelihood that JCI's § 367(b) income will exceed JCI shareholders' 367(a) gain.

130.   Notwithstanding the foregoing inherent uncertainties, JCI confidently stated in its January 25th announcement, without condition or qualification, that the "combina-

---

[21]  Fidelity.com at https://eresearch.fidelity.com/eresearch/evaluate/snapshot.jhtml? symbols=JCI [visited 8/4/16].

tion *will be . . . taxable* to Johnson Controls shareholders" and continues to state in the S-4 that "receipt of ordinary shares of the combined company and/or cash in exchange for Johnson Controls common stock pursuant to the merger *will be* treated as a *taxable* transaction for U.S. federal income tax purposes" (emphasis supplied).[22]

131.    The statements recited in the preceding paragraph can only be true if JCI intentionally structured its inversion so as to avoid the application of section 367(b) and it did so without knowing whether the 367(b) income would exceed the 367(a) gain.  This represents a conscious choice to structure the transaction so as to shift the inversion tax onto Minority Taxpaying JCI Shareholders regardless of the relative tax cost of the two alternatives.

132.    The JCI Defendants acknowledge certain uncertainties that should have precluded such repeated unqualified statements of whether it is JCI shareholders or JCI itself that will be taxed.  JCI reports that it has approximately $8.06 billion of undistributed earnings of consolidated foreign subsidiaries included in shareholders' equity.[23] JCI further states, "It is not practicable to estimate the amount of unrecognized withholding taxes and deferred tax liability on such earnings." *Id*. Finally, Defendants acknowledge that "estimates" of certain financial statement items "cannot be reasonably made [where] it would require highly uncertain and unsubstantiated assumptions to be made, and therefore would not result in factually supportable adjustments to the unaudited combined pro forma financial information."[24]

133.    If JCI is unable with any degree of certainty to "estimate the amount of unrecognized withholding taxes and deferred tax liability on [its own foreign earnings]," it most certainly is unable to make any kind of estimate of its shareholders' capital gain

---

[22]  S-4 pp. 17, 39, 114, 225.

[23]  JCI Form 10-K Annual Report p. 105.

[24]  *Id*. at 240; *see also id*. at 254, n.30 *supra*.

under § 367(a), an amount that is for all practical purposes unknowable to JCI, or at least JCI has not disclosed that it does know this amount. In any event, even if it did, it cannot determine that its shareholders' § 367(a) gain exceeds its own § 367(b) taxable income because it admits it does not know what that amount is. Thus, JCI knows neither its own tax exposure, nor likely that of its shareholders, but nevertheless has deliberately determined to expose its shareholders to the Inversion-imposed taxes.

134. If JCI were to use an alternative structure, and assuming sufficient earnings and profits (as determined for U.S. income tax purposes), the § 367(b) amount would be the value of JCplc stock used to acquire JCI. Assuming a $38 billion value of JCplc and JCI shareholders receive 56%, this would be approximately $21 billion. Assuming Tyco is eligible for the US/Ireland tax treaty, this would be subject to a U.S. 5% withholding tax of approximately $1 billion.

135. Assuming JCI shareholders' built-in gain on the closing date will be two-thirds of JCI's $22.7 billion market capitalization (as of January 4, 2016), JCI shareholders have a built-in gain of $15 billion, which is less than what appears to be JCI's § 367(b) taxable income of $21 billion. Assuming an average combined federal/state capital gains tax rate of 23%, Defendants are proposing a plan that *theoretically* exposes JCI shareholders to $3.5 billion (0.23 x $15 billion) in capital gains taxes so that JCI may permanently avoid paying $1 billion in U.S. income taxes under § 367(b). If, instead of a two-thirds gain, JCI shareholders built-in gain on the closing date will be half of JCI's $22.7 billion market capitalization (as of January 4, 2016), JCI shareholders have a built-in gain of $11 billion and theoretical capital gains taxes of $2.5 billion.

136. Assuming 80% of JCI shareholders are tax-indifferent, those JCI shareholders would not be forced to pay tax on the 367(a) income recognized as a result of the inversion. Thus, rather than incur a capital gains tax of either $3.5 billion or $2.5 billion (depending on the assumptions), the JCI shareholders would in fact incur only $700 mil-

lion or $500 million of actual cash taxes (20% of $3.5 billion and $2.5 billion, respectively). This amount would be borne exclusively by the JCI Minority Shareholders.

137.    On April 22, 2016, JCI's shares were approximately $46 per share and has generally traded around that price since. Assuming, hypothetically, that 100% of JCI's public float turns over at an average price of $46 per share between January 1 and September 30, 2016 (*see* ¶¶ 128-29 *supra*) and (2) the market value of JCI's stock remains at $46 on the closing date, the cost basis of JCI shareholders' shares would range from $35 to $46 per share (*see* ¶ 126 *supra*), JCI shareholders' *theoretical* § 367(a) taxable gain would be dramatically reduced, making it likely that JCI's 367(b) income would exceed the shareholders' 367(a) income. Accordingly, JCI could—and should—have chosen to structure the transaction so as to spare the JCI shareholders from being forced to pay capital gains taxes by subjecting JCI to tax under § 367(b), and the Individual Defendants' fiduciary duties to JCI public shareholders required them to so choose.

138.    Given IRC §§ 367(a) and (b) and Treas. Reg. §§ 1.367(a)-3 and §1.367(b)-10, JCI cannot say, with the certainty with which it has repeatedly said in both its January 25th announcement and its S-4 proxy statement, that its *shareholders* "*will be*" taxed in connection with the Inversion and, by implication, that it (JCI or JCplc) will not be. This statement can only be true to the extent JCI intentionally structured the transaction so as to shift the tax liability from the Inversion away from JCI/JCplc and onto the Minority Taxpaying JCI Shareholders or recklessly did so in ignorance of whether it or its shareholders should be paying the Inversion-imposed taxes.

139.    Based on these assumptions, Defendants are proposing to force its Minority Taxpaying JCI Shareholders to pay $700 million (or $500 million) in federal capital gains taxes (plus state for many shareholders) so that JCI may permanently avoid paying $1 billion in U.S. income taxes. Assuming shareholders indirectly bear the incidence of the

corporate tax, this results in the Minority Taxpaying JCI Shareholders incurring a 367(a) tax of several hundred million dollars greater than what their share of a 367(b) tax would be. This is a very bad deal for both Minority Taxpaying JCI Shareholders and all U.S. taxpayers.

### B. Defendants Are Concealing Material Facts Regarding JCI Shareholders' Liability for Taxes and JCplc's Avoidance of Taxes.

140.     Defendants have repeatedly concealed material facts regarding JCI shareholders' liability for taxes as a result of the Inversion in that JCI states, without qualification, that its shareholders "will be" taxed when JCI has not known whether it is JCI or its shareholders who will be responsible for the Inversion-imposed taxes, and it most certainly cannot know or say that if the Individual Defendants adhered to their fiduciary duty of loyalty and directed JCI to structure the Inversion to subject JCI to taxation under § 367(b).

141.     On January 25, 2015, JCI announced its agreement with Tyco to combine the two companies. JCI told its shareholders that the Inversion "will be taxable" to them.[25]

142.     In the S-4, Defendants make the following statements regarding JCI shareholders' liability for the Inversion-imposed taxes:

(a)     Q: WHAT ARE THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE TRANSACTION TO JOHNSON CONTROLS SHAREHOLDERS?

A: The receipt of ordinary shares of the combined company and/or cash in exchange for Johnson Controls common stock pursuant to the merger **will be treated as a taxable transaction for U.S. federal income tax purposes**. A U.S. holder (as defined under "*Certain Tax Consequences of the Merger—U.S. Federal Income Tax Considerations*") of Johnson Controls common stock will

---

[25]   January 25, 2016 Announcement p. 2.

generally recognize taxable gain or loss equal to the difference between (i) the sum of the fair market value of the ordinary shares of the combined company and the amount of cash (including any cash received in lieu of fractional ordinary shares of the combined company) received in the merger and (ii) the U.S. holder's adjusted tax basis in the shares of Johnson Controls common stock surrendered in exchange therefor.

. . .

Holders of Johnson Controls common stock should read the section entitled "*Certain Tax Consequences of the Merger—U.S. Federal Income Tax Considerations*" for a more complete discussion of the U.S. federal income tax consequences of the merger. Tax matters can be complicated, and the tax consequences of the merger to a particular holder of Johnson Controls common stock will depend on such holder's particular facts and circumstances. Holders of Johnson Controls common stock should consult their own tax advisors to determine the specific tax consequences to them of the merger.

S-4 pp. 17-18 (emphasis supplied).

(b) **Certain U.S. Federal Income Tax Consequences (page 212)**

The receipt of ordinary shares of the combined company and/or cash in exchange for Johnson Controls common stock pursuant to the merger **will be treated as a taxable transaction for U.S. federal income tax purposes**. A U.S. holder (as defined under "*Certain Tax Consequences of the Merger— U.S. Federal Income Tax Considerations*") of Johnson Controls common stock will generally recognize taxable gain or loss equal to the difference between (i) the sum of the fair market value of the ordinary shares of the combined company and the amount of cash (including any cash received in lieu of fractional ordinary shares of the combined company) received in the merger and (ii) the U.S. holder's adjusted tax basis in the shares of Johnson Controls common stock surrendered in exchange therefor.

. . .

Holders of Johnson Controls common stock should read the section entitled "*Certain Tax Consequences of the Merger—U.S. Federal Income Tax Considerations*" for a more complete discussion of the U.S. federal income tax consequences of the merger. Tax matters can be complicated, and the tax consequences of the merger to a particular holder of Johnson Controls common stock will depend on such holder's particular facts and circumstances. Holders of Johnson

43

Controls common stock should consult their own tax advisors to determine the specific tax consequences to them of the merger.

S-4 pp. 39-40 (emphasis supplied).

(c)     The Johnson Controls board of directors also considered the various risks and other potentially negative factors concerning the merger, including the following:

- . . . .

- The fact that the consideration received by Johnson Controls shareholders in the merger **will be taxable for U.S. federal income tax purposes**;

S-4 p. 114 (emphasis supplied).

(d)     ***U.S. Federal Income Tax Consequences of the Merger to Johnson Controls Shareholders***

*U.S. Holders*

The **receipt of combined company ordinary shares** and/or cash in exchange for Johnson Controls common stock pursuant to the merger **will be a taxable transaction for U.S. federal income tax purposes**. . . . a U.S. holder of shares of Johnson Controls common stock that exchanges such shares for combined company ordinary shares and/or cash in the merger will generally recognize taxable gain or loss equal to the difference between (i) the sum of the fair market value of the combined company ordinary shares and the amount of cash (including any cash received in lieu of fractional ordinary shares of the combined company) received in the merger and (ii) the U.S. holder's adjusted tax basis in the shares of Johnson Controls common stock surrendered in exchange therefor. Such gain or loss must be determined separately for each separate block of shares of Johnson Controls common stock held by such U.S. holder (i.e., shares acquired at different times and at different prices).

S-4 p. 225 (emphasis supplied).

143.    The representations recited in the preceding two paragraphs and ¶ 130 are false and misleading for the reasons alleged in ¶¶ 117-39 and for failing to disclose the following material facts:

(a)     Whether, in connection with its consideration of the Inversion, the Board considered:

(i)     that the need to pay capital gains taxes could particularly affect long-term Minority Taxpaying JCI Shareholders with a low basis in their JCI shares and could, among other things, force them to sell some of their shares to provide the cash to pay the tax;

(ii)    that forcing Minority Taxpaying JCI Shareholders to sell shares to pay these taxes will also deprive those shareholders of the dividends they have been receiving on those shares and upon which many of such shareholders depend for their retirement or other income;

(iii)   that the Inversion-related tax consequences have created a divergence of interests between the Minority Taxpaying JCI Shareholders, on the one hand, and the majority non-taxpaying JCI shareholders and JCI, on the other; and

(iv)    that the JCI Defendants' determination to avoid the Inversion-related tax consequences pursuant to §§ 4985 and 7874 by limiting JCI shareholders' equity interest in JCplc to under 60% created a divergence of interests between JCI and its public shareholders; or

(v)     whether to structure the Inversion to avoid forcing Minority Taxpaying JCI Shareholders to pay taxes and, instead, to impose the Inversion-mandated taxes on JCplc.

(b)    All facts relevant to the statements recited in the preceding two paragraphs and ¶ 130 that the Inversion "will be taxable" to JCI shareholders, including the fact that JCI recklessly or deliberately chose to structure the transaction so as to impose a capital gains tax on the Minority Taxpaying JCI shareholders, all calculations and methodologies in support of such statements, the amount of JCI's expected § 367(b) taxable income at September 30,

2016, and JCI's estimate of the amount of its shareholders' expected built-in gain subject to § 367(a) on the closing date;

(c)     In making the statement without reservations or qualifications that the Inversion will be taxable to JCI shareholders, unambiguously implying that it will not be taxable to JCI or JCplc, the availability of the 367(b) alternative or other uncertainties regarding the tax structure;

(d)     Defendants may be compelled, in satisfaction of the Individual Defendants' fiduciary duty to JCI shareholders, to restructure the Inversion so that JCI or JCplc, instead of JCI's taxpaying shareholders, may be required to pay the Inversion-imposed taxes;

(e)     JCI's potential liability pursuant to § 367(b) and  the risk that the Defendants could have structured the transaction such that JCI or JCplc, would be required to pay the Inversion-imposed taxes instead of the JCI shareholders;

(f)     Whether JCI has estimated, or intends to estimate, the aggregate gain of its shareholders as of the anticipated closing date of the Proposed Merger pursuant to IRC § 367(a);

(g)     Whether JCI has estimated, or intends to estimate, its taxable income pursuant to IRC § 367(b);

(h)     JCI's expected shareholders' built-in gain as of September 30, 2016 or the anticipated date of closing;

(i)     JCI's potential taxable income pursuant to IRC § 367(b) as of September 30, 2016 or the date of closing;

(j)     JCI's methodology for determining the estimates described in the preceding four clauses;

(k)     JCI's taxable income pursuant to IRC § 367(b) as of the end of its most re-

cent fiscal quarter;

(l)    The determination of JCI shareholders' aggregate gain under IRC § 367(a) is subject to far greater uncertainty than JCI's taxable income under IRC § 367(b);

(m)    Whether Defendants considered alternatives to structuring the Proposed Merger as an inversion that subjected Minority Taxpaying JCI Shareholders to IRC § 367(a) and, if so, a description of such alternatives and why they were rejected;

(n)    Whether Defendants have compared the costs versus benefits of the Inversion from the standpoint of the Minority Taxpaying JCI Shareholders who are being forced to pay the price of the tax benefits JCI is seeking via the Inversion and, if so, what that cost versus benefit analysis from the perspective of the Minority Taxpaying JCI Shareholders reveals;

(o)    Whether Defendants will seek an opinion of counsel that the Inversion will qualify for the disclosed tax treatment;

(p)    Whether Defendants will request a ruling from the IRS regarding the U.S. federal income tax consequences of the Proposed Merger; and

(q)    Whether JCI will seek to determine whether its taxable income under § 367(b) exceeds its shareholders' taxable gain under § 367(a).

144.    If JCI does not voluntarily, or is not compelled to, abandon its plan to reincorporate in Ireland, the JCI Defendants should be required to disclose:

(a)    The application of IRC § 367 and the possibility that JCI could choose to structure the Inversion so that it or JCplc, not JCI shareholders, would be required to pay the taxes imposed by § 367 as the price of the Inversion;

(b)    That reincorporating in Ireland is not necessary to enable JCI to achieve the

expected non-tax benefits of its acquisition of Tyco;

(c)     Whether the Individual Defendants considered compensating Minority Taxpaying JCI Shareholders for the capital gains taxes they will be forced to pay;

(d)     The fact that Defendants chose to structure JCI's acquisition of Tyco as an inversion, and further chose the structure of inversion, with the intent of shifting JCI's, or JCplc's, liability for U.S. taxes on their foreign earnings to Minority Taxpaying JCI Shareholders without compensating them for the inversion-imposed forced capital gains taxes;

(e)     The fact that the Individual Defendants chose to limit JCI shareholders' equity interest in JCplc to under 60% in order that (1) the Individual Defendants will not be subject to the § 4985 excise tax that Congress intended directors of inverting corporations to pay and (2) JCI will be shielded from the adverse tax consequences of § 7874 applicable to inverting corporations, both of which provisions are intended to discourage inversions; and

(f)     The fact that Defendants' decision to structure JCI's acquisition of Tyco as an inversion subjected the Individual Defendants to conflicting fiduciary duties in that said Defendants owe fiduciary duties to JCI, JCplc, majority JCI shareholders, and minority Taxpaying JCI Shareholders, each of which entities and groups has interests that are in conflict with the others, which conflicts required separate representation for such interests that has not been provided and which conflicts would not have existed but for the Inversion.

145.     If taxpaying JCI shareholders constituted a substantial majority of JCI shareholders, JCI would not have proposed a transaction that would be taxable to its

shareholders.

**C. The JCI Defendants and Their Advisors Have Ignored the Material Inversion-Driven Costs to JCI shareholders Alleged Herein in Determining the Fairness of the Inversion to JCI Public Shareholders.**

146. The injuries caused by the Inversion include the capital gains taxes that the Minority Taxpaying JCI Shareholders are to be forced to pay and the dilution of JCI public shareholders' equity interest in JCplc resulting from the need to limit JCI shareholders' equity interest in JCplc to under 60% to avoid the Inversion's adverse tax consequences to Defendants (including the Individual Defendants' exposure to the § 4985 excise tax and JCplc's exposure to § 7874's limits on an inverting corporation's use of certain tax attributes), which includes the forced $3.86 billion buyback of JCI shares.

147. These "Inversion-Driven Costs" to JCI shareholders were ignored by the Board's financial advisors. Neither the Board nor its financial advisors undertook a cost-benefit analysis from the perspective of JCI public shareholders that compared the Inversion-Driven Costs to the expected benefit to (i) JCI public shareholders in light of the Inversion-driven dilution and (ii) the Minority Taxpaying JCI Shareholders in light of both the Inversion-driven dilution and the Inversion-imposed taxes.

148. Centerview and Barclays were retained by JCI to act as its financial advisors to, *inter alia*, opine as to whether the Proposed Merger was "fair" to JCI shareholders. Both Centerview and Barclays disclaimed any responsibility for advising anyone other than JCI.

149. "On January 24, 2016, Centerview rendered to the board of directors of Johnson Controls its oral opinion, which was subsequently confirmed by delivery of a written opinion dated January 24, 2016, that, as of such date and based upon and subject to the various assumptions made. . . the aggregate merger consideration to be paid to the holders of Johnson Controls common stock (other than excluded shares) pursuant to the

merger agreement was fair, from a financial point of view, to such holders." S-4 p. 112.

150.    The S-4 recites the factors purportedly considered by Centerview (includ-ing "certain tax and other cost savings and operating synergies projected by the manage-ment of Johnson Controls to result from the proposed transaction"). *Id.* at 116.

151.    The S-4 further discloses the following regarding the information consid-ered by Centerview in reaching its opinion and the limitations thereon:

> *Centerview assumed*, without independent verification or any responsibility therefor, *the accuracy and completeness of the financial*, *legal, regulatory, tax*, accounting and other information supplied to, discussed with, or re-viewed by Centerview for purposes of its opinion and, with Johnson Con-trols' consent, Centerview relied upon such information as being complete and accurate. In that regard, Centerview assumed, at Johnson Controls' di-rection, that the Johnson Controls internal data (including, without limita-tion, the Johnson Controls internal forecasts) and the synergies were reason-ably prepared on bases reflecting the best currently available estimates and judgments of the management of Johnson Controls as to the matters covered thereby, and that the Tyco internal data (including, without limitation, the Tyco internal forecasts) were reasonably prepared on bases reflecting the best currently available estimates and judgments of the management of Tyco as to the matters covered thereby, and Centerview relied, at Johnson Con-trols' direction, on the Johnson Controls internal data, the Tyco internal data and the synergies for the purposes of Centerview's analysis and opinion. . . . *Centerview also assumed that the proposed transaction would have the tax consequences described in discussions with, and materials furnished to Cen-terview* by, representatives of Johnson Controls. . . . Centerview is not a le-gal, regulatory, *tax* or accounting advisor, and *Centerview expressed no opinion as to* any legal, regulatory, *tax* or accounting *matters*.

> Centerview's opinion expressed no view as to, and did not address, Johnson Controls' *underlying business decision to proceed with or effect the pro-posed transaction*, or the relative merits of the proposed transaction as com-pared to any alternative business strategies or transactions that might be available to Johnson Controls or in which Johnson Controls might engage. Centerview's opinion was limited to and addressed *only the fairness, from a financial point of view, as of the date of Centerview's written opinion, to the holders of Johnson Controls common stock* (other than excluded shares) of the aggregate merger consideration to be paid to such holders pursuant to the merger agreement. For purposes of its opinion, *Centerview was not asked to, and Centerview did not, express any view on, and its opinion did not ad-*

*dress, any other term or aspect of the merger agreement or the proposed transaction*, including, without limitation, the *structure or form of the proposed transaction*, or *any other agreements or arrangements contemplated by the merger agreement or entered into in connection with or otherwise contemplated by the proposed transaction*, including, without limitation, (i) the fairness of the proposed transaction or any other term or aspect of the proposed transaction to, or any consideration to be received in connection therewith by, or the impact of the proposed transaction on, the holders of any other class of securities, creditors or other constituencies of Johnson Controls or any other party, (ii) the *allocation of the aggregate merger consideration as among holders of Johnson Controls common stock who receive the cash consideration or the share consideration* or (iii) the *relative fairness of the cash consideration and the share consideration*. . . .

*Id*. at 117-18 (emphasis supplied).

152.    Centerview makes clear that it is not opining as to the fairness of the exchange ratio—i.e., the 56% of JCplc that JCI shareholders are to receive or to the Inversion itself:

. . . We have not been asked to, nor do we express any view on, and our opinion does not address, any other term or aspect of the Agreement or the Transaction, including, without limitation, the *structure or form of the Transaction*, or any other agreements or arrangements contemplated by the Agreement or entered into in connection with or otherwise contemplated by the Transaction, including, without limitation, . . . (iii) the relative fairness of the Cash Consideration and the Share Consideration. . . .

*Id*. at C-3.

153.    Nowhere in the representations recited in the preceding four paragraphs is there any statement that the Inversion-Driven Costs to be forced on the minority Taxpaying JCI Shareholders, in particular, and on all JCI public shareholders, in general, were considered by Centerview in rendering its purported "fairness opinion."

154.    Barclays likewise delivered its "fairness opinion" to the Board. "On January 24, 2016, Barclays rendered its oral opinion (which was subsequently confirmed in writing) to the board of directors of Johnson Controls that, as of such date and based upon and subject to the qualifications, limitations and assumptions stated in its opinion,

the aggregate merger consideration pursuant to the merger agreement is fair, from a financial point of view, to holders of Johnson Controls common stock (other than excluded shares)." *Id.* at 119.

155.    The S-4 recites the factors purportedly considered by Barclays. *Id.* at 120-21.

156.    The S-4 further discloses the following regarding the information considered by Barclays in reaching its opinion:

> Barclays' opinion, the issuance of which was approved by Barclays' Valuation and Fairness Opinion Committee, is *addressed to the board of directors of Johnson Controls, addresses only the fairness, from a financial point of view, of the aggregate merger consideration to be offered to the holders of Johnson Controls common stock* (other than excluded shares) and *did not address any other term or aspect of the merger agreement or the proposed transaction.* Elections by Johnson Controls shareholders for the share consideration and cash consideration will be subject to proration and adjustment procedures set forth in the merger agreement, as to which procedures Barclays' opinion expressed no view or opinion. Barclays' opinion does not constitute a recommendation to any shareholder of Johnson Controls as to how such shareholder should vote with respect to the proposed transaction or any other matter, including, without limitation, whether such shareholder should elect to receive the cash consideration or the share consideration, or make no election, in the proposed transaction. The terms of the proposed transaction were determined through arm's-length negotiations between Johnson Controls and Tyco and were unanimously approved by the board of directors of Johnson Controls. Barclays did not recommend any specific form of consideration to Johnson Controls or that *any specific form of consideration constituted the only appropriate consideration for the proposed transaction.* Barclays was not requested to address, and its opinion does not in any manner address, Johnson Controls' underlying business decision to proceed with or effect the proposed transaction. In addition, *Barclays expressed no opinion on, and its opinion does not in any manner address,* (i) the fairness of the amount or the nature of any compensation to any officers, directors or employees of any parties to the proposed transaction, or any class of such persons, relative to the aggregate merger consideration to be offered to the holders of Johnson Controls common stock in the proposed transaction or otherwise; (ii) the *allocation of the aggregate merger consideration as among holders of Johnson Controls common stock who receive the cash*

*consideration or the share consideration*; or (iii) *the relative fairness of the cash consideration and the share consideration*.

. . .

In arriving at its opinion, *Barclays assumed and relied upon the accuracy and completeness of the financial and other information* used by Barclays without any independent verification of such information (and Barclays has not assumed responsibility or liability for any independent verification of such information). *Barclays also relied upon the assurances of management of Johnson Controls that they were not aware of any facts or circumstances that would make such information inaccurate or misleading*. Upon the advice and at the direction of Johnson Controls, Barclays assumed that the Johnson Controls internal forecasts were reasonably prepared on a basis reflecting the best currently available estimates and judgments of the management of Johnson Controls as to the financial performance of Johnson Controls and that Johnson Controls will perform substantially in accordance with such projections. With respect to the Tyco internal forecasts, upon the advice and at the direction of Johnson Controls, Barclays assumed that such projections were reasonably prepared on a basis reflecting the best currently available estimates and judgments of the management of Tyco as to the financial performance of Tyco and that Tyco will perform substantially in accordance with such projections. With respect to the synergies, upon the advice and at the direction of Johnson Controls, Barclays assumed that the synergies were reasonably prepared on a basis reflecting the best currently available estimates and judgments of the managements of Johnson Controls and Tyco, including as to the amount and timing of realization. Barclays relied, at the direction of Johnson Controls, on the Johnson Controls internal forecasts, the Tyco internal forecasts and the synergies and Barclays assumed no responsibility for and expressed no view as to the estimates or the assumptions on which they were based. . . . .

. . . . *Barclays did not express any opinion as to any tax* or other *consequences that might result from the proposed transaction*, nor did its opinion address any legal, *tax*, regulatory or accounting *matters*, as to which Barclays understood that Johnson Controls had obtained such advice as it deemed necessary from qualified professionals.

In connection with rendering its opinion, Barclays performed certain financial, comparative and other analyses as summarized below. In arriving at its opinion, *Barclays did not ascribe a specific range of values to the shares of Johnson Controls common stock or Tyco ordinary shares* but *rather made its determination as to fairness, from a financial point of view, to the holders of Johnson Controls common stock* (other than excluded

shares) of the *aggregate merger consideration to be offered to such holders* in the proposed transaction *on the basis of various financial and comparative analyses*.

*Id.* at 120-22 (emphasis supplied).

157.    Nowhere in the representations recited in the preceding three paragraphs is there any statement that the Inversion-Driven Costs to be forced on the Minority Taxpaying JCI Shareholders, in particular, and on all public JCI shareholders, in general, were considered by Barclays in rendering its purported "fairness opinion."

158.    In addition to the representations recited at ¶¶ 149-56, the S-4 includes over 20 representations that the Inversion is "fair" and in the "best interests of" JCI shareholders.[26] For example:

- The Johnson Controls board of directors. . . has determined that the merger agreement and the transactions contemplated by the merger agreement, including the merger, are advisable and *fair to, and in the best interests of Johnson Controls and its shareholders*. It therefore unanimously recommends that you vote "FOR" the Johnson Controls merger proposal,. . . S-4 fourth page (emphasis supplied).

- At its meeting on January 24, 2016, the Johnson Controls board of directors determined that the merger agreement and the transactions contemplated by the merger agreement were advisable, *fair to and in the best interests of* Johnson Controls and *its shareholders*, and approved and adopted the merger agreement and the transactions contemplated by the merger agreement. The Johnson Controls board of directors unanimously recommends that the Johnson Controls shareholders vote their shares in favor of the approval of the merger agreement and the transactions contemplated by the merger agreement. *Id.* at p. 23 (emphasis supplied).

- After careful consideration, the Johnson Controls board of directors, by unanimous vote of all directors at a meeting held on January 24, 2016, determined that the merger agreement and the transactions contemplated by the merger agreement are advisable, *fair to and in the best interests of* Johnson Controls and *its shareholders*, and approved and adopted the merger agreement and the transactions

---

[26] S-4 fourth page, pp. 6, 23, 24-25, 49, 110, 111, 113, 115-16, 118-20, 189, 214, A-1, A-16, A-26, C-1, C-3, D-1, D-3.

contemplated by the merger agreement. *Id.* at 111-12 (emphasis supplied).

- Based upon and subject to the foregoing, we are of the opinion as of the date hereof that, the aggregate Merger Consideration pursuant to the Agreement is *fair*, from a financial point of view, *to the holders of Company Common Stock* (other than the Excluded Shares). *Id.* at D-3 (emphasis supplied).

159. The S-4 contains approximately a dozen representations regarding the "fairness" of the Proposed Merger to Tyco shareholders.

160. Notwithstanding the representations of the purported "fairness" of the Inversion to *all* JCI shareholders, neither Centerview nor Barclays considered the substantial adverse tax consequences to the Minority Taxpaying JCI Shareholders, nor did they consider the Inversion-Driven Costs to all JCI shareholders, and disclaimed any responsibility for doing so.

161. The representations alleged at ¶ 142(c) that the Board considered the "potentially negative factor[] that the consideration received by Johnson Controls shareholders in the merger will be taxable for U.S. federal income tax purposes" and at ¶¶ 148-58 regarding the purported "fairness" of the Inversion and Centerview's and Barclays's acknowledged failures to consider the Inversion's adverse tax consequences to the Minority Taxpaying JCI Shareholders, or the Inversion-Driven Costs to all JCI shareholders, are false and misleading for failing to disclose whether anyone other than Centerview or Barclays, and specifically the Individual Defendants, performed, was asked to perform, or asked someone to perform, an analysis as to, or whether anyone other than Centerview or Barclays (specifically the Individual Defendants) considered, *inter alia*:

(a) The supposed value (discounted to present value) of achieving the lower Irish corporate tax rate and the period over which such value will be realized;

(b) The extent to which that value is expected to be reflected in the form of an

increased value of the JCplc stock to be issued to JCI shareholders attributable to the Inversion's tax savings, as distinguished from what would be the value of JCplc stock attributable to JCI's "acquisition" of Tyco without structuring such acquisition as an inversion;

(c) The extent to which any such projected values attributable to the Inversion's expected tax savings are subject to significant uncertainty;

(d) A comparison of such values attributable to the Inversion's expected tax savings with the costs to JCI public shareholders of the Inversion in the form of the capital gains taxes that Minority Taxpaying JCI Shareholders are to be forced to pay, including the loss of dividends attributable to shares these JCI shareholders will be forced to sell to pay such taxes;

(e) The supposed value (discounted to present value) of achieving the savings attributable to the avoidance of IRC § 7874 and the period over which such value will be realized;

(f) The extent to which that value is expected to be reflected in the form of an increased value of the JCplc stock to be issued to JCI shareholders attributable to the IRC § 7874 tax savings, as distinguished from what would be the value of JCplc stock in the absence of such savings or if JCI's "acquisition" of Tyco were not structured as an inversion;

(g) The extent to which any such projected values attributable to the expected tax savings attributable to avoiding § 7874, assuming the Inversion, are subject to significant uncertainty;

(h) A comparison of such values attributable to the Inversion's expected § 7874 tax savings with the costs to JCI public shareholders of the dilution attributable to the need to limit JCI shareholders' equity interest in JCplc to

under 60%, including the loss of dividends attributable to shares these JCI shareholders would, in the absence of such dilution, have received;

(i) The aggregate amount of the excise tax and related costs that, in the absence of limiting JCI public shareholders' equity interest in JCplc to under 60%, would be payable pursuant to IRC § 4985;

(j) A comparison of the amount of such excise tax pursuant to IRC § 4985 avoided by limiting JCI public shareholders' equity interest in JCplc to under 60% with the costs to JCI public shareholders of the dilution attributable to so limiting JCI shareholders' equity interest in JCplc, including the loss of dividends attributable to shares these JCI shareholders would, in the absence of such dilution, have received; and

(k) The factors alleged at ¶ 143(a).

**D. Defendants and Their Advisors Are Concealing the Dilution of JCI Public Shareholders' Equity Interest in JCplc Attributable to the Inversion.**

162. Defendants fail to disclose that JCI shareholders' equity interest in JCplc is to be diluted for reasons unrelated to the relative values of JCI and Tyco (*see* ¶ 71 *supra*) but to enable JCplc to avoid the adverse tax consequences of IRC § 7874.

163. Defendants represent the following regarding the allocation of the equity of JCplc between current JCI shareholders and Tyco shareholders and the consideration to be received by JCI shareholders in the Inversion:

(a) The number of Tyco ordinary shares being registered is based upon the product obtained by multiplying (i) 571,426,893 shares of common stock, par value $1.00 per share, of Johnson Controls, Inc. by (ii) the exchange ratio of one Tyco ordinary share for each share of Johnson Controls common stock. The number of shares of Johnson Controls common stock set forth in clause (i) of the prior sentence equals (A) 648,370,147 shares of Johnson Controls common stock outstanding as of March 29, 2016, plus (B) 24,392,689 shares of Johnson Controls common stock subject to

options and other equity-based awards of Johnson Controls outstanding as of March 29, 2016 or that may be granted after such date and prior to consummation of the merger, minus (C) 101,335,943 shares of Johnson Controls common stock expected to be exchanged for cash in the merger. S-4 second page.

(b)     After consummation of the merger, Johnson Controls shareholders and Tyco shareholders are expected to own approximately 56% and 44%, respectively, of the issued and outstanding ordinary shares of the combined company. . . . Based on the number of Johnson Controls shares and equity awards outstanding as of June 27, 2016, the total number of combined company shares that are expected to be issued or reserved for issuance pursuant to the merger is approximately 548,853,000 ordinary shares. *Id.* at third page, pp. 1, 20, 96, 176.

(c)     Immediately prior to the merger, Tyco shareholders will receive 0.955 ordinary shares of Tyco, which will become ordinary shares of the combined company in the merger, for each Tyco ordinary share they hold. Tyco shareholders will receive these shares by virtue of a 0.955-for-one share consolidation. As of July 5, 2016, and assuming that each ordinary share of the combined company will have a value equal to the closing price of one share of Johnson Controls common stock on the New York Stock Exchange ("NYSE") on such date, the implied value of the 0.955 shares of the combined company to Tyco shareholders was approximately $ 40.86. Because Johnson Controls' and Tyco's share prices will fluctuate between now and the closing of the merger, the value of the merger consideration to Johnson Controls shareholders and the value of the combined company ordinary shares to Tyco shareholders as of the closing date may differ from the implied value based on the share prices on July 5,, 2016 or at the time of the Johnson Controls special meeting or Tyco extraordinary general meeting. *Id.* at third page.

(d)     Immediately prior to the merger, Tyco shareholders will receive 0.955 ordinary shares of Tyco, which will become ordinary shares of the combined company in the merger, for each Tyco ordinary share they hold. Tyco shareholders will receive these shares by virtue of a 0.955-for-one share consolidation (the "Tyco share consolidation"). After consummation of the merger, Johnson Controls shareholders and Tyco shareholders are expected to own approximately 56% and 44%, respectively, of the issued and outstanding ordinary shares of the combined company. *Id.* at 1; *see also id.* at 2, 7, 20, 96.

(e)     For the purposes of rendering their opinions, Centerview and

Barclays assumed that, immediately prior to the effective time of the proposed transaction, and as required pursuant to the merger agreement, each issued and unissued Tyco ordinary share will be consolidated into 0.955 Tyco ordinary shares, which will become ordinary shares of the combined company. *Id*. at 24.

(f) ***Johnson Controls shareholders will have a reduced ownership and voting interest after the merger and will exercise less influence over management***.

Johnson Controls shareholders currently have the right to vote in the election of the Johnson Controls board of directors and on other matters affecting Johnson Controls. Upon the consummation of the merger, each Johnson Controls shareholder will become a shareholder of the combined company with a percentage ownership of the combined company that is smaller than the shareholder's prior percentage ownership of Johnson Controls. After consummation of the merger, Johnson Controls shareholders are expected to own approximately 56% of the issued and outstanding ordinary shares of the combined company. Because of this, Johnson Controls shareholders will have less influence on the management and policies of the combined company than they now have on the management and policies of Johnson Controls. In addition, former Johnson Controls shareholders will own only approximately 56% of the shares of Adient following the spin-off of Adient.

*Id*. at 48.

(g) ***The Internal Revenue Service may not agree that the combined company should be treated as a non-U.S. corporation for U.S. federal tax purposes and may not agree that the combined company's U.S. affiliates should not be subject to certain adverse U.S. federal income tax rules***.

. . . .

Under Section 7874, if (1) the Johnson Controls shareholders own (within the meaning of Section 7874) 80% or more (by vote or value) of the ordinary shares of the combined company after the merger by reason of holding Johnson Controls common stock (the "80% ownership test," and such ownership percentage the "Section 7874 ownership percentage"), and (2) the combined company's "expanded affiliated group" does not have "substantial business activities" in Ireland (the "substantial business activities test"), the combined company will be treated as a U.S. corporation for U.S. federal tax purposes. If the Section 7874 ownership percentage of

the Johnson Controls shareholders in the combined company after the merger is less than 80% but at least 60% (the "60% ownership test"), and the substantial business activities test is not met, Johnson Controls and its U.S. affiliates (including the U.S. affiliates historically owned by Tyco) may, in some circumstances, be subject to certain adverse U.S. federal income tax rules (which, among other things, could limit their ability to utilize certain U.S. tax attributes to offset U.S. taxable income or gain resulting from certain transactions).

Based on the terms of the merger, the rules for determining share ownership under Section 7874 and certain factual assumptions, *Johnson Controls shareholders are expected to own (within the meaning of Section 7874) less than 60% (by both vote and value) of the ordinary shares of the combined company after the merger by reason of holding shares of Johnson Controls common stock*. Therefore, under current law, it is expected that the combined company should not be treated as a U.S. corporation for U.S. federal tax purposes and that Section 7874 should otherwise not apply to the combined company or its affiliates as a result of the merger.

However, the rules under Section 7874 are relatively new and complex and there is limited guidance regarding their application. In particular, ownership for purposes of Section 7874 is subject to various adjustments under the Code and the Treasury regulations promulgated thereunder, and there is limited guidance regarding Section 7874, including with respect to the application of the ownership tests described above. As a result, the determination of the Section 7874 ownership percentage is complex and is subject to factual and legal uncertainties. Thus, there can be no assurance that the Internal Revenue Service (the "IRS") will agree with the position that the combined company should not be treated as a U.S. corporation for U.S. federal tax purposes or that Section 7874 does not otherwise apply as a result of the merger.

*Id*. at 54-55 (emphasis supplied).

(h)    ***Consideration to be Received by the Johnson Controls Shareholders***

In the merger, each share of Johnson Controls common stock issued and outstanding immediately prior to the effective time of the merger (other than shares held by Johnson Controls, Tyco, Merger Sub and certain subsidiaries of Johnson Controls and Tyco, as described in the merger agreement) will be converted into the right to receive, at the election of its holder (subject to proration as described in this joint proxy statement/prospectus), either:

- one ordinary share of the combined company; or

- $34.88 in cash, without interest.

Any non-electing share will be deemed to have elected to receive share consideration.

Elections by Johnson Controls shareholders for the share consideration and cash consideration will be subject to proration procedures set forth in the merger agreement, such that Johnson Controls shareholders will receive in the aggregate approximately $3.864 billion in cash. As a result, an aggregate of approximately 110,778,083 shares of Johnson Controls will receive the cash consideration. The merger agreement provides for adjustments to and reallocation of the share elections and cash elections made by Johnson Controls shareholders in the event that the cash consideration is undersubscribed or oversubscribed.

Specifically, if Johnson Controls shareholders elect an aggregate of $3.864 billion, cash electing shares will be converted to the right to receive cash consideration and share electing shares and non-electing shares will be converted into the right to receive share consideration. If Johnson Controls shareholders elect to receive an aggregate of less than $3.864 billion of cash consideration, cash electing shares will be converted into the right to receive cash consideration and a portion of the share electing shares and non-electing shares of each Johnson Controls shareholder will be converted into the right to receive cash consideration, with the remaining shares of such Johnson Controls shareholder converted into the right to receive share consideration. If Johnson Controls shareholders elect to receive an aggregate of more than $3.864 billion of cash consideration, share electing shares and non-electing shares will be converted into the right to receive share consideration and a portion of the cash electing shares of each Johnson Controls shareholder will be converted into the right to receive cash consideration, with the remaining shares of such Johnson Controls shareholder converted into the right to receive share consideration. Accordingly, depending on the elections made by other Johnson Controls shareholders, each Johnson Controls shareholder who elects to receive share consideration for all of their shares of Johnson Controls common stock in the merger may receive a portion of their merger consideration in cash consideration and each Johnson Controls shareholder who elects to receive cash consideration for all of their shares of Johnson Controls common stock in the merger may receive a portion of their merger consideration in share consideration. A Johnson Controls sharehold-

er who elects to receive a combination of cash consideration and share consideration for their shares of Johnson Controls common stock in the merger may receive cash consideration and share consideration in a proportion different from that which such shareholder elected. For further information, including hypothetical scenarios demonstrating the possible effects of proration on a holder of 1,000 shares of Johnson Controls common stock, see "*The Merger—Consideration to be Received by Johnson Controls Shareholders.*"

*Id*. at 96-97.

(i) In evaluating the merger, the Johnson Controls board consulted with Johnson Controls' senior management and its legal and financial advisors and, in reaching its decision, considered a number of factors that the Johnson Controls board believed supported its decision, including the following material factors:

- . . . .

- The fact that the merger consideration would result in Johnson Controls shareholders holding approximately 56% of the outstanding shares of the combined company immediately after the merger and receiving approximately $3.864 billion in aggregate cash consideration to be funded by Tyco;

*Id*. at 112.

(j) After consummation of the merger, Johnson Controls shareholders and Tyco shareholders are expected to own approximately 56% and 44%, respectively, of the issued and outstanding ordinary shares of the combined company. . . . *Id*. at 176.

(k) As a result of the merger, each outstanding share of Johnson Controls common stock, other than shares held by Johnson Controls, its subsidiaries, Tyco, or Merger Sub, will be converted into the right to receive (subject to proration as described below), at the holder's election, either: (i) one (1) ordinary share of the combined company or (ii) an amount in cash equal to $34.88. Elections will be prorated so that Johnson Controls shareholders will receive in the aggregate approximately $3,864 million of cash in the merger. The exchange ratio takes into account the effects of the Tyco share consolidation contemplated by the merger agreement whereby, immediately prior to the merger, every issued and unissued ordinary share of Tyco will be consolidated into 0.955 of a share of Tyco. After consummation of the merger, Johnson Controls shareholders and Tyco shareholders are expected to own approximately 56% and 44%, respectively, of the issued and outstanding ordinary shares of the combined compa-

ny. *Id*. at 246.

164. Under the heading "Risks Related to the Business of the Combined Company," Defendants recite numerous risks and factors that might jeopardize the realization of the transaction's expected benefits. Defendants conclude this recitation as follows:

> All of these factors could cause dilution to the earnings per share of the combined company, decrease or delay the expected accretive effect of the merger, and negatively impact the price of the combined company ordinary shares. As a result, it cannot be assured that the combination of Johnson Controls and Tyco will result in the realization of the full benefits anticipated from the transaction within the anticipated time frames or at all.

*Id*. at 51-52.

165. Defendants purport to disclose financial data on a "pro forma" basis that gives effect to the Proposed Merger, including, *inter alia*, a "Pro Forma Combined Statement of Income Data," including "Diluted earnings per share attributable to controlling shareholders from continuing operations," and "Pro Forma Combined Statement of Financial Position Data," including, *inter alia*, "Shareholders' equity attributable to Johnson Controls and Tyco," under the heading, "SELECTED UNAUDITED PRO FORMA COMBINED FINANCIAL DATA." *Id*. at 68-69.

166. Defendants purport to disclose "comparative historical and unaudited pro forma per share financial data" that includes the following data:

> "(i) selected per share information for Johnson Controls common stock on a historical basis for the year ended September 30, 2015 and the six months ended March 31, 2016, (ii) selected per share information for Tyco ordinary shares on a historical basis for the year ended September 25, 2015 and the six months ended March 25, 2016 and (iii) selected per share information on a pro forma combined basis and Tyco equivalent basis for the year ended September 30, 2015 and the six months ended March 31, 2016. Except for the historical cash dividends per share and earnings per share attributable to Johnson Controls shareholders from continuing operations information as of and for the year ended September 30, 2015, in the case of Johnson Controls, and the historical information as of and for the year ended September 25, 2015, in the case of Tyco, the information in the table is unaudited. . . .

> The pro forma combined and Tyco equivalent pro forma earnings per share

63

from continuing operations were calculated using the methodology described in the section entitled "*Unaudited Pro Forma Combined Financial Information*" and take into account the Tyco share consolidation. The pro forma combined per share amounts (i) reflect the 0.955-for-one share consolidation to be effected by Tyco immediately prior to consummation of the merger and (ii) are shown both before and after giving effect to the separation of Johnson Controls' Automotive Experience business. See "*Unaudited Pro Forma Combined Financial Information*."

| **Johnson Controls Historical** | **As of or for the Six Months Ended March 31, 2016** | **As of or for the Year Ended September 30, 2015** |
|---|---|---|
| Book value per share | $ 15.40 | $ 16.03 |
| Cash dividends per share | $ 0.58 | $ 1.04 |
| Earnings (loss) per share attributable to Johnson Controls shareholders from continuing operations | | |
| Basic | $ (0.12) | $ 2.20 |
| Diluted | $ (0.12) | $ 2.18 |

| **Tyco Historical** | **As of or for the Six Months Ended March 25, 2016** | **As of or for the Year Ended September 30, 2015** |
|---|---|---|
| Book value per share | $9.74 | $ 9.56 |
| Cash dividends per share | $0.41 | $ 0.77 |
| Earnings per share attributable to Tyco shareholders from continuing operations | | |
| Basic | $0.51 | $ 1.47 |
| Diluted | $0.51 | $ 1.44 |

| **Combined Company Pro Forma** | **As of or for the Six Months Ended March 31, 2016** | | **As of or for the Year Ended September 30, 2015** | |
|---|---|---|---|---|
| | **Pre-spin** | **Post-spin** | **Pre-spin** | **Post-spin** |
| Book value per share | $27.63 | $ 21.24 | n/a | n/a |
| Cash dividends per share(1) | | | | |
| Basic earnings per share attributable to controlling shareholders from continuing operations | $0.06 | $0.71 | $1.76 | $1.09 |
| Diluted earnings per share attributable to controlling shareholders from continuing operations | $0.06 | $0.70 | $1.74 | $1.08 |

## Tyco Pro Forma Equivalent

The .955 for 1 share consolidation is reflected in the Combined Company

Pro Forma per share data above (see **Note 8** of the *Unaudited Pro Forma Combined Financial Information* for the calculation of pro forma basic and diluted earnings per share of the combined company). Subsequent to the Tyco share consolidation occurring immediately prior to the merger, Johnson Controls shareholders will receive one share of the combined company for each share of Johnson Controls common stock. Accordingly, there would be no change for Tyco on an equivalent pro forma basis.

*Id.* at 70-71.

167.   Defendants purport to disclose how the "unaudited pro forma weighted average number of [Tyco] basic shares outstanding" is calculated:

### Earnings per share

The unaudited pro forma weighted average number of basic shares outstanding is calculated as follows (in millions, except share consolidation ratio and per share amounts):

|  | Fiscal Year Ended 9/30/2015 | Six Months Ended 3/31/2016 |
|---|---|---|
| Weighted average Tyco shares outstanding—Basic(1) | 421.0 | 424.0 |
| Share consolidation ratio: | 0.955 | 0.955 |
| **Post-share consolidation shares:** | **402.1** | **404.9** |
| Johnson Controls shares outstanding as of June 27, 2016: | 639.7 | 639.7 |
| **Sub-total** | **1,041.8** | **1,044.6** |
| Cash consideration to Johnson Controls shareholders: | $ 3,864 | $ 3,864 |
| Per share consideration: | $ 34.88 | $ 34.88 |
| Reduction in shares: | 110.8 | 110.8 |
| **Adjusted weighted average shares outstanding—Basic(2)** | **931.0** | **933.8** |

[footnotes omitted]

The unaudited pro forma weighted average number of diluted shares outstanding is calculated by adding the effect of dilutive securities to the unaudited pro forma weighted average number of basic shares outstanding. For the fiscal year ended September 30, 2015, the effect of dilutive securities are comprised of 6.3 million shares and 5.7 million shares of common stock of the combined company exercisable or issuable pursuant to outstanding awards of Johnson Controls and Tyco, respectively. For the six months ended March 31, 2016, the effect of dilutive securities are comprised of 4.5 million shares and 4.0 million shares of common stock of the combined company exercisable or issuable pursuant to outstanding awards of Johnson Controls and Tyco, respectively. The dilutive effects of these share-based awards were computed using the treasury stock method.

| (in millions) | Fiscal Year Ended 9/30/2015 | Six Months Ended 3/31/2016 |
|---|---|---|
| Pro forma weighted basic shares outstanding: | 931.0 | 933.8 |
| Dilutive impact of Tyco awards outstanding: | 5.7 | 4.0 |
| Dilutive impact of Johnson Controls awards outstanding: | 6.3 | 4.5 |
| **Adjusted weighted average shares outstanding—Diluted** | **943.0** | **942.3** |

*Id.* at 263-64.

168.    In connection with the determination of the present values of JCI and Tyco common stock, Defendants represented the following:

The present value of Johnson Controls was adjusted for net debt as of the end of September 30, 2015 to derive a range of implied fully diluted per share equity value for Johnson Controls. Centerview's analysis implied a value per share range for Johnson Controls common stock of approximately $42.50 to $58.50. Barclays' analysis implied a value per share range for shares of Johnson Controls common stock of approximately $39 to $53.

Johnson Controls' financial advisors compared these per share ranges to the $34.88 implied value, as of January 22, 2016, of the cash consideration per share of Johnson Controls common stock proposed to be paid pursuant to the merger agreement based on Johnson Controls' 5-day VWAP of $34.88 and to Johnson Controls' closing price of $35.60 on January 22, 2016.

. . . .

The present value of Tyco was adjusted for net debt to derive a range of implied fully diluted per share equity value for Tyco. Johnson Controls' financial advisors' analysis implied a value per share range for Tyco ordinary shares of approximately $31 to $43.

Johnson Controls' financial advisors compared the per share ranges for Tyco ordinary shares to Tyco's closing price of $30.59 on January 22, 2016 and to the $33.31 implied value, as of January 22, 2016, of the share consideration per share of Johnson Controls common stock proposed to be paid pursuant to the merger agreement at the implied transaction exchange ratio of 0.955 Tyco ordinary shares per share of Johnson Controls common stock (before giving effect to the Tyco share consolidation).

*Id.* at 129.

169.    Defendants disclose that the "unaudited pro forma combined financial in-

formation is presented to illustrate the estimated effects of the pending merger between Johnson Controls and Tyco and other activities contemplated by the merger agreement based on the historical financial position and results of operations of Johnson Controls and Tyco." Defendants further disclose that the Proposed Merger:

> will be accounted for as a reverse acquisition using the acquisition method of accounting in accordance with Accounting Standards Codification ("ASC") 805, "Business Combinations," ("ASC 805"). Johnson Controls will be the acquirer solely for financial accounting purposes. The unaudited pro forma combined financial information set forth below primarily gives effect to the following:
>
> • adjustments to conform the accounting policies of Tyco to those of Johnson Controls;
>
> • application of the acquisition method of accounting in connection with the merger;
>
> • repayment of certain existing debt facilities and new or assumed borrowings under new debt facilities in connection with the merger;
>
> • transaction costs in connection with the merger and related financing;
>
> • issuance of new equity in connection with the merger;
>
> • Tyco's planned 0.955 for 1 share consolidation in connection with the merger; and
>
> • Johnson Controls' planned spin-off of the Automotive Experience business.

The unaudited pro forma combined financial information follows at pages 243-45. *Id*. at 240-45.

170. Defendants disclose the dilution calculations used to determine earnings per share on a "pro forma" basis. *Id*. at 263-64.

171. Defendants disclose the following regarding the exchange ratio to be used in effecting the Inversion:

> (a) The number of Tyco ordinary shares being registered is based upon the product obtained by multiplying (i) 571,426,893 shares of common stock, par value $1.00 per share, of Johnson Controls, Inc. by (ii) the exchange ratio of one Tyco ordinary share for each share of Johnson Controls common stock. The number of shares of Johnson

Controls common stock set forth in clause (i) of the prior sentence equals (A) 648,370,147 shares of Johnson Controls common stock outstanding as of March 29, 2016, plus (B) 24,392,689 shares of Johnson Controls common stock subject to options and other equity-based awards of Johnson Controls outstanding as of March 29, 2016 or that may be granted after such date and prior to consummation of the merger, minus (C) 101,335,943 shares of Johnson Controls common stock expected to be exchanged for cash in the merger. The number of shares of Johnson Controls common stock set forth in clause (C) of the prior sentence equals (1) $3,863,939,529, which is the aggregate amount of cash to be paid by Tyco to Johnson Controls' shareholders in the merger, divided by (2) the average of the high and low sales prices of Johnson Controls common stock on the New York Stock Exchange on March 29, 2016 of $38.13.
*Id*. at second page.

(b) **Risks Related to the Merger**

***Because the market price of Tyco ordinary shares and shares of Johnson Controls common stock will fluctuate, Johnson Controls shareholders cannot be sure of the value of the consideration they will receive in the merger and Tyco shareholders cannot be sure of the value of their consolidated shares following the Tyco share consolidation.***

As a result of the merger, each share of Johnson Controls common stock (other than certain shares described in the merger agreement) will be converted into the right to receive, at the election of the holder of such share and subject to proration procedures set forth in the merger agreement, either (i) one ordinary share of the combined company or (ii) $34.88 in cash, without interest. Additionally, immediately prior to the merger, Tyco shareholders will receive 0.955 ordinary shares of Tyco, which will become ordinary shares of the combined company in the merger, for each Tyco ordinary share they hold. As of July 5, 2016, and assuming that each ordinary share of the combined company will have a value equal to the closing price of a share of Johnson Controls common stock on the New York Stock Exchange on such date, the implied value of the 0.955 shares of the combined company to Tyco shareholders was approximately $40.86.

The exact value of the per share merger consideration to be received by the Johnson Controls shareholders will depend in part on the price per share of Tyco ordinary shares at the closing of the merger, and the value of the 0.955 of a share of the combined company to be received by the Tyco shareholders will depend in part on the price per

share of Johnson Controls common stock at the closing of the merger. These prices will not be known at the time of the Johnson Controls special meeting or the Tyco EGM and may be greater than, the same as or less than the current prices at the time of the Johnson Controls special meeting or the Tyco EGM. The market prices of Johnson Controls common stock and Tyco ordinary shares are subject to general price fluctuations in the market for publicly traded equity securities and have experienced volatility in the past. Stock price changes may result from a variety of factors, including general market and economic conditions, changes in the respective businesses, operations and prospects of Johnson Controls and Tyco, and an evolving regulatory landscape. Market assessments of the benefits of the merger and the likelihood that the merger will be consummated, as well as general and industry specific market and economic conditions, may also impact market prices of Johnson Controls common stock and Tyco ordinary shares. Many of these factors are beyond Johnson Controls' and Tyco's control. You should obtain current market price quotations for Johnson Controls common stock and for Tyco ordinary shares; but as indicated above, the prices at the effective time of the merger may be greater than, the same as or less than such price quotations.

***Because the exchange ratio and the share consolidation ratio are fixed, the number of ordinary shares of the combined company to be received by holders of Johnson Controls common stock in the merger, and the number of combined company ordinary shares to be received by holders of Tyco ordinary shares in the Tyco share consolidation, will not change between now and the time the merger is consummated to reflect changes in the trading prices of Johnson Controls common stock or Tyco ordinary shares, share repurchases or other factors.***

The exact value of the merger consideration to be received by the Johnson Controls shareholders and the exact value of the combined company shares to be received by the Tyco shareholders will depend in part on the prices per share of Johnson Controls common stock and/or Tyco ordinary shares at the closing of the merger. The merger agreement does not provide for any adjustment to the exchange ratio or the share consolidation ratio as a result of changes in the trading prices of Johnson Controls common stock or Tyco ordinary shares or for any other reason.

In addition, prior to the closing of the merger, Johnson Controls expects to repurchase approximately $500 million in shares of its common stock prior to the effective time of the merger pursuant to its

previously announced share repurchase program. However, the exchange ratio and the share consolidation ratio are fixed and will not be adjusted prior to consummation of the merger to account for the share repurchases or other changes in the number of outstanding shares of Johnson Controls common stock or Tyco ordinary shares. As a result, changes in the number of outstanding shares of Johnson Controls common stock will reduce the proportion of the outstanding combined company ordinary shares held by either the former Johnson Controls shareholders (in the event of a decrease in the number of outstanding shares of Johnson Controls common stock) or the former Tyco shareholders (in the event of an increase in the number of outstanding shares of Johnson Controls common stock) immediately after the consummation of the merger and may affect the value of the combined company ordinary shares that Johnson Controls shareholders and Tyco shareholders will receive as a result of the share consolidation and the merger.

*Id*. at 42-43.

(c)     . . . During those discussions, they reviewed different methodologies for determining the exchange ratio. Johnson Controls presented written materials that included a range of premiums to the Tyco shareholders of between 10% and 15% based on the "spot" closing prices of Johnson Controls common stock and Tyco ordinary shares. Based on the trading prices of the shares as of November 23, 2015, the range of premiums would have resulted in an exchange ratio of between 0.85 to 0.88 of a Johnson Controls share for each Tyco share. No exchange ratio was proposed or agreed at that time.

Throughout the negotiations between Johnson Controls and Tyco described in this section of the joint proxy statement/prospectus, the parties discussed the transaction in terms of an exchange ratio of the number of shares of Johnson Controls common stock for each Tyco ordinary share. The parties ultimately agreed to a transaction structure, where each share of Johnson Controls common stock could elect to receive one ordinary share of the combined company and where the Tyco ordinary shares would be converted into a different number of shares of the combined company through a share consolidation. The exchange ratio being discussed between the parties is therefore equivalent to the Tyco share consolidation ratio.

. . . .

On December 8, 2015, Mr. Guyett and representatives of Centerview met with Mr. Armstrong and representatives of Lazard to discuss key terms of the proposed combination. Among other items, Lazard pre-

sented Tyco's view of potential synergies and the value creation opportunities from the combination for both companies if the exchange ratio were set to provide the Tyco shareholders with a premium of 20% based on the volume weighted average price of a share of Johnson Controls common stock and a Tyco ordinary share for the 30 trading days ending prior to the date of the merger agreement. Based on the trading prices of the shares as of December 7, 2015, such a premium would result in an exchange ratio of 0.96 of a Johnson Controls share for each Tyco share. . . . . Additionally, the parties agreed to recommend to their respective boards of directors and Chief Executive Officers a narrowed range of expected premiums to the Tyco shareholders of 15% to 17.5% using the volume weighted average price of a share of Johnson Controls common stock and a Tyco ordinary share for the 30 trading days ending prior to the date of the merger agreement. Based on the volume weighted average price of a share of Johnson Controls common stock and a Tyco ordinary share for the 30 trading days ending December 7, 2015, such a premium would result in an exchange ratio of 0.92 to 0.94 of a Johnson Controls share for each Tyco share. The parties further discussed that this exchange ratio assumed that each share of Johnson Controls common stock would be equal to one share of the combined company, but that the parties desired for Johnson Controls shareholders to receive cash in lieu of a portion of its share of the combined company and, therefore, the parties would need to agree on the amount of cash that each Johnson Controls share could receive and the total cap on the cash that would be paid by Tyco to the Johnson Controls shareholders.

. . . .

On December 10, 2015, the Johnson Controls board of directors held a telephonic board meeting. Members of Johnson Controls management and representatives of Centerview and Wachtell Lipton also attended the meeting. At the meeting, members of Johnson Controls management and its advisors updated the board on the status of discussions with Tyco and its advisors, including Tyco's proposed methodology for calculating the exchange ratio. They also discussed the parties' respective calculation of potential synergies and other value creation opportunities from the combination. Johnson Controls management then discussed with the board other terms of the proposed transaction, including transaction structure. . . . .

On December 11, 2015 . . . Messrs. Molinaroli and Guyett held a telephone call with Messrs. Oliver and Armstrong to discuss certain key terms of the potential business combination. Among other items, Messrs. Molinaroli and Guyett proposed that the parties proceed on

71

the basis of an exchange ratio of between 0.92 and 0.93 of a Johnson Controls share for each Tyco share, which was at the lower end of the range of exchange ratios previously discussed on December 8, 2015. Based on the volume weighted average price of a share of Johnson Controls common stock and a Tyco ordinary share for the 30 trading days ended December 9, 2015, this range of exchange ratios represented a premium to the Tyco shareholders of approximately 15% to 16%. Johnson Controls' proposal on the exchange ratio was also based on the assumption that each share of Johnson Controls common stock would be equal to one share of the combined company. However, the exchange ratio would be adjusted to reflect that Johnson Controls shareholders would have a right to elect to receive cash in lieu of shares of the combined company, and that the cash and stock elections would be prorated to ensure that a fixed amount of cash would be paid by Tyco to the Johnson Controls shareholders. . . . .

. . . .

On December 16, 2015, Wachtell Lipton, on behalf of Johnson Controls, sent to Simpson Thacher, on behalf of Tyco, a draft merger agreement and an accompanying term sheet summarizing its key terms. The draft agreement provided that the combination of Johnson Controls and Tyco would be structured as a "reverse merger," in which Tyco would be the parent entity of the combined company and Johnson Controls would be merged with a wholly owned subsidiary of Tyco. In the merger, each outstanding share of Johnson Controls common stock would be converted into the right to receive, at the election of such holder, either one share of the combined company or a fixed amount of cash, subject to proration so that the aggregate amount of cash paid by Tyco to the Johnson Controls shareholders would be fixed. The draft merger agreement also contemplated that, immediately prior to the merger, Tyco would effect a share consolidation that would reflect the exchange ratio to be agreed between the parties. . . . .

On December 18, 2015, the Tyco M&A Committee held an in-person meeting. Members of Tyco management and representatives of Lazard and Simpson Thacher also attended. . . . . Mr. Armstrong and representatives of Lazard then reported on recent discussions with Johnson Controls management and reviewed the current proposals from Tyco and Johnson Controls relating to, among other matters, the exchange ratio, . . . noting that the midpoint of the range of exchange ratios had increased since the time of Tyco's December board meeting.. . . . .

On December 19, 2015, . . . . representatives of Lazard delivered Tyco's revised proposal on the exchange ratio to Mr. Guyett. Tyco proposed an exchange ratio of 0.94 of a Johnson Controls share for each Tyco share. Based on the volume weighted average price of a share of Johnson Controls common stock and a Tyco ordinary share for the 30 trading days ending on December 18, 2015, this exchange ratio reflected a premium of approximately 17% to the Tyco shareholders. . . . .

On December 19, 2015, the Johnson Controls board of directors held a telephonic meeting. Members of Johnson Controls management and representatives of Centerview and Wachtell Lipton also attended the meeting. At the meeting, members of Johnson Controls management informed the board of Tyco's revised proposal. After discussion, the Johnson Controls board discussed with management and its advisors different exchange ratios. . . . .

. . . .

On January 3 and 4, 2016, Mr. Joerres and Mr. Breen spoke by telephone. During their conversations, Mr. Joerres proposed, on behalf of Johnson Controls, an exchange ratio of 0.935 of a Johnson Controls share for each Tyco share. Based on the volume weighted average price of a share of Johnson Controls common stock and a Tyco ordinary share for the 30 trading days ending on December 31, 2015, this exchange ratio reflected a premium of approximately 18% to the Tyco shareholders. . . . .

On January 4, 2016, the Johnson Controls board of directors held a telephonic meeting. Members of Johnson Controls management and representatives of Centerview and Wachtell Lipton also attended the meeting. At the meeting, members of Johnson Controls management updated the board on the status of discussions with Tyco, . . . Mr. Joerres then updated the Johnson Controls board on his conversations with Mr. Breen, including the proposal that he delivered regarding the exchange ratio . . . Following this update, the Johnson Controls board discussed in detail the potential options to move forward with the transaction.

On January 6, 2016, the Tyco M&A Committee held a telephonic meeting. . . . . The Tyco M&A Committee, with the support of the other directors participating in the meeting, agreed that Mr. Breen should continue to engage with Mr. Joerres with respect to the exchange ratio . . . .

On January 7, 2016, members of Johnson Controls management,

members of Tyco management and their respective legal and financial advisors met to discuss the proposed transaction structure and financing for the transaction. During that meeting, members of Tyco management reviewed Tyco's revised proposal on certain transaction terms, including that it was proposing an exchange ratio of 0.945 of a Johnson Controls share for each Tyco share. Tyco noted that it was proposing an increase in the exchange ratio to reflect that the price of Johnson Controls common stock had declined relative to the price of Tyco ordinary shares since their last discussion of the exchange ratio. Based on the volume weighted average price of a share of Johnson Controls common stock and a Tyco ordinary share for the 30 trading days ended January 6, 2016, the exchange ratio represented an approximately 19% premium to the Tyco shareholders. As previously discussed between the parties, this exchange ratio assumed that each share of Johnson Controls common stock would be equal to one share of the combined company, but the parties desired for Johnson Controls shareholders to receive cash in lieu of a portion of its share of the combined company and, therefore, the parties would need to agree on the amount of cash that each Johnson Controls share could receive and the total cap on the cash that would be paid by Tyco to the Johnson Controls shareholders. Tyco proposed that approximately $3.9 billion in cash would be paid to the Johnson Controls shareholders in the aggregate in the merger and that the exchange ratio would therefore be adjusted to reflect this cash. . . . .

. . . .

On January 14, 2016, the Tyco M&A Committee held a telephonic meeting. Certain other members of the Tyco board of directors, members of Tyco management and representatives of Simpson Thacher and Lazard also attended the meeting. . . . . Tyco management then reviewed the relative stock price performance of Johnson Controls and Tyco, noting that Johnson Controls' stock price had declined relative to the price of Tyco's ordinary shares, and the Tyco M&A Committee supported the position that the exchange ratio should be increased in response to the change in the stock prices. . . . .

Also on January 14, 2016, the Johnson Controls board of directors held a telephonic meeting. Members of Johnson Controls management and representatives of Centerview and Wachtell Lipton also attended the meeting. At the meeting, Johnson Controls management and its advisors provided an update on the status of discussions with Tyco, including the open issues on exchange ratio. . . The Johnson Controls board also reviewed the changes in Johnson Controls' and Tyco's share prices since the December 10, 2015 board meeting and

the impact of such changes on the premium to the Tyco shareholders using different exchange ratios. In particular, members of Johnson Controls management and representatives of Centerview noted that, given the change in the stock prices of Johnson Controls common stock and Tyco ordinary shares, the exchange ratios that had been previously discussed between the parties would result in a much smaller premium to the Tyco shareholders. They informed the Johnson Controls board that, as a result, Tyco and its financial advisors had noted that Tyco would require an increase in the exchange ratio.

. . . .

On January 17, 2016, Mr. Guyett, Mr. Armstrong and representatives of Centerview and Lazard held a telephone meeting to discuss certain outstanding items in the draft merger agreement. During those discussions, Mr. Armstrong and Lazard noted that, given that the price of Johnson Controls common stock had declined relative to the price of Tyco ordinary shares, the exchange ratio that had been previously discussed between the parties would result in a smaller premium to the Tyco shareholders. They therefore requested an increase in the exchange ratio to 0.98 to 0.99 of a Johnson Controls share for each Tyco share. Based on the volume weighted average price of a share of Johnson Controls common stock and a Tyco ordinary share for the 30 trading days ending on January 15, 2016, this exchange ratio reflected a premium of approximately 20% to 22% to the Tyco shareholders. Tyco also proposed that the cash consideration that a Johnson Controls shareholder would receive from Tyco if such shareholder made a cash election would be calculated using the volume weighted average price of a share of Johnson Controls common stock for the 5 trading days prior to the signing of the merger agreement.

. . . .

On January 19, 2016, the Tyco M&A Committee held a telephonic meeting. Members of Tyco management and representatives of Lazard and Simpson Thacher also attended the meeting. At the meeting, Mr. Oliver advised that representatives of Lazard had communicated Tyco's proposal to increase the exchange ratio to representatives of Centerview. . . . . After discussion of the proposed transaction premium, exchange ratio and the synergies analysis, among other matters, the Tyco M&A Committee determined that Tyco management and Mr. Breen should continue discussions with Johnson Controls.

. . . .

On January 20, 2016, members of Johnson Controls management, in-

cluding Mr. Guyett, members of Tyco management, including Mr. Armstrong, and representatives of Centerview and Lazard had a discussion to resolve certain outstanding items in the draft merger agreement. After discussion and negotiation, members of Johnson Controls management and members of Tyco management agreed to continue discussion on the basis of an exchange ratio of 0.955 of a share of the combined company for each Tyco share. Assuming Tyco effected a share consolidation so that each share of the combined company had a value equal to one share of Johnson Controls common stock and based on the volume weighted average price of a share of Johnson Controls common stock and a Tyco ordinary share for the 30 trading days ending on January 19, 2016, this exchange ratio represented a premium of approximately 14% to the Tyco shareholders. The parties also discussed the cash/share election and proration mechanics that would exist for the Johnson Controls shareholders, which would permit Johnson Controls shareholders to receive, at their option and in lieu of one share of the combined company for each of their shares of Johnson Controls common stock, a fixed amount of cash. The parties agreed to proceed on the basis that this fixed amount of cash would be equal to the five-day volume weighted average price of a Johnson Controls common share prior to the signing of the merger agreement. The parties also agreed that the cash and share elections would be subject to proration to ensure that approximately $3.864 billion would be paid to the Johnson Controls shareholders in the aggregate. . . . .

. . . .

On January 21, 2016, members of the Tyco board of directors, members of Tyco management and representatives of Lazard and Simpson Thacher held a telephone call. Tyco management and its advisors provided an update on the status of discussions with Johnson Controls, including with respect to the exchange ratio and the relative value of the exchange ratio based on the stock price performance of Johnson Controls and Tyco during the period of negotiations . . .

*Id.* at 101-109.

(d)     The exchange ratio takes into account the effects of the Tyco share consolidation contemplated by the merger agreement whereby, immediately prior to the merger, every issued and unissued ordinary share of Tyco will be consolidated into 0.955 of a share of Tyco. After consummation of the merger, Johnson Controls shareholders and Tyco shareholders are expected to own approximately 56% and 44%, respectively, of the issued and outstanding ordinary shares of

the combined company.

*Id.* at 246.

(e) ***Estimated Merger Consideration***

The total estimated merger consideration is calculated as follows (in millions, except for share data):

| | |
|---|---|
| Number of Tyco ordinary shares outstanding as of June 27, 2016 | 426,181,054 |
| Tyco share consolidation ratio | 0.955 |
| Tyco ordinary shares outstanding following the share consolidation and immediately prior to the merger(1) | 407,002,906 |
| Johnson Controls share price as of June 27, 2016 | $41.33 |
| Fair value of equity portion of the merger consideration | $16,821 |
| Fair value of Tyco equity awards(2) | $224 |
| **Total estimated merger consideration** | **$ 17,045** |

*Id.* at 249.

(f) **Total shareholders' equity**

Represents the elimination of Tyco capital in excess of par value, retained earnings, and accumulated other comprehensive loss, as well as the following adjustments to reflect the capital structure of the combined company:

a.  The reduction of common stock by $713 million represents the adjustment to the aggregate historical par value of Johnson Controls and Tyco of $722 million, to reflect 935,933,107 shares outstanding at a total par value of $9 million ($0.01 per share) calculated as follows:

. . . .

| | |
|---|---|
| Johnson Controls shares outstanding (as of June 27, 2016) | 639,708,284 |
| Cash contributed by Tyco used to purchase shares of Johnson Controls | $3,863,939,529 |
| Johnson Controls per share consideration | $ 34.88 |
| **Reduction in shares due to cash consideration paid by Tyco** | **(110,778,083)** |
| **Adjusted Johnson Controls shares outstanding (1:1 exchange ratio)** | **528,930,201** |
| **Pro-forma shares outstanding** | **935,933,107** |

*Id.* at 258.

(g) In its "fairness opinion", Barclays "understands":

We understand that Johnson Controls, Inc., a Wisconsin corporation (the "Company"), intends to enter into a transaction (the "Proposed

Transaction") with Tyco International plc, a Republic of Ireland public limited company (the "Counterparty"), pursuant to which . . . (ii) each of the shares of common stock of the Company, par value $1.00 per share (the "Company Common Stock"), issued and outstanding will be converted into the right to receive . . . : (a) $34.88 in cash per share (the "Cash Consideration") or (b) one common share (the "Exchange Ratio") of the Counterparty (the "Counterparty Common Stock") . . . .The Exchange Ratio was calculated based on an assumption that the Parent Share Consolidation (as defined in the Agreement), pursuant to which each share of Counterparty Common Stock will be converted into 0.9550 share of Counterparty Common Stock, will have been effectuated prior to the effective time of the Proposed Transaction in accordance with the Agreement. We understand it is anticipated that, immediately following the consummation of the Proposed Transaction, holders of Company Common Stock will own approximately fifty-six percent of the outstanding Counterparty Common Stock.

*Id.* at D-1.

172.    In summarizing JCI's financial advisors' financial analyses, Defendants disclosed the following regarding the exchange ratio:

Pursuant to the merger agreement, each share of Johnson Controls common stock issued and outstanding immediately prior to the effective time of the proposed transaction (other than excluded shares) will be converted into the right to receive, at the election of its holder, either (i) one ordinary share of the combined company or (ii) $34.88 in cash, without interest. For the purposes of rendering their opinions, Centerview and Barclays assumed that the Tyco share consolidation, pursuant to which each issued and unissued Tyco ordinary share will be converted into 0.955 Tyco shares, which will become ordinary shares of the combined company, will have been effectuated prior to the effective time of the proposed transaction in accordance with the merger agreement. In performing their analyses and in the summaries of their financial analyses set forth below, Johnson Controls' financial advisors refer to the exchange ratio of 0.955, the exchange ratio in effect prior to the Tyco share consolidation, as the reference exchange ratio for the proposed transaction.

*Id*. at 124.

Johnson Controls' financial advisors compared these per share ranges for Tyco ordinary shares to Tyco's closing price of $30.59 on January 22, 2016 and to the $33.31 implied value, as of January 22, 2016, of the share consideration per share of Johnson Controls common stock proposed to be paid

pursuant to the merger agreement at the implied transaction exchange ratio of 0.955 Tyco ordinary shares per share of Johnson Controls common stock (before giving effect to the Tyco share consolidation).

*Id.* at 126; *see also id.* at 128-29.

173.    In connection with JCI's financial advisors' "relative value analysis," Defendants disclose various ranges of exchange ratios. *Id.* at 131.

174.    Tyco's financial advisors' financial analyses also were based on the exchange ratio. *Id.* at 145-46.

175.    The exchange ratio is among the factors considered by the Tyco Board of Directors in determining to recommend the Proposed Merger to Tyco shareholders:

> The fact that the 0.955x exchange ratio represented a premium of approximately 14% to Tyco shareholders, assuming that each share of the combined company has a value equal to one share of Johnson Controls common stock and based on the volume weighted average price of a share of Johnson Controls common stock and a Tyco ordinary share for the 30 trading days ending on January 19, 2016.
>
> . . . .
>
> The fact that the exchange ratio for the share consideration is fixed and will not be increased to compensate Johnson Controls shareholders in the event of a decline in the share price of Tyco's ordinary shares prior to the effective time of the merger, and that the terms of the merger agreement do not include termination rights for Johnson Controls triggered in the event of an increase in the value of Johnson Controls relative to the value of Tyco;
>
> . . . .
>
> The fact that the exchange ratio for the share consideration is fixed and will not be increased to compensate Johnson Controls shareholders in the event of a decline in the share price of Tyco's ordinary shares prior to the effective time of the merger, and that the terms of the merger agreement do not include termination rights for Johnson Controls triggered in the event of an increase in the value of Johnson Controls relative to the value of Tyco;
>
> . . . .
>
> The fact that the exchange ratio for the share consideration is fixed and will not be reduced in the event of an increase in the share price of Tyco ordinary shares prior to the effective time of the merger, and that the terms of the merger agreement do not include termination rights for Tyco triggered in the event of a decrease in the value of Johnson Controls relative to the

value of Tyco;

*Id.* at 132-33, 135.

176.   Defendants disclosed the following risks in connection with the possibility that an IRS challenge to the JCI Defendants' allocation of JCplc's equity interest between JCI public shareholders and Tyco shareholders may be successful:

> If the Section 7874 ownership percentage of the Johnson Controls share-holders in the combined company after the merger is less than 80% but at least 60% (the "60% ownership test"), and the substantial business activities test is not met, Johnson Controls and its U.S. affiliates (including the U.S. affiliates historically owned by Tyco) may, in some circumstances, be subject to certain adverse U.S. federal income tax rules (which, among other things, could limit their ability to utilize certain U.S. tax attributes to offset U.S. taxable income or gain resulting from certain transactions).

> Based on the terms of the merger, the rules for determining share owner-ship under Section 7874 and certain factual assumptions, Johnson Controls shareholders are expected to own (within the meaning of Section 7874) less than 60% (by both vote and value) of the ordinary shares of the combined company after the merger by reason of holding shares of Johnson Controls common stock. Therefore, under current law, it is expected that the combined company should not be treated as a U.S. corporation for U.S. federal tax purposes and that Section 7874 should otherwise not apply to the combined company or its affiliates as a result of the merger.

*Id.* at 54.

> In addition, on April 4, 2016, the U.S. Treasury Department (the "U.S. Treasury") and the IRS issued temporary Treasury regulations under Section 7874 (the "Temporary Section 7874 Regulations"), which, among other things, require certain adjustments that generally increase, for purposes of the Section 7874 ownership tests, the percentage of the stock of a foreign acquiring corporation deemed owned (within the meaning of Section 7874) by the former shareholders of an acquired U.S. corporation by reason of holding stock in such U.S. corporation. For example, these temporary regulations disregard, for purposes of determining this ownership percentage, (1) any "non-ordinary course distributions" (within the meaning of the temporary regulations) made by the acquired U.S. corporation (such as Johnson Controls) during the 36 months preceding the acquisition, including certain dividends and share repurchases, (2) potentially any cash consideration received by the shareholders of such U.S. corporation in the acquisition to the extent such cash is, directly or indirectly, provided by the U.S. corporation, as well as (3) certain stock of the foreign acquiring corporation that was is-

sued as consideration in a prior acquisition of another U.S. corporation (or U.S. partnership) during the 36 months preceding the signing date of a binding contract for the acquisition being tested. Taking into account the effect of these temporary regulations, it is currently expected that the Section 7874 ownership percentage of the Johnson Controls shareholders in the combined company will be less than 60%. However, these temporary regulations are new and complex and there is no guidance regarding their application. Accordingly, there can be no assurance that the Section 7874 ownership percentage of the Johnson Controls shareholders will be less than 60% as determined under the temporary regulations, or that the IRS will not otherwise successfully assert that either the 80% ownership test or the 60% ownership test were met after the merger.

. . . .

If the 60% ownership test were met, several adverse U.S. federal income tax rules could apply to the U.S. affiliates of the combined company. In particular, in such case, Section 7874 could limit the ability of such U.S. affiliates to utilize certain U.S. tax attributes (including net operating losses and certain tax credits) to offset any taxable income or gain resulting from certain transactions, including any transfers or licenses of property to a foreign related person during the 10-year period following the merger. The Temporary Section 7874 Regulations generally expand the scope of these rules. If the 60% ownership test were met after the merger, such current and future limitations would apply to Johnson Controls and its U.S. affiliates (including the U.S.affiliates historically owned by Tyco), and their application could limit their ability to utilize such U.S. tax attributes against any income or gain recognized in connection with certain currently contemplated transactions (including certain transactions contemplated to be undertaken in connection with the contemplated spin-off). In such case, the application of such rules could result in significant additional U.S. tax liability. In addition, the Temporary Section 7874 Regulations (and certain related temporary regulations issued under other provisions of the Code) include new rules that would apply if the 60% ownership test were met, which, in such situation, may limit the combined company's ability to restructure or access cash earned by certain of its non- U.S. subsidiaries, in each case, without incurring substantial U.S. tax liabilities. Moreover, in such case, Section 4985 of the Code and rules related thereto would impose an excise tax on the value of certain stock compensation held directly or indirectly by certain "disqualified individuals" at a rate equal to 15%. The merger agreement permits Johnson Controls and Tyco to enter into agreements with their directors and executive officers providing for the reimbursement of any taxes imposed under Section 4985 of the Code in connection with the merger. See *The Merger—Interests of Johnson Controls' Directors and*

*Executive Officers in the Merger—Other Compensation Matters*."

*Id.* at 55-56.

Following the acquisition of a U.S. corporation by a non-U.S. corporation, Section 7874 can limit the ability of the acquired U.S. corporation and its U.S. affiliates to utilize certain U.S. tax attributes (including net operating losses and certain tax credits) to offset U.S. taxable income resulting from certain transactions. These limitations will potentially apply if (i) the non-U.S. corporation acquires, directly or indirectly, substantially all of the properties held, directly or indirectly, by the U.S. corporation (including through the direct or indirect acquisition of all of the outstanding shares of the U.S. corporation), (ii) after the acquisition, the non-U.S. corporation's "expanded affiliated group" does not have "substantial business" activities in the non-U.S. corporation's country of organization or incorporation and tax residence relative to the expanded affiliated group's worldwide activities (as determined under the Treasury regulations), and (iii) after the acquisition, the former shareholders of the acquired U.S. corporation hold less than 80% but at least 60% (by either vote or value) of the shares of the non-U.S. acquiring corporation by reason of holding shares in the U.S. acquired corporation (taking into account the receipt of the non-U.S. corporation's shares in exchange for the U.S. corporation's shares) as determined for purposes of the 60% ownership test. If each of these conditions is met, then the taxable income of the U.S. corporation (and any U.S. person related to the U.S. corporation) for any given year, within a period beginning on the first date the U.S. corporation's properties were acquired directly or indirectly by the non-U.S. acquiring corporation and ending 10 years after the last date the U.S. corporation's properties were acquired, will be no less than that person's "inversion gain" for that taxable year. A person's inversion gain includes gain from the transfer of shares or any other property (other than property held for sale to customers) and income from the license of any property that is either transferred or licensed as part of the acquisition or after the acquisition to a non-U.S. related person. In addition, the Temporary Section 7874 Regulations (and certain related temporary regulations issued under other provisions of the Code) broaden the definition of "inversion gain" to, among other things, include income or gain recognized by reason of certain transfers of property by certain foreign affiliates, and limit the ability to restructure the non-U.S. members of the U.S. corporation's group or access cash earned by the U.S. corporation's non-U.S. subsidiaries, in each case without incurring substantial U.S. tax liabilities.

Based on the terms of the merger, the rules for determining share ownership under Section 7874 and the Treasury regulations promulgated thereunder (including the Temporary Section 7874 Regulations) and based upon certain factual assumptions, Johnson Controls and Tyco currently expect

that the Section 7874 ownership percentage of the Johnson Controls share-holders in the combined company should be less than 60% and accordingly the limitations and other rules described above are not expected to apply to Johnson Controls and its U.S. affiliates (including the U.S. affiliates histor-ically owned by Tyco) after the merger. However, whether the 60% owner-ship test has been satisfied must be finally determined at consummation of the merger, by which time there could be adverse changes to the relevant rules and relevant facts and circumstances. In addition, as discussed above under "—*Tax Residence of the Combined Company for U.S. Federal Tax Purposes*," the rules for determining ownership under Section 7874 are complex, unclear and the subject of recent and ongoing regulatory change and there can be no assurance that the IRS would not assert that the 60% ownership test is met with respect to the merger and that accordingly the foregoing limitations and rules would apply or that such an assertion would not be sustained by a court.

If the IRS were to successfully assert that the 60% ownership test has been met, the ability of Johnson Controls and its U.S. affiliates (including the U.S. affiliates historically owned by Tyco) to utilize certain U.S. tax attrib-utes against income or gain recognized pursuant to certain transactions, in-cluding certain transactions expected to be undertaken in connection with the contemplated spin-off, may be limited. In such case, Johnson Controls and its U.S. affiliates (including the U.S. affiliates historically owned by Tyco) could be subject to substantial additional U.S. federal income tax lia-bility. In addition, the ability of the combined company to restructure or ac-cess cash earned by its non-U.S. subsidiaries without significant U.S. tax li-ability may be limited.

*Id.* at 222-23; *see also* ¶¶ 97-102 *supra*.

177. Defendants disclosed the following regarding the source of the funds to buy

back JCI shareholders' JCI shares to reduce their equity interest in JCplc:

In connection with the merger, Tyco International Holding S.à r.l., an indirect wholly owned subsidiary of Tyco (the "Borrower"), is expected to enter into a new senior unsecured term loan facility (the "Tyco term loan facility") in the amount of $4.0 billion with Citibank, N.A., as administrative agent, to finance the cash consideration for the merger and fees, expenses and costs incurred in connection with the merger. Neither Tyco, nor any other direct or indirect parent of the Borrower, will be a borrower under, or guarantor of, the Tyco term loan facility. The Tyco term loan facility is being provided to and arranged for the Borrower on the basis of its properties, assets and credit only, and will not be guaranteed, or otherwise supported, directly or indirectly, by the legacy Johnson Controls

entities, properties, assets or credit.

S-4 p. 38.

> In connection with the merger, the Borrower, is expected to enter into the Tyco term loan facility in the amount of $4.0 billion with Citibank, N.A., as administrative agent, to finance the cash consideration for the merger and fees, expenses and costs incurred in connection with the merger. Neither Tyco, nor any other direct or indirect parent of the Borrower, will be a borrower under, or guarantor of, the Tyco term loan facility. The Tyco term loan facility is being provided to and arranged for the Borrower on the basis of its properties, assets and credit only, and will not be guaranteed, or otherwise supported, directly or indirectly, by the legacy Johnson Controls entities, properties, assets or credit.

> The credit agreement in respect of the Tyco term loan facility was executed on March 10, 2016. The closing of the Tyco term loan facility remains subject to the satisfaction or waiver of customary conditions contained therein, including the consummation of the merger in accordance with the terms of the merger agreement.

> . . . .

> The Tyco term loan facility will contain representations and warranties, affirmative and negative covenants, including a financial covenant, and events of default, that Tyco believes are usual and customary for credit agreements of this type. Tyco expects that such representations and warranties, covenants and events of default will be substantially similar to the representations and warranties, covenants and events of default under its existing senior unsecured revolving credit facility, except that the representations and warranties, covenants and events of default in the new Tyco credit facility will apply only to the Borrower and its subsidiaries and not to Tyco International plc, the direct or other indirect parent companies of the Borrower or any other subsidiaries of each of them (including Johnson Controls and its subsidiaries).

S-4 p. 177.

> Tyco has agreed to use its reasonable best efforts to take, or cause to be taken, all appropriate action, and to do, or cause to be done, all things necessary, proper or advisable to cause the debt financing contemplated by the merger agreement to be consummated. Without the prior written consent of Johnson Controls (not to be unreasonably withheld, conditioned or delayed), Tyco will not, and will cause TIFSA and the borrower not to, consent or agree to any material amendment or modification to, or any waiver of any material provision under, or any replacement of, the debt commitment letters or the definitive agreements relating to the debt

84

financing contemplated by the merger agreement, or enter into any material agreement or arrangement with respect to such debt financing (including in respect of any alternative financing) other than definitive agreements relating to the debt financing as contemplated by (and substantially upon the express terms set forth in) the debt commitment letters, with certain exceptions.

At Johnson Controls' reasonable request from time to time, Tyco will inform Johnson Controls in reasonable detail of the status of its efforts to arrange the debt financing contemplated by the merger agreement. Subject to the terms and conditions set forth in the immediately succeeding paragraph, Johnson Controls will use its reasonable best efforts to provide to Tyco such cooperation and assistance as may be reasonably requested by Tyco that is customary in connection with the arranging, obtaining and syndication of the debt financing contemplated by the merger agreement. Notwithstanding the foregoing, neither Johnson Controls nor any of its subsidiaries shall be required to (i) deliver any financial or other information with respect to Johnson Controls or any of its subsidiaries in connection with the debt financing contemplated by the merger agreement or (ii) cause the independent auditors of Johnson Controls to cooperate with Tyco or the Borrower in connection with the debt financing contemplated by the merger agreement.

Tyco has agreed that the definitive agreements relating to the debt financing contemplated by the merger agreement will not (i) require Johnson Controls or any of its subsidiaries to guarantee, grant liens on their respective properties or assets or otherwise provide, directly or indirectly, credit or collateral support for such debt financing, whether prior to or after the effective time of the merger or (ii) contain any representations, warranties, covenants or events of default, or any other terms or conditions, in each case that would apply to Johnson Controls, any of its subsidiaries or any of their respective properties or assets, whether prior to or after the effective time of the merger. Tyco shall use its reasonable best efforts to cause its financing sources to confirm in writing (which confirmation may be contained in the definitive agreements relating to the debt financing contemplated by the merger agreement) that the debt financing contemplated by the merger agreement is being provided to Borrower on the basis of its properties, assets and credit only.

S-4 p. 200; *see also Id.* at A-42 – A-43.

178. The statements and representations alleged in ¶¶ 99, 162-77 are false and misleading for failing to disclose the following material facts:

(a) These financial data and the other matters recited in said paragraphs were not the only factors in determining the allocation of JCplc's equity between JCI and Tyco shareholders but that factors wholly unrelated to such financial and other data improperly influenced the determination of such allocation;

(b) The extent to which JCI shareholders' equity interest in JCplc is to be diluted because of the need to limit JCI shareholders' equity interest in JCplc to under 60% to avoid the Inversion's adverse tax consequences to the Defendants if over 60%, including the Individual Defendants' exposure to the § 4985 excise tax and JCplc's exposure to § 7874's limits on an inverting corporation's use of certain tax attributes; and

(c) The financing ostensibly obtained by Tyco is for the purpose of diluting JCI shareholders' equity interest in JCplc for the benefit of JCplc and the Individual Defendants and is structured to purportedly comply with the highly formalistic IRS regulations to avoid the appearance of the monies for the buyback coming from JCI, which would cause the dilution scheme for the benefit of JCplc and the Individual Defendants to fail.

179. In so doing, given the extensive disclosures relating to these financial data and the other factors recited in said paragraphs, Defendants created the illusion that the allocation of JCplc's equity between JCI and Tyco shareholders was based solely on such data and factors.

180. Among the factors considered by the Board in determining to recommend the Proposed Merger to JCI shareholders that the Board deemed to be "negative" were, *inter alia*, the following fact:

The fact that, because the aggregate amount of cash consideration and the number of shares of the combined company to be received in respect of

each share of Johnson Controls common stock are fixed, they will not be increased in the event of an increase in the relative market price of Johnson Controls common stock as compared to the market price of Tyco ordinary shares prior to the closing;

*Id.* at 114.

181.   The Board considered several additional "negative" factors in determining to recommend the Proposed Merger to JCI shareholders. *Id.* at 114-15.

182.   The Board considered several  factors by the that supported its determination to approve the Proposed Merger "and the transactions contemplated by the merger agreement," including the Inversion. *Id.* at 111-14.

183.   The statements and representations alleged in the preceding three paragraphs are false and misleading because the need to limit JCI shareholders' equity interest in JCplc to under 60% to avoid the Inversion's adverse tax consequences to the JCI Defendants (including the Individual Defendants' exposure to the excise tax and JCplc's exposure to § 7874's limits on an inverting corporation's use of certain tax attributes and the Individual Defendants' exposure to the § 4985 excise tax) and the factors alleged at ¶ 143(a) are not among these "negative" or supportive factors.

## V.   ADDITIONAL MATERIAL OMISSIONS

184.   The S-4 purports to disclose differences between Wisconsin and Irish law but contains material omissions.

185.   The S-4 discloses the following:

The following is a summary comparison of certain differences between the rights of Johnson Controls shareholders under the WBCL, the Johnson Controls articles of incorporation and the Johnson Controls bylaws, on the one hand, and the rights that Johnson Controls shareholders will have as shareholders of the combined company under the Irish Companies Act and Tyco's memorandum and articles of association, which, subject to the amendments contemplated by the Tyco governing documents proposals and set forth on Annex B-1 and Annex B-2 to this joint proxy statement/prospectus, will become the memorandum and articles of association of the combined company, on the other hand. The discussion in

this section does not include a description of rights or obligations under the U.S. federal securities laws or NYSE listing requirements. Such rights and obligations generally apply equally to Johnson Controls common stock and Tyco ordinary shares, and therefore will apply equally to combined company ordinary shares.

S-4 p. 267.

186. The S-4 purports to disclose the "duties of directors" under the WBCL:

Under the WBCL, a director or officer, in discharging his or her duties to the corporation and determining what he or she believes is in the best interests of the corporation, may, in addition to considering the effects of any action on shareholders, consider:

- the effects of the action on employees, suppliers and customers of the corporation;

- the effects of the action on the communities in which the corporation operates; and

- any other factors that the director or officer considers pertinent.

*Id.* at 279.

187. The disclosures recited in the preceding two paragraphs are false and misleading because, *inter alia*:

(a) These disclosures omit the standards of conduct for directors that have developed through case law, which include the duties of loyalty, due care, fair dealing, and good faith.

(b) These disclosures omit all references to case law, which defines, and is indispensable to an understanding of, shareholders' rights and a corporation's and its officers' and directors' obligations to its shareholders.

(c) Under Wisconsin law, the fiduciary duties owed by officers and directors to their corporations extend to all shareholders of such corporations, and shareholders are able to enforce such duties in direct actions. The disclosures are silent regarding the extent to which such protections, to the extent that they exist under Irish law, are directly enforceable by shareholders and

88

extend liability to third parties for aiding and abetting a breach of fiduciary duty by a corporation's officers and directors.

## VI. THE INDIVIDUAL DEFENDANTS' FIDUCIARY RESPONSIBILITIES

### A. The Individual Defendants Have Interests that Differ from JCI Public Shareholders' Interests.

188. Defendants disclose that the Individual Defendants have interests that "are different from" JCI shareholders' interests:

> . . . the Johnson Controls board of directors considered the fact that Johnson Controls' directors and executive officers have interests in the merger that are different from, or in addition to, their interests as Johnson Controls shareholders. See "—*Interests of Johnson Controls' Directors and Executive Officers in the Merger.*"

S-4 p. 115.

189. These interests, in which JCI public shareholders do not share, include:

- JCI's executive officers are entitled to specified benefits under change in control employment agreements in the event of a qualifying termination of employment during the 24 months following the consummation of the merger;

- JCI has entered into the Amended and Restated Change of Control Employment Agreement, as amended, with its current Chief Executive Officer, Alex A. Molinaroli, which will become effective as of, and contingent upon the consummation of the merger;

- The terms and conditions of JCI's stock options, stock appreciation rights, restricted stock, restricted stock unit awards, and performance share unit awards (as converted) held by JCI's executive officers provide for full vesting upon a qualifying termination of employment in the 24 months following the consummation of the merger;

- Amounts held under JCI's deferred compensation plans will become payable, and, upon the consummation of the merger, each JCI executive officer who participated in a deferred compensation plan will be granted an award of restricted stock units, which will vest 36 months (30 months, in the case of Mr. Molinaroli) following the consummation of the merger, subject to the executive officer's continued employment and accelerated vesting upon an earlier qualifying termination;

- The merger agreement provides that six members of the Board prior to the

closing will serve on the board of directors of JCplc following the con-
summation of the merger; and

- JCI's directors and executive officers are entitled to continued indemnifica-
tion and insurance coverage under the merger.

*Id*. at 27-28, 151-61.

190. Certain of these interests include performance-based compensation, which
will be carried over into JCplc. *Id*. at 152.

191. Defendant Molinaroli will be entitled to significant severance compensa-
tion, which was adjusted in contemplation of the Proposed Merger. *Id*. at 154-55; *see ¶¶*
75-76 *supra*.

192. To the extent that any of these forms of compensation are based on, in
whole or in part, increases in JCplc revenues and earnings versus JCI's revenues and
earnings, and to the extent that the growth in earnings may be attributable to the realiza-
tion of the expected tax savings arising from the Inversion, JCI shareholders who are of-
ficers and directors who are entitled to such compensation will benefit directly from the
Inversion and the Inversion-Driven Costs that are to be borne by JCI public shareholders
and Minority Taxpaying JCI Shareholders, who will not share in such compensation.

193. It is a reasonable and plausible inference that JCI management and the
Board deem the prospect of such increased compensation attributable to the Inversion's
benefits to JCplc to substantially outweigh the Inversion-Driven Costs to such persons as
JCI shareholders.

194. Additionally, the disclosures in ¶¶ 188-89 are false and misleading for fail-
ing to disclose that section 6.13 of the Merger Agreement, the agreement to reimburse the
Individual Defendants if they become subject to the Excise Tax (S-4 p. 56), and the
agreement to limit JCI shareholders' equity interest in JCplc to protect the Individual De-
fendants from the Inversion's adverse tax consequences under IRC § 4985 constitute
"interests in the merger that are different from, or in addition to, their interests as Johnson

90

Case 2:16-cv-01093-PP   Filed 08/16/16   Page 93 of 130   Document 1

Controls shareholders."

**B. The Individual Defendants' Perception of Their Fiduciary Responsibilities and Corporate Governance.**

195.    The Board has adopted "Corporate Governance Guidelines" that, in the context of the facts alleged herein, inadequately address matters such as the Board's duties, director independence, director responsibilities, and Board structure and operation.

196.    The following are excerpts of the Board's "Corporate Governance Guidelines":

> All corporate authority resides with the Board as fiduciaries of the Company's shareholders, except for those matters reserved to the shareholders. The Board has retained oversight authority — defining and overseeing the implementation of and compliance with standards of accountability and monitoring the effectiveness of management policies and decisions in an effort to ensure that the Company is managed in such a way to achieve its objectives. The Board has delegated to management the authority to pursue the Company's objectives. Management, not the Board, is responsible for managing the Company.

Consistent with this division of authority, the Board in discharging its obligations under law shall, among other things:

Corporate Focus

- Confirm that processes are in place designed to maintain the integrity and ethical conduct of the Company, including the integrity of its financial statements, its compliance with law and ethics, and its relationships with shareholders, customers, employees, and the communities in which the Company operates

- . . . .

- Stay apprised of relations with shareholders

Management Focus

- Oversee and evaluate management's systems for internal control, financial reporting, and public disclosure

- . . . .

Board Focus

- Represent the shareholders in carrying out the Board's statutory role of overseeing management to assure that the Company serves the

long-term interests of its shareholders

- . . . .
- Establish corporate governance standards . . .

197. The nine-page "Corporate Governance Guidelines":

(a)     Contain a single reference to "fiduciary";

(b)     Contain no reference to "loyal" or "loyalty";

(c)     Contain a single reference to "conflict of interest," that being in connection with service on one or more other boards of directors.

198. The primary areas of "risk oversight" of the Corporate Governance Committee include risks and exposures relating to JCI's programs and policies relating to "corporate governance, director independence, conflicts of interest, ethics and compliance, and director candidate and succession planning."

199. The primary functions of the Board's Corporate Governance Committee include reviewing "potential conflicts of interest referred to the Corporate Governance Committee involving us, our directors or our executive officers."

200. The "Corporate Governance Guidelines" do not identify the conflicting interests described herein or the potential for such conflicting interests arising from a transaction such as the Inversion.

201. The JCI Defendants fail to disclose whether the conflicting interests identified herein have been reviewed by the Board's Corporate Governance Committee.

**C.     The Individual Defendants Owe Fiduciary Duties to Persons with Conflicting Interests.**

202. The Individual Defendants owe a fiduciary duty of loyalty to JCI, JCplc, and all of JCI's public shareholders. Pursuant to this duty, the Individual Defendants are obliged to treat all JCI shareholders fairly. The Inversion does not treat all JCI shareholders fairly because the Inversion is intended to benefit JCI and JCplc and a majority of

JCI shareholders at the expense of Minority Taxpaying JCI Shareholders with respect to the capital gains taxes imposed on the latter as a result of the Inversion and is intended to benefit JCI and inside shareholders (officers and directors) at the expense of JCI public shareholders with respect to the Inversion-inspired dilution.

203.    The Inversion pits entities and groups with conflicting interests against each other.  The Individual Defendants owe a duty of loyalty to each of these conflicting entities and groups.

204.    These interests include (1) JCI's and JCplc's desire to reduce future taxes at the expense of Taxpaying JCI Shareholders; (2) the Individual Defendants' personal interests to avoid inversion-imposed taxes pursuant to IRC § 4985, which has resulted in reducing JCI shareholders' ownership of JCplc to less than 60%; (3) JCI's and JCplc's interest to avoid the loss of certain tax attributes pursuant to IRC § 7874, which has resulted in reducing JCI shareholders' ownership of JCplc to less than 60%; (4) Minority Taxpaying JCI Shareholders' interest to also avoid inversion-imposed taxes, regarding which no ameliorative action is to be taken; (5) non-taxpaying JCI shareholders who are not affected by the inversion-imposed taxes; and (6) all JCI public shareholders' interest in maximizing their interest in JCplc's equity but whose equity interest in JCplc will be reduced to below 60% to enable the JCI Defendants and JCplc to avoid the undesirable tax consequences under IRC §§ 4985 and 7874.

205.    In considering the Proposed Combination, the JCI Defendants were faced with four options: (1) no inversion, thereby avoiding exposure to IRC §§ 4985 and 7874 and the need to limit JCI shareholders' equity interest in JCplc to under 60% and further avoiding forcing the Minority Taxpaying JCI Shareholders to pay capital gains taxes; (2) structure the Proposed Merger in a manner whereby JCI would avoid U.S. income taxes on its future foreign earnings but would pay US withholding taxes on its existing earnings

and profits (up to the value of JCI), thereby enabling JCI shareholders to avoid paying capital gains taxes; (3) compensate the Minority Taxpaying JCI Shareholders for the capital gain taxes that they will be forced to pay and compensate all JCI public shareholders for the Inversion-inspired dilution; or (4) structure the Proposed Merger to enable JCI to avoid U.S. taxes on both its existing unrepatriated foreign earnings and future foreign earnings but subject its shareholders to the Inversion-Driven Costs (dilution and forced capital gains taxes).

206.    The first three options favor both Taxpaying JCI Shareholders and JCI public shareholders. But the first option denies JCI all of the tax benefits it is seeking (while preserving all of the non-tax business merits of the Tyco acquisition), while the second and third alternatives enable JCI to achieve some of those benefits, but without injuring its public shareholders and, particularly, its minority taxpaying shareholders.  The fourth option, which the JCI Defendants have chosen, grants the JCI Defendants the maximum tax benefits that they are seeking but imposes the Inversion-Driven Costs on JCI public shareholders and the Minority Taxpaying JCI Shareholders.

207.    Faced with such conflicting interests and options, the Individual Defendants were obliged to, but did not, ensure that all JCI shareholders were properly represented in the Individual Defendants' consideration of the Inversion.  The Individual Defendants' failure to do so, unless corrected, will harm Minority Taxpaying JCI Shareholders and JCI public shareholders and will benefit the JCI Defendants.

208.    Two inversions in early 2014 were structured in such a manner as to cause the inverting corporations to bear the taxes imposed by Congress to discourage such transactions, instead of their shareholders.[27]

---

[27]    Endo International Limited, Amendment No. 1 to Form S-4 Registration Statement under the Securities Act of 1933, pp. 7, 21-22, 37, 106-108, at: www.sec.gov/ Archives/edgar/data/1593034/000119312514020465/d636864ds4a.htm#toc63686452 [visited

209. There can be no doubt that if Taxpaying JCI Shareholders constituted a substantial majority of JCI shareholders, JCI would not propose a transaction that would be taxable to its shareholders.[28]

210. The Inversion-imposed tax consequences have caused a divergence of interests among JCI public shareholders. However, the shareholders with whom JCI is most concerned are the large non-taxpaying shareholders, who constitute the majority needed to approve the Inversion.

211. As officers and directors of JCI and prospective officers and directors of JCplc and as controlling persons of Merger Sub, the Individual Defendants also owed a fiduciary duty to the three corporations that are parties to the Merger Agreement just as they owed to the JCI shareholders, or, notwithstanding their fiduciary duty to JCI and JCplc, they also owe to JCI shareholders, including both the Class and Minority Subclass, which is the fiduciary duty of loyalty, due care, disclosure, good faith, and fair dealing.

212. JCI is to merge with Merger Sub, a Wisconsin corporation, with JCI the surviving corporation. Merger Sub is a wholly owned subsidiary of Tyco/JCplc. JCI, the Wisconsin corporation, will become a directly wholly owned subsidiary of JCplc. JCI has directed the activities of, and, therefore, controls, Merger Sub in contemplation of JCI's acquisition of Tyco prior to the shareholders of JCI and Tyco voting on the transaction. Six of JCI's directors and five of Tyco's directors will become JCplc's directors effective as of the closing of the transaction. Defendant Molinaroli will become chief exec-

---

2/25/2015]; Liberty Global Corporation Limited, Amendment No. 3 to Form S-4 Registration Statement under the Securities Act of 1933, pp. 17-20, at: www.sec.gov/Archives/edgar/data/1570585/000119312513189466/d489504ds4a.htm#toc48950474 [visited 2/23/2015]

[28] In the absence of the structure adopted, in Liberty Global, the founder and a major shareholder would have been subject to IRC § 367(a) capital gains taxes on his stock, which presumably had a very low tax basis. *See* "IRS Aims at Innovative M&A Inversion Structure," Sidley Austin LLP, at http://m.sidley.com/04-29-2014-Tax-Update/.

utive officer of JCplc.

213.    These several relationships have exposed the Individual Defendants to a web of conflicting loyalties that precludes them from adequately and fairly representing all such interests.

214.    The Individual Defendants have made no effort to cure their conflicting loyalties or arrange for separate loyal representation of the Minority Taxpaying JCI Shareholders with respect to the Inversion-imposed capital gains taxes and of JCI public shareholders with respect to the Inversion-inspired dilution.  Instead, the Individual Defendants have favored the interests of majority JCI shareholders, JCI, and JCplc over the interests of Minority Taxpaying JCI Shareholders, resulting in the Minority Taxpaying JCI Shareholders being forced to bear the penalty imposed by Congress on an inverting corporation's shareholders for their corporation's avoidance of U.S. income taxes on their foreign earnings.

215.    Likewise, ignoring the separate interests of JCI public shareholders that are in conflict with the interests of JCI, JCplc, and the Individual Defendants, the Individual Defendants have favored the interests of themselves, JCI, and JCplc over the interests of JCI public shareholders, resulting in the said shareholders' equity interest in JCplc being diluted for the benefit of the Individual Defendants, JCI, and JCplc.

216.    None of JCI's advisers represents the interests of either Minority Taxpaying JCI Shareholders or JCI public shareholders.  JCI's two financial advisors unequivocally state that they are not advising or representing anyone other than JCI. Centerview states it is representing "no one else in connection with the proposed transaction" and "will not regard any other person as their client, nor will they be responsible to anyone other than Johnson Controls for providing the protections afforded to their clients or for giving ad-

vice in connection with the proposed transaction."[29]

217.    Likewise, Barclays states it is representing "no one else in connection with the proposed transaction" and "will not regard any other person as their client, nor will they be responsible to anyone other than Johnson Controls for providing the protections afforded to their clients or for giving advice in connection with the proposed transaction." *Id*.

218.    Barclays states that its opinion "is for the use and benefit of the Board of Directors of the Company and is rendered to the Board of Directors in connection with its consideration of the Proposed Transaction. This opinion is not intended to be and does not constitute a recommendation to any shareholder of the Company as to how such shareholder should vote with respect to the Proposed Transaction." *Id*. at D-4.

219.    JCI has identified a single U.S. law firm as its "outside counsel." JCI's outside counsel's only client is JCI with respect to the Proposed Merger.

220.    By disclaiming any responsibility for advising JCI public shareholders, Centerview and Barclays seek to absolve themselves of any duty to inform JCI public shareholders of the concealed material facts identified herein. That the advisers rendering the fairness opinions upon which JCI and the Individual Defendants are presumably relying seek to avoid any duty to the JCI shareholders leaves the JCI Defendants without advisers who are responsible for providing advice that would benefit JCI public shareholders instead of the JCI Defendants and disclosing the omitted material facts identified herein.

221.    Given their advisers' disclaiming any duty to JCI public shareholders, the JCI Defendants cannot reasonably rely on their advice, including, *inter alia*, the fairness opinion. Having thus failed to obtain advice from advisers equipped to enable them to

---

[29] JCI Announcement.

carry out their fiduciary duties to JCI public shareholders, the Individual Defendants did not act prudently or in good faith and, accordingly, are not entitled to the protection of the business judgment rule.

222.    The interests of the JCI public shareholders, including the Minority Taxpaying JCI Shareholders, have not been represented in connection with the JCI Defendants' consideration of the Inversion, notwithstanding the multitude of conflicting interests created by the Inversion that the Individual Defendants were obliged to recognize and address but have failed to do so.

223.    As a result of their conflicting loyalties, the Individual Defendants have breached and, unless enjoined, will continue to breach their fiduciary duty of loyalty to Minority Taxpaying JCI Shareholders and to JCI public shareholders.

224.    Regardless of whether any of the non-monetary relief sought herein is granted, Defendants' plan to obtain a substantial benefit for JCI and JCplc at the expense of Minority Taxpaying JCI Shareholders and JCI public shareholders constitutes a breach of the Individual Defendants' fiduciary duty of loyalty and other wrongful conduct for which compensation is required.

## VII.    IRREPARABLE HARM

225.    The irreparable harm to be suffered by the Minority Subclass members includes the need to sell shares and forfeit the accompanying dividend income long before the damages sought by this litigation can be recovered and distributed and JCI shareholders' exposure to the Irish CAT, for which there can be no compensation in this action.

226.    Plaintiffs seek to enjoin Defendants from continuing to proceed with the Inversion:

(a)    To avoid the irreparable harm alleged herein; or

(b)    Unless and until the remediation described in ¶¶ 55, 143, and 144 are made

and implemented.

227.   The disclosure of the omitted material facts regarding JCI's potential liability for the Inversion-imposed taxes and dilution is necessary to ensure that *all* JCI *public* shareholders are fully informed in voting on the Proposed Merger. The failure to disclose such facts will cause irreparable harm to *all* JCI *public* shareholders.

228.   Plaintiffs seek to enjoin Defendants from wrongfully subjecting the Minority Taxpaying JCI Shareholders to the coercive tax consequences under IRC § 367(a) to enable JCI and JCplc to escape U.S. income taxes on JCI's foreign earnings and subjecting all JCI *public* shareholders to the Inversion-Driven Costs to enable Defendants to avoid the adverse tax consequences under IRC §§ 4985 and 7874.

229.   Unless the Inversion is enjoined, Defendants (1) will wrongfully file with the IRS reports of the Inversion and the resulting imposition of federal income and capital gains taxes in connection therewith and (2) will wrongfully send to Plaintiffs and other Class members IRS Form 1099 or other forms informing Plaintiffs and other Class members of their obligation to report and pay capital gains or other taxes as a consequence of the Inversion.

230.   A challenge by an individual taxpayer on the basis of the Code to any such reports and the liability imposed on the taxpayer by the Code will require such taxpayer to establish facts that such taxpayer has no means to obtain—namely, the capital gains of all JCI shareholders and JCI's taxable income under IRC § 367(b).  Accordingly, Plaintiffs and other Minority Subclass members will have no practical means to challenge the tax liabilities under the IRC that Defendants intend to wrongfully impose upon them.

231.   The facts pertaining to the forced reliance described in the two preceding paragraphs are common to all Plaintiffs and all other Minority Subclass members.

## CLAIMS

232.   By engaging in the conduct alleged herein, Defendants have acted know-

ingly, willfully, and/or recklessly.

233. Even if all disclosures sought herein are made, such disclosures do not cure the wrongful scheme to reduce JCI's U.S. taxes at the expense of Minority Taxpaying JCI Shareholders.

234. By engaging in the conduct alleged herein, the Individual Defendants have (1) knowingly and willfully failed to deal fairly with the Minority Subclass and with JCI public shareholders in connection with a matter in which the Individual Defendants have material conflicts of interest, (2) have proposed a transaction that has been structured to enable the Individual Defendants to derive an improper personal profit, or (3) otherwise engaged in willful misconduct.

235. With respect to any applicable statute of limitations, this action was commenced (i) within one year of the date on which Plaintiffs first discovered, or could have discovered by the exercise of reasonable diligence, the facts constituting the breaches and other wrongful conduct alleged herein, or (ii) within one year of the date on which the Plaintiffs were injured or became aware of their injury.

236. JCI and Tyco "jointly prepare[d] and cause[d] to be filed with the SEC the Joint Proxy Statement/Prospectus/Prospectus." The JCI Defendants, for the benefit of JCplc, made the statements in the S-4 being used by the JCI Defendants and JCplc in connection with soliciting the votes of JCI shareholders to approve the Inversion and in connection with the offer to sell and sale of Tyco/JCplc shares in exchange for JCI shares and in connection with the offer to purchase/redeem and the purchase/redemption of JCI shares in exchange for Tyco/JCplc shares, all in connection with the Inversion, in that the Corporate Defendants, acting through their respective officers, employees, agents, and independent contractors, all of whom acted within the scope of their actual and apparent authority and each of whom acted under the control, supervision and/or direction of JCI's

and Tyco's respective senior officers and directors, for whose conduct JCI and Tyco/JCplc, respectively, are liable as their employer and principal,

    (a)    composed, prepared, and otherwise made the statements in the S-4 and all other materials that are being used in connection with soliciting the votes of JCI shareholders to approve the Inversion and in connection with the offer to sell and sale of Tyco/JCplc shares in exchange for JCI shares and in connection with the offer to purchase/redeem and the purchase/redemption of JCI shares in exchange for Tyco/JCplc shares ("Disclosure/Sales Materials"); and then

    (b)    issued, published, distributed or circulated in paper form or on the Internet the Disclosure/Sales Materials and used the Disclosure/Sales Materials to solicit the votes of JCI shareholders to approve the Inversion and in connection with the offer to sell and sale of Tyco/JCplc shares in exchange for JCI shares and in connection with the offer to purchase/redeem and the purchase/redemption of JCI shares in exchange for Tyco/JCplc shares; and

    (c)    the Independent and Corporate Defendants have the ultimate authority over the statements in the Disclosure/Sales Materials, including their content and whether and how to communicate them.

Therefore, the Independent and Corporate Defendants, acting through their respective officers, employees, agents, and independent contractors made the statements that appeared in the Disclosure/Sales Materials.

## COUNT I

### CLAIM AGAINST THE JCI DEFENDANTS PURSUANT TO THE SECURITIES EXCHANGE ACT OF 1934 §§ 14(a) AND 20

237.    Plaintiffs repeat and reallege each and every allegation set forth herein, except to the extent any of the above allegations contain any facts that are unnecessary or

irrelevant for purposes of stating a claim for violations of § 14(a) of the Exchange Act, 15 U.S.C. §§ 78n(a), and Rule 14a-9, 17 C.F.R. § 240.14a-9.

238. Exchange Act § 14(a)(1) provides that:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title.

15 U.S.C. § 78n(a)(1).

239. SEC Rule 14a-9 provides that:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 CFR § 240.14a–9 (2016).

240. The S-4 and Defendants' solicitation of proxies for the approval of the Inversion is subject to Exchange Act § 14(a)(1) and Rule 14a-9. Each of the Defendants is a "person" with the meaning of § 14(a)(1).

241. By negligently, or knowingly and willfully, and in an absence of good faith, engaging in the conduct described herein, and specifically with respect to the false and misleading statements alleged at ¶¶ 140-85 above, Defendants are violating and will continue to violate § 14(a)(1) and Rule 14a-9, in that Defendants, in connection with the Proposed Merger, propose to solicit proxies from JCI shareholders for their approval of the Inversion by use of a proxy statement that is false and misleading within the meaning

of Rule 14a-9 for the reasons alleged herein.

242.    Exchange Act § 20 provides, as relevant herein, that:

(a)    Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . ., unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

243.    The Individual Defendants are controlling persons within the meaning of Exchange Act § 20(a). The Individual Defendants directly or indirectly controlled JCI, or were officers or directors of JCI and materially participated in the conduct giving rise to the liability asserted herein.

244.    Each of the Individual JCI/JCplc Defendants consented "to being named in the joint proxy statement/prospectus included in the Registration Statement on Form S-4 filed by Tyco International plc (the "Company") on April 4, 2016 (including any amendments to such Registration Statement) in connection with the Agreement and Plan of Merger, dated as of January 24, 2016, among Johnson Controls, Inc., the Company, and certain other parties named therein, including Jagara Merger Sub LLC, as a person who will become a director of the Company and to the filing of this consent as an exhibit to the Registration Statement." Exs. 99.4-99.9 to S-4.

## COUNT II

### CLAIM AGAINST THE CORPORATE DEFENDANTS
### FOR VIOLATIONS OF THE TAXPAYER BILL OF RIGHTS II

245.    Plaintiffs repeat and reallege each and every allegation set forth herein.

246.    The Corporate Defendants will, unless enjoined from continuing in their present course of conduct, file false information returns in violation of the Taxpayer Bill of Rights II, 26 U.S.C.A. § 7434.

247.    JCI and/or JCplc have announced their intention to file, and will cause to be

filed within not more than six months after consummation of the transaction described in the S-4, with the IRS information returns to inform the IRS of "payments" in the form of shares of JCplc ordinary shares in exchange for shares of JCI common stock made to JCI shareholders in connection with the Inversion and of the consequent tax liability of JCI shareholders.

248. For the reasons set forth herein, those information returns will be fraudulent in that JCI and JCplc wrongfully caused taxes owed by them pursuant to IRC § § 367(b) to be shifted to the Minority Subclass.

249. JCI and/or JCplc will, unless enjoined, willfully file fraudulent information returns with respect to payments purportedly made to JCI shareholders, entitling the Minority Subclass to bring this action for damages against JCI and JCplc for filing such returns, pursuant to 26 U.S.C.A. § 7434(a).

250. Pursuant to 26 U.S.C.A. § 7434(b), JCI and/or JCplc shall be liable to each and every member of the Minority Subclass for damages in an amount equal to the greater of $5,000 or the sum of:

(a)   any actual damages sustained by the plaintiff as a proximate result of the filing of the fraudulent information return (including any costs attributable to resolving deficiencies asserted as a result of such filing),

(b)   the costs of the action, and

(c)   in the court's discretion, reasonable attorneys' fees.

## COUNT III

### CLAIM AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

251. Plaintiffs repeat and reallege each and every allegation set forth herein.

252. The Individual Defendants owe JCI public shareholders the fiduciary duties of due care, disclosure, good faith, loyalty, and fair dealing.

104

253. By virtue of their positions as officers/directors of JCI and/or their exercise of control over the business and corporate affairs of the Company, the Individual Defendants have, and at all relevant times had, the power to control and influence and did control and influence and cause the Company to engage in the practices complained of herein.

254. The Individual Defendants likewise owe fiduciary duties of due care, disclosure, good faith, loyalty, and fair dealing to JCI, and the Individual JCI/JCplc Defendants owe said duties to both JCI and JCplc.

255. Each of the Individual Defendants have acted and continue to act in concert with each of the other Individual Defendants in breach of their respective fiduciary duties of loyalty to JCI shareholders, and the Individual JCI Defendants have aided and abetted and continue to aid and abet the Individual JCI/JCplc Defendants in breaching their fiduciary duties of loyalty of JCI shareholders.

256. In breach of the above-described fiduciary duties to JCI public shareholders and the Minority Taxpaying JCI Shareholders, the Individual Defendants have failed to disclose or to consider or sought advice with respect to:

(a)  The application and prospective effect of IRC § 367 and, more particularly, the possibility that JCI could choose to have itself, and not JCI shareholders, pay the taxes imposed by § 367 as the price of the Inversion;

(b)  That reincorporating in Ireland is not necessary to enable JCI to achieve the expected non-tax benefits of its acquisition of Tyco to avoid the conflicting interests to which the Individual Defendants were subject;

(c)  Compensating Minority Taxpaying JCI Shareholders for the capital gains taxes they will be forced to pay;

(d)  Choosing to structure JCI's acquisition of Tyco as an inversion and in a

form thereof for the purpose and with the intent of shifting JCI's, or JCplc's, liability for U.S. taxes to Minority Taxpaying JCI Shareholders without compensating them for the Inversion-imposed forced capital gains taxes;

(e) The conflicting interests of the entities and groups to whom the Individual Defendants owed fiduciary duties of due care, disclosure, good faith, loyalty, and fair dealing and the need to obtain separate representation of and advisers for such entities and groups; and

(f) The other omitted material facts alleged herein.

257. In breach of the above-described fiduciary duties to the Minority Taxpaying JCI Shareholders, the Individual Defendants:

(a) Have acted to prefer the interests of JCI, JCplc, and a majority of JCI shareholders over the interests of the Minority Taxpaying JCI Shareholders;

(b) Have failed to take adequate measures to ensure that the interests of Minority Taxpaying JCI Shareholders are properly protected but instead have engaged in conduct that purposely ensures that not all of JCI's shareholders are treated equally and fairly and that a minority of JCI's shareholders whose approval is not necessary for the Inversion are forced to pay capital gains taxes that a majority of JCI shareholders will not have to pay;

(c) Notwithstanding their knowledge that they owe a duty to treat all holders of JCI's common stock fairly and equally, the Individual Defendants have knowingly and willfully elected to structure the Proposed Merger in a manner that, for the benefit of JCI, JCplc, and a majority of JCI shareholders, subjects a minority of JCI shareholders to punitive taxes intended by Congress to prevent the transaction structure adopted by Defendants, while at

the same time protecting the Defendants from the anti-inversion Congressionally imposed punitive taxes aimed at them; and

(d)     In the event that the 56%/44% allocation failed to prevent the imposition on them of the § 4985 excise tax, caused JCI and JCplc to agree to reimburse them for such taxes while failing to arrange for any similar amelioration for Minority Taxpaying JCI Shareholders.

258.    In breach of the above-described fiduciary duties to all JCI public shareholders, the Individual Defendants:

(a)     Have acted to prefer their own interests over the interests of JCI public shareholders;

(b)     Chose to limit JCI shareholders' equity interest in JCplc to under 60% so that the Individual Defendants are not subject to the § 4985 excise tax that Congress intended directors of inverting corporations to pay to discourage inversions and so that JCI and JCplc are shielded from the adverse tax consequences of § 7874;

(c)     Have failed to disclose or consider the true costs of the Inversion with respect to the Inversion-Driven Costs to JCI public shareholders and Minority Taxpaying JCI Shareholders, as alleged herein; and

(d)     Have acted to favor Defendants' interests over the interests of all JCI public shareholders.

259.    By the acts, transactions, and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, have and will continue to unfairly deprive Plaintiffs and other members of the Class and the Minority Subclass of the true value of their JCI investment.

260.    By reason of the foregoing acts, practices, and courses of conduct, the Indi-

vidual Defendants have failed to exercise candor, due care, diligence, good faith, loyalty, and fair dealing in the satisfaction of their fiduciary obligations toward Plaintiffs and the other members of the Class and the Minority Subclass. The foregoing conduct constitutes a breach of the fiduciary duties owed by the Individual Defendants to the Class and Minority Subclass, because the Inversion involves unlawful self-dealing and is not entirely fair to Plaintiffs and the Class and Minority Subclass and further because said conduct confers an improper benefit on the Individual Defendants to the substantial injury of the Class and the Minority Subclass.

261.    Even without regard to whether the Individual Defendants owe a fiduciary duty to JCplc, they have favored JCplc's interests over those of JCI public shareholders, including Minority Taxpaying JCI Shareholders, to whom the Individual Defendants do owe a fiduciary duty.

262.    The business judgment rule is not applicable to the Individual Defendants' conduct herein because they have failed, and are continuing to fail to act in good faith, for the reasons alleged herein, including:

(a)    The Individual Defendants have knowingly and willfully recommended that the Inversion be approved by JCI shareholders notwithstanding the Individual Defendants' knowledge that it will cause substantial harm to Minority Taxpaying JCI Shareholders;

(b)    The Individual Defendants have knowingly and willfully recommended that the Inversion be approved by JCI shareholders notwithstanding the Individual Defendants' knowledge that JCI public shareholders' equity interest in JCplc will deliberately be significantly reduced below 60% in order to protect themselves and the other Defendants from the adverse tax consequences of IRC §§ 4985 and 7874 and will cause substantial harm to JCI

public shareholders;

(c)     The Individual Defendants have knowingly and willfully approved the Merger Agreement even though a term thereof limits JCI public shareholders' equity interest in JCplc to significantly under 60% in order to protect themselves and the other Defendants from the adverse tax consequences of IRC §§ 4985 and 7874 and will cause substantial harm to JCI public shareholders;

(d)     The Individual Defendants' exposure to the 15% excise tax pursuant to IRC § 4985 if the Proposed Merger provided that JCI public shareholders' equity interest in JCplc should exceed 60% is a material financial interest;

(e)     The Individual JCI/JCplc Defendants will have positions with JCplc, which constitutes both a material financial interest and a conflict of interest;

(f)     In connection with their approval of the Inversion and their recommendation that JCI shareholders likewise approve the Inversion, the Individual Defendants have acted with the knowledge that they owe the fiduciary duties of due care, disclosure, good faith, loyalty, and fair dealing to persons and entities whose interests are in conflict;

(g)     In connection with their approval of the Inversion and their recommendation that JCI shareholders likewise approve the Inversion, the Individual Defendants cannot reasonably or in good faith rely on their financial advisors because:

    (i)     the Individual Defendants know that those advisors do not purport to represent any person or entity to whom the Individual Defendants owe fiduciary duties of due care, disclosure, good faith, loyalty, and fair dealing other than JCI;

109

(ii)     the Individual Defendants know that those advisors were directed to ignore, and did ignore, the tax consequences to Minority Taxpaying JCI Shareholders in rendering their so-called "fairness opinion";

(iii)    the Individual Defendants know that those advisors were directed to ignore, and did ignore, the Inversion-inspired dilution of JCI public shareholders' equity interest in JCplc in rendering their so-called "fairness opinion"; and

(h)    Notwithstanding their knowledge that they owe the fiduciary duties of due care, disclosure, good faith, loyalty, and fair dealing to persons and entities whose interests are in conflict, the Individual Defendants have made no effort to secure independent representation for the Minority Taxpaying JCI Shareholders or JCI public shareholders who will be substantially injured by the Inversion.

263.    The Individual Defendants' conduct alleged in the preceding paragraph and elsewhere herein constitutes or involves:

(a)    A willful failure to deal fairly with JCI public shareholders and Minority Taxpaying JCI Shareholders in connection with a matter in which the JCI directors have material conflicts of interest;

(b)    A transaction from which the JCI directors will derive improper personal profits; and/or.

(c)    Willful misconduct.

As a result thereof, the Individual Defendants are not entitled to the benefit of either the statutory protection of the business judgment rule, as codified in Wis. Stat. § 180.0828, or any common law version thereof.

264.    In causing JCI and JCplc to, *inter alia*, (i) agree to reimburse themselves

for any excise tax that may be imposed against them pursuant to IRC § 4985 and (ii) enter into the Merger Agreement, which contractually limits JCI shareholders to less than 60% of the equity of JCplc for the protection of themselves and the other Defendants from the adverse tax consequences of IRC §§ 4985 and 7874, and in agreeing to approve the Inversion and to recommend to JCI shareholders approval thereof, the Individual Defendants have (1) acted in their own self-interest or in the interest of someone other than the JCI public shareholders, or (2) failed to act in good faith.

265.    Based on the conduct described in the preceding paragraph and elsewhere herein, the Individual Defendants are not disinterested because each and all of them, or a majority of the JCI directors (the Individual JCI/JCplc Defendants), will receive a personal, material benefit from the Inversion that is not equally shared by the JCI stockholders or such conduct will have a material financial impact on them but not on the JCI or its stockholders.

266.    To the extent that the dilution of JCI public shareholders' equity interest in JCplc to under 60%, or to the extent that the contractual provision in the Merger Agreement to reimburse the Individual Defendants for any excise taxes that may be imposed upon the Individual Defendants pursuant to IRC § 4985, may be deemed to be indemnification, such indemnification is not allowed by Wis. Stat. § 180.0851 for the reasons alleged herein and because such indemnification was neither determined nor approved in the manner required or provided by Wis. Stat. §§ 180.0855 or 180.0858.

267.    By choosing to favor their interests and those of JCI and JCplc over those of JCI shareholders and the Minority Subclass, the Individual Defendants intentionally failed to act in the face of the fiduciary duty of loyalty, good faith, and fair dealing that they owed to said shareholders, thereby demonstrating a conscious disregard of their duties.

268.   All of the actions described herein were designed to specifically injure and will injure (a) the Minority Subclass for the benefit of JCI, JCplc, and JCI majority shareholders with respect to the forced capital gains taxes and (b) the Class with respect to (i) the Inversion-inspired dilution for the benefit of the JCI Defendants and JCplc and (ii) the Individual Defendants' disloyal and faithless acts that deprived the Class of a Board loyal to their interests.

269.   Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiffs and the Class and Minority Subclass, all to the irreparable harm of the Class and Minority Subclass.

270.   As a result of the actions of the Individual Defendants, Plaintiffs and the Class have been, and will be, irreparably harmed in that they have not, and will not, receive their fair portion of the value of stock in JCplc, and will be prevented from obtaining the real value of their equity ownership of JCplc through the Proposed Merger.

271.   As a result of the actions of the Individual Defendants, Plaintiffs and the Minority Subclass have been, and will be, irreparably harmed in that they have not, and will not, receive their fair portion of the value of stock in JCplc, and will be prevented from obtaining the real value of their equity ownership of JCplc through the Proposed Merger, so long as the Minority Subclass will be forced to pay capital gains taxes.

272.   Plaintiffs and the other members of the Class do not have a complete remedy at law.   Only through the exercise of this Court's equitable powers can Plaintiffs and the Class be fully protected from immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT IV

### CLAIM AGAINST THE CORPORATE DEFENDANTS FOR AIDING AND ABETTING THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTY

273.   Plaintiffs repeat and reallege each and every foregoing allegation herein.

274. The Individual Defendants breached and will continue to breach their fiduciary duties to the Plaintiffs and the Class and Minority Subclass by the actions alleged herein.

275. These breaches of fiduciary duties could not, and would not, have occurred, and would not continue to occur, but for the conduct of the Corporate Defendants, which, therefore, have aided and abetted and will continue to aid and abet such breaches by agreeing to enter into the Inversion for the benefits that the Corporate Defendants will obtain therefrom..

276. The Corporate Defendants have knowledge that they were and are aiding and abetting the Individual Defendants' breaches of fiduciary duties to the Class and Minority Subclass.

277. The Corporate Defendants, through the acts and omissions of their executive officers, agents and advisers, and unnamed employees as described herein, have engaged in conduct that has aided the Individual Defendants in their breach of their fiduciary duty and (2) consciously desired or intended that their conduct would yield such assistance and would yield and, indeed, require such breach of fiduciary duty in order that the Corporate Defendants could accomplish the Inversion. Such conduct consisted of that alleged herein, including, with JCI's and its management's knowledge that the Individual Defendants were wholly or primarily dependent upon JCI management and JCI's advisers for all relevant information about the acquisition and Inversion, *inter alia*:

(a) Failing to ensure that the Individual Defendants were provided with advisers who were not selected by JCI's management but who were selected to represent the interests of the Class and the Minority Subclass;

(b) Providing to the Individual Defendants advisers whose only loyalty is to JCI and who disclaimed any duty to JCI public shareholders;

(c)     Failing to ensure that the Individual Defendants were fully informed regarding the conflicting interests of those to whom the Individual Defendants owed their fiduciary duties and were presented with all information necessary to enable them to consider the Inversion from the conflicting perspectives of all entities and shareholders who had an interest therein;

(d)     Proposing a transaction to the Individual Defendants that was structured to create conflicts of interest on the part of the Individual Defendants, even though such structure was not necessary for JCI to obtain the non-tax benefits of the Tyco acquisition and even though the Individual Defendants' conflicting interests could easily have been avoided if such acquisition was not so structured;

(e)     Failing to ensure that the advisers to JCI and the Individual Defendants included in their opinions all facts and factors, including but not limited to the Inversion's tax consequences and tax avoidance schemes, that would be relevant to all persons to whom the Individual Defendants owed a fiduciary duty and would injure such persons;

(f)     Negotiating the allocation of JCplc's equity between JCI shareholders and Tyco shareholders to ensure that JCI, JCplc, and the Individual Defendants would be able to avoid the adverse  tax consequences of IRC §§ 4985 and 7874 without so informing the Individual Defendants or doing so without ensuring that the Individual Defendants understood that such allocation for such purposes was a breach of the fiduciary duty that they owed to JCI public shareholders;

(g)     Including a provision in the Merger Agreement that improperly limits the equity interest in JCplc allocable to JCI shareholders for reasons unrelated

to the relative values of JCI and Tyco to ensure that JCI, JCplc, and the Individual Defendants would be able to avoid the adverse tax consequences of IRC §§ 4985 and 7874 without so informing the Individual Defendants or doing so without ensuring that the Individual Defendants understood that such allocation for such purposes was a breach of the fiduciary duty that they owed to JCI public shareholders;

(h) Failing to ensure that the Individual Defendants thoroughly understood the perverse incentives motivating JCI's senior management with respect to negotiating the allocation of JCplc's equity between JCI shareholders and Tyco shareholders; and

(i) Failing to ensure that the Individual Defendants thoroughly understood the conflicting interests to which they were exposed as a direct consequence of the Inversion.

278. In engaging in the acts and omissions described in the preceding paragraph, the Corporate Defendants' executive officers and unnamed employees at all times relevant herein acted within the scope of their authority, for which acts and omissions the Corporate Defendants are liable under the principles of *respondeat superieur*.

279. Likewise, the Individual JCI Defendants have assisted, aided, abetted, and facilitated the Individual JCI/JCplc Defendants' breaches of their fiduciary duties, as described herein.

280. The Corporate Defendants rendered, and will continue to render, substantial assistance to, and facilitate, the Individual Defendants' breaches of their fiduciary duties to the Class and Minority Subclass, including insisting on and/or agreeing to the terms of the Merger Agreement that provide for disparate treatment of JCI shareholders, improperly limiting the equity interest of JCI public shareholders in JCplc to under 60%, and as

otherwise alleged herein.

281.   As a result of the Corporate Defendants' conduct of aiding and abetting, and continuing to aid and abet, and facilitate, the Individual Defendants' breaches of fiduciary duties, Plaintiffs and the other members of the Class and Minority Subclass have been, and will be, damaged in that they have been, and/or will be, denied fair treatment.

282.   As a result of the unlawful actions of the Corporate Defendants, Plaintiffs and the other members of the Class and Minority Subclass will be irreparably harmed in that they will be prevented from obtaining the fair value of their proposed equity ownership in JCplc.  Unless enjoined by this Court, the Corporate Defendants will continue to aid and abet the Individual Defendants' breaches of their fiduciary duties to Plaintiffs and the members of the Class and Minority Subclass, and will aid and abet a process that inhibits the maximization of shareholder value, fair and uniform treatment of all JCI shareholders, and the disclosure of material facts.

283.   Plaintiffs and the other members of the Class and Minority Subclass do not have a complete remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiffs and the Class and Minority Subclass be fully protected from immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT V

### CLAIM AGAINST DEFENDANTS FOR
### UNJUST ENRICHMENT AND RESTITUTION

284.   Plaintiffs repeat and reallege each and every foregoing allegation herein.

285.   Defendants will be unjustly enriched by, without compensation to Plaintiffs and the Class and Minority Subclass:

(a)   Shifting JCI's and JCplc's liability for future U.S. income taxes on their foreign earnings and profits pursuant to Reg. 1.367(a)-3 to the Minority Taxpaying JCI Shareholders in connection with the capital gains taxes that

such shareholders are being forced to pay currently, resulting in substantial injury to Plaintiffs and the members of the Minority Subclass and

(b)     Diluting JCI public shareholders' equity interest in JCplc to enable Defendants to avoid the anti-inversion, adverse tax consequences that, in the absence of such dilution, would be imposed on them pursuant to IRC §§ 4985 and 7874, resulting in substantial injury to Plaintiffs and the members of the Class.

286.    Defendants are knowingly and willfully unjustly enriching themselves at the expense of the Minority Taxpaying JCI Shareholders and JCI public shareholders inasmuch as (1) the sole purpose of the Inversion is to shift JCI's and JCplc's liability for future U.S. income taxes on their earnings and profits from their foreign operations to the Minority Taxpaying JCI Shareholders and (2) the sole purpose for the Proposed Merger's limit on JCI shareholders' equity interest in JCplc to under 60% is to enable the JCI Defendants to avoid the adverse tax consequences that, in the absence of such dilution, would be imposed on them pursuant to IRC §§ 4985 and 7874.

287.    Defendants' acquisition, acceptance, and retention of these benefits, without compensation to Plaintiffs and the Class and Minority Subclass, are and will be unjust and inequitable as the benefit is to be obtained using the Individual Defendants' positions, authority, and control over, and as agents of, Defendants JCI and JCplc for the benefit of Defendants, including themselves, and in violation of the Individual Defendants' fiduciary duties to the Minority Taxpaying JCI Shareholders and JCI public shareholders, thereby enabling JCI, JCplc, and the Individual Defendants to wrongfully exploit their relationship with JCI public shareholders for their benefit to the harm of the shareholders.

288.    If Defendants do not restructure the Inversion to subject JCI and/or JCplc to being taxed pursuant to § 367(b), thereby shielding Minority Taxpaying JCI Shareholders from being forced to recognize gain and pay taxes thereon pursuant to Reg. 1.367(a)-3, and do not revise the allocation of JCplc's equity between JCI and Tyco shareholders,

(A) JCI and JCplc should be required to (1) disgorge the present value of the future tax benefits that said Defendants intend to receive; or (2) reimburse the Minority Taxpaying JCI Shareholders for all taxes incurred as a consequence of the Inversion-imposed tax consequences, including lost dividends on JCI shares sold to pay such taxes, lost interest on other assets sold to pay such taxes, or loan interest expense; and (B) the JCI Defendants and JCplc should be required to reimburse all JCI public shareholders for the value of the dilution attributable to Defendants' scheme to shield themselves from IRC §§ 4985 and 7874.

## COUNT VI

### CLAIM AGAINST THE INDIVIDUAL DEFENDANTS FOR AIDING AND ABETTING THE UNJUST ENRICHMENT OF JCI AND JCPLC

289.    Plaintiffs repeat and reallege each and every foregoing allegation herein.

290.    The unjust enrichment alleged in the preceding Count will not occur but for the conduct of the Individual Defendants, who are aiding and abetting JCI's and JCplc's unjust enrichment.

291.    The Individual Defendants are knowingly and willfully aiding and abetting, and will continue to aid and abet, and consciously desire or intend that their conduct would yield such assistance and would yield, JCI's and JCplc's unjust enrichment.

292.    The Individual Defendants are rendering substantial assistance to JCI's and JCplc's unjust enrichment by agreeing to recommend to JCI shareholders:

(a)    The Inversion whose sole purpose and effect are to shift JCI's and JCplc's liability for U.S. income taxes on their future foreign earnings to the Minority Taxpaying JCI Shareholders; and

(b)    The Proposed Merger on terms that dilute JCI public shareholders' equity interest in JCplc to enable the Defendants to avoid the anti-inversion, adverse tax consequences that, in the absence of such dilution, would be im-

posed on them pursuant to IRC §§ 4985 and 7874.

293.   As a result of the Individual Defendants' aiding and abetting JCI's and JCplc's unjust enrichment, JCI and JCplc are to be unjustly enriched at the direct expense of Plaintiffs and the Minority Taxpaying JCI Shareholders in that JCI and JCplc seek to obtain substantial benefits that can be realized only by the Minority Taxpaying JCI Shareholders being forced to pay the penalty imposed by Congress on shareholders of an inverting corporation.

294.   As a result of the Individual Defendants' aiding and abetting JCI's and JCplc's unjust enrichment, Plaintiffs and the other members of the Class will be damaged in that JCI public shareholders' equity interest in JCplc is to be wrongfully diluted.

## COUNT VII

### CLAIM AGAINST ALL DEFENDANTS FOR CONVERSION

295.   Plaintiffs repeat and reallege each and every allegation set forth herein.

296.   The Corporate Defendants propose to wrongfully appropriate and convert property belonging to JCI public shareholders (including the Minority Taxpaying JCI Shareholders)—namely, that portion of their shares of JCI common stock that, absent the Inversion and the Inversion-inspired taxes and dilution, would entitle them to a greater share of JCplc's equity than they are now intended to receive—to their own use and benefit in order that JCI and JCplc may avoid (a) the taxes imposed on JCI as a U.S. corporation in the absence of an inversion and on JCplc as an inverting corporation and (b) the taxes imposed on the Individual Defendants as officers and directors of, and the potential limitation on certain tax attributes available to, JCplc, pursuant to IRC §§ 367, 4985, and 7874. Defendants' proposed actions constitute the wrongful exercise of control over Plaintiffs' and the other Class and Minority Subclass members' shares.

297.   Such wrongful actions could not, and would not, occur but for the conduct

119

of the Individual Defendants, who are aiding and abetting such wrongful conduct, and who consciously desire or intend that their conduct would yield such assistance and would yield such conversion, by causing the Tyco acquisition to be structured as an inversion and by limiting JCI shareholders' equity interest to under 60% of JCplc.

298.   The Individual Defendants are consciously, knowingly, and willfully rendering substantial assistance to the Corporate Defendants' wrongful conversion of:

(a)   The JCI public shareholders' equity interest in JCplc by insisting on and/or agreeing to the Inversion-inspired decision to limit to under 60% JCI public shareholders' equity interest in JCplc;

(b)   The Minority Subclass's JCI shareholdings and equity interest in JCplc by forcing the Minority Subclass to sell shares or to use other resources to satisfy the forced capital gains taxes being imposed on them for the benefit of JCI and JCplc; and

(c)   The forced buyback of $3.86 billion of JCI shares.

299.   JCI stock is currently trading at $45 per share, but JCI shareholders are to receive only $34.88 in the forced redemption of their shares.

300.   As a result of the Individual Defendants' aiding and abetting the Corporate Defendants' wrongful conversion of JCI public shareholders' equity interest in JCplc and of the Minority Taxpaying JCI Shareholders' forced sale of JCI shares or use of other resources to pay the capital gains taxes, Plaintiffs and the other members of the Class and the Minority Subclass have been damaged in that they have been deprived of the equity interest in JCplc to which they would be entitled in the absence of the Inversion-inspired dilution and taxes.

## COUNT VIII

### Claim against All Defendants for Violation of Wis. Stat. § 180.0601

301.   Plaintiffs repeat and reallege each and every allegation set forth herein.

302.    Wis. Stat. § 180.0601 provides that "[a]ll shares of a class shall have preferences, limitations and relative rights identical with those of other shares of the same class unless the class is divided into series."

303.    JCI has a single class of common stock, which is not divided into series.

304.    Wis. Stat. § 180.0601 and the terms of JCI common stock require that Defendants treat all holders of shares of JCI common stock equally and without preference or discrimination and, insofar as within their power to do so, to cause all holders of shares of JCI common stock to be treated equally and without preference or discrimination, which obligation extends to structuring corporate transactions.

305.    The JCI Defendants have proposed a transaction where the known and inevitable consequences of such transaction are that a minority of JCI shareholders will be subject to disparate treatment.

306.    Accordingly, the JCI Defendants have violated, and breached their obligation pursuant to, Wis. Stat. § 180.0601 and the terms of JCI common stock, to treat all holders of shares of JCI common stock equally and without preference or discrimination and, insofar as within their power to do so, to cause all holders of shares of JCI common stock to be treated equally and without preference or discrimination. It is within the power of the JCI Defendants to avoid the preferentially favorable treatment of non-taxpaying JCI shareholders and the discriminatorily unfavorable treatment of Minority Taxpaying JCI Shareholders that is to result from the Inversion.

307.    As a result of such preferential treatment, the Minority Subclass is to be irreparably injured.

## COUNT IX

### CLAIM AGAINST ALL DEFENDANTS FOR CONSPIRACY

308.    Plaintiffs repeat and reallege each and every allegation set forth herein.

309.   At all times relevant herein, Defendants, with intent to deceive and defraud Plaintiffs and the other Class and Minority Subclass members, have conspired and, unless enjoined, will continue to conspire to falsely represent and conceal material facts as alleged herein and, unless enjoined, will continue to do so.

310.   At all times relevant herein, Defendants have knowingly and willfully conspired and, unless enjoined, will continue to knowingly and willfully conspire to wrongfully (1) shift JCI's and JCplc's liability for U.S. income taxes on their future foreign earnings to the Minority Taxpaying JCI Shareholders and (2) impose on JCI shareholders the Inversion-Driven Costs to enable Defendants to avoid the anti-inversion tax consequences.

311.   Defendants formed and operated the above-described conspiracy to breach duties owed to, to convert property belonging to, and to treat unfairly Plaintiffs and the other Class and Minority Subclass members for the unjust enrichment of the Defendants, in a scheme that will wrongfully enable (1) JCI and JCplc to avoid U.S. taxes on future foreign earnings and (2) Defendants to avoid the anti-inversion tax consequences.The above-described false representations were done pursuant to and in furtherance of a conspiracy by Defendants and their advisors to induce Plaintiffs and the other Class and Minority Subclass members to approve the Inversion in order that (1) JCI and JCplc may avoid U.S. taxes on future foreign earnings and (2) Defendants may avoid the anti-inversion tax consequences pursuant to IRC §§ 4985 and 7874.

312.   As a result of this conspiracy, Plaintiffs and the other Class and Minority Subclass members are being, and will be, injured.

# COUNT X

## CLAIM AGAINST THE JCI DEFENDANTS FOR
## TORTIOUS INTERFERENCE WITH CONTRACT

313.   Plaintiffs repeat and reallege each and every allegation set forth herein.

314.     JCI's articles of incorporation constitute a valid contract between JCI and Plaintiffs and other Class and Minority Subclass members as holders of a single class of shares of JCI's common stock.

315.     JCI's articles of incorporation are subject to, and incorporate, the provisions of the Wisconsin Business Corporation Law, including but not limited to Wis. Stat. § 180.0601.

316.     Pursuant to said contract, all holders of JCI common stock are to be treated by the JCI Defendants fairly, equitably, and in good faith, without fear or favor, and without preference or discrimination.

317.     The JCI Defendants have breached and propose to breach, or have caused and propose to cause, JCI to breach this contract between JCI and its common stockholders with the intent to injure Plaintiffs and the other members of the Class and Minority Subclass to the benefit of the JCI Defendants in that, in order that the JCI Defendants may obtain substantial tax savings or avoid inversion-imposed taxes on, or denial of tax benefits to, them, said Defendants propose to force the Minority Taxpaying JCI Shareholders to pay capital gains taxes and propose to dilute the JCI public shareholders' equity interest in JCplc to under 60%, whereas in the absence of such inversion-related tax matters, the Minority Subclass would not be forced to pay capital gains taxes and the JCI public shareholders' equity interest in JCplc would not be limited to under 60%.

318.     The JCI Defendants' actions are not in the legitimate interests of JCI in that they are contrary to federal tax policy and have exposed JCI to liability for forcing on to its shareholders the cost of certain tax benefits it seeks to obtain. The JCI Defendants are acting only out of self-interest to the injury of JCI public shareholders, and their actions are neither privileged nor protected by business judgment and are the result of an improper purpose.

319.     Plaintiffs and the other members of the Class and Minority Subclass have

and will suffer irreparable injuries or damages as a result of the conduct described above in an amount to be determined at trial.

320. The conduct described above is intentional and is being performed with malice and/or with an intentional disregard of Plaintiffs' and the other Class and Minority Subclass members' rights justifying an award of punitive damages against the JCI Defendants.

## COUNT XI

### CLAIM AGAINST JCI FOR
### BREACH OF CONTRACT

321. Plaintiffs repeat and reallege each and every allegation set forth herein.

322. JCI's articles of incorporation constitute a valid contract between JCI and Plaintiffs and other Class and Minority Subclass members as holders of a single class of shares of JCI's common stock.

323. Pursuant to said contract, all holders of JCI common stock are to be treated by the JCI Defendants fairly, equitably, and in good faith, without fear or favor, and without preference or discrimination.

324. JCI has breached and proposes to breach this contract between JCI and its common stockholders to injure Plaintiffs and the other members of the Class and Minority Subclass to its benefit, in order that JCI may obtain substantial tax savings or avoid inversion-imposed taxes on, or denial of tax benefits to, it.

325. In connection with said breach, JCI proposes to force the Minority Taxpaying JCI Shareholders to pay capital gains taxes and proposes to dilute the JCI public shareholders' equity interest in JCplc to under 60%, whereas in the absence of such breach, the Minority Subclass would not be forced to pay capital gains taxes and the JCI public shareholders' equity interest in JCplc would not be limited to under 60%.

326. Plaintiffs and the other members of the Class and Minority Subclass have

and will suffer irreparable injuries or damages as a result of said breach in an amount to be determined at trial.

## COUNT XII

### CLAIM AGAINST JCI FOR BREACH OF
### THE COVENANT OF GOOD FAITH AND FAIR DEALING

327. Plaintiffs repeat and reallege each and every foregoing allegation herein.

328. The contract between JCI and JCI public shareholders described herein implies a covenant of good faith and fair dealing.

329. There is nothing in the JCI articles of incorporation that specifically authorizes the wrongful conduct alleged herein or that would be breached by enforcement of the covenant of good faith and fair dealing.

330. Pursuant to the covenant of good faith and fair dealing implied in the JCI articles of incorporation, JCI and its officers and directors, on the one hand, and JCI shareholders, on the other, are required to act in good faith towards the other and deal fairly with each other when acting in accordance with the JCI articles of incorporation.

331. Pursuant to this duty of good faith and fair dealing, JCI and its officers and directors are not to do anything that will have the effect of injuring or destroying the rights or ability of the JCI public shareholders, including the Minority Taxpaying JCI Shareholders, to receive the benefits and protections of the JCI articles of incorporation.

332. By virtue of the wrongful conduct alleged herein, the JCI Defendants have acted in a manner that will injure or destroy the rights or ability of the JCI public shareholders, including the Minority Taxpaying JCI Shareholders, to receive the benefits and protections of the JCI articles of incorporation.

333. JCI is responsible for the wrongful conduct of its officers and directors and will enjoy the benefits thereof to the injury of its public shareholders.

334. Accordingly, JCI has breached the covenant of good faith and fair dealing

that it owes JCI shareholders and will be unjustly benefited thereby.

WHEREFORE, Plaintiffs pray for judgment, as follows:

A.     Declaring this action to be a proper class action and certifying Plaintiffs as the representatives of the Class and Minority Subclass and Plaintiffs' counsel as Class and Minority Subclass counsel;

B.     Injunctive relief enjoining Defendants from effectuating the Inversion without complying with IRC § 367 and without diluting JCI public shareholders' equity interest in JCplc and/or requiring the disclosures sought herein and such other equitable relief to which Plaintiffs may be entitled;

C.     Requiring disgorgement and imposing a constructive trust on all property and profits Defendants receive as a result of their wrongful conduct;

D.     Awarding damages, including compensatory, rescissory, or restitution damages, in favor of Plaintiffs and the Class and Minority Subclass against all Defendants, jointly and severally, in an amount to be determined at trial, together with interest thereon;

E.     Awarding reasonable fees, together with expenses, to Plaintiffs' counsel; and

F.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: August 16, 2016

**WAGNER LAW GROUP, S.C.**

*s/ K. Scott Wagner*_____
K. Scott Wagner
839 N Jefferson St, Suite 400
Milwaukee, Wisconsin 53202
Tel: 414-278-7000
Fax: 414-278-7590
ksw@WAGNER-LAWGROUP.COM

**LOCKRIDGE GRINDAL NAUEN, PLLP**
Vernon J. Vander Weide
Gregg M. Fishbein
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401-2159
Tel: 612-596-4026
Fax: 612-339-0981
vjvanderweide@locklaw.com
gmfishbein@locklaw.com

*Counsel for Plaintiffs and the Putative Class*