UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ARLENE D. GUMM ET AL,                    Case No. 16-CV-1093-PP

                    Plaintiffs,

v.

ALEX A. MOLINAROLI ET AL,

                    Defendants.

## DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION (DKT. NO. 14)

Generations of Wisconsin citizens are familiar with a company called, until recently, Johnson Controls. Born in Wisconsin in the 1880s, for much of its lifespan the company manufactured, installed and serviced thermostats—actually, devices that could control the temperature in commercial buildings. In January 2016, the Wisconsin company announced that it was going to merge with an Irish company named Tyco. Among other things, the merger agreement would move the company headquarters from Wisconsin to Ireland. The named plaintiffs hold shares of common stock in the merged company (now called "Johnson Controls, Inc.", or "JCI"), and they hold those shares in taxable accounts. They challenge the tax structure that resulted from the merger—one that, they argue, improperly places the tax burden on them, rather than on the newly-formed company. In their motion seeking a preliminary injunction, they ask the court to enjoin JCI "from continuing to act in a manner that will force [the plaintiffs and others similarly situated] to pay

taxes and from falsely reporting to the IRS that JCI shareholders owe capital gains taxes in connection" with JCI's current tax structure. Dkt. No. 15 at 32. The court denies the motion, because the plaintiffs have not demonstrated that they would suffer irreparable harm in the absence of the injunction.

## 1.    BACKGROUND

### A.    The Merger

JCI and Tyco International (a company domiciled in Ireland) entered into the merger plan on January 24, 2016. Dkt. No. 1 at ¶1. The plan came to fruition after "months of negotiations between the companies . . . ." Dkt. No. 36 at 8. In its January 25, 2016 announcement of the merger, JCI stated that the merger would be tax-free to Tyco shareholders and taxable to JCI shareholders. Dkt. No. 1 at ¶6. The shareholders voted to approve the merger. Dkt. No. 36 at 5. JCI and Tyco finalized the merger on September 2, 2016. Id. at 5.

### B.    The Complaint

The August 16, 2016 complaint names certain senior executive officers of JCI, all members of JCI's board of directors, JCI itself, Jagara Merger Sub LLC (a wholly-owned subsidiary of Tyco), and Tyco. Dkt. No. 1 at ¶29-45. It asserts that the defendants structured the merger in such a way as to allow JCI to gain tax benefits by reincorporating in Ireland. Id. at ¶¶3, 5. Citing various provisions of the tax code, the plaintiffs allege that, to gain these tax benefits, JCI diluted the stock to a point that any tax liability for reincorporating in Ireland shifted to the shareholders. Id. at ¶¶11,12. Specifically, they argue that because the merger resulted in the shareholders of JCI owning a particular

percentage of the "parent" corporation (Tyco, dkt. no. 1 at ¶2), the Internal Revenue Code triggers capital gains taxes for the shareholders. Id. at ¶¶10, 11. The complaint alleges that this result has damaged two groups: (1) all public shareholders of JCI, and (2) the "minority taxpaying shareholders"—people like the named plaintiffs, who hold their shares in taxable accounts. Id. at ¶1.

      C.    The Motion for Preliminary Injunction

Although the complaint states twelve causes of action, the preliminary injunction motion focuses on the third one. Dkt. No. 15 at 1. Count III of the complaint alleges that the individual defendants breached their fiduciary duties to the plaintiffs by failing to disclose, or failing to seek advice about, several issues. Dkt. No. 1 at 104-112. For example, Count III alleges that the individual defendants either should have sought advice about the possible capital gains consequences of the merger structure they ultimately chose, or should have disclosed those possible consequences to the plaintiffs (and other shareholders). Id. at ¶256. It alleges that in choosing the merger structure that they did, the individual defendants elevated their own interests over those of the plaintiffs. Id. at ¶257. It alleges that the individual defendants failed to disclose the true costs, in terms of tax consequences to shareholders, of locating the new company's global headquarters outside the United States. Id. at ¶258. The motion for preliminary injunction states that all of these alleged breaches of fiduciary duty have resulted in a situation in which the plaintiffs are facing large capital gains tax consequences for the 2016 tax year, which,

they argue, constitute irreparable harm to them, and which cannot be remedied at law. See generally, Dkt. No. 29.

## II.     PRELIMINARY INJUNCTION STANDARD

"A preliminary injunction is an extraordinary equitable remedy that is available only when the movant shows clear need." Turnell v. CentiMark Corp., 796 F.3d 656, 661 (7th Cir. 2015) (citing Goodman v. Ill. Dep't of Fin. and Prof'l Regulation, 430 F.3d 432, 437 (7th Cir. 2005)). "An equitable, interlocutory form of relief, 'a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.'" Girl Scouts of Manitou Council, Inc. v. Girl Scouts of USA, Inc., 549 F.3d 1079, 1085 (7th Cir. 2008) (quoting Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 389 (7th Cir. 1984)) To determine whether such extraordinary relief is warranted, the district court "proceeds in two distinct phases: a threshold phase and a balancing phase." Id. at 1085-86.

### A.     The Threshold Phase

The first phase of the preliminary injunction analysis requires the "party seeking a preliminary injunction [to] make a threshold showing that: (1) absent preliminary injunctive relief, he will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) he has a reasonable likelihood of success on the merits." Turnell, 796 F.3d at 661-62. "If the court determines that the moving party has failed to demonstrate any one of these three threshold requirements, it *must* deny the injunction." Girl

<u>Scouts</u>, 549 F.3d at 1086 (citing <u>Abbott Labs v. Mead Johnson & Co.</u>, 971 F.2d 6, 11 (7th Cir. 1992)) (emphasis added).

B. <u>The Balancing Phase</u>

Only if the movant satisfies the three criteria of the threshold phase will the court move on to the second phase. The second phase requires the court to consider: "(4) the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted; and (5) the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties (the 'public interest')." <u>Turnell</u>, 796 F.3d at 662. This second phase is often referred to as "balancing the harms." <u>Girl Scouts</u>, 549 F.3d at 1086 (citing <u>Abbott Labs</u>, 971 F.2d at 11). "The court weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely [the plaintiff] is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." <u>Turnell</u>, 796 F.3d at 662. But a court never reaches this balancing of harms—this use of the sliding scale—if the plaintiff fails to make the threshold showing in the first phase. Under that circumstance, the court does not move onto the second phase. <u>See</u> <u>Girl Scouts</u>, 549 F.3d at 1086 (citing <u>Abbott Labs</u>, 971 F.2d at 11).

III. **ANALYSIS**

The plaintiffs' brief in support of the motion for preliminary injunction explains in detail the intricacies of the tax code. In particular, it focuses on the tax code in the context of explaining why the plaintiffs believe that the

defendants chose a merger structure in which a company with a foreign domicile—Tyco—would essentially purchase a company with a U.S. domicile— the former Johnson Controls—and thus change the U.S. company's country of residence. Dkt. No. 15. The brief explains "inversions"—"a process by which a U.S.-domiciled corporation becomes a subsidiary of a foreign parent corporation and the shareholders of the U.S. corporation become shareholders of the new foreign parent in an exchange of their U.S. corporation's stock for stock in the new parent corporation." <u>Id.</u> at 4.[1] It explains various provisions of the tax code, of Treasury Department regulations (with such colorful names as "anti-Helen of Troy regulations," or "HOT Regs," for short, and "anti-Killer B" regulations), <u>id.</u> at 9, nn. 7, 8, and of tax notices. It cites to learned articles in which experts comment on the issue of companies incorporating abroad for tax reasons. The plaintiffs attached forty-seven exhibits—everything from offering documents for the merger to the affidavit of an expert in these sorts of transactions to newspaper articles to stock reports. <u>See</u> Dkt. Nos. 16-1 through 16-47.

At the preliminary injunction stage, this detailed information is relevant to the question of whether the plaintiffs have a reasonable likelihood of success on the merits of the litigation—the third part of the three-part threshold phase inquiry. The plaintiffs' brief in support of the motion spends some nine pages

---

[1] At oral argument, counsel for the plaintiffs indicated that the merger that resulted in JCI was not a true "inversion," but argued that for the same reasons a company might "invert" to avoid certain tax consequences, the defendants had made their selection of merger structure to avoid certain tax consequences.

focusing on that question. The information is less relevant, however, to the first two parts of that threshold inquiry—whether the plaintiffs have an adequate remedy at law, and whether they will suffer irreparable harm in the absence of an injunction. For the court to answer those questions, it looks less to how and why the plaintiffs are facing significant tax obligations on their stock shares, and more to the harm that they argue those tax obligations will cause.

A. The Plaintiffs Have Not Demonstrated that They Have No Adequate Remedy at Law.

"The absence of an adequate remedy at law is a precondition to any form of equitable relief." Roland Mach. Co., 749 F.2d at 386. To show that they have no adequate remedy at law, the plaintiffs must show "that traditional legal remedies would be inadequate." Girl Scouts, 549 F.3d at 1086 (citation omitted). Money damages are "traditional legal remedies." Id. at 1095.

Tax obligations are obligations to pay money. The plaintiffs argue that the harm they will suffer is the requirement that they pay taxes which, but for the merger structure the defendants chose, they would not have been obligated to pay. If they are right—if the litigation results in a conclusion that the plaintiffs should not have been obligated to pay those taxes—the obvious remedy would be for the defendants to refund to them the taxes they paid (along with, perhaps, any fees or penalties).

The plaintiffs did not argue in their opening brief, or in their reply brief, or at oral argument, that they had no remedy at law. They have not—because they cannot—argue that the traditional remedy of money damages is not available. Rather, they argue that money damages would be inadequate to

repair the harm they will suffer. This argument bleeds into another of the three parts of the threshold phase—the question of whether the plaintiffs will suffer "irreparable injury" if the court does not issue an injunction.

B.  The Plaintiffs Have Not Demonstrated that They Will Suffer Irreparable Harm in the Absence of an Injunction.

1.  *The Harm the Plaintiffs Will Suffer*

In support of the motion for preliminary injunction, the plaintiffs filed affidavits, describing the harm they will suffer as a result of the tax liability. The court read every affidavit the plaintiffs filed. The affidavits describe long-time, loyal Johnson Controls employees who feel betrayed. They describe generations of employees who painstakingly accrued stock and assumed that that stock, and the income from it, would be there in the way they'd come to expect, for them and for their heirs. They describe dashed expectations and unexpected uncertainty at a time in their lives when they anticipated certainty and security—not just for themselves, but for others who rely on them. The affidavits express anger, hurt, frustration and fear.

Some plaintiffs stated that they would have to sell, or already had sold, some of their shares to pay the taxes on the capital gains resulting from the merger. Dkt. Nos. 16-26 at 2; 16-27 at 3; 16-28 at 2; 16-29 at 3; 16-30 at 3; 16-31 at 3; 16-32 at 2; 16-33 at 2; 16-36 at 2; 16-42 at 2. Some anticipate having to borrow funds, or sell assets other than their stock, to pay the taxes. Dkt. No. 16-39 at 2; 16-40 at 3 (sale of a vacation cottage). Some anticipated having to dip into, or use a good portion of, their retirement accounts to pay the taxes. Dkt. No. 16-28 at 2; 16-43 at 4.

Some described the possibility of being forced into a higher tax bracket, or becoming subject to the alternative minimum tax. Dkt. Nos. 16-26 at 2; 16-27 at 3. Some who already had sold some shares in anticipation of the capital gains obligations indicated that they had lost their ability to itemize deductions. Dkt. No. 16-27 at 3. One stockholder had made charitable contributions, and set up a charitable remainder trust, to offset the capital gains liability. Dkt. No. 16-30 at 2. This same stockholder had planned to build a retirement home on a lakefront lot, but instead had placed the lot in the charitable remainder trust, and made it available for sale. Id. at 3. Some stated that their Medicare premium would increase as a result of having to sell shares, dkt. no. 16-26 at 2, or that they would face a Medicare surtax, dkt. no. 16-27 at 3.

Many expect a reduction in their annual dividends. Dkt. No. 16-26 at 2; 16-29 at 3; 16-30 at 3; 16-31 at 3; 16-32 at 2; 16-33 at 2; 16-36 at 2. Several stockholders indicated that they depend on the dividends for living expenses (dkt. no. 16-31 at 2; 16-32 at 2; 16-38 at 2), medical expenses for loved ones (dkt. no. 16-29 at 2), or money to leave to family members upon their passing (dkt. no. 16-37 at 3; 16-44 at 3). Some described a "considerable reduction" of their net worth. Dkt. No. 16-27 at 3; 16-31 at 3. Some anticipate having to find other sources of income "to create a sufficient income stream." Dkt. No. 16-41 at 2. One stockholder indicated that, at the age of 73, he did not anticipate he would live long enough to be able to make up, in his retirement savings, the taxes he will have to pay as a result of the merger. Dkt. No. 16-28 at 2.

One affiant, Cynthia Pontier, inherited her stock from her father, a Johnson Controls employee. Dkt. No. 16-34 at 2. She, like other affiants, has had to sell shares, will lose dividends, and has suffered a reduction in her net worth. Id. Her dividends made up part of the money that she uses to make her mortgage payment on her new home. Id. Her sister, Patricia Pontier, also inherited shares from their father. Id. Patricia's 6,000 shares of stock make up 45% of her net worth. Id. at 3. Patricia has metastatic breast cancer; while her dividends made up 36% of her income, id. at 2, her health expenses for 2015 were some 50% of her income, id. at 3. She relies on family support to supplement her income. Id. Patricia has only "negligible" balances in her retirement accounts. Id. Cynthia expects that, all told, Patricia will have to sell a total of 2,300 of her 6,000 shares to pay the taxes and to cover medical expenses. Id. at 3, 4.

Cynthia and Patricia's brother John also provided an affidavit. Dkt. No. 16-35. He describes how the siblings' mother Frances' 51,000 shares provide dividends that make up 58% of her gross income; the shares represent 75% of her net worth. Id. at 2. Frances is 91 years old and is in declining health. Id. She will have to sell 7,000 of her shares to pay the taxes, and will lose significant dividends. Id. at 3. John adds to Cynthia's description of their sister Patricia that Patricia is autistic, and has lived with their mother Frances her entire life. The family had planned to use Frances' estate to help care for Patricia into the future. Id. John, too, has had to sell shares and expects to lose

dividends, id., and the tax obligation have made it difficult for him to conduct tax planning for this year, id. at 3-4.

### 2. *The Definition of Irreparable Harm*

The plaintiffs argue that they "will suffer irreparable harm because they are to be forced to pay a substantial portion of their net worth in capital gains taxes . . . ." Dkt. No. 15 at 25. The defendants respond that because the plaintiffs' harm is monetary—the payment of taxes—the harm is, by definition, reparable. Dkt. No. 36 at 21-22. As indicated above, the question is not whether money damages are available to the plaintiffs—they are. The question is not whether the plaintiffs will suffer harm by paying the taxes or trying to avoid them—the above, brief summary of the plaintiffs' affidavits clearly demonstrates that they will. The question is whether the harm that the plaintiffs will suffer is "irreparable"—whether the money damages available to them as a remedy are inadequate to repair that harm.

What is "irreparable" harm? The Seventh Circuit has described it in various ways. In 1984, the court described irreparable harm as "harm that cannot be prevented or fully rectified by the final judgment after trial." Roland Mach. Co., 749 F.2d at 386. In 1997, the court used language from a seventeenth century North Carolina Supreme Court decision, describing irreparable harm as harm "which cannot be repaired, retrieved, put down again, atoned for . . . .[T]he injury must be of a particular nature, so that compensation in money cannot atone for it." Graham v. Medical Mut. of Ohio, 130 F.3d 293, 296 (7th Cir. 1997) (quoting Gause v. Perkins, 56 N.C. (3 Jones

Eq.) 177 (1857)). Because irreparable harm is harm for which money cannot compensate, "[a]s a general rule, a defendant's ability to compensate [a] plaintiff in money damages precludes issuance of a preliminary injunction."[2] Signode Corp. v. Weld-Loc Sys., Inc., 700 F.2d 1108, 1111 (7th Cir. 1983) (citations omitted).

3. *Whether Money Damages Are "Adequate" to "Repair" the Harm.*

The plaintiffs argue that their harm is just that—harm that the defendants cannot repair with money, even though money is available as a remedy. The Seventh Circuit addressed this kind of irreparable injury argument in its decision in Roland Machinery Corporation v. Dresser Industries, Inc..

Judge Posner, writing for the panel, explained that if the only remedy a plaintiff seeks is money damages, "the two requirements—irreparable harm, and no adequate remedy at law—merge." Roland Mach. Co., 749 F.2d at 386. In that circumstance, Judge Posner explained, the district court must answer the question the plaintiffs pose here—"whether the plaintiff will be made whole if he prevails on the merits and is awarded damages." Id. To show that, the

---

[2] At the hearing, counsel for the plaintiffs made a perplexing argument. He argued that the motion for a preliminary injunction sought only equitable relief, and emphasized that it did *not* ask the court to order the defendants to pay money to the plaintiffs. Because the motion does not ask the court to order the defendants to pay money, he argued, the motion does not fall within the general rule precluding issuance of a preliminary injunction when money damages are available. This is a head-scratcher. A motion for a preliminary injunction, by definition, asks for equitable relief, not money, and the reason it does so is precisely because it posits that money can't solve the problem. Thus, in order to obtain equitable relief, a movant *must* show that money can't solve the problem.

plaintiff need not demonstrate that damages at the end of the trial would be "wholly ineffectual." Id. Rather, the plaintiff must demonstrate that a damages award would be "seriously deficient as a remedy for the harm suffered." Id.

The Roland court identified four ways in which a damages award could be "inadequate." Id.

> (a) The damage award may come too late to save the plaintiff's business . . . .
>
> (b) The plaintiff may not be able to finance his lawsuit against the defendant without the revenues from his business that the defendant is threatening to destroy.
>
> . . .
>
> (c) Damages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected.
>
> . . .
>
> (d) The nature of the plaintiff's loss may make damages very difficult to calculate . . . .

Id. (citations omitted). None of these reasons, however, are present here.

### a. Will a Damage Award Come Too Late to Avoid Insolvency?

The Roland court hypothesized that money damages might not provide a sufficient remedy if the plaintiff "may go broke while waiting, or may have to shut down his business but without declaring bankruptcy." Id. at 386. In Builder's World, Inc., v. Marvin Lumber & Cedar, Inc., Judge Adelman discussed the definition of "going broke," or insolvency:

> Although there is no hard and fast definition of insolvency, *Webster's Third New International Dictionary* 1170 (3d ed.1986) defines it as being "unable or having ceased to pay debts as they fall due in the usual course of business; having liabilities in excess of the reasonable value of assets held." And the Supreme Court has stated that when a person "is unable to pay his debts, he is understood to be insolvent. It is difficult to give a more accurate definition of insolvency." *Cunningham v. Norton,* 125 U.S. 77, 90, 8 S.Ct. 804, 31 L.Ed. 624 (1888).

482 F. Supp. 2d 1065, 1076 (E.D. Wis. 2007), modified *sub nom.*, <u>Builders World, Inc. v. Marvin Lumber & Cedar, Inc.</u>, No. 06C0555, 2007 WL 2138760 (E.D. Wis. July 23, 2007).

Many, if not all, of the affiants are retired. Many describe losses to their retirement income, reductions in their retirement assets, decreases in other assets. All talk of reduction in income or loss of income, and many indicate that the lost or reduced income was part of the money they have relied upon for living expenses, or for medical expenses for loved ones. None, however, state that paying these taxes will render them insolvent. None argue that they will "go broke" if they have to wait until the end of the litigation to collect money damages.

The court does not mean, by that statement, to trivialize the harm the plaintiffs describe. Some arguably describe greater harm than others; all describe harm significant to them. <u>Roland</u>, however, does not provide that a plaintiff could show that monetary damages are inadequate by alleging significant harm. It provides that a plaintiff could show that monetary damages

would be inadequate if the plaintiff were to go broke waiting for them. The plaintiffs have not made that showing.

### b. Will the Plaintiffs Be Unable to Finance the Lawsuit?

The plaintiffs have not alleged that they will be unable to finance this suit if they have to wait for money damages. The plaintiffs plan to pursue the case as a class action; the court already has appointed lead class counsel. Dkt. No. 40.

### c. Will Damages be Unobtainable Due to the Defendants' Insolvency?

The plaintiffs have not alleged that, if they prevail, they will not be able to collect money damages because the defendants will be insolvent. In fact, at oral argument, counsel for the plaintiffs noted that the plaintiffs are not challenging the merger itself; they challenge only the structure they allege that the defendants chose for the merger. Counsel told the court that the new company, JCI, appeared to be doing quite well.

### d. Will the Nature of the Plaintiffs' Loss Make Damages Very Difficult to Calculate?

The plaintiffs focused their argument that money damages would be inadequate to repair their harm on the last of Roland's four reasons.

The plaintiffs conceded at the hearing that calculating the amount of damages for the *known* plaintiffs would not be prohibitively difficult. They argued instead that the total amount of damages is difficult to calculate because, in the class action context, there are *unknown* plaintiffs. This argument took two forms.

In the preliminary injunction brief, the plaintiffs argued that if the court does not issue the injunction, the defendants will file returns with the Internal Revenue Service that will cause the Service to impose income and capital gains taxes on the basis of the merger structure currently in place. Dkt. No. 15 at 25. The IRS then will issue to the plaintiffs, as well as to unknown individuals who own stock held in taxable accounts, Forms 1099, which will inform the recipients that they owe these taxes. The plaintiffs argue that they will be unable to challenge these tax liabilities, because in order to do so, they would have to know things like the capital gains of all of the JCI shareholders, JCI's taxable income, and other pieces of information that they don't currently have. Thus, they argue, "the availability of damages as a remedy is too uncertain to be considered an alternative remedy to the injunctive relief being sought herein." Id. at 26.

This argument assumes that because the plaintiffs may not have the tools to challenge the imposition of the taxes this year, there will be no way for them to calculate the damages to which they will be entitled if they eventually prevail. The court disagrees. Many of the plaintiffs already have obtained from their financial and tax advisors a dollar figure for the tax they will have to pay, and a dollar figure for the dividends they expect to lose. There are formulas for calculating the income (both dividend and interest) they would have earned on those amounts between the time they pay the taxes or lose the dividends until the time of an award in their favor.

At the hearing, counsel for the plaintiffs also argued that because the plaintiffs don't know the identities of all of the members of the putative class, it is impossible to calculate damages. The fact that the plaintiffs do not know how many members the putative class may have, or don't know the identities of putative members at this stage, or don't know what harms the putative members may suffer, is a fact common to many class action lawsuits, yet class action counsel are able to calculate damages.

In sum, while the plaintiffs have demonstrated harm, they have not demonstrated that the traditional remedy of money damages—admittedly available to them, and susceptible to calculation if they prevail—is inadequate to repair that harm. Because the plaintiffs have not made the showing required at the threshold phase, the court must deny the motion for preliminary injunction.

C.     <u>The Court Will Briefly Examine the Balancing Phase.</u>

"If the court determines that the moving party has failed to demonstrate any one of these three threshold requirements, it *must* deny the injunction." <u>Girl Scouts</u>, 549 F.3d at 1086 (citing <u>Abbott Labs</u>, 971 F.2d at 11) (emphasis added). The Seventh Circuit has noted, however, that "[w]here . . . a district court decides that a party moving for a preliminary injunction has not satisfied one of the threshold requirements, we have encouraged the court to conduct at least a cursory examination of all the aforementioned preliminary injunction considerations." <u>Id.</u> at 1087 (citations omitted).

The third part of the threshold phase asks whether the plaintiffs have a reasonable likelihood of success on the merits of their claim. In this case, that claim is Count III of the complaint, which alleges that the individual defendants breached their fiduciary duties to the plaintiffs and other shareholders. In particular, the plaintiffs argue that the individual defendants had conflicting interests when deciding how to structure the merger. During the hearing, the plaintiffs identified three aspects of the merger which they allege created conflicts of interest.

First, they alleged that the individual defendants built into the merger documents an indemnification clause, to protect themselves if the merger resulted in an excise tax. The plaintiffs argue that this shows that, rather than looking out for the shareholders, they were looking out for themselves.

Second, the plaintiffs alleged that at some point it became clear to the individual defendants that they had a choice between structuring the merger in a way that would impose a tax liability on the corporations, or structuring it in a way that would shift that tax liability to the shareholders. The plaintiffs argue that at that point, there was a conflict between the interest of the new corporation in being shielded from tax liability, and the interests of the shareholders in not being taxed. The plaintiffs argue that the defendants, in their capacity as fiduciaries, should have selected the structure that would impose the tax liability on the corporation.

Third, (a subset of the second aspect), the plaintiffs argued that the defendants had a fiduciary duty to seek advice about the tax consequences of

various merger forms to the plaintiffs and to all shareholders. The plaintiffs argue if the defendants had sought such advice, they would have learned of the tax burdens that the structure they ultimately chose would place on shareholders who hold their shares in taxable accounts. At that point, the plaintiffs argue, the defendants had a fiduciary duty to select a merger structure that would avoid that burden on those shareholders.

Wis. Stat. §180.0828 is Wisconsin's codification of the business judgment rule. The statute provides, in pertinent part, that:

> (1) Except as provided in sub. (2), a director is not liable to the corporation, its shareholders, or any person asserting rights on behalf of the corporation or its shareholders, for damages, settlements, fees, fines, penalties or other monetary liabilities arising from a breach of, or failure to perform, any duty resulting solely from his or her status as a director, unless the person asserting liability proves that the breach or failure to perform constitutes any of the following:
>
> > (a) A willful failure to deal fairly with the corporation or its shareholders in connection with a matter in which the director has a material conflict of interest . . .
> >
> > (c) A transaction from which the director derived an improper personal profit . . . .

Id.

At the hearing, the plaintiffs argued that §180.0828 does not apply, because the preliminary injunction motion did not ask for monetary relief. The question the court must ask in deciding whether to issue a preliminary injunction, however, is not whether the *motion for preliminary injunction* seeks monetary relief; it is whether the *lawsuit* seeks monetary relief. See n.1, *supra*. As the court has discussed above, this suit seeks monetary relief. This

19

argument does not support the plaintiffs' assertion that §180.0828 doesn't apply.

Nor can the court conclude that the plaintiffs have shown a reasonable likelihood of success on the merits of the claim in Count III. The plaintiffs argue that the defendants had a choice of different merger structures, some of which would result in heavier tax consequences to the plaintiffs. They argue that the individual defendants had a fiduciary duty to select the structure that would avoid those heavier tax consequences to the plaintiffs. They assert that the individual defendants deliberately opted for a structure that would place the tax burden on the plaintiffs—either to their individual benefit, or to the benefit of the new corporation.

The defendants do not agree. They begin by disputing the very question of whether the merger was subject to the tax provisions the plaintiffs claim have shifted the tax burden to them. Dkt. No. 36 at 6, 11-12; Dkt. No. 37; Dkt. No. 38. The defendants dispute that they even made the tax structure choice that the plaintiffs allege they made. Dkt. No. 36 at 15.

They move on to argue that §180.0828 curtails a court's review of the defendants' decisions if the defendants were informed and acted in good faith. Dkt. No. 36 at 12. They dispute the premise that they had an easily-identifiable option for benefitting the plaintiffs, and an easily identifiable option for burdening them. Dkt. No. 36 at 2. They argue that because the plaintiffs misapprehend which tax code provision applies, the plaintiffs "erroneously . . . conjure a scenario of JCI and Tyco being faced with a zero-sum game: either

choose a transaction under which JCI pays a tax, or choose the same transaction but force the JCI shareholders to foot that bill." <u>Id.</u> They disagree that this was the choice they faced, or made. <u>Id.</u>

As to the plaintiffs' allegations that the individual defendants had conflicts of interest, the defendants argued in their papers that the plaintiffs had failed to allege any conflict of interest on the individual defendants' parts. <u>Id.</u> at 15-16. The court enquired about this at the hearing, and it was then that counsel for the plaintiffs articulated the three alleged conflicts discussed above. The defendants dispute that the fact that the merger agreement allows JCI to agree to reimburse the individual defendants for certain tax liabilities constitutes a conflict of interest. <u>Id.</u> at 16. They disagree that Wisconsin law (or law from Delaware, upon which the plaintiffs relied in their briefs) required them to consider the tax consequences to each particular set of shareholders. <u>Id.</u> at 16. They argue that the plaintiffs cannot prove that the individual defendants did not honestly believe that the merger was in the best interest of all shareholders. <u>Id.</u> at 17.

In short, the parties have asserted conflicting sets of facts. While each party has argued law in support of its version of the facts, it is the defendants who ground their arguments—as to the fiduciary duty claim—in Wisconsin law. The court cannot, at this stage, say that a jury would find in the defendants' favor. But had the court reached this part of the threshold test, it could not conclude that the plaintiffs have a reasonable likelihood of success on the merits as to the fiduciary duty claim.

If the plaintiffs had passed the threshold phase, the balancing phase would have required the court to balance the likelihood that they would succeed on the merits of the fiduciary duty claim against the potential harms, and the court would have had to use that sliding scale. The higher the likelihood of success on the merits, the less the plaintiffs would have had to prove regarding the risk of irreparable harm. Even assuming a likelihood that the plaintiffs would succeed on the merits of that claim, that likelihood is not so high that it would counter the plaintiffs' failure to demonstrate irreparable harm.[3]

The defendants made other arguments in anticipation of the court possibly reaching the balancing phase. One in particular warrants discussion. The defendants argued that because the merger already has taken place, in its current structure, the IRS will calculate tax liability based on that structure; thus, the tax liabilities already have accrued. Dkt. No. 36 at 25-27. What the plaintiffs ask the court to do, the defendants argue, is to require the defendants either to file false corporate returns with the IRS, or to violate the requirement that they issue Forms 1099 based on the existing corporate structure, or both. Id. at 26; oral argument. The plaintiffs assert that such an order would make it "possible" that JCI could ask the IRS to run alternative tax calculations under different provisions of the tax code, the result of which "might" show that a different merger structure than the one currently in place would result in less, or no, tax liability to the plaintiffs. Id. at 26-27. The defendants respond that

---

[3] Neither party spent much time discussing the effects of the grant or denial of injunctive relief on the public interest.

even if all these "possibles" and "mights" were to come to pass, what the plaintiffs truly seek is for the court to effectuate an unwinding of the merger transaction that closed last September, and to somehow require that the defendants replace it with a structure that would not subject them to capital gains consequences. Id. at 27.

This amounts to an argument that the plaintiffs do not seek a preliminary injunction in order to "preserve the status quo pending a final hearing on the merits." American Hospital Ass'n v. Harris, 625 F.2d 1328, 1330 (7th Cir. 1980) (citation omitted). They seek, instead, to upend the status quo. That is not the purpose of a preliminary injunction.

## IV.    CONCLUSION

Because the plaintiffs have not demonstrated that the monetary damages available as a remedy are inadequate to address the harm they allege, the court **DENIES** the plaintiffs' motion for preliminary injunction. Dkt. No. 14. The court reminds the plaintiffs that, under its December 12, 2016 order (Dkt. No. 50), within twenty-one days of the date of this order, they shall file either an amended complaint or a notice that they do not plan to amend the complaint.

Dated in Milwaukee, Wisconsin this 25th day of January, 2017.

BY THE COURT:

HON. PAMELA PEPPER
United States District Judge