UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ARLENE D. GUMM, *et al.*,

               Plaintiffs,

                                        Case No. 16-cv-1093-pp

    v.

ALEX A. MOLINAROLI, *et al.*,

               Defendants.

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS COUNTS I AND II OF AMENDED COMPLAINT WITH PREJUDICE (DKT. NO. 55), GRANTING DEFENDANTS' MOTION TO DISMISS COUNTS III THROUGH XII WITHOUT PREJUDICE AND DECLINING TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THOSE CLAIMS (DKT. NO. 55), GRANTING PLAINTIFFS' UNOPPOSED MOTION REQUESTING LEAVE TO FILE SUPPLEMENTAL BRIEF (DKT NO. 71), DENYING AS MOOT PLAINTIFFS' MOTION TO MODIFY STAY OF PSLRA DISCOVERY (DKT. NO. 76), DENYING AS MOOT PLAINTIFFS' MOTION FOR LEAVE TO SERVE NON-PARTY SUBPOENAS (DKT. NO. 81) AND DISMISSING CASE**

The plaintiffs are a group of former shareholders of Johnson Controls,

Inc. (JCI). In August 2016, they brought this class action suit against JCI, its

officers and directors, the Irish corporation Tyco (with which JCI since has

merged to form a new company) and Merger Sub (the subsidiary through which

the merger was effectuated). Dkt. No. 1. The 134-page complaint alleged that

JCI and its leadership, as well as the entities with whom it (at that time)

intended to merge, had (in various combinations) violated federal and state

securities laws and federal tax laws, breached fiduciary duties to the plaintiffs,

been unjustly enriched, committed state-law conversion, conspired, committed

1

tortious interference with contract and breach of contract and breached the covenant of good faith and fair dealing. Id. In January 2017, the court denied the plaintiffs' motion for a preliminary injunction, dkt. no. 52, after which the plaintiffs amended the complaint, dkt. no. 53. On April 3, 2017, the defendants moved to dismiss the amended complaint for failure to state a claim. Dkt. No. 55. They seek dismissal with prejudice. Dkt. No. 56 at 48.

The motion was fully briefed by June 15, 2017. See Dkt. No. 60 (defendants' reply brief in support of their motion to dismiss). The court, however, did not rule. In fact, it took over two years for the court to hold oral argument on the motion to dismiss; the court held that hearing on October 17, 2019. Dkt. Nos. 67-69.

At the end of the hearing, the court took the motion to dismiss under advisement. Dkt. No. 69. It had planned to contact the parties "shortly" to schedule a date for the court to issue an oral ruling on the motion to dismiss, and it told the parties as much. Id. But although at the October 17, 2019 hearing, the court had apologized to the parties for the already-extensive delay in addressing the motion, the court did *not* act "shortly," or promptly. It did not rule, either orally or in writing. It has been over two years since that hearing with no ruling on the motion, even though the plaintiffs since have filed a motion for leave to file a supplemental brief, dkt. no. 71, a motion to modify the stay of the discovery under the Private Securities Litigation Reform Act, dkt. no. 76, and a Civil Local Rule 7(h) (E.D. Wis.) expedited, non-dispositive motion to serve subpoenas, dkt. no. 82.

This delay finally prompted the plaintiffs to petition for mandamus from the Seventh Circuit Court of Appeals. Dkt. No. 88. While the court has explanations for the delay, they are of no moment or succor to the parties. There is no excuse for the court having delayed this long in ruling on the motion to dismiss, or the other pending motions. The court will dismiss Counts I and II with prejudice, dismiss Counts III through XII without prejudice and dismiss the case.

## I.     **The Amended Complaint**

### A.     Context

The court stated the following in its January 25, 2017 order denying the plaintiffs' motion for a preliminary injunction:

> Generations of Wisconsin citizens are familiar with a company called, until recently, Johnson Controls. Born in Wisconsin in the 1880s, for much of its lifespan the company manufactured, installed and serviced thermostats—actually, devices that could control the temperature in commercial buildings. In January 2016, the Wisconsin company announced that it was going to merge with an Irish company called Tyco. Among other things, the merger agreement would move the company headquarters from Wisconsin to Ireland. The named plaintiffs hold shares of common stock in the merged company (now called "Johnson Controls, Inc." or "JCI",[1]), and they hold those shares in taxable accounts. They challenge the tax structure that resulted from the merger—one that, they argue, improperly places the tax burden on them, rather than on the newly-formed company.

Dkt. No. 52 at 1-2.

---

[1] The court got this detail wrong. The new company that resulted from the merger is called Johnson Controls International plc ("JCplc"). Dkt. No. 53 at p. 6.

B.    The Players

Prior to January 2016, Johnson Controls, Inc. was a corporation organized under Wisconsin law and headquartered on Green Bay Avenue in Milwaukee; it was publicly traded on the New York stock exchange. Dkt. No. 53 at ¶46. Tyco International plc had its U.S. headquarters in Princeton, New Jersey. Id. at ¶47. Defendant Merger Sub was a limited liability subsidiary of Tyco used to effectuate the January 2016 merger of JCI and Tyco. Id. at ¶48. The entity that resulted from the merger was incorporated and is headquartered in Ireland and is known as Johnson Controls International plc (the plaintiffs sometimes refer to it as "Tyco/JCplc"). Id. at ¶47.

There are forty-six named plaintiffs, id. at ¶¶28-30; the amended complaint asserts that as of January 25, 2016 (the day after the merger agreement was executed), they and their immediate family members held more than 1.2 million shares of JCI "representing tens of millions of dollars of taxable capital gain and/or ordinary income and millions of dollars of capital gain, ordinary income, and other taxes," id. at ¶31.

Defendants Molinaroli, Stief, Guyett and Janowski were officers of JCI; Abney, Black, Bushman, Conner, Goodman, Joerres, William H. Lacy (now represented by his estate), del Valle Perochena and Vergnano were directors. Id. at ¶¶32-44.

The plaintiffs allege that the corporate entities had several financial and legal advisors helping them in the months leading up to the merger: U.S.-registered broker/dealers Centerview Partners LLC and Barclays Capital, LLC,

4

whom the plaintiffs assert were financial advisors to JCI; Wachtell, Lipton,

Rosen & Katz (the firm representing the defendants in this litigation) and A&L

Goodbody, whom the plaintiffs assert were legal advisors to JCI; Lazard Freres

& Co. and Goldman Sachs, whom the plaintiffs assert were financial advisors

to Tyco; and Simpson Thacher & Bartlett and Arthur Cox, whom the plaintiffs

alleged were Tyco's legal advisors. Id. at ¶¶50-57.

    C.    <u>Chronology of Events</u>

The plaintiffs allege that on July 24, 2015, JCI announced that it

planned to separate its "Automotive Experience business" from Johnson

Controls proper "by means of a spin-off of a newly formed company, to be

named Adient." Id. at ¶¶176, 194(h). The amended complaint cites a July 24,

2015 news release indicating that the spin-off was to be "tax free." Id. at ¶176

and n.55. The plaintiffs assert that Adient "represented over half of JCI's

market capitalization." Id.

The amended complaint alleges that on November 25, 2015, the JCI

board of directors had a telephonic board meeting with representatives of

financial advisor Centerview and legal counsel Wachtell Lipton in attendance,

discussing the progress of the merger discussions with Tyco and the "potential

synergies" from the merger, including JCI management's estimates of hundreds

of millions in operational and U.S. tax "synergies." Id. at ¶209(b).

On December 8, 2015, JCI's executive director of corporate development

(defendant Guyette) and representatives from Centerview met with someone

named "Mr. Armstrong"—presumably from Tyco—and representatives of Tyco's

5

financial advisor Lazard Freres to discuss the merger, including stock exchange ratios for the stockholders of each company. Id. at ¶236(c).

On December 10, 2015, the JCI board of directors held another telephonic board meeting, attended by representatives from Centerview and Wachtell Lipton, where the board was updated on the discussions with Tyco and the proposed method of calculating the stock exchange ratio. Id.

On December 11, 2015, defendants Molinari (CEO of JCI) and Guyette had a phone call with "Messrs. Oliver[2] and Armstrong" to discuss "key terms of the potential business combination," including the exchange ratio and the assumptions underlying it. Id.

On December 16, 2015, JCI's counsel, Wachtell Lipton, sent a draft merger agreement and term sheet to Simpson Thacher (Tyco's legal counsel); according to the plaintiffs, the defendants described the agreement as providing for a merger that would be structured as a "'reverse merger,' in which Tyco would be the parent entity of the combined company and Johnson Controls would be merged with a wholly owned subsidiary of Tyco." Id. Between December 18, 2015 and January 23, 2016, there was a series of phone calls and meetings—internal to each entity and between entities—discussing the structure of the merger and the stock exchange ratio. Id. at ¶¶209(c), 236(c).

The plaintiffs allege that on January 20, 2016—four days before the merger agreement was signed—defendant Merger Sub was formed "for the sole purpose of effecting the merger." Id. at ¶188(b). They allege that Merger Sub, a

---

[2] Presumably George Oliver, Tyco's CEO. Dkt. No. 53 at ¶78.

6

Wisconsin limited liability company, was a wholly owned subsidiary of Tyco. Id. Merger Sub was to merge with and into JCI, leaving Johnson Controls as a wholly owned subsidiary of Tyco. Id. at ¶188(c).

The plaintiffs assert that as of January 4, 2016, JCI's market capitalization was $27 billion ("648 million shares times $35 per share as of January 4, 2016"). Id. at ¶158.

On January 24, 2016, JCI and Tyco executed an "Agreement and Plan of Merger;" the companies later announced that their boards had unanimously approved the agreement. Id. at ¶¶1, 68. Under the merger agreement, JCI merged with Merger Sub, which the plaintiffs allege "result[ed] in JCI becoming a directly and indirectly wholly-owned subsidiary of Tyco/JCplc," JCplc standing for "Johnson Controls International plc," the name of the new entity. Id. at ¶69.

> Section 6.13 of the merger agreement provided:
>
> Tax Matters. From and after the execution of this Agreement until the earlier of the Effective Time or the date, if any, on which this Agreement is terminated pursuant to Section 8.1, except as may be required by Law, notwithstanding anything to the contrary in Section 5.1 or Section 5.2, none of Parent, Merger Sub or the Company shall, and they shall not permit any of their respective Subsidiaries to, take any action (or knowingly fail to take any action) that causes, or could reasonably be expected to cause, the *ownership threshold of Section 7874(a)(2)(B)(ii) of the Code to be met* with respect to the Merger.

Id. at ¶103 (quoting "S-4 at A-72 (emphasis supplied)").

The plaintiffs allege that although there was no requirement that the new company be domiciled in Ireland, JCI reincorporated in Ireland. Id. at ¶¶97-98. They allege that what made it necessary for the new corporation to be

reincorporated in Ireland was the defendants' need "to establish the platform upon which Defendants' tax avoidance schemes depended . . . ." Id. at ¶21. They assert that although the merger was structured as an acquisition of Johnson Controls by Tyco, Johnson Controls paid approximately $16.5 billion for Tyco (citing an article from Reuters). Id. at ¶3, n.2.

The plaintiffs allege that the next day—January 25, 2016—JCI announced the merger. Id. at ¶68. The plaintiffs allege that the announcement indicated that the merger would be "tax-free to Tyco shareholders and taxable to JCI shareholders." Id. at ¶6. They claim that in announcing the merger, the defendants "touted" a list of benefits that they expected to result from the merger—growth opportunities and expanded global reach, better partnerships with customers, one of the largest "energy storage platforms with capabilities including traditional lead acid as well as advanced lithium ion battery technology serving the global energy storage market" and the possible delivery of "at least $500 million in operational synergies over the first three years after closing." Id. at ¶74.

The plaintiffs allege that on April 4, 2016, the defendants filed "the S-4 with the Securities and Exchange Commission . . . ." Id. at ¶2. In a footnote, the plaintiffs state that "all references to the JCI/Tyco joint proxy/registration statement ('S-4') are to the document as filed with the SEC in final form on July 6, 2016." Id. at n.1. According to the plaintiffs, the "S-4" stated that

> Tyco and Johnson Controls have agreed that, from and after the execution of the merger agreement until the earlier of the effective time of the merger or the date, if any, on which the merger agreement is terminated, except as be required by law, *none of Tyco, Merger Sub*

8

*or Johnson Controls will*, and they will not permit any of their respective subsidiaries to, *take any action* (or knowingly fail to take any action) *that causes*, or could reasonably be expected to cause, *the 60% ownership test to be met with respect to the merger.*

Id. at ¶104. (Emphasis added by the plaintiffs.)

The plaintiffs assert that on April 8, 2016, the JCI board met by telephone with JCI management to discuss certain tax regulations and their impact on the transaction; the plaintiffs allege that after this discussion, "all members of the Johnson Controls board of directors present unanimously determined that the merger transaction with Tyco was still in the best interest of Johnson Controls and its shareholders because of, among other things, the strategic rationale for the combination and the operational synergies that could be achieved from the transaction." Id. at ¶209(d). The plaintiffs allege that the board decided that management should proceed with the merger on the terms set out in the agreement. Id. On April 21, 2016, "Johnson Controls and Tyco announced that they intended to proceed with the merger and that the combined company expected to deliver at least $650 million in operational and global tax synergies by the third year after closing." Id.

The plaintiffs allege that between January 4 and September 2, 2016, JCI's shares "traded between $35 and $46 per share." Id. at ¶169.

The merger closed on September 2, 2016; "JCI shareholders sold their JCI shares to Tyco for Tyco shares constituting 56% of Tyco/JCI plus cash at a price that was below or at the bottom of the ranges of values of JCI shares determined by Defendants' financial advisors." Id. at ¶1. The plaintiffs assert that

9

JCI shareholders received in exchange for approximately 83% of their JCI shares one ordinary share of JCplc for each share of JCI common stock plus cash for the remaining 17% of their JCI shares at $34.88 per share, which was below or at the bottom of the ranges of fair values of JCI shares determined by JCI's advisers. On September 2, 2016, JCI shares closed at $42.72. Tyco shareholders received for each ordinary share of Tyco 0.955 of an ordinary share of JCplc.

Id. at ¶5.

The plaintiffs allege that the new company has an eleven-member board of directors—six former JCI directors and five former Tyco directors. Id. at ¶78. They assert that at the time the amended complaint was filed in February 2017, defendant Molinaroli—formerly chairman, president and CEO of JCI, id. at ¶32—was the chairman and CEO of the new company, id. at ¶78. In February 2017, George Oliver, whom the plaintiffs assert was Tyco's CEO, was president and chief operating officer of the new company. Id. at ¶78. Molinaroli was to serve as chairman and CEO of the new company for eighteen months, after which Oliver would become CEO and Molinaroli would spend one year as executive chair; then Oliver would become chairman and CEO. Id.

The plaintiffs assert that on September 16, 2016—two weeks after the merger closed—JCI made a new disclosure on its website, stating that it intended to "'take the position' with the IRS that both the cash payment for the forced sale to JCI of approximately 17% of each Minority Subclass member's JCI shares and an additional portion of the JCplc shares received by JCI shareholders 'could potentially be treated as dividend' subject to ordinary income taxes." Id. at ¶129. "Thus, a substantial portion of the proceeds from the 'sale' of JCI shares in the merger may be taxed at what may be higher

ordinary income tax rates, not the previously understood more favorable capital gains rates." Id.

On October 3, 2016, JCplc disclosed in an Information Statement attached to an SEC Form 8-K "that the holding period of U.S. shareholders in JCplc was restarted as a result of the JCI/Tyco merger being treated as a taxable transaction and that this could have adverse tax effects on JCplc shareholders with respect to the distribution of Adient." Id. at ¶182. Recall that in the summer of 2015, JCI had indicated that the Adient spin-off would be tax free; the plaintiffs allege that by waiting until after the merger to complete the Adient spin-off, the defendants rendered the Adient spin-off taxable. Id. at ¶181.

      D.    The Structure of the Merger

Early in the amended complaint, the plaintiffs explain that they

> do not take issue with the purported business or financial merits of the Merger; Plaintiffs challenge only structuring the deal as an "inversion" (i.e., reincorporating JCI in Ireland and otherwise rendering the Merger taxable to JCI shareholders) to enable JCI/JCplc to implement earnings-stripping and other tax avoidance schemes to reduce U.S. taxes at the expense of JCI's minority taxpaying shareholders and diluting the JCI public shareholders' equity interest in JCplc to under 60% to avoid the inversion-related adverse tax consequences under IRC [Internal Revenue Code] §§ 4985 and 7874. Because it is the inversion structure and the accompanying tax avoidance schemes that have and will cause the injuries to Plaintiffs and fellow class members, and not JCI's acquisition of Tyco itself, the term "Inversion" is hereinafter from time to time used to refer to the Merger.

Id. at ¶8.

To understand the named plaintiffs' allegations, one first must understand how they held their stock. As of the day after JCI and Tyco signed

11

the merger agreement, each of the named plaintiffs held more than 200 shares of common stock in *taxable* accounts. Id. at ¶¶17, 28-30.[3] The named plaintiffs allege that because the defendants structured the merger in a way that made the transaction taxable to JCI shareholders, "JCI shareholders who held their JCI shares in taxable accounts and who have held the stock for over a year will pay federal taxes at rates of 20% to 30% on their gains, in addition to state capital gains and potentially ordinary income taxes." Id. at ¶17. The plaintiffs also allege that "[a]ll JCI public shareholders have been harmed," id. at ¶18, and their proposed class appears to be all public shareholders, not just those who held their shares in taxable accounts, id. at ¶64(a).[4]

Next, one must understand what the plaintiffs mean by an "inversion." The plaintiffs describe an inversion as

> a process by which a U.S.-domiciled "target" corporation (here, JCI) becomes a subsidiary of a foreign parent corporation (Tyco) and the shareholders of the U.S. corporation (JCI) become shareholders of the foreign parent in an exchange of their U.S. corporation's stock for stock in the foreign parent.

---

[3] Paragraph 30(rr) of the amended complaint states that Philip Zena of Town & Country, Missouri held in excess of 200 shares of JCI common stock but does not allege that he held it in a taxable account. The court assumes this is an oversight.

[4] The amended complaint alleges a "class" and a "minority subclass." Dkt. No. 53 at ¶64. The class is defined as JCI shareholders who held shares of JCI common stock during the relevant period "who were injured by the failure to disclose" and other "wrongful conduct" or who were entitled to vote on the merger or who sold their shares in connection with the merger for cash and JCplc ordinary shares as part of the share exchange. Id. at ¶64(a). The "minority subclass" is defined as those members of the class who held their shares in taxable accounts and includes those who "received the Adient spin-off as of October 21, 2016." Id. at ¶64(b).

12

<u>Id.</u> at ¶9. They allege that by changing the country in which it is domiciled,

> the U.S. corporation (which remains a U.S. corporation subject to U.S. taxes on its U.S.-source income) is able to shield the earnings from its foreign and, to a lesser extent, domestic operations from U.S. federal and state corporate income taxes; the new foreign parent is subject to a lower home country tax rate and no tax on its or its subsidiaries' foreign-source income derived from other countries.

<u>Id.</u> According to the plaintiffs, this is because, while the U.S. taxes all income of U.S. corporations regardless of the source, "almost all developed countries (and all of the popular foreign lower-tax domiciles, like Ireland) tax only the income earned by the locally-domiciled company in that country ('territorial taxation')."

<u>Id.</u> The plaintiffs explain that

> [a]lthough widely viewed as a "tax inversion," the Merger technically was not an inversion to the extent that it evaded the anti-inversion provisions found in [26 U.S.C.] § 7874 and the anti-inversion excise tax found in [26 U.S.C.] § 4985, which evasion was accomplished by the improper dilution of JCI shareholders' equity interest in JCplc to under 60%. However, the Merger was structured to enable JCI to move its domicile to Ireland to take advantage of its lower corporate tax rate and earnings-striping and other tax avoidance schemes, as a result of which certain JCI shareholders are being forced to pay taxes, all of which are characteristic of "inversions."

<u>Id.</u> at ¶7.

A section of the amended complaint titled "The Notoriety of Inversions" expands on the plaintiffs' implication that in structuring the merger as an "inversion," the defendants did something increasingly recognized in policy circles as improper or ill-advised.[5] <u>Id.</u> at ¶¶116-123. Citing articles from the Washington Post and the New York Times (one of which allegedly quoted former

---

[5] The plaintiffs also refer to what the defendants did as "tax sleight-of-hand." Dkt. No. 53 at ¶12.

13

President Barak Obama), a legal blog and a law review article by a pair of authors (one of whom was Deborah Paul, a partner at the law firm of defense counsel Wachtell Lipton), the plaintiffs argue that inversions have been criticized for eroding the U.S. tax base and assert that "[t]he practice of reimbursing directors of inverting corporations for inversion-related taxes imposed on directors and senior officers has been widely criticized." Id. at ¶¶118, 122.

At paragraph 20 of the amended complaint, the plaintiffs first mention the phrase "'busted' merger." Id. at ¶20. In a footnote, they state that a "busted" merger "is a merger that fails to satisfy one or more of the requirements of [26 U.S.C.] § 368 to achieve a tax-free reorganization." Id. at n.5. Later in the amended complaint, the plaintiffs assert that "[w]hile the usual corporate acquisition or merger is arranged to be tax-free under IRC [Internal Revenue Code] § 368 to its shareholders for obvious reasons, here the JCI Defendants intentionally avoided § 368 by 'busting the merger,' so that the Merger would fall outside of the tax-free treatment of § 368 and would be taxable to tax-paying shareholders without regard to § 367(a)'s taxing of inversions." Id. at ¶131. They assert that "[a] publicly held corporation will construct a 'busted merger'—i.e., to deliberately deny their shareholders tax-free treatment of a merger—to enable losses to be recognized or to increase basis, which invariably requires the payment of capital gains taxes." Id. at

14

¶134.[6]

In asserting that the defendants deliberately chose an "inversion" and a "busted merger" for the tax advantages they allegedly provide, the plaintiffs reference several tax statutes: 26 U.S.C. §§7874, 4985, 367, 368 and 1001. The plaintiffs characterize the first two statutes—§§7874 and 4985—as "anti-inversion regulations." Id. at ¶12. Section 7874 is titled "Rules relating to expatriated entities and their foreign parents," and it subjects a "foreign" corporation to certain tax treatment if that entity acquired all or substantially all the properties of a domestic corporation and, after the acquisition, at least 60% of the stock of the entity was held by former shareholders of the domestic corporation. 26 U.S.C. §7874. Section 4985 is titled "Stock compensation of insiders in expatriated corporations," and imposes a tax on those who meet the definition of "insiders" in the event a gain is realized from an "inversion." The definition of "expatriated corporation" is the same definition provided in §7874, which includes the requirement that at least 60% of the stock in the "foreign" corporation be held by former shareholders of the acquired domestic corporation. 26 U.S.C. §4985(e)(2).

The plaintiffs assert that 26 U.S.C. §368 "provides that, if the reorganization satisfies the requirements of § 368, the transaction is tax-free to

---

[6] The court could not find in the amended complaint a citation to any authority or source for the plaintiffs' definition of the phrase "busted merger." A quick Google search of that phrase brings up articles about mergers that fell apart after protracted negotiation and due diligence, which is not the way the plaintiffs use the phrase.

Case 2:16-cv-01093-PP   Filed 11/03/21   Page 15 of 105   Document 89

the corporation's shareholders." Dkt. No. 53 at ¶148.[7] They assert that 26 U.S.C. §367(a) "provides an exception from such tax-free treatment for inverting corporations," id.[8], and contend that it, too, is intended to "discourage inversions," id. at ¶10. Finally, the plaintiffs cite 26 U.S.C. §1001, which is the provision of the tax code that governs the computation of the amount of gain or loss and the recognition of gains or losses.

On top of this collection of tax statutes, the plaintiffs state that there are two relevant rules created by IRS regulations. The first rule "requires shareholders of inverting U.S. corporations to recognize capital gain and pay taxes if applicable, in part to offset some of those corporations' future lost U.S. income taxes." Id. at ¶149 (citing §367(a) and 26 C.F.R. §1.367(a)-3). The second is a "separate rule" under §367(b) and Treas. Reg. §1.367(b)-10, which the plaintiffs allege requires the inverting corporation to pay taxes "to the extent that corporation uses the inversion as an opportunity to distribute earnings as part of the transaction." Id. at ¶149 and n.45. The plaintiffs allege that when both rules apply, a "special tiebreaker rule imposes only the rule resulting in the greater amount of income subject to tax." Id. at ¶149. As the

---

[7] The title of §368 is "Definitions relating to corporate reorganizations;" it applies to mergers generally, not just mergers that result in a change in the domicile of the corporate entity.

[8] "If, in connection with any exchange described in section 332, 351, 354, 356, or 361, a United States person transfers property to a foreign corporation, such foreign corporation shall not, for purposes of determining the extent to which gain shall be recognized on such transfer, be considered to be a corporation." 26 U.S.C. §367(a)(1), "Transfers of Property from the United States; General Rule."

16

plaintiffs explain it, "in the circumstance when both rules apply, the larger of the inverting corporation's income subject to tax under § 367(b) or the shareholders' built-in gain under § 367(a) takes priority in determining whether the corporation or the shareholders are to be taxed on the inversion." Id.

The plaintiffs allege that the defendants paid "careful attention to the intricacies of the . . . anti-inversion regulations," id. at ¶12, and used that knowledge to structure the merger to "skirt [JCplc's] obligation to pay its fair share of taxes to the United States" and instead seek "tax shelter in Ireland as an Irish corporation," id. at ¶15, thus shifting "a significant portion of its liability for future U.S. taxes on its historic and future earnings to its taxpaying shareholders, by forcing them to pay capital gains and potentially ordinary income taxes, and at the direct expense of all JCI public shareholders, by improperly diluting their equity interest in JCplc," id. at ¶11. They assert that

> [t]he inversion-imposed tax consequences cause a significant divergence of interests between the inverting corporation and the inverting corporation's non-taxable shareholders, on the one hand, and the inverting corporation's taxable shareholders, on the other. The inverting corporation's non-taxable shareholders include pension funds, non-profit organizations, institutional investors, and those individual shareholders who hold their JCI shares in IRAs, 401(k), 403(b), or other tax-deferred accounts, for whom taxable gain realized by shareholders under the 367(a) rules is not subject to tax and thus not a relevant consideration.

Id. at ¶152.

Understanding the tax statutes and regulations is necessary to understand the plaintiffs' allegations of a "busted merger" and the dilution of their equity in the new company. The plaintiffs allege that the defendants failed to disclose the fact that the defendants deliberately "busted" the merger (by the

17

plaintiffs' definition, structured the merger so that it would fail the requirements of §368) to prevent the company from having to pay taxes under §367(b). Id. at ¶133. They assert that given the interplay between the two anti-inversion regulations—the fact that, as they put it, "the larger of the inverting corporation's income subject to tax under § 367(b) or the shareholders' built-in gain under § 367(a) takes priority in determining whether the corporation or the shareholders are to be taxed on the inversion," id. at ¶149—there was no way that the merging entities could have stated unequivocally in the January 25, 2016 merger announcement that the merger would be taxable to JCI shareholders unless they had deliberately taken some action to ensure that §367(b) would not apply, and the plaintiffs allege that that "action" was the intentional "busting" of the merger. Id. at ¶¶148-174.

As best the court can tell, the amended complaint does not specify what actions the plaintiffs believe the defendants took to ensure that the merger would not meet the requirements of §368, but the amended complaint references two declarations from the preliminary injunction briefing. See id. at ¶133 (citing Dkt. No. 37 at ¶¶6–7; Dkt. No. 38 at ¶¶10–11). One is a declaration from Steven Janowksi, vice president of corporate global taxation at JCI. Dkt. No. 37. The other is a declaration from an attorney named H. David Rosenbloom of the law firm of Caplin & Drysdale, Chartered and a visiting professor of tax at NYU Law School. Dkt. No. 38. The declarations list several reasons the affiants believe the merger didn't meet the requirements of §368:

- Janowski and Rosenbloom stated that Merger Sub was a limited

18

liability company, not a corporation. Dkt. No. 37 at ¶6; Dkt. No. 38 at ¶10.

- Rosenbloom and Janowski stated that JCI shareholders received a combination of consideration rather than just stock or just cash. Id.

- Rosenbloom stated, citing Revenue Ruling 74-564, that "the other consideration" JCI shareholders received other than cash "was stock of a corporation (Tyco) that was both a direct and indirect owner of the merged limited liability company." Dkt. No. 38 at ¶10.

- Rosenbloom stated that after the merger JCI didn't "hold substantially all of the properties held by JCI and the merged limited liability company prior to the Merger." Id.

- Janowski stated that even if Merger Sub had been a corporation, "the Merger still would not have qualified as a reorganization due to the introduction of additional leverage at JCI and the recent spin-off of JCI's automotive business." Dkt. No. 27 at ¶6.

The plaintiffs imply that these declarations show that the defendants engineered the above circumstances deliberately to ensure that the merger would not meet the requirements of §368, stating that "[t]he 'busted merger' was first disclosed by Defendants in their response to Plaintiffs' motion for a preliminary injunction that JCI deliberately employed the 'busted' merger, which rendered IRC ¶ 368 inapplicable to the Inversion." Dkt. No. 53 at ¶133. The plaintiffs allege that the S-4 "failed to disclose both the use of a 'busted'

19

merger and an earnings-stripping scheme." Id.[9]  The plaintiffs also allege that the defendants waited until after the merger to reveal that JCI would treat the shareholders' consideration for the merger as a dividend under tax law. Id. at ¶¶129–136.

The plaintiffs allege that the defendants contractually bound themselves "to prevent JCI public shareholders from getting 60% or more of JCplc's equity." Id. at ¶105. They allege that the defendants took steps to reduce JCI shareholder equity in JCIplc to less than 60% to avoid the merger being subject to taxes under 26 U.S.C. §7874 and to avoid the insiders being subject to the excise tax imposed by 26 U.S.C. §4985. Id. at ¶¶107, 111. The plaintiffs assert that as a result, "JCI public shareholders were short-changed by $5.46 billion to enable the Individual Defendants to dodge $4 million in excise taxes and JCI/JCplc to protect $450 million in tax savings." Id. at ¶111.

The plaintiffs identify two strategies that they contend the defendants used to ensure that the transaction did not trigger the 60% threshold:

First, they allege that the defendants "determined that 17% of JCI's shares would need to be redeemed in order to reduce the amount of JCplc equity to be allocated to JCI shareholders to significantly less than 60% to shield JCI/JCpls's senior officers and directors and JCI/JCIplc from the anti-inversion tax consequences otherwise applicable to inverting corporations and

---

[9] The information the defendants provided in these declarations and other documents they filed in opposition to the plaintiffs' motion for injunctive relief appears to be what prompted the plaintiffs to amend the complaint—the plaintiffs wanted to add the allegations of deliberate "merger busting."

their senior officers and directors under IRC §§ 4985 and 7874." Id. at ¶196. So, they allege, the defendants "forced" JCI stockholders to sell approximately 17% of their shares at $34.88 per share. Id. at ¶72. The plaintiffs assert:

> JCI stockholders were given the option to receive either one share of JCplc for each of their JCI shares or cash equal to $34.88 per share. Elections by JCI shareholders to receive cash were subject to proration such that an aggregate of no more than $3.86 billion in cash would be paid in the merger; elections by JCI shareholders to receive only JCplc share were subject to enough JCI shareholders electing to receive the $3.86 billion in cash. Because holders of only 1.1% of JCI shares elected to receive cash for their shares, all JCI shareholders were forced to sell approximately 17% of their JCI shares to JCplc for cash at $34.88 per share and receive JCplc ordinary shares for the remaining approximately 83% of their JCI shares. Stated differently, for each JCI share, a JCI shareholder received $6.085 and 0.8255 JCplc share, which valued each JCI share at $34.88.

Id. at ¶72.

The plaintiffs claim that $34.88 per share "was below or at the bottom of the ranges of fair values of JCI shares determined by JCI's and Tyco's advisors, amounting to a 25% *discount* to the average of the medians of the ranges of per share values for JCI shares by said advisers ($46.24),[10] notwithstanding that JCI was the *acquired* company according to the transaction's legal structure

---

[10] In their response to the plaintiffs' a supplemental brief, the defendants challenge the plaintiffs' repeated assertion that the calculations of the financial advisors show that JCI shareholders should have received a per-share price of $46.24. Dkt. No. 72 at 3. They point out that the plaintiffs took the information disclosed in the proxy statement about the financial advisors' calculations, then "selected the 'average of the median values' of the [advisors'] valuation ranges *without explanation* (why not the median of the medians? why not the 75th percentile?) and unilaterally declared that this is the price JCI stockholders should have received." Id. (emphasis in the original). See Dkt. No. 53 at ¶199 for the plaintiffs' summary of the S-4's disclosures about how Barclays, Centerview and Lazard Freres calculated ranges of values for a share of JCI common stock.

and tax treatment." Id. at ¶73 (emphasis in the original).

They assert that in contrast, "[p]rior to the merger, Tyco effected a reverse stock split pursuant to which Tyco shareholders received a fixed exchange ratio of 0.9550 of a JCplc share for each of their existing Tyco shares, resulting in Tyco shareholders receiving shares valued at $34.88 per share for their Tyco shares." Id. at ¶71.

The plaintiffs appear to argue that the defendants engineered a discount in the price of JCI shares so that the merger would avoid triggering the 60% post-acquisition threshold and the ensuing anti-inversion tax consequences.

Second, the plaintiffs claim that the defendants deliberately delayed what was supposed to have been a tax-free spin-off of the new company, Adient. When JCI announced in the summer of 2015 that it planned to separate its automotive business into a new business, JCI said that this "spin-off" would be tax-free. Id. at ¶176. The plaintiffs assert, however, that in April 2016 when the defendants first filed the S-4, the S-4 revealed that JCI would complete the spin-off *after* consummation of the merger. Id. at ¶177. The S-4 revealed that former JCI shareholders would own only approximately 56% of Adient shares after the spin-off. Id. at ¶178. The plaintiffs allege that

> [g]iven that Adient represented over half of JCI's market capitalization, spinning off Adient before the Merger closed likely would have reduced JCI shareholders' share of JCplc's equity to under 50%, in which case the Merger would not have been subject to §§ 367, 4985, or 7874, and there would have been no need for the dilution or the "busted" merger. In that event, JCI would not have been able to tout the Merger as an acquisition of Tyco by JCI, the Individual JCI/JCplc Defendants would not have been able to become a majority of the JCI/JCplc board and Molinaroli might not have been able to become chief executive officer.

22

Id. at ¶179. Relevant to the defendants' alleged desire to avoid triggering the 60% post-acquisition threshold, the plaintiffs assert that "[a]n Adient spin-off prior to the Merger risked being subject to the IRS's 'skinnying-down' anti-inversion rules, pursuant to which the IRS might disregard the spin-off in calculating whether JCI shareholders' equity interest in JCplc was under 60%." Id. at ¶181 n.57 (citing the S-4 at 55-56).

Reiterating that in October 2016, after the merger closed, the new company revealed that the Adient spin-off would be treated as a dividend, id. at ¶192, the plaintiffs also assert that because the defendants delayed the Adient spin-off until after the merger, the plaintiffs who held their JCI shares in taxable accounts were taxed twice—once when the value of Adient was included in "their taxable capital gain triggered by the exchange of their JCI shares for Tyco/JCplc shares," and again when "the value of Adient, already having been taxed as a capital gain, was again taxable as a dividend at ordinary income tax rates," id. at ¶193. They assert that the S-4 did not reveal that this would happen. Id. at ¶¶194-195.

Finally, the plaintiffs argue that the S-4 (and thus, the defendants) misled them into believing that the merger was for and in their best interests. Id. at ¶223. The plaintiffs allege that much of the millions of dollars in fees paid to JCI's financial advisors—Centerview and Barclays—was contingent on the completion of the merger. Id. at ¶213. Both advisors concluded the merger was fair to shareholders. Id. at ¶¶214, 219. Centerview qualified, however, that it was not opining on the fairness of the "forced buyback" of shares or the

exchange ratio. Id. at ¶217. Barclays specified that it was not opining as to the

tax consequences of the transaction, the value of the shares to JCI

stockholders, the fairness of compensation to the officers or the fairness of

cash and stock consideration. Id. at ¶221. The plaintiffs assert that in opining

that the merger was "fair" to the shareholders, neither Centerview nor Barclays

considered "the substantial adverse tax consequences to the Minority

Taxpaying JCI Shareholders" or the "Inversion-Driven Costs to all JCI public

shareholders." Id. at ¶225.

The plaintiffs allege that the defendants had five options for structuring

the merger, given the requirements of the tax code:

(a) No inversion (i.e., no reincorporation in Ireland), thereby
avoiding exposure to IRC §§ 4985 and 7874 and the need (i) to limit
JCI shareholders' equity interest in JCplc to under 60% to evade
§§ 4985 and 7874, (ii) to "bust" a tax-free merger to protect earnings-
stripping and other tax avoidance schemes, (iii) to delay the Adient
spin-off, and (iv) to force the Minority Taxpaying JCI Shareholders
to pay capital gains, ordinary income, and other taxes;

(b) Structure the Merger (reincorporation in Ireland) in a manner
whereby JCI/JCplc would avoid U.S. income taxes on its future
foreign earnings but would pay U.S. withholding taxes on its existing
earnings and profits (up to the value of JCI), thereby sparing JCI
shareholders from being forced to pay the Inversion/Merger-
imposed taxes, and pay all JCI shareholders a fair value for their
shares in the Merger;

(c) Structure the Merger (also reincorporating in Ireland) in a
manner whereby JCI/JCplc would avoid U.S. income taxes on its
future foreign earnings but force its shareholders to pay capital
gains taxes instead of paying the inversion-imposed taxes itself;

(d) Structure the acquisition as a "busted" merger, thereby
finessing the choice between the second and third options, to enable
JCI to avoid U.S. taxes on both its historic domestic and
unrepatriated foreign earnings (through the earnings-stripping and
other tax avoidance schemes) and future foreign earnings (through

24

the reincorporation) and also protect the Individual Defendants from the excise tax but subject it shareholders to the Inversion-Driven Costs, including the inversion-imposed taxes because of the reincorporation (third choice); and/or

(e)     Allow the Adient spin-off to proceed as tax-free, and thus allow the Merger (including the reincorporation and the accompanying tax savings) to be tax-free to JCI shareholders, or to delay it to protect Defendants' tax avoidance scheme and thereby convert the spin-off into a doubly taxable event and preclude the Merger from tax-free treatment.

Id. at ¶271. The plaintiffs assert that the defendants chose "[t]he third, fourth, and fifth options," with the result that they obtained the "maximum tax benefits that they were seeking but imposed the maximum Inversion-Driven Costs on JCI public shareholders and the Minority Taxpaying JCI Shareholders." Id. at ¶274.

And the plaintiffs contend, over seventy-four pages and seventy paragraphs containing multi-part block quotes from the S-4, that the defendants did not disclose that these options existed, which of these options had been considered and what the likely impact of the defendants' choices—the ones that were not made and the ones that were—would be on shareholders who held their JCI shares in taxable accounts, either by omitting information or providing false and misleading information. Id. at ¶¶183-253.

E.     The Allegations of Concealment

The section of the amended complaint that alleges that the defendants concealed material facts from the plaintiffs is Section IV. It consists of fifty-eight paragraphs of factual allegations, many of which appear in other sections of the amended complaint. The plaintiffs summarize the factual allegations in

25

the opening paragraph of the section:

> Defendants' "Inversion/Merger Tax avoidance Scheme" consisted of five elements:
>
> (a)  JCI's reincorporation in Ireland pursuant to which JCI will achieve a lower tax rate and avoid US. taxes on future foreign earnings;
>
> (b)  The "busted" merger by which JCI/JCplc will protect its earnings-stripping and other tax avoidance schemes to avoid U.S. taxes on existing "trapped" foreign earnings and reduce U.S. taxes on domestic earnings;
>
> (c)  Delaying the Adient spin-off, by which what would have been a tax-free spin-off of JCI's automotive business became, first, part of the §§ 367(a)/1001 taxable capital gain and, second, a dividend taxable as ordinary income to ensure JCI shareholders received less than 60% of JCplc's equity;
>
> (d)  The dilution of JCI public shareholders' equity interest in JCplc to protect Defendants from the adverse tax consequence applicable to inverting corporations and their officers and directors pursuant to §§ 4985 and 7874, which included pricing JCI's shares below or at the bottom of the ranges of fair values of JCI shares determined by JCI's and Tyco's advisers for purposes of allocating JCplc's equity between JCI and Tyco shareholders; and
>
> (e)  The forced buyback[11] of 17% of JCI shares from its shareholders at a price of $34.88 per share, which was below or at the bottom of the ranges of fair values calculated by JCI's and Tyco's financial advisers, to reduce JCI shareholders' share of JCplc equity to under 60%.

Id. at ¶124. They claim that these tactics were employed to achieve three tax

---

[11] As the defendants point out in the brief in support of their motion to dismiss, it is not clear why the plaintiffs refer to surrender of their JCI shares as a "buyback." Dkt. No. 56 at 27 n.8. The defendants recount that "JCI shareholders were able to choose between receiving cash (at a rate of $34.88 per share), shares, or a mix of both as consideration in the merger. Those shareholders who opted for cash and faced proration were not selling their shares of JCI back to JCI; shares of JCI *no longer exist*. . . . The value of their new shares of JCplc going forward will be set by the market, not the merger." Id. (citing Dkt. No. 56-1 at 31; Dkt. No. 53 at ¶46).

advantages: avoiding taxes on future foreign earnings, shifting "current U.S.-derived earnings to Ireland to be taxed under Ireland's lower tax rates," and shifting JCI's "existing trapped foreign earnings to Ireland to be taxes under Ireland's lower tax rates." Id. at ¶125.

Subsection IV(D) lists six categories of allegedly material facts that the plaintiffs assert the defendants concealed: facts regarding "JCI shareholders' liability for taxes and JCI/JCplc's avoidance of taxes" (Section IV(D)(1), id. at ¶¶183-187); facts regarding "the 'busted' merger" (Section IV(D)(2), id. at ¶¶188-190); facts about "the doubly taxable Adient spin-off" (Section IV(D)(3), id. at ¶¶191-195); facts about "the forced buy-back of 17% of JCI shares to avoid §§ 4985 and 7874" (Section IV(D)(4), id. at ¶¶196-203); facts about "the Individual Defendants' lack of exposure to the Inversion/Merger-related taxes and the cost to JCI public shareholders of shielding the Defendants from §§ 4985 and 7874" (Section IV(D)(5), id. at ¶¶204-208); and facts about "the projected $450 million in tax savings from the Inversion" (Section IV(D)(6), id. at ¶¶209-210). Each of these sections first states factual allegations about the merger, then quotes large chunks of the S-4, then concludes by listing facts that the plaintiffs argue should have been disclosed in the quoted sections of the S-4 about the particular factual allegations.

## II.     The Procedural History

The plaintiffs filed their complaint on August 16, 2016. Dkt. No. 1. At that time, the merger was pending. Forty-five days later, the plaintiffs filed a motion for injunctive relief, dkt. no. 14, asking the court to enjoin the "JCI

27

Defendants" "from continuing to act in a manner that will force the Minority Subclass to pay taxes and from falsely reporting to the IRS that JCI shareholders owe capital gains taxes in connection with the Inversion," dkt. no. 15 at 32. After the motion had been fully briefed, the plaintiffs asked for an extension of the deadline by which to amend the complaint. Dkt. No. 44. The court granted that request. Dkt. No. 50.

On January 4, 2017, the court held a hearing on the motion for preliminary injunction. Dkt. No. 51. Three weeks later, it denied the motion. Dkt. No. 52. On February 15, 2017, the plaintiffs filed the amended complaint. Dkt. No. 53. The defendants filed their motion to dismiss on April 3, 2017. Dkt. No. 55. As the court has conceded, it did not hold a hearing on the motion until October 17, 2019. Dkt. Nos. 67-69. Four days later, the plaintiffs asked for leave to file a supplemental brief. Dkt. No. 71. The defendants responded that while the plaintiffs had provided no basis for filing a supplemental brief, they did not object to the court considering it as long as the court also considered their response. Dkt. No. 72.

On June 4, 2021—some twenty months after oral argument on the motion to dismiss—the plaintiffs asked the court to allow them to conduct discovery to obtain documents produced by the defendants in a 2016 state-court putative class action in which the plaintiffs had alleged that JCI and its directors had breached their fiduciary duties in relation to the merger. Dkt. No. 76. The defendants opposed this motion, arguing that the plaintiffs had not alleged any undue prejudice and that they had not identified any particularized

28

discovery they would seek if the court were to grant the motion. Dkt. No. 78.

Finally, in early August of this year, the plaintiffs asked the court to modify the stay to allow them to serve subpoenas on non-parties. Dkt. No. 81. The defendants also objected to this motion. Dkt. No. 84.

## III. The Claims

The amended complaint raises twelve claims. The first two are based on federal statutes. Count I asserts that in making the allegedly false and misleading statements in the S-4, the JCI defendants violated §14(a) of the Securities and Exchange Act of 1934 (15 U.S.C. §§78n(a)), SEC Rule 14a-9 (17 C.F.R. §240.14a-9) and SEC Rule 14a-101 (17 C.F.R. §240.14a-101). Dkt. No. 53 at ¶302-307. It also asserts that the individual defendants violated §20 of the Act as "controlling persons." Id. at ¶308-310.

In Count II, the plaintiffs allege that the corporate defendants either filed, or were going to file, false Forms 1099 in violation of the Taxpayer Bill of Rights II (26 U.S.C. §7434). Id. at ¶¶312-317.

The last ten claims are state-law claims. In Count III, the plaintiffs allege that the individual defendants violated state law fiduciary duties of due care, disclosure, good faith, loyalty, and fair dealing by structuring the merger to benefit the corporation and harm the plaintiffs. Id. at ¶¶318-337. Count IV alleges that the corporate defendants aided and abetted the individual defendants in violating these duties. Id. at ¶¶338-347. Count V alleges that all the defendants were unjustly enriched by the merger structure and demands restitution. Id. at ¶¶348-353. Count VI alleges that the individual defendants

29

aided and abetted the unjust enrichment of JCI and JCplc. Id. at ¶¶354-360.

Count VII claims that the corporate defendants wrongfully converted the

plaintiffs' JCI stock through the merger, and that the individual defendants

aided and abetted that conversion. Id. at ¶¶361-366. Count VIII asserts that

the JCI defendants violated Wis. Stat. §180.0601 by treating shareholders with

shares in taxable accounts differently from shareholders with shares in non-

taxable accounts. Id. at ¶¶367-373. Count IX alleges that all the defendants

conspired to "(1) shift a substantial portion of JCI's and JCplc's liability for U.S.

income taxes to the Minority Taxpaying JCI Shareholders and (2) impose on

JCI shareholders the Inversion-Driven Costs to enable Defendants to avoid the

anti-inversion tax consequences imposed by the Code on inverting corporations

and their officers and directors." Id. at ¶376. Count X alleges that the JCI

defendants tortiously interfered with JCI's duties under its articles of

incorporation, a valid contract under Wisconsin law. Id. at ¶¶380-387. Count

XI alleges that JCI breached its contractual duties under its articles of

incorporation by structuring the merger to impose tax burdens on the plaintiffs

and to reduce the plaintiffs' equity in the new company. Id. at ¶¶388-393.

Finally, Count XII alleges that JCI breached the covenants of good faith and

fair dealing. Id. at ¶¶394-402.

## IV.    Jurisdiction

The amended complaint does not identify the statutory basis for the

court's jurisdiction. The court assumes that the plaintiffs intended to assert

that the court has 28 U.S.C. §1331 federal question subject matter jurisdiction

30

over the claims in Count I (violations of federal securities laws) and Count II (violation of the federal Taxpayer Bill of Rights II), because the plaintiffs describe those two claims in the jurisdictional statement. Dkt. No. 53 at ¶25. They also mention "the Court's pendent jurisdiction;" by this, the court assumes they mean that because the court has federal question jurisdiction to hear the first two claims, it may exercise its supplemental jurisdiction under 28 U.S.C. §1367 over the ten state-law claims. Id.

## V.    **Legal Standard**

To survive a motion to dismiss brought under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Rule 12(b)(6) "tests the sufficiency of the complaint, not the merits of the case." McReynolds v. Merrill Lynch & Co., 694 F.3d 873, 878 (7th Cir. 2012). The allegations in the complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Plaintiffs need not provide detailed factual allegations, but they must provide enough factual support to raise their right to relief above a speculative level. Twombly, 550 U.S. at 555. A claim must be facially plausible, meaning that the pleadings must "allow . . . the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 The claim must be described "in sufficient detail to give the defendant 'fair notice of what the . . . claim is and the grounds upon which it rests.'" E.E.O.C. v. Concentra Health

31

Servs., Inc., 496 F.3d 773, 776 (7th Cir. 2007) (quoting Twombly, 550 U.S. at 555).

In ruling on a 12(b)(6) motion to dismiss, the court generally considers only those facts alleged within the four corners of the complaint. See Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.") But "[d]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." Adams v. City of Indianapolis, 742 F.3d 720, 729 (7th Cir. 2014) (quoting Menominee Indian Tribe of Wis. v. Thompson, 161 F.3d 449, 456 (7th Cir. 1998)). The defendants presented the court with documents outside the pleadings, both as attachments to the motion to dismiss, dkt. nos. 56-1 through 56-5, and as an exhibit to a declaration of defense counsel, dkt. no. 57-3. The amended complaint references some of those documents, but not all of them; the court has considered only those documents referenced in, and central to the claims in, the amended complaint, such as the combined registration/proxy statement (dkt. no. 56-1; the plaintiffs also provided it at dkt. no. 59-1) and the Form 8-K (dkt. no. 56-2). The amended complaint also referenced documents the defendants filed in opposition to the motion for injunctive relief, Dkt. Nos. 37 and 38. Because the Seventh Circuit has held that on a motion to dismiss, a court may consider attached "documents that are central to the complaint and are referred to in it," Williamson v. Curran, 714 F.3d 433, 436 (7th Cir. 2013)

32

(citing <u>Geinosky v. City of Chi.</u>, 675 F.3d 743, 745 n.1 (7th Cir. 2012)), the court has considered those documents.

The Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. §78u-4, "is applicable to suits under section 14a [of the Securities and Exchange Act]. <u>Beck v. Dobrowski</u>, 559 F.3d 680, 681-82 (7th Cir. 2009). The PSLRA states that complaints alleging omissions or untrue statements of material fact "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. §78u–4(b)(1). If a plaintiff fails to meet this standard, "the court shall . . . dismiss the complaint." 15 U.S.C. §78u-4(b)(3).

## VI. The Parties' Arguments

### A. Ddefendants' opening motion

The defendants first argue that Count I of the amended complaint does not meet the heightened pleading standard that the PSLRA imposes on §14(a) claims. Dkt. No. 56 at 20. Second, they argue that to state a claim under §14(a), the plaintiff must plead that any misrepresentation or omission was "material;" they contend that the plaintiffs have failed to demonstrate that any of the alleged misrepresentations or omissions were material. <u>Id.</u> at 24. Third, they argue that the PSLRA and the case law require the plaintiff to plead loss causation—that the alleged misrepresentations or omissions caused the losses for which the plaintiffs seek to recover damages. <u>Id.</u> at 31. The defendants

argue that the plaintiffs have alleged no harm caused by the combined S-4 registration statement/proxy statement and have not tied any injury to the alleged misrepresentations or omissions. Id. Fourth, they argue that the complaint does not plead a §14(a) claim against the non-director officers of JCI or the directors who did not sign the proxy statement. Id. at 33. Finally, they assert that the amended complaint does not state a "plausible control-person claim" under §20(a). Id. at 34.

The defendants argue that the court also must dismiss Count II, the claim that the corporate defendants (the term the plaintiffs use to refer to JCI, Tyco/JCplc and Merger Sub, dkt. no. 53 at ¶49) violated the Taxpayer Bill of Rights II (26 U.S.C. §7434). Id. at 35. They assert that the corporate defendants complied with the tax code and, in any event, that the plaintiffs have not alleged that there was any fraudulent intent, concealment or deception in the information on the Forms 1099 the corporate defendants filed. Id.

The defendants assert that the court must dismiss any claims relating to breach of fiduciary duty because the Wisconsin business judgment rule supports the judgment of corporate boards, officers and directors and because "with a shareholder base as broad and diverse as JCI's, it is simply not possible to please each shareholder with every decision, and the law does not require that boards do so." Id. at 37-38.

Finally, the defendants assert that the remaining state law claims are "just aliases" for the breach of fiduciary duty claims and must fail for the same reasons. Id. at 45.

B.    Plaintiffs' opposition

The plaintiffs respond that the amended complaint meets the heightened pleading standard under the PSLRA, because with respect to each alleged false and misleading statement in the S-4, they have given reasons why the statement is misleading. Dkt. No. 58 at 20. They assert that because the sufficiency of a pleading under the PSLRA's heightened pleading standard is determined on a case-by-case basis, "rulings in other cases on the adequacy of a complaint's allegations [are] of limited utility." Id. They next assert that the omitted facts are material, emphasizing the failure to disclose that JCI stockholders allegedly were short-changed $5.46 billion to achieve a tax savings of only $450 million and the allegation that the defendants and their financial advisors did not consider the impact of the inversion structure on stockholders like them. Id. at 25. They assert that they have adequately alleged loss causation by alleging the $5.46 billion cost of the $450 million tax savings and the fact that they are being forced to pay hundreds of millions in taxes. Id. at 28. They assert that they have alleged "control person" liability under Section 20, noting that this is a factual question often not susceptible to determination at the pleadings stage. Id. at 29.

The plaintiffs also assert that they have stated a claim under the Taxpayer Bill of Rights II, arguing that the 1099s issued by JCplc to the JCI shareholders were "the product of a scheme that was conceived by the Individual Defendants in breach of their fiduciary duties and approved by uninformed JCI shareholders on the basis of a misleading proxy statement that

35

violated Rule 14a-9." Id. at 45. The plaintiffs assert that the actions that led to the issuance of the 1099s constituted intentional violations of legal duties; had those violations not happened, the plaintiffs would not have had to pay taxes and 1099s would not have been needed. Id. at 45-46.

The plaintiffs assert—reiterating many of the claims from the amended complaint—that the amended complaint states a claim for various breaches of fiduciary duty. Id. at 32. They emphasize a board's duty to maximize shareholder value, id., and while they concede that there were shareholder groups with varying interests, they argue that the defendants chose to maximize their own interests over those of any shareholder group, id. at 33-37. They argue that the Wisconsin business judgment rule applies only when corporate directors make "informed good faith decisions." Id. at 37. They assert that the defendants did not do that in structuring the merger and in failing to disclose information about that structure. Id. They assert that their other state-law claims are sufficiently pled. Id. at 46.

C.   Defendants' reply

In their reply brief, the defendants argue that the amended complaint violates Fed. R. Civ. P. 8. Dkt. No. 60 at 7.

They argue that despite the length of their opposition brief, the plaintiffs still have not identified what statements were misleading as the result of what omissions or why. Id. at 8-9. They assert that the plaintiffs have clearly conceded that the defendants disclosed that the merger would be taxable and that JCI shareholders would ultimately own 56% of the new company, and

36

characterize this as "fatal to plaintiffs' Section 14 claim." Id. at 11. They reiterate that the plaintiffs seek to assert a Section 20 claim against individual defendants who did not allow their names to be used to solicit proxies or participate in any drafting. Id. at 17.

The defendants again emphasize that the plaintiffs have not identified how the 1099s were inaccurate and repeat that the court must dismiss the Taxpayer Bill of Rights claim. Id. at 18.

They argue that the plaintiffs' fiduciary duty claims cannot survive the application of the Wisconsin business judgment rule. Id. at 18-19. They also urge the court to dismiss the claim as to the individual officer defendants because the amended complaint does not specify what each did wrong. Id. at 23. They conclude by briefly touching, again, on the remaining state-law claims. Id. at 24-27.

D.     Plaintiffs' motion for leave to file a supplemental brief

After the October 2019 hearing on the motion to dismiss, the plaintiffs asked the court to allow them to file a supplemental brief. Dkt. No. 71. They sought to respond to two issues raised at that hearing. Id. The proposed supplemental brief is only five pages. Dkt. No. 71-1. In it, the plaintiffs first sought to respond to a case the defendants had cited at oral argument, Trahan v. Interactive Intelligence Grp., Inc., 308 F. Supp. 3d 977 (S.D. Ind. 2018). Dkt. No. 71-1 at 1. The plaintiffs argue that Trahan is distinguishable from the facts in this case for several reasons. Id. at 1-4. Second, the plaintiffs recount that at oral argument, "the Court mentioned TSC Industries, Inc. v. Northway, Inc., 426

37

U.S. 438 (1976) and asked whether the Amended Complaint contained any allegations that the shareholder vote would have been different had the alleged omissions been disclosed." Id. at 4. The plaintiffs point out that they need not prove that the allegedly omitted information would have caused any shareholder to change his or her vote. Id. at 4-5.

The defendants responded to the motion. Dkt. No. 72. They asserted that the plaintiffs' attempt to distinguish Trahan does the opposite—it supports the defendants' assertion that the court should dismiss the amended complaint. Id. at 1-4. As for the question the court asked at the hearing, the defendants responded that "it is black letter law that plaintiffs must plead facts that demonstrate that an omitted fact would have been significant to a reasonable investor in deciding how to vote." Id. at 4.

## VII. Analysis

### A. Count I—Violations of §§14(a) and 20 of the Securities and Exchange Act of 1934

A "proxy" is a consent or authorization. 17 C.F.R. §240.14c-1. Section 14(a) of the Securities and Exchange Act of 1934—15 U.S.C. §78n—governs the solicitation of proxies from shareholders or investors. It states that it is "unlawful" for anyone to use the mail or interstate commerce to solicit proxies in violation of SEC rules and regulations. "Rule 14a-9"—17 C.F.R. §240.14a-9—states that

> [n]o solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false and misleading with respect to any material fact, or

38

which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. §240-14a-9(a).

"To state a claim under §14(a), a plaintiff must allege: (i) that the proxy contained a material misrepresentation or omission that (ii) caused the plaintiff's injury, and (iii) that the proxy solicitation was an essential link in accomplishing the transaction." <u>Kuebler v. Vectren Corp.</u>, 13 F.4th 631, 637 (7th Cir. 2021) (citing <u>Mills v. Elec. Auto-Lite Co.</u>, 396 U.S. 375, 384-85 . . . (1970)). "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." <u>TSC Indus.</u>, 426 U.S. at 449.

It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

<u>Id.</u>

Causation in securities law consists of two components: transaction causation and loss causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-42 . . . (2005); *Grace v. Rosenstock*, 228 F.3d 40, 47 (2d Cir. 2000). Transaction causation, often called reliance, is generally easier to establish than loss causation. See *Dura Pharmaceuticals*, 544 U.S. at 345-46 . . . . Where materiality is alleged and proven, proof of reliance on the particular statement or omission is not necessary. *Mills*, 396 U.S. at 384-85 . . . (rejecting court of appeals' additional requirement of proof that specific defect

39

in proxy statement actually had a decisive effect on voting). The proxy solicitation itself serves as the causal link in the transaction— that the challenged violation(s) caused the plaintiff to engage in the challenged transaction. *Id.* at 385 . . .: *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1099-1100 . . . (1991). The loss causation requirement, codified in the Private Securities Litigation Reform Act (PSLRA), requires a plaintiff to allege and prove that the challenged misrepresentations or omissions caused her economic loss. 15 U.S.C. § 78u-4(b)(4); *Dura Pharmaceuticals*, 544 U.S. at 342 . . .; see also *Law v. Medco Research, Inc.*, 113 F.3d 781, 786-87 (7th Cir. 1997) (§ 78u-4(b)94) codified judge-made "loss causation" rule).

Kuebler, 13 F.4th at 637-38. Although the Supreme Court has not yet decided whether both loss causation and transaction causation must be proven under Section 14(a), the Seventh Circuit has been "persuaded by the Second and Ninth Circuits" that the Supreme Court's reasoning that both must be proved under Section 10(b) of the Securities and Exchange Act "extends to Section 14(a) claims." Id. at 638 n.1 (citing Grace, 228 F.3d at 47; N.Y. City Emps. Ret. Sys. v. Jobs, 593 F.3d 1018, 1023 (9th Cir. 2010), overruled in part on other grounds by Lacey v. Maricopa Cty., 693 F.3d 896 (9th Cir. 2012) (en banc)).

      1.    *The complaint does not meet the heightened pleading standard of the PSLRA.*

In 2007, the Supreme Court explained why there is a heightened pleading standard in private securities fraud litigation. In Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007), Justice Ginsberg wrote:

This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission (SEC). See, *e.g.*, *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 345 . . . (2005); *J.I. Case Co. v. Borak*, 377 U.S. 426, 432 . . . (1964). Private securities fraud actions, however, if not adequately contained, can be

40

employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law. See *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71,81 . . . (2006). As a check against abusive litigation by private parties, Congress enacted the Private Securities Litigation Reform act of 1995 (PSLRA), 109 Stat. 737.

Exacting pleading requirements are among the control measures Congress included in the PSLRA. The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention "to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, and n. 12 . . . (1976); see 15 U.S.C. § 78u-4(b)(1), (2). . . . As set out in § 21D(b)(2) of the PSLRA, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

The Seventh Circuit has held, however, that "[t]here is no required state

of mind for a violation of section 14(a) [of the Securities and Exchange Act of

1934] . . . ." Beck, 559 F.3d at 682. The court explained that

a proxy solicitation that contains a misleading misrepresentation or omission violates the section even if the issuer believed in perfect good faith that there was nothing misleading in the proxy materials. *Kennedy v. Venrock Associates*, 348 F.3d 584, 593 (7th Cir. 2003); *In re Exxon Mobil Corp. Securities Litigation*, 500 F.3d 189, 196-97 (3d Cir. 2007); *Shidler v. All American Life & Financial Corp.*, 775 F.2d 917, 926-27 (8th Cir. 1985); *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1300-01 (2d Cir. 1973); 3 Alan R. Bromberg & Lewis D. Lowenfels, *Bromberg & Lowenfels on Securities Fraud & Commodities Fraud* § 8.4(430), pp. 204.71-72 (2d ed. 1996). The requirement in the Private Securities Litigation Reform Act of pleading a state of mind arises only in a securities case in which "the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind." 15 U.S.C. § 78u-4(b)(2). Section 14(a) requires proof only that the proxy solicitation was misleading, implying at worst negligence by the issuer. *Kennedy v. Venrock Associates, supra*, 348 F.3d at 593. And negligence is not a state of mind; it is a failure, whether conscious or even unavoidable (by the particular defendant, who may be below average in his ability to exercise due care), to come up to the specified standard of case. E.g., *Desnick v. ABC*, 223 F.3d 514, 518 (7th Cir.

41

2000); *United States v. Ortiz*, 427 F.3d 1278, 1283 (10th Cir. 2005); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 31, p. 169 (5th ed. 1984) ("negligence is conduct, and not a state of mind"). That is a basic principle of tort law, though it is sometimes overlooked, as in *Dasho v. Susquehanna Corp.*, 461 F.2d 11, 29-30 n. 45 (7th Cir. 1972).

Id.

Section 14(a) plaintiffs, then, need not allege scienter; rather, they "must identify each statement alleged to have been misleading, the reason why each statement was misleading, and all relevant facts supporting that conclusion." Kuebler, 13 F.4th at 638 (citing 15 U.S.C. §78u-4(b)(1)).

The defendants argue that the plaintiffs "point to 65 paragraphs (spanning 82 pages) of the Amended Complaint in which they cite more than 80 block quotations from the Proxy (several of which go on for multiple pages), some of which they claim were made misleading due to allegations in an assortment of preceding paragraphs, and all of which they claim were rendered misleading due to more than 130 alleged omissions." Dkt. No. 56 at 21 (citing the amended complaint, Dkt. No. 53 at ¶307, in which the plaintiffs reference the amended complaint at ¶¶183-248). They assert that this is "impermissible," and that "courts have aptly termed this improper method of pleading 'puzzle pleading' because it 'requires the Court and the defendants to piece together exactly which statements the plaintiff is challenging and which allegations contradict those statements.'" Id. (quoting Constr. Workers Pension Fund-Lake Cty. & Vicinity v. Navistar Int'l Corp., No. 13 C 2111, 2014 WL 3610877, at *4 (N.D. Ill. July 22, 2014) ("Courts around the country have made clear that a complaint does not satisfy the PSLRA's pleading standards when it quotes the

42

defendant at length and then uses a stock assertion that the statement is false or misleading for reasons stated in an earlier paragraph," and collecting cases)). The defendants characterize the amended complaint as a "mash-up" of block quotes and "imprecise allegations." Dkt. No. 56 at 21. They assert that the plaintiffs have not alleged what other statements became misleading or false as a result of any alleged omission, and that stuffing the amended complaint with lengthy block quotes from the proxy statement does not suffice. Id. at 21-22. The defendants also argue that the plaintiffs have not alleged why any fact transformed by an alleged omission is misleading or false, characterizing the plaintiffs' claims as "vague allegations that the block-quoted disclosures were 'false and misleading when made for failing to disclose' (Compl. ¶¶189, 195, 202, 248(c)) pages and pages of over a hundred items, labeled in conclusory fashion 'material facts . . . .'" Id. at 22.

As noted, in their reply brief, the defendants tossed in the argument that the amended complaint violated Fed. R. Civ. P. 8. It does. Rule 8(a)(2) requires a pleading to contain a "short and plain statement" of the claim. The amended complaint is not short; as the Seventh Circuit once colorfully said, it suffers from "extreme logorrhea." Davis v. Anderson, 718 F. App'x 420, 423 (7th Cir. 2017). It is 195 pages long—sixty-one pages longer than the original complaint—and contains 402 numbered paragraphs. Many of these paragraphs have dozens of sub-paragraphs (and even sub-sub-paragraphs). See, e.g., Dkt. No. 53 at ¶186. There are dozens of pages of block quotes, some of which have bolded or italicized language for emphasis. See, e.g., Id. at ¶185. The amended

43

complaint often is repetitive—for example, ¶¶6, 68 and 184 assert the same facts, as do ¶¶176 and 191; there are many more examples of duplication throughout the pleading. Four pages of the complaint are devoted to a discussion of the policy arguments against inversions; it is not clear what bearing this has on the legal claims, given that the plaintiffs do not (and cannot) allege that inversions are unlawful.

Nor is the complaint "plain." For example, the Section 14(a) cause of action is premised on the allegation that the defendants omitted information from a proxy statement. The amended complaint never directly states that the defendants issued a proxy statement or how. Paragraph 2 of the amended complaint states that by "causing, participating in, and agreeing to, or acquiescing in the filing of the S-4 filed with the Securities and Exchange Commission ('SEC') on April 4, 2016 as successively amended," some of the defendants breached their fiduciary duties. Dkt. No. 53 at ¶2. Nowhere do the plaintiffs explain that an "S-4" is an SEC registration statement. See https://www.sec.gov/files/forms-4.pdf. They drop a footnote to paragraph 2 in which they assert that "all references to the JCI/Tyco joint proxy-registration statement ("S-4") are to the document as filed with the SEC in final form on July 6, 2016." Id. at ¶2 n.1. The amended complaint then refers both to the S-4 and the "JCI/Tyco proxy/registration statement." Piecing this information together, it appears that on April 4, 2016, the defendants simultaneously filed with the SEC the first version of their S-4 Registration Statement and a shareholder proxy statement, or maybe they filed both as a combined

44

document, and that any references in the amended complaint to the "S-4," a "proxy" or a "registration statement" are references to the joint filing of these two documents. The amended complaint would be easier to follow if, early on, the plaintiffs simply had explained that on April 4, 2016, the defendants filed something called an S-4 registration statement with the SEC, and that they combined with that the proxy statement advising shareholders of the details of the proposed merger.

The amended complaint is not consistent in how it refers to the defendants. It indicates that "[d]efendants Molinaroli, Abney, Black, Joerres, del Valle Perochena, and Vergnano are *sometimes* referred to herein as the 'Individual JCI/JCplc Defendants.'" Dkt. No. 53 at ¶45 (emphasis added). It says that "[d]efendants Stief, Guyett, Jasnowski, Bushman, Conner, and Goodman are *sometimes* referred to herein as the 'Individual JCI Defendants.'" Id. (emphasis added). It says that "[d]efendants Molinaroli, Abney, Black, Bushman, Conner, Goodman, Joerres, Lacy Estate, del Valle Perochena, and Vergnano are *sometimes* collectively referred to herein as the 'Director Defendants.'" Id. (emphasis added). The amended complaint sometimes calls the new company "JCplc" and sometimes calls it "Tyco/JCplc." The amended complaint refers to "Individual Defendants," "Individual JCI/JCplc Defendants," "Individual JCI Defendants" and "Director Defendants"—as well as just "Defendants." Id.

The amended complaint often buries the lede, dropping into footnotes or later sections of the pleading facts that would help the reader better

45

understand the earlier claims. For example, the plaintiffs repeatedly reference the fact that the defendants had announced in 2015 that the Adient spin-off would be tax free but that they then waited to spin off the new business until after the merger. It is only in footnote 57 at page 65, ¶181 that the plaintiffs link the alleged deliberate delay in consummating the spin-off with any tax consequences, stating that completing the spin-off prior to the merger could have caused the IRS to "disregard the spin-off in calculating whether JCI shareholders' equity interest in JCplc was under 60%."

The early portions of the amended complaint discuss concepts that the plaintiffs do not explain (or sort of explain) until pages and pages later, and reference events that the plaintiffs do not explain until pages and pages later. As the court discusses below, later sections of the amended complaint cite earlier paragraphs which one must go back to and read to understand the allegations made in the later sections. A reader must flip forward and back to different portions of the amended complaint to determine what happened and when and how what happens relates to the claims.

But though the defendants made the Rule 8 argument in their reply brief, the Rule 8 violation is not the basis for their motion to dismiss. This court (and perhaps the defendants) likely would have found a more compact, concise and differently-organized complaint easier to digest and comprehend, but that is not a basis for dismissing a lawsuit with prejudice. The question is whether Count I of the amended complaint meets the heightened pleading standard under the PSLRA. The court thus turns to the portion of the amended

46

complaint in which the plaintiffs assert that the defendants concealed material facts—¶¶183-253.

In Section IV(D)(1), the plaintiffs allege that the defendants concealed material facts about their liability for taxes and the new company's avoidance of taxes. Dkt. No. 53 at ¶183. They reiterate that in its January 25, 2016 announcement of the merger, JCI advised shareholders—without qualification—that the merger would be taxable to them. Id. at ¶¶183-184. They assert that the only way JCI could have known with certainty on January 25, 2016 that the merger would be taxable to its shareholders was because they had structured the merger to make it so. Id. at ¶183. The amended complaint then reproduces a two-page, single-spaced section of the S-4 with four subsections. Id. at ¶185. The first sentence in the quoted section is, "Q: WHAT ARE THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE TRANSACTION TO JOHNSON CONTROLS SHAREHOLDERS?" Id. The plaintiffs bolded several phrases and sentences in the paragraphs that follow, including "will be treated as a taxable transaction for U.S. federal income tax purposes," "Certain U.S. Federal Income Tax Consequences . . .," "will be treated as a taxable transaction for U.S. federal income tax purposes," "will be taxable for U.S. federal income tax purposes," "U.S. Federal Income Tax Consequences of the Merger to Johnson Controls Shareholders," and "receipt of combined company ordinary shares . . . will be a taxable transaction for U.S. federal income tax purposes." Id.

The amended complaint next asserts that these representations, as well

47

as representations in ¶¶129 and 162 of the amended complaint, "were false and misleading for the reasons alleged in ¶¶ 128-69 and for failing to disclose the following material facts . . . ." Id. at ¶186. The reader must go back to ¶129 (which references the S-4's disclosure that the merger would be taxable and discusses the September 16, 2016 announcement on JCI's web site that it was going to take the position with the IRS that the cash and stock the JCI shareholders received could potentially be treated as a dividend subject to income taxes) and ¶162 (in which the plaintiffs aver that JCI stated with confidence in the January 25, 2016 announcement of the merger that it would be taxable to JCI shareholders "[n]otwithstanding the foregoing inherent uncertainties") to collect all of the representations the plaintiffs allege were false and misleading. Having reviewed these sections of the amended complaint, the court concludes that the plaintiffs are asserting that JCI's unequivocal representation to the shareholders in the S-4 (and in the public announcement of the merger, although that is not actionable under Section 14(a)) was false and misleading. The plaintiffs have identified which statements in the portion of the S-4 reproduced in ¶185 that they claim were false and misleading.

As to *why* they claim these statements were false and misleading, the plaintiffs reference *forty-one* paragraphs of the amended complaint—¶¶128-169—as well as asserting that the defendants "fail[ed] to disclose" five and a half pages of what the plaintiffs characterize as material facts. Id. at ¶186. Paragraphs 128-169 are the plaintiffs' description of what they characterize as

48

the "busted merger." In the five and a half pages of allegedly material facts, the plaintiffs assert that the S-4 omitted information about: (a) whether, in considering the merger, the "Director Defendants" considered:

(i)     that the need to pay capital gains and ordinary income taxes would particularly affect long-term Minority Taxpaying JCI Shareholders with a low basis in their JCI shares and could, among other things, force them to sell a significant number of their shares to provide the cash to pay the taxes;

(ii)     that forcing Minority Taxpaying JCI Shareholders to sell shares to pay these taxes would also deprive those shareholders of the dividends they have been receiving on those shares and upon which many of such shareholders depend for their retirement or other income;

(iii)     that the Inversion/Merger-related tax consequences would create a divergence of interests between the Minority Taxpaying JCI Shareholders, on the one hand, and the majority non-taxpaying JCI shareholders and JCI, on the other;

(iv)     that the JCI Defendants' determination to avoid the Inversion-related tax consequences pursuant to §§ 4985 and 7874 by limiting JCI shareholders' equity interest in JCplc to under 60% would create a divergence of interests between the JCI Defendants and JCI public shareholders;

(v)     that the Inversion was structured as a "busted" merger to protect JCI/JCplc's earning-stripping and other tax avoidance schemes, not to enable shareholders to realize losses;

(vi)     that structuring the Inversion as a "busted" merger to protect JCI/JCplc's tax avoidance schemes would mean circumventing the option to impose the Inversion-mandated taxes on JCI/JCplc, instead of the Minority Taxpaying JCI Shareholders;

(vii)     that related-party debt was to be created to enable JCI/JCplc's earnings-stripping scheme, resulting in JCplc being paid twice for the shares it issued in exchange for the shares of JCI shareholders (*see* ¶146 *supra*); and

(viii)     whether to reject reincorporating JCI in Ireland and thereby spare Minority Taxpaying JCI Shareholders from being forced to pay the Inversion-imposed taxes; or

49

(ix)    if JCI was to incorporate in Ireland, whether to structure the Inversion to avoid forcing Minority Taxpaying JCI Shareholders to pay taxes and, instead, to impose the Inversion-mandated taxes on JCplc; or

(x)    instead, whether to structure the Inversion as a "busted" merger in order to enable Minority Taxpaying JCI Shareholders to claim losses.

Id. at ¶186(a). They also list "all facts relevant to the facts recited in the preceding two paragraphs and ¶¶129 and 162 that the Inversion 'will be taxable' to JCI Shareholders, including" three facts (that JCI allegedly chose to structure the transaction to impose taxes on the shareholders holding their shares in taxable accounts by structuring a busted merger, that the busted merger avoided imposing the inversion-related taxes on the new company and "if such option was considered, all calculations and methodologies in support of the option chosen"). Id. at ¶186(b). They list seventeen other "facts," ranging from questions about what alternatives to the merger the defendants considered to whether JCI estimated certain taxable income and consequences to itself and to shareholders to whether JCI sought advice of counsel on the tax consequences of the merger. Id. at ¶¶186(c)-(s). Finally, they list ten facts that they assert were "necessary to avoid making the statements recited at ¶¶ 129, 162, and 184-85 false and misleading when made," such as—again—the allegations that the JCI defendants structured the merger as a "busted" merger, that reincorporating in Ireland was not necessary to achieve "the expected non-tax benefits" of the merger, whether the "Individual Defendants considered compensating Minority Taxpaying JCI Shareholders for the capital

50

gains and ordinary income taxes they will be forced to pay," the fact that the defendants chose to conduct the merger as an inversion and the facts surrounding the alleged delay of the Adient spin-off. Id. at ¶187.

This *is* an example of "puzzle pleading." As Judge Kennelly of the Northern District of Illinois recently explained:

> Though the Seventh Circuit has never used the term "puzzle pleading," *Hughes v. Accretive Health, Inc.*, No. 13 C 3688, 2014 WL 4784082, at *5 (N.D. Ill. Sept. 25, 2014), many of this circuit's district courts have used that term to describe a complaint that would "require[] the Court and the defendant to piece together exactly which statements the [p]laintiffs are challenging and which allegations contradict those statements," rather than the complaint itself doing so. *See Constr. Workers Pension Fund-Lake Cty. & Vicinity v. Navistar Int's Corp.*, No. 13 C 2111, 2014 WL 3610877, at *5 (N.D. Ill. July 22, 2014).

> Courts have found so-called "puzzle pleadings" where the complaint "quotes the defendant at length and then uses a stock assertion that the statement is false or misleading for reasons stated in an earlier paragraph." *See Alizadeh v. Tellabs, Inc.*, No. 13 C 537, 2014 WL 276676, at *4 (N.D. Ill. June 16, 2014). Courts have also dismissed complaints whose "net effect" is to "leave the reader … jumping from page to page in an attempt to link the alleged statements to the background that supposedly makes them false or misleading," especially where it is "difficult to discern where the supposedly challenged statements end and [] context or characterization begins." *Conlee v. WMS Indus., Inc.*, No. 11 C 3503, 2012 WL 3042498, at *4 (N.D.Ill. July 25, 2012).

Macovski v. Groupon, Inc., No. 20 C 2581, 2021 WL 1676275, at *5 (N.D. Ill. Apr. 28, 2021).

While the plaintiffs have identified, by bolding or italicizing them, some of the statements in the S-4 that they allege are misleading, the amended complaint forces the reader to flip between various paragraphs of the 402-paragraph document to determine which facts the plaintiffs believe

51

demonstrate that the bolded statements are misleading. In some instances, the plaintiffs have not bolded or italicized any bits of extended sections of the S-4, forcing the reader to assume that they allege that every word of multiple paragraphs or pages is false or misleading, or to guess which portion of the long excerpt the plaintiffs believe is false or misleading. That is "puzzle pleading" under the definition articulated in <u>Macovski</u>.

Despite the puzzle pleading, the court believes that it can identify the facts that the plaintiffs claim provide a reason for why the bolded statements are misleading. The question is whether any or all of these facts—the facts about the choice to structure the merger as an inversion, about what the plaintiffs deem the "busted merger," about what JCI or its board or officers or directors considered or didn't consider when deciding how to structure the merger, about how the merger could have been structured to avoid imposing tax consequences on those shareholders who held their shares in taxable accounts—provide a reason why the statements in the S-4 that the merger would be treated as a taxable transaction for U.S. federal income tax purposes was misleading. They do not. They provide reasons why the plaintiffs believe the defendants should have done things differently, but they do not provide a reason why, for example, the S-4's statement that "[t]he receipt of combined company ordinary shares and/or cash in exchange for Johnson Controls common stock pursuant to the merger will be a taxable transaction for U.S. federal income tax purposes" was either false or misleading. Dkt. No. 53 at ¶185(d). It appears undisputed that that statement is true, and the plaintiffs do

52

not identify what is misleading about the statement or how any of the omitted "facts" show that the statement is misleading.

If the S-4 had said, for example, that there was no way for the defendants to have avoided the merger resulting in taxable events for JCI shareholders, the facts the plaintiffs recite might provide a reason why that statement could have been false or misleading. If the S-4 had said that the defendants had no choice but to reincorporate in Ireland, the facts the plaintiffs cite could have provided a reason why that statement might have been false or misleading. But none of the many facts the plaintiffs cite (or in many instances, questions they pose) provide a reason why the statement that the merger would result in a taxable event for shareholders was misleading.

The plaintiffs imply that the S-4 was misleading because it should have said something like, "The receipt of ordinary shares of the combined company and/or cash in exchange for Johnson Controls common stock pursuant to the merger will treated as a taxable transaction for U.S. federal income tax purposes, *but it didn't have to be for the following reasons*," or "The fact that consideration received by Johnson Controls shareholders in the merger will be taxable for U.S. federal income tax purposes, *but it didn't have to be for the following reasons*." The court will discuss whether the facts that the plaintiffs claim were omitted from the S-4 were material, but the fact that the plaintiffs would like to have known, before the merger was consummated and before they were asked to vote whether to approve it, if there were other options that would not have resulted in taxable events for them does not make the

53

statement that the merger *did* result in taxable events for them misleading.

The same is true of the plaintiffs' allegations in Section IV(D)(2) that the defendants concealed material facts about the "busted" merger. Id. at ¶¶188-190. The amended complaint begins by quoting ten paragraphs from the S-4 disclosing that Merger Sub was a Wisconsin limited liability corporation and an indirect, wholly owned subsidiary of Tyco, that Merger Sub would merge with Johnson Controls and that Johnson Controls would emerge as an indirect, wholly owned subsidiary of Tyco. Id. at ¶188. The plaintiffs then cite to the affidavit of H. David Rosenbloom, which the defendants filed in opposition to the motion for injunctive relief, in support of statements such as "Merger Sub was not an 'indirect wholly owned subsidiary of Tyco'; it was structured as partially indirectly wholly owned and partially directly owned by Tyco to 'bust' the Merger." Id. at ¶189(a) (citing Dkt. No. 38 at ¶10). The amended complaint reiterates its allegations that Merger Sub was created to bust the merger by rendering §368 inapplicable, referencing Rosenbloom's affidavit. Id. at ¶189(b)-(f).

Again, it appears undisputed that the facts stated in the S-4 were true. The plaintiffs' insistence that the merger was effectuated through a Wisconsin limited liability company for the purpose of avoiding the requirements of §368 of the tax code does not explain why the statements that Merger Sub was a Wisconsin limited liability company, that it was going to merge with Johnson Controls and that Johnson Controls would emerge as an indirect wholly owned subsidiary of Tyco, were misleading. Had the S-4 stated that this was the only

54

option for effectuating the merger, the facts the plaintiffs identify might have provided a reason that that statement could have been false or misleading. But the facts the plaintiffs emphasized (in italics, this time) do not show why the statements in the S-4 were misleading.

The plaintiffs next attack the sections of the S-4 that discuss the Adient spin-off. After reiterating the facts surrounding the July 2015 announcement that the spin-off would be tax-free and the October 2016, post-merger announcement that it would be taxable, id. at ¶¶191-193, the plaintiffs quote over four, single-spaced pages of the S-4, id. at ¶194. The plaintiffs bolded only four portions of this section of the S-4 and it is not clear how those portions link to the facts. The plaintiffs bold two headings that read "Spin-off of Johnson Controls' Automotive Experience Business." Id. at ¶¶194(b), 194(h). These are headings identifying the topics of the paragraphs that follow. The court assumes that the plaintiffs did not mean to allege that those *headings* were false or misleading. The plaintiffs also bolded and italicized the heading of subsection (d) of the excerpted portion of the S-4, which reads: "There can be no assurance that the separation of Johnson Controls' Automotive Experience business will occur following the closing of the merger, or at all, and until it occurs, the terms of the separation may change." Id. at ¶194(d). And they bolded and italicized the heading of subsection (e) of the excerpted portion, which reads: "The combined company and its shareholders may not realize the potential benefits from the separation of Johnson Controls' Automotive Experience business." Id. at ¶194(e). Finally, the plaintiffs italicized one

55

sentence in the four-page, single-spaced excerpt: "The spin-off is a separate, independent transaction from the merger, and *is currently expected to generally proceed in substantially the same manner as originally planned* and on the timeline previously announced by Johnson Controls, with such adjustments to reflect that the distributing corporation will be the combined company instead of Johnson Controls." Id. at ¶194(b).

The plaintiffs allege that this section of the S-4 was false and misleading because it did not disclose that the Adient spin-off allegedly was purposefully delayed until after the closing of the merger "to avoid or minimize the risk that the IRS would disregard the spin-off in determining whether the former JCI shareholders in fact own less than 60% of JCplc, thereby threatening Defendants' scheme to avoid §§ 4985's and 7874's adverse tax consequences." Id. at ¶195. They cite to ¶¶103-115 and 175-182 of the amended complaint. Id. The plaintiffs' assertions that the Adient spin-off was deliberately delayed for the purpose of assisting the defendants in their alleged tax-avoidance efforts seem to have little to do with the bolded headings from the S-4 concerning the uncertainty that the Adient spin-off would come to fruition or produce benefits to the company or its shareholders. It appears that the plaintiffs meant to argue that the omitted "facts" render the statement that the spin-off was going to proceed "in substantially the same manner as originally planned" false and misleading. If this is what the plaintiffs meant, it is not clear. Do the plaintiffs interpret "in the same manner as originally planned" to mean that the Adient spin-off would be tax free to shareholders, and argue that given that, the

56

statement was false or misleading because the defendants knew that it would not be tax free? If it were clearer, this allegation *might* come closer to meeting the PSLRA's heightened pleading standard.[12]

Next, the plaintiffs assert that the defendants concealed facts about the "forced buyback" of the 17% of JCI shares. They reiterate the details of their claim that the defendants calculated the percentage of JCI shares that would need to be redeemed to reduce JCI shareholder equity in the new company below 60% and engineered achieving that percentage by pricing the shares. Id. at ¶¶196-200. They then quote seven, single-spaced pages of the S-4. Id. at ¶201. This time, they did not bold or italicize anything other than headings. They appear to assert that all seven pages, as well as statements recounted in ¶199 of the amended complaint, were false and misleading. Id. at ¶202. Paragraph 199 of the amended complaint describes twelve portions of the S-4 having to do with how JCI's financial advisors—Centerview and Barclays— determined the ranges of fair values for the shares (a range the plaintiffs assert was higher than the $34.88 "forced buyback" price).

The seven quoted pages are from the section of the S-4 that advises shareholders that the merger will be a "reverse merger," in which Tyco would

---

[12] The defendants argued at the January 2017 hearing on the motion for injunctive relief that Adient filed its own information statement with the SEC, disclosing information about the spin-off transaction, dkt. no. 51; they repeat that argument in their brief in support of the motion to dismiss, asserting that Adient filed the information statement in April 2016, dkt. no. 56 at 28 and n.9. They also attach that statement to their motion to dismiss. Dkt. No. 56-3. The plaintiffs have not addressed this filing in the amended complaint or in their briefing and the court has not considered the statement attached to the defendants' motion to dismiss.

end up being the parent of the new company. Id. at ¶201(a). It tells shareholders that they can elect whether to accept a share in the new company or $34.88 for each of their current JCI shares. Id. It tells them that elections will be prorated, which means they may not get the number of shares or cash they indicate on their election form. Id. at ¶201(b). It advises them of the risk that they may not be sure of the valuation they will receive from the merger. Id. at ¶201(d). It tells them that the value of new company shares to Tyco shareholders, as of July 5, 2016, was $40.86. Id. It tells them that neither Johnson Controls nor Tyco was recommending whether they should elect stock or cash. Id. at ¶201(h). It tells them that they should get their own personal financial advice "immediately from your stockbroker, bank manager, solicitor, accountant or other appropriate independent financial advisor . . . ." Id. at ¶201(i).

If the plaintiffs mean to allege that every word of those seven pages of the S-4, including the information recounted above, is false and misleading because it did not tell the shareholders that the defendants designed the transaction and set the stock price as tax-avoidance mechanisms for the new company, this set of allegations suffers from the same defects as the prior ones.

The plaintiffs next assert fourteen facts, or allegations, about the unfairness of the $34.88 "forced buyback" price and their allegations that that price was set lower than the financial advisors had calculated was fair only to assist the defendants in accomplishing their alleged tax-avoidance scheme. Id. at ¶202. One of the "facts" that the plaintiffs assert made the S-4 false and

58

misleading is that "[t]he complexity of the Inversion/Merger was such that the accountants, brokers, financial advisers, and attorneys accessible to most JCI public shareholders, and especially the Minority Taxpaying JCI Shareholders, lacked the knowledge and experience that would enable them to provide the advice that JCI shareholders required in order to understand this transaction and to mitigate their injuries." Id. at ¶202(l).

The plaintiffs next assert that the S-4 concealed material facts about the individual defendants' lack of exposure to merger-related taxes and the costs of that lack of exposure to JCI shareholders. In this section of the amended complaint, the plaintiffs reproduced only two paragraphs of the S-4:

> (a)     In addition, the Temporary Section 7874 Regulations (and certain related temporary regulations issued under other provisions of the Code) include new rules that would apply if the 60% ownership test were met, . . . in such case, Section 4985 of the Code and rules related thereto would impose an excise tax on the value of certain stock compensation held directly or indirectly by certain "disqualified individuals" at a rate equal to 15%. The merger agreement permits Johnson Controls and Tyco to enter into agreements with their directors and executive officers providing for the reimbursement of any taxes imposed under Section 4985 of the Code in connection with the merger. S-4 at 56.

> (b)     The merger agreement also permits Johnson Controls to enter into agreements with its directors and executive officers providing for the reimbursement of any taxes that may be imposed under Section 4985 of the Code in connection with the merger, though no such reimbursements are currently expected to become necessary or payable. Id. at 157-58.

Id. at ¶207.

This section also asserts that "the S-4's statements recited in ¶¶ 103, 104, and 106, supra" were rendered false or misleading by omitted material facts. Id. Those paragraphs state the following:

103. While exposing JCI shareholders to the Code's forced Inversion/Merger-related taxes, Defendants took great care to structure the Merger to avoid the Inversion-imposed tax consequences that JCI and the Individual Defendants would have faced if JCI shareholders got 60% or more of JCplc's shares. The Merger Agreement provided:

> Section 6.13 Tax Matters. From and after the execution of this Agreement until the earlier of the Effective Time or the date, if any, on which this Agreement is terminated pursuant to Section 8.1, except as may be required by Law, notwithstanding anything to the contrary in Section 5.1 or Section 5.2, none of Parent, Merger Sub or the Company shall, and they shall not permit any of their respective Subsidiaries to, take any action (or knowingly fail to take any action) that causes, or could reasonably be expected to cause the *ownership threshold of Section 7874(a)(2)(B)(ii) of the Code to be met* with respect to the Merger.

S-4 at A-72 (emphasis supplied).

104. The obligation set out in the Merger Agreement was described as follows in the S-4:

> ### Tax Matters
>
> Tyco and Johnson Controls have agreed that, from and after the execution of the merger agreement until the earlier of the effective time of the merger or the date, if any, on which the merger agreement is terminated, except as may be required by law, *none of Tyco, Merger Sub or Johnson Controls will*, and they will not permit any of their respective subsidiaries to, *take any action* (or knowingly fail to take any action) *that causes,* or could reasonably be expected to cause, *the 60% ownership test to be met with respect to the merger*.

S-4 at 202 (emphasis supplied).

\* \* \* \* \* \*

106. Following the Merger Agreement, certain procedures were to be followed by JCI and Tyco to ensure that the 60% obligation set forth in ¶ 103 was satisfied. S-4 at 202; *see also id.* at 223.

The plaintiffs assert that the S-4 was materially misleading for

60

failing to disclose the facts alleged in ¶¶ 86-94, 105, 107-09, 111, and 202-04, as it concealed (i) the extent to which the Individual Defendants and senior JCI executives were shielded from the Inversion/Merger-related taxes being imposed on Minority Taxpaying JCI Shareholders, (ii) the dollar amount of the § 4985 excise tax that they sought to avoid ($4 million), and (iii) the harm to JCI public shareholders in the form of the reduction of the JCplc equity allocated to JCI public shareholders to enable the Individual Defendants to avoid the excise tax and JCplc to avoid § 7874's adverse tax consequences ($5.46 billion [see fns. 63, 65]).[13]

Id. at ¶205. They also assert that the omitted information "concealed the potential cost to JCI and JCplc of their agreement to reimburse the Individual Defendants for any such excise tax, including whether such reimbursement would, if made, be 'grossed up' for the income taxes due on such reimbursement." Id. at ¶206.

Again, the plaintiffs do not provide reasons why the omitted information rendered the statements in the S-4 false or misleading. The S-4 told shareholders that the parties to the merger were not going to take any action to let the JCI equity hit the 60% threshold. It identified the relevant provisions of the tax code and told shareholders that if the 60% threshold were to be met, certain disqualified individuals would be subject to a 15% excise tax. It told them that the agreement allowed JCI and Tyco to reimburse those disqualified individuals should they be subject to such a tax. The plaintiffs do not explain how the dollar amounts involved render those statements false or misleading. They imply that the S-4 should have said, "The merger agreement also permits Johnson Controls to enter into agreements with its directors and executive

---

[13] It is sentences like this that make it hard to credit the plaintiffs' insistence that the amended complaint does not constitute puzzle pleading.

officers providing for the reimbursement of any taxes that may be imposed under Section 4985 of the Code in connection with the merger, *and the amount of those taxes would be in the millions of dollars*." The italicized language, while perhaps relevant and of interest to JCI shareholders before their vote on the merger, does not render the preceding, unitalicized language false or misleading.

The plaintiffs assert that the defendants concealed material facts about the merger's projected tax savings. They reproduce nine paragraphs of the S-4 spanning four pages, discussing (often in obtuse accountant-speak, with terms like "synergy DCF analysis" and "P/E multiple" and "EV/EBITDA multiples") the "tax synergies" that JCI and Tyco hoped or anticipated the merger would create and how they predicted or calculated those "synergies." Id. at ¶209. The plaintiffs argue that these statements were rendered false and misleading by the fact that the S-4 did not disclose that the hoped-for "synergies" allegedly were dependent on a tax-avoidance scheme that required the individual defendants to breach their fiduciary duties to shareholders, to give Tyco shareholders more than 40% of the equity in the new company, to price the JCI shareholders' shares at a 25% discount "to the average of the medians of the ranges of per share fair values for JCI shares determined by JCIs' and Tyco's advisers ($46.24)" and to "bust" the merger. Id. at ¶210. The plaintiffs also assert that other "omitted material facts alleged elsewhere herein at ¶¶ 186, 187, 195, and 202" would have revealed "that Defendants' tax avoidance schemes were driving a deal that would not generate for JCI shareholders the

62

best value reasonably attainable." Id. Again, these allegations do not

demonstrate that the calculations and the hoped-for "synergies" were false or

misleading.

None of these allegations[14] meet the PSLRA heightened pleading

standard. They do not explain why the omitted facts would have rendered the

identified S-4 statements false or misleading.

The plaintiffs have amended their complaint once with leave of court. It is

not uncommon for courts that have identified defects in pleadings to give the

plaintiffs leave to amend those pleadings to correct the defects, and Fed. R. Civ.

P. 15(a)(2) instructs courts to "freely give leave" to amend "when justice so

requires." But "district courts have broad discretion to deny leave to amend . . .

---

[14] The defendants included one other set of allegations of omissions. In Section
V, titled "Additional Material Omissions," id. at 152, the plaintiffs alleged that
the S-4 "purported to disclose differences between the Wisconsin Business
Corporation Law ("WBCL") and Irish law but contains material omissions," id.
at ¶250. It reproduced two sections of the S-4, one describing the duties of
directors under Wisconsin law. Id. at ¶¶251-252. The plaintiffs then argue that
the statements in these two sections were false and misleading because they
did not disclose "the standards of conduct for directors that have developed
through American statutory and case law," omitted references to American
statutory and case law "which defines, and is indispensable to an
understanding of, shareholders' rights and a corporation's and its officers' and
directors' obligations to its shareholders," the fiduciary duties of officers and
directors under Wisconsin law, the fact that the Wisconsin business judgment
rule "does not apply to officers" and the extent to which such protections, "to
the extent that they exist under Irish law, are directly enforceable by
shareholders and extend liability to third parties for aiding and abetting a
breach of fiduciary duty by a corporation's officers and directors." Id. at ¶253.
As the court explains later in this order, it has concluded that the plaintiffs'
Section 14(a) allegations are claims of breach of fiduciary duty labeled as
federal securities violations. These allegedly omitted facts are nothing more
than an allegation that the defendants had a fiduciary duty to educate
shareholders on American, Irish and Wisconsin law relating to fiduciary duty.

where the amendment would be futile." Mulvania v. Sheriff of Rock Island Cty., 850 F.3d 849, 855 (7th Cir. 2017) (quoting Arreola v. Godinez, 546 F.3d 788, 796 (7th Cir. 2008)).

Allowing the plaintiffs to amend the complaint would be futile. The plaintiffs have not plausibly alleged that the information in the S-4 was not true or explained why the omitted information rendered that information misleading. Their allegations boil down to a claim that JCI could have effectuated the merger without using the inversion structure and without using tax strategies that would shift the tax burden of the merger onto the shareholders, but that it did not tell the JCI shareholders that because it was trying to reduce the tax exposure to its officers and directors and to the new company at the expense of the shareholders. The question is whether, if the plaintiffs could surmount the pleading deficiencies, those allegations would state a federal claim under Section 14(a). If not, allowing them to amend would be futile. The allegations do not state a federal claim under Section 14(a)/Rule 14a-9 because the plaintiffs have failed to plead the first two elements of that cause of action—a material misrepresentation or omission and loss causation.

2. *The amended complaint fails to plead a material misrepresentation or omission.*

The defendants argue that the plaintiffs have not sufficiently pled the first element of a Section 14(a) claim—that the alleged omissions were "material." "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." TSC Indus., 426 U.S. at 449.

It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberation of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

Id.

At the October 2019 hearing, the court asked the plaintiffs' counsel whether the amended complaint alleged that the shareholder vote to approve the merger would have been different had the omitted information been disclosed. In their supplemental brief (Dkt. No. 71-1 at 4-5) the plaintiffs responded that they were not required to plead (nor prove) that the omitted information would have had a decisive effect on the vote of any JCI shareholder to approve or disapprove the merger. They are correct. The court's question did not appropriately frame the inquiry. The question is whether there is a substantial likelihood that reasonable shareholders would have considered the omitted information important to making their voting decision.

Generally, the defendants argue that despite the volume of information in the proxy statement (including the ballot page, it is 539 pages long, dkt. no. 56-1), the plaintiffs' arguments amount to "tell me more" pleading. Dkt. No. 56 at 25-26. They assert that courts have deemed immaterial detailed information about board decision-making. Id. at 25. They argue that the proxy statement disclosed the structure of the transaction, the fact that it would be taxable, the fact that JCI shareholders would own 56% of the new company, the fact that

65

the Adient spin-off was taxable and that Adient had filed its own registration form with the SEC providing information about the spin-off and the fact that some portions of the merger consideration could be treated as ordinary taxable income. Id. at 25-29. They argue that the proxy statement was not required to disclose all the financial information an investor would need to determine for herself the fair market value of the merger. Id. at 26 n.7. They assert that failing to disclose "pejorative characterizations" and "adverse inferences" is not enough to state a Section 14(a) claim. Id. at 27. Finally, they argue that the plaintiffs have "bootstrapped" their fiduciary duty claims to a Section 14(a) claim under the rationale of upholding Section 14(a)'s goal of protecting investors. Id. at 29.

The court first addresses some of the defendants' broader arguments. The defendants argue that the plaintiffs' assertions that the S-4 should have revealed whether the directors considered certain factors or options—whether to decline to reincorporate in Ireland, what impact the various facets of the merger might have on shareholders with shares in taxable accounts, etc.—are demands for "play-by-play details" of board activity that "courts in this circuit have deemed immaterial in assessing claims brought under Section 14(a)." Dkt. Id. at 25. Despite using the plural, the defendants cite only one decision in support of this claim, Himmel v. Bucyrus Int'l., Inc., Nos. 10-C-1104, 10-C-1106, 10-C-1179, 2014 WL 1406279, *17-18 (E.D. Wis. Apr. 11, 2014), and they take the quoted language out of context. The Himmel court said, "If a company discloses some history leading to a merger, the company must

66

provide an accurate, full, and fair characterization of those events. However, it need not provide a play-by-play description of merger negotiations." Id. at *17 (citing Globis Partners, LP v. Plumtree Software, Inc., No. 1577-VCP, 2007 WL 4292024, at *14 (Del. Ch. Nov. 30, 2007)).

The amended complaint alleges that the S-4 disclosed some history of the merger—for example, ¶¶209 and 236 excerpt paragraphs that discuss several board meetings and explain how the board decided on the exchange ratio and decided to approve going ahead with the merger. Under the reasoning in Himmel and Globis Partners, any omitted information necessary to provide a full, fair and accurate recitation of that history would be material.

Granted, many of the plaintiffs' allegations about "omitted" facts appear to be inferences. The plaintiffs assume, for example, that the decision-makers either compared "whether to structure the Inversion to avoid forcing Minority Taxpaying JCI Shareholders to pay taxes and, instead, to impose the Inversion-related taxes on JCplc" or "instead, whether to structure the Inversion as a 'busted' merger in order to enable Minority Taxing JCI Shareholders to claim losses," dkt. no. 53 at ¶¶186(a)(ix) and (x), or that they deliberately chose not to investigate that comparison. This appears to be an inference the plaintiffs have drawn from information they possess (much of which, the defendants point out, they obtained from the proxy statement, dkt. no. 56 at 27, citing dkt. no. 53 at ¶¶76, 202(e)), their research into the tax laws and the results they have experienced (being taxed). Though the plaintiffs allege that the proxy statement left out of its recitation of the history "the fact that JCI deliberately chose to

67

structure the transaction so as to impose capital gains and ordinary income taxes on the Minority Taxpaying JCI Shareholders by structuring the Inversion as a 'busted' merger to protect JCI/JCIplc's earnings-strippings and other tax avoidance schemes," dkt. no. 53 at ¶186(b)(i), implying that JCI intentionally structured the merger for the purpose of shifting the tax obligations to them, that omitted "fact" may be nothing more than an inference drawn from the events that occurred. That said, it is not an implausible or impermissible inference, and on a motion to dismiss, the court must construe their claims in the light most favorable to the plaintiffs as the non-moving parties. See, *e.g.*, Koppel v. 4987 Corp., 167 F.3d 125, 133 (2d Cir. 1999).

The defendants argue that "[n]ot disclosing 'pejorative characterizations and adverse inferences which, it appears, the plaintiff has drawn without the defendants' help' is not grounds for a disclosure claim." Dkt. No. 56 at 27 (citing Klamberg v. Roth, 473 F. Supp. 544, 553 (S.D.N.Y. 1979)). Again, that is not exactly what the cited case said. The Klamberg court found that failure to disclose that the company was "considering" divesting itself of certain holdings was not materially deceptive, then said, "[t]he remainder of the paragraph [in the complaint] comprises pejorative characterizations and adverse inference which, it appears, the plaintiff has drawn without the defendants' help." Klamberg, 473 F. Supp. at 553.

Perhaps the defendants meant to argue that the drafters of the proxy statement were not required to frame the information in it in the light least favorable to JCI and Tyco and most favorable to shareholders who held their

68

stock in taxable accounts. While the court has not found a case that puts it that way, that appears to be true—Rule 14a-9 prohibits "false or misleading" statements of material fact, or omissions that would make facts in the statement false or misleading. It does not appear to require characterization of information as "positive" or "negative" to shareholders (or to the merging entities). In Virginia Bankshares, the Supreme Court stated that "[s]ubjection to liability for misleading others does not raise a duty of self-accusation; it enforces a duty to refrain from misleading." 501 U.S. at 1098 n.7. But the question of whether an omitted fact was "pejorative" or a "self-accusation," as opposed to a fact that a reasonable investor would have found important to her vote in the overall mix of information she received, is a question of fact. Whether one characterizes it as "pejorative" or "self-accusation," the materiality element requires the court to determine whether a reasonable investor would have found important the fact that some of the decision-makers who decided on the structure of the merger could have faced millions of dollars in excise taxes had JCI shareholders ended up with more than 60% of the equity in the new company, or that there may have been other ways to structure the merger that would not have resulted in the plaintiffs' merger-related gains being taxed to them.

The defendants cite a series of cases which, they say, stands for the awkwardly worded proposition that "[a] plaintiff does not state a disclosure claim by asking whether or not something happened." Dkt. No. 56 at 25 (citing In re Sauer-Danfoss Inc. S'holders Litigation, 65 A.3d 1116, 1132 (Del. Ch.

69

2011); In re Lukens Inc. S'holders Litigation, 757 A.2d 720, 736 (Del. Ch. 1999), *aff'd sub nom* Walker v. Lukens, Inc., 757 A.2d 1278 (Del. 2000); In re Plains Expl. & Prod. Co. Stockholder Litigation, C.A. No. 8090-VCN, 2013 WL 1909124, at *10 (Del. Ch. May 9, 2013)). These cases did not involve Section 14(a) suits alleging that proxy statements omitted material facts. They involved suits brought in Delaware state court for breach of fiduciary duty. The cited cases admittedly make a logical point; the court in Sauer-Danfoss reasoned that

> [o]mitting a statement that the board *did not* do something is not material, because "requiring disclosure of every material event that occurred *and* every decision not to pursue another option would make proxy statements so voluminous that they would be practically useless." *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 736 (Del. Ch. 1999). If a disclosure document does not say that the board or advisors did something, then the reader can infer that it did not happen. *See In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 204 (Del. Ch. 2007) ("[S]o long as what the investment banker did is fairly disclosed, there is no obligation to disclose what the investment banker did not do.")

Sauer-Danfoss, 65 A.3d at 1132. But the defendants have not cited a federal case applying the same reasoning in a Section 14(a) suit—particularly the holding that if a proxy statement does not say that the board or advisors did something, they can be presumed not to have done it.

There *is* a federal case from this circuit—decided long after the parties briefed the motion—that analyzes "how much information is enough" in the context of Section 14(a) claims. In Kuebler, Judge Hamilton wrote:

> In *TSC Industries*, the Supreme Court explained the logic underpinning the materiality standard and its requirement that a reasonable investor would have viewed the omitted fact "as having

significantly altered the 'total mix' of information made available." 426 U.S. at 449 . . . . The Court emphasized that "the disclosure policy embodied in the proxy regulations is not without limit." *Id.* at 448 . . ., citing *Mills*, 396 U.S. at 384 . . . . To that effect, the Court reasoned that:

> if the standard of materiality is unnecessarily low, not only may the corporation and its management be subjected to liability for insignificant omissions ... but also management's fear of exposing itself to substantial liability may cause it simply to bury the shareholders in an avalanche of trivial information.

*Id.* The goal is to strike the proper balance between "not enough" information and an "avalanche" of information.

*TSC Industries* rejected this court's more expansive standard of materiality, under which material facts had included "all facts which a reasonable shareholder *might* consider important." *Id.* at 445 . . . , quoting *Northway, Inc. v. TSC Industries, Inc.*, 512 F.2d 324, 330 (7th Cir. 1975) (emphasis added). Such a standard, the Court reasoned, painted the operative inquiry in broad brushstrokes unintended by the Court's earlier decisions. *Id.* at 446-47 . . .; see, e.g., *Mills*, 396 U.S. at 381 . . . (Section 14(a)'s purpose is to ensure that disclosures by corporate management enable shareholders to make informed choices). Rather, the Court explained, the function of the materiality standard was to evaluate whether there was a substantial likelihood that a reasonable shareholder would have considered the omitted fact important in deciding how to vote. *TSC Industries*, 426 U.S. at 449 . . . . It made sense, then, to formulate a standard of materiality that acknowledged the value of the omitted information in light of the total mix of information made available to shareholders. *Id.* Because shareholders did not decide how to vote in the abstract, it did not make sense to assess the value of an omitted fact in the abstract.

Kuebler, 13 F.4th at 641-42.

This brings the court to the defendants' more specific arguments about what, exactly, the proxy statement disclosed. The proxy statement provided over 540 pages of information. The amended complaint itself asserts that the proxy statement informed shareholders:

71

\*      that the receipt of ordinary shares in JCplc and/or cash in exchange for Johnson Controls common stock as part of the merger would be treated as a taxable transaction for federal income tax purposes, dkt. no. 53 at ¶185;[15]

\*      that the merger would be effectuated through a Wisconsin limited liability company (Merger Sub), which was formed in January 2016 for the sole purpose of effecting the merger and which would merge with Johnson Controls and result in Johnson Controls becoming an indirect, wholly owned subsidiary of Tyco, id. at ¶188;

\*      that in July 2015 Johnson Controls had announced that it would spin-off the Automotive Experience business as Adient, that it expected to complete the spin-off after the consummation of the merger, that it was expected that the spin-off would "generally" proceed in "substantially" the same manner as originally planned and on the same timeline, that there was no assurance that the separation would occur on that timeline or at all or in the same manner, that the terms of the separation might change and that the new company and its shareholders might not realize the potential benefits from the spin-off, id. at ¶194;

\*      that the merger would be structured as a "reverse merger" with Tyco becoming the parent entity, id. at ¶201;

\*      that each share of Johnson Controls stock would be converted, at the shareholder's election, into either one share of new company's stock or $34.88 in cash, with JCI shareholders receiving approximately $3.864 billion in cash, id.;

\*      that elections would be subject to proration, meaning that depending on the elections made by other JCI shareholders, a particular shareholder might not receive the amount of cash or number of shares she requested on her election form, id.;

\*      that because the market value of JCI and Tyco shares would fluctuate, JCI shareholders could not be sure of the value of the consideration they would receive, id.;

\*      that just before the merger, Tyco shareholders would

---

[15] The amended complaint reproduces multiple sections of the S-4 that reference each of the pieces of information listed in the text above. In the interest of relative brevity, the court has cited only one source paragraph for each piece of information.

72

receive 0.955 shares of Tyco, which would convert to one share of the new company, and that the implied value of the 0.955 Tyco share as of July 5, 2016 was approximately $40.86, id.;

    \* that Tyco would finance the transaction with $4,000 million in debt through credit agreements with Citibank, Citigroup, Merrill Lynch, Wells Faro and JP Morgan Chase, id.;

    \* that 26 U.S.C. ¶7874 would result in consequences if the "60% ownership test" was met, including the imposition of a 15% excise tax rate on certain "disqualified individuals" under 26 U.S.C. §4985, id. at ¶207;

    \* that the merger agreement allowed Johnson Controls and Tyco to enter into agreements reimbursing their directors and officers for any excise taxes imposed on them under §4985, id.;

    \* that certain tax regulations could adversely affect the new company's ability to "realize the $150 million of previously identified annual U.S. tax synergies of the merger), that there could be other "global" tax synergies, and that former JCI shareholders would bear 56% of those potential adverse consequences and former Tyco shareholders would bear 44%, id. at ¶209;

    \* that the financial advisors had performed calculations to try to calculate the "present value of the operational synergies and tax synergies anticipated to be achieved as a result of the proposed transaction" (with an explanation of those calculations), id.;

    \* that the financial advisors had concluded that the merger was "fair" to shareholders (with detailed explanations of what factors the financial advisors had and had not considered in reaching those opinions), id. at ¶¶214, 216-217, 219, 221;

    \* that the JCI board had concluded that the merger was fair to common stock holders and that the board recommended that shareholders vote in favor of the merger, id. at ¶223;

    \* that Johnson Controls shareholders would have a reduced ownership and voting interest after the merger and would exercise less influence over management, id. at ¶228;

    \* that under §7874, if JCI shareholders owned 80% or more of the new equity in the new company and the new company did not have "substantial business activities" in Ireland, the IRS could treat the new company as a U.S. company for tax purposes,

id.;

> \* that under the same statute, if JCI shareholders owned between 60% and 80% of the equity in the new company and the new company didn't do substantial business in Ireland, there could be certain adverse tax consequences to Johnson Controls and its U.S. affiliates ("which, among other things, could limit their ability to utilize certain U.S. tax attributes to offset U.S. taxable income or gain resulting from certain transactions"), id.;

> \* that Johnson Controls shareholders were expected to own less than 60% of the equity in the new company, id.; and

> \* that the rules under §7874 were fairly new and complex and so "there can be no assurance that the [IRS] will agree with the position that the [new company] should not be treated as a U.S. corporation for U.S. federal tax purposes or that Section 7874 does not otherwise apply as a result of the merger," id.

The amended complaint also reproduces numerous excerpts from the S-4 disclosing financial data, as well as information about how share cost, earnings per share, present values for JCI and Tyco, the exchange ratio, the percentage of JCI equity in the new company, the total merger consideration and other financial elements of the merger were calculated. Dkt. No. 53 at ¶¶231-242. And the amended complaint reproduces sections of the S-4 advising shareholders to consult with their own financial and legal advisors before making their elections. See, _e.g._, id. at ¶201(i). The sheer volume of information provided in the proxy statement weighs against a finding that the alleged omissions are material.

Also weighing against a materiality determination is the fact that the plaintiffs' arguments rely on assumptions, requiring the court to consider the value of omitted facts in the abstract. Their argument depends on the assumption that there existed a way to successfully merge JCI and Tyco

74

without the new company being reincorporated in Ireland; if there was no other way to structure the merger, the proxy statement omitted nothing in that regard.[16] Their argument that the $34.88 share price for JCI stock was a 25% discount is an assumption, based on the plaintiffs' own selection of a price calculation method using the financial advisors' projections reflected in the proxy statement. Because they are assumptions, it is difficult to conclude that the alleged omissions were material *facts* that a reasonable investor would have considered important in deciding how to vote.

The plaintiffs' arguments imply that Section 14(a) and Rule 14a-9 required the decision makers to select the form of transaction that was most fair to its shareholders. But as the Supreme Court has explained in the context of Section 10(b) of the Securities and Exchange Act and the accompanying Rule 10b-5, the "fundamental purpose" of the Securities and Exchange Act is to "implement[] a 'philosophy of full disclosure.'" Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 477-78 (1977) (citing Affiliated Ute Citizens v. United States, 406 U.S. 128, 151 (1972)). For that reason, "the fairness of the transaction is at most a tangential concern of the statute." Id. The Santa Fe Court stated that it was "reluctant to recognize a cause of action . . . to serve what is 'at best a subsidiary purpose' of the federal legislation." Id. at 478.[17]

---

[16] The defendants assert, without citation, that "Plaintiffs' counsel confirmed that Tyco, which had already domiciled in Ireland, likely would not have accepted a different structure." Dkt. No. 72 at 2.

[17] On the other hand, proof that the merger was "fair" does not foreclose Section 14(a) liability. Mills, 396 U.S. at 381.

As the court noted, the amended complaint reproduces multiple pages from the S-4 disclosing financial data and explaining how the parties reached certain valuations and financial conclusions. The plaintiffs argue that despite the amount of information disclosed, the disclosures were misleading because they "created the illusion that the allocation of JCplc's equity between JCI and Tyco shareholders was based solely on such data and factors" and because the S-4 failed to disclose that "[t]hese financial data and the other matters recited in said paragraphs were not the only factors in determining the allocation of JCplc's equity between JCI and Tyco shareholders but that factors wholly unrelated to such financial and other data improperly influenced the determination of such allocation." Dkt. No. 53 at ¶243. The plaintiffs do not assert that the S-4 did not give them enough financial data. That would be a difficult claim to support. "[S]hareholders are not entitled to the disclosure of every financial input used by a financial advisor so that they may double-check every aspect of both the advisor's math and its judgment." Kuebler, 13 F.4th at 643-44. "Section 14(a) is not a license for shareholders to acquire all the information needed to act as a sort of super-appraiser: appraising the appraiser's appraisal after the fact." Id. Nor do the plaintiffs claim that the extensive financial data in the S-4 was false. Rather, they read into the proxy statement a representation that is not there: that the decision-makers made their choices about merger structure and share price based solely on the financial information in the paragraphs the plaintiffs reproduce. The S-4 does not say that.

76

Nor does the fact that the plaintiffs would have liked more information render the omitted information material. As the Seventh Circuit held in Beck, "there is nothing in the complaint to suggest that any shareholder was misled or was likely to be misled by the dearth of backup information—that is, that the shareholder drew a wrong inference from that dearth." Beck, 559 F.3d at 685.

What weighs most heavily against a finding of materiality is the fact that, despite being framed as Section 14(a)/Rule 14a-9 arguments that the S-4 was false or misleading, the plaintiffs' arguments boil down to a claim that the defendants breached their fiduciary duties to their shareholders by failing to act in the shareholders' best interests. The plaintiffs have not alleged that the information in the S-4 was false. They have alleged that the defendants did not structure the merger or price the JCI shares in a way that would avoid personal tax liability to the JCI shareholders when they had the ability to do so.

In 1977, the Supreme Court rejected the argument that "a breach of fiduciary duty by majority stockholders, without any deception, misrepresentation, or nondisclosure, violates [Section 10(b) and Rule 10b-5]." Santa Fe, 430 U.S. at 476. Four years later, in the context of reviewing a district court's grant of a motion for a directed verdict, the Seventh Circuit considered whether a shareholder could claim a breach of fiduciary duty via a Section 10(b)/Rule 10b-5 claim. Panter v. Marshall Field & Co., 646 F.2d 271 (7th Cir. 1981). The plaintiff shareholders had alleged that the defendants'

directors had "wrongfully deprived [them] of an opportunity to dispose of their shares at a substantial premium over market when the defendants successfully fended off a takeover attempt . . . ." Id. at 277. They asserted that the directors had acted in accordance with a "long-standing undisclosed policy of independence and resistance to all takeover attempts, designed to perpetuate the defendant directors' control of the corporation." Id. at 287. They claimed that the defendants' "failure to disclose this policy was an omission of a material fact which made other statements and conduct of the defendants misleading." Id.

In concluding that this argument was nothing more than a claim for breach of fiduciary duty, the Seventh Circuit explained:

> As the Supreme Court noted in *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 47-78 . . . (1977), [Rule 10b-5] is a manifestation of the "philosophy of full disclosure," embodied in the Securities Exchange Act of 1934; it therefore requires proof of the element of deception, and does not provide a remedy for the breach of fiduciary duty a director owes his corporation and its shareholders under the law. See *In re Sunshine Mining Securities Litigation*, (1979-80 Transfer Binder) Fed.Sec.L.Rep. (CCH) P97, 217 at 96, 635 (S.D.N.Y. 1979) (An interpretation of 10b-5 "which would include instances of corporate mismanagement where shareholders were treated unfairly by a fiduciary, however, would be wholly inconsistent with the Congressional intent.").

> In the wake of Santa Fe, courts have consistently held that since a shareholder cannot recover under 10b-5 for a breach of fiduciary duty, neither can he "bootstrap" such a claim into a federal securities action by alleging that the disclosure philosophy of the statute obligates defendants to reveal either the culpability of their activities, or their impure motives for entering the allegedly improper transaction. See, e.g., *Bucher v.* Schumway, (1979-80 Transfer Binder) Fed.Sec.L.Rep. (CCH) P 97,142 at 96,300 (S.D.N.Y. 1979), aff'd, 622 F.2d 572 (2d Cir.), cert denied, — U.S. —, 101 S. Ct. 120 . . . (1980) ("The securities laws, while their central insistence is upon disclosure, were never intended to attempt any such measures

78

of psychoanalysis or preported (sic) self-analysis.")

Id. at 287-88.

The Seventh Circuit has reiterated this holding since. See Atchley v. Qonaar Corp., 704 F.2d 355, 358 (7th Cir. 1983); Kademian v. Ladish, 792 F.2d 614, 622 (7th Cir. 1986) (proxy statement's omission of a "market freeze" allegedly perpetrated by president and board chairman and his alleged self-interest in controlling the company prices and keeping them artificially low was "simply a failure to reveal a breach of fiduciary duty, and this court has already held, in [Panter] . . . that a plaintiff may not 'bootstrap' a state law claim into a federal case 'by alleging that the disclosure philosophy of the statute obligates defendants to reveal either the culpability of their activities, or their impure motives for entering the allegedly improper transaction.'"). See also, Dixon v. Ladish Co., 597 F. Supp. 20, 23 (E.D. Wis. 1984) rev'd in part on other grounds by Kademian, 792 F.2d at 630 (citing Panter for the proposition that "[i]t is . . . fundamental that the securities laws do not penalize traders merely for failing or refusing to confess their 'true' motives or characterize the fairness of the transaction."); Coronet Ins. Co. v. Seyfarth, 665 F. Supp. 661, 667-68 (N.D. Ill. 1987) ("The critical issue, according to the *Panter* and *Kademian* courts, is not whether the defendant breached a fiduciary duty or failed to disclose a breach of duty or the reason behind a breach of duty, but 'whether the conduct complained of includes the omission or misrepresentation of a material fact.'"); Washington Bancorporation v. Washington, No. CIV. A. 88-3111 (RCL), 1989 WL 180755, at *17 (D.D.C. Sept. 26, 1989) ("Accordingly, a party does not state

79

a claim under section 14(a) 'where the failure to disclose involves the "true" motivations of the directors and so would require a court to probe the business judgment of the directors.'").[18]

The Third Circuit cited <u>Panter</u> in stating that "we must be alert to ensure that the purpose of *Santa Fe* is not undermined by 'artful legal draftsmanship;' claims essentially grounded on corporate mismanagement are not cognizable under federal law." <u>Craftmatic Securities Litigation v. Kraftsow</u>, 890 F.2d 628, 638 (3d Cir. 1989) (citing <u>Panter</u>, 646 F.2d at 288). The Ninth Circuit cited <u>Panter</u> in upholding a grant of summary judgment for the defendants in a case where the plaintiffs had alleged that the undisclosed purpose behind the merger was to prevent competition with another company. <u>Bleich v. American Network, Inc.</u>, 958 F.2d 376 (Table), 1992 WL 55855, at *5 (9th Cir. Mar. 23, 1992).

The omitted information described in the amended complaint is not material to a claim of a violation of Section14(a)/Rule 14a-9 because it does not render the statements in the S-4 false or misleading and that is because it asserts violations of the defendants' fiduciary duties to the shareholders, not

---

[18] The Second Circuit has "long recognized that no general cause of action lies under § 14(a) to remedy a simple breach of fiduciary duty." <u>Koppel</u>, 167 F.3d at 133-34 (citations omitted) (characterizing the plaintiffs' allegations that decision-makers did not recommend a more cost-effective alternative, failed to disclose conflicts of interest and implemented an unreasonably coercive buy-back provision were "no more than state law breach of fiduciary duty claims under a thin coat of federal paint."). The <u>Koppel</u> court found that to the extent that the plaintiffs were harmed by such misstatements or omissions, "they may seek their remedies through state fiduciary breach law, not through federal securities law." <u>Id.</u> at 134.

Case 2:16-cv-01093-PP    Filed 11/03/21    Page 80 of 105    Document 89

fraud. The plaintiffs' counsel almost conceded as much at the October 2019 hearing. During the hearing, the plaintiffs' counsel told the court that this case raised a basic question of "whether structuring a deal to avoid taxes can give rise to breach of a fiduciary duty and under federal securities law for undisclosed facts when such avoidance was achieved at the expense of shareholders." Dkt. No. 68 at approximately 24:12. He also told the court that the fiduciary relationship had been riddled with conflicts.

In arguing at the hearing that the court should not dismiss the Section 14(a)/Rule 14a-9 claim, the plaintiffs' counsel urged the court to look at Kas v. Fin. Gen. Bankshares, Inc., 796 F.2d 508, 512-13 (D.C. Cir. 1986). Kas involved allegations of omissions or misrepresentations in the Section 10(b) proxy statement issued in relation to the merger of Financial General Bankshares, Inc. and FGB Holding Corporation; the D.C. Circuit concluded that the failure to disclose in the Rule 10b-5 statement the fact that two of the directors of Financial General "served not only as officers, directors, and legal advisors for Financial General but also as attorneys for the Investors and as attorneys, officers and directors for the Investors' various corporate vehicles, including FGB Holding Corporation," could not be considered immaterial as a matter of law for disclosure purposes. Id. at 511, 515. The court concluded that their "dual roles would in all probability have assumed actual significance in the deliberations of a reasonable shareholder." Id. (citing TSC Industries, 426 U.S. 438). The court found, however, that the proxy statement had disclosed the dual roles. Id. at 515-517.

Kas does not support the plaintiffs' argument; it undermines it. Aside from the factual distinction—the plaintiffs have not alleged that any of the individual defendants on the JCI side of the merger also acted as advisors to investors and/or Tyco—the Kas court's explanation of the difference between an allegation of a breach of fiduciary duty in federal securities law clothing and an allegation of a breach of the Securities Exchange Act illustrates why the plaintiffs in this case have not stated a claim under Section 14(a)/Rule 14a-9.

The Kas court began by stating that "an action under the Securities Exchange Act based on a material nondisclosure or misrepresentation" is not precluded "simply because the undisclosed facts involved might also support a breach of fiduciary duty claim." Id. at 512. It reasoned that "*Santa Fe* requires a court to distinguish between an actionable omission or misrepresentation of a material fact and a claim solely for breach of a state-law fiduciary duty." Id. at 513. The court conceded that "[t]his distinction has admittedly proven somewhat difficult to apply in practice," and cited Panter's holding that a plaintiff could not "bootstrap" claims of breaches of fiduciary duties into federal securities claims simply by "alleging that directors failed to disclose that breach of fiduciary duty." Id. The court said, "This is true even though knowledge that an officer or director had actually breached his fiduciary duty might well satisfy the materiality requirement that the omitted or misstated fact be likely to 'have assumed actual significance in deliberations of the reasonable shareholder.' *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 . . . (1976))." Id.

The Kas court turned to the Supreme Court's decision in Santa Fe to

82

help "resolve this apparent tension." Id. It concluded that "liability under the federal securities laws should not turn on the resolution of essentially state-law issues," and held that

> if the validity of a shareholder's claim of material misstatement or nondisclosure rests solely on a legal determination that the transaction was unfair to a minority shareholder or that an officer or director's conduct amounted to a breach of his fiduciary duty, the claim does not state a cause of action under sections 10(b) or 14(a) of the Securities Exchange Act. Similarly, where the failure to disclose involves the "true" motivations of the directors and so would require a court to probe the business judgment of the directors, *Santa Fe* holds that the claim states no cause of action under the 1934 Act.

Id.

The validity of the plaintiffs' claims of false or misleading statements in the S-4 rests solely on determinations that the merger was not structured or priced fairly to shareholders who held their JCI shares in taxable accounts and that the JCI defendants breached their fiduciary duties to the JCI shareholders. Many of the alleged omissions are failures to disclose the "true" motivations of the individual defendants on the JCI side of the merger. Under the reasoning in Kas, the plaintiffs have not stated a Section 14(a)/Rule 14a-9 claim.

At the October 2019 hearing, the plaintiffs argued that it was not appropriate for the court to determine materiality as a matter of law at the pleadings stage. "A court may resolve the question of materiality as a matter of law . . . when the information at issue is 'so obviously unimportant' to an investor 'that reasonable minds could not differ on the question.'" Kuebler, 13 F.4th at 638 (quoting Ganino v. Citizens Utilities Co., 228 F.3d 154, 162 (2d

83

Cir. 2000)). As the Supreme Court observed in TSC Industries, the materiality

determination "requires delicate assessments of the inferences a 'reasonable

shareholder' would draw from a given set of facts and the significance of those

inferences to him, and these assessments are peculiarly ones for the trier of

fact." TSC Industries, 426 U.S. at 450. So the court has proceeded cautiously

in evaluating the defendants' arguments that none of the alleged omissions

from the S-4 were material as a matter of law. But after paging through the

amended complaint repeatedly, the court concludes that the alleged omissions

are not material to a Section 14(a)/Rule 14a-9 claim—not because they may

not have been of interest to shareholders deciding whether to approve the

merger or how to make their post-merger elections, but because they are

fiduciary duty claims under a thin coat of federal paint.

> 3.     *The amended complaint fails to plea loss causation.*

In an abundance of caution, the court also considers the defendants'

arguments that the plaintiffs have not pled the second element of a Section

14(a)/Rule 14a-9 claim—that the alleged false statements or omissions caused

injury to the plaintiffs.

As stated, there are two components to "causation" in securities law—

transaction causation and loss causation. Kuebler, 13 F.4th at 637. If a

plaintiff alleges and proves materiality, she does not have to prove that she

relied on the particular false statement or omission in the proxy statement. Id.

(citing Mills, 396 U.S. 384-85). "The proxy solicitation itself serves as the

causal link in the transaction—that the challenged violation(s) caused the

plaintiff to engage in the alleged transaction." Id. Putting it another way, "where a materially deficient proxy statement was an essential link in the consummation of a transaction that the plaintiff alleges caused him financial harm," he demonstrates transaction causation. Id. at 645. The plaintiffs cannot demonstrate transaction causation because the S-4 was not materially deficient.

"To plead loss causation, a Section 14(a) plaintiff must plead both economic loss and proximate causation." Id. (citing 15 U.S.C. § 78u-4(b)(4); Dura Pharmaceuticals, 544 U.S. at 342; N.Y. City Emps.' Ret. Sys., 593 F.3d at 1023; Grace, 228 F.3d at 46). The plaintiffs have not done so.

Count I of the amended complaint contains ten paragraphs—¶¶302-311. The paragraphs reproduce the text of Section 14(a) and Rule 14a-9. Dkt. No. 53 at ¶¶303-304. Paragraph 307 alleges that the defendants violated the statute and the rule (as well as Rule 14a-101). Id. at ¶307. The remaining paragraphs discuss "controlling person" liability under Section 20. There is no mention of injury, economic loss or proximate causation.

The amended complaint contains a section titled "The Injuries and the Injured." Dkt. No. 53 at 25. In this section—as they do throughout the amended complaint—the plaintiffs allege that they had been and would be forced to pay capital gains (and possibly ordinary income) taxes on the consideration they received from the merger, that they were doubly taxed on

85

the "delayed" Adient spin-off,[19] that their equity in the new company was kept below 60% and thus diluted,[20] and that their shares were purposefully undervalued. Id. at ¶60. These allegations do not state a claim for economic loss. There is no allegation that the plaintiffs would have been in a better economic position had the merger not occurred (and they state early in the amended complaint that they do not "take issue with the purported business or financial merits of the Merger," dkt. no. 53 at ¶8). While they imply that the merger could have been structured differently—without reincorporation in Ireland, without ensuring that the JCI shareholders ended up with less than 60% of the equity of the new company, without allegedly undervaluing the JCI shares, without the Adient spin-off being delayed until after the merger was consummated—the plaintiffs have not alleged that the merger would have been, or could have been, consummated had it been structured in the ways they hypothesize.

The amended complaint alleges that the plaintiffs were economically harmed by having to pay capital gains, and possibly ordinary income, taxes on the consideration they received due to the merger. But it does not allege that

---

[19] This argument appears to apply only to those plaintiffs who elected to receive JCplc stock as some or all of their merger consideration.

[20] This argument appears to apply only to the plaintiffs who elected to receive JCplc stock as some or all of their consideration for the merger. And as the defendants point out, at least one federal appellate court has concluded that a claim of dilution of shareholders' interests does not necessarily equate to economic loss and has found allegations of dilution insufficient to adequately plead economic loss under Section 14(a). Dkt. No. 56 at 32-33 (citing N.Y. City Emps.' Ret. Sys., 593 F.3d at 1024).

86

the plaintiffs would have been economically better off had the merger been structured in such a way that the new company was taxed under U.S. tax laws. It alleges that such a hypothetical structure would have avoided tax consequences to the plaintiffs personally, but that is only part of a complicated equation. If the new company had been subject to higher U.S. tax rates on all income, regardless of where the company earned it, that fact would have affected the terms of the financial agreement between Tyco and JCI, the calculation of share price for both JCI and Tyco shares, the value of the new company and the new company's profits (a relevant factor for valuing the consideration of any shareholders who elected to receive new company stock).

The plaintiffs' assertions of economic loss are, at best, speculative. For example, they allege the following:

> From January 4, 2016 to September 2, 2016, JCI's shares traded between $35 and $46 per share. Assuming that 100% of JCI's shares turned over at the median price of $40 per share between January 4 to September 2 (see ¶¶ 160-161 *supra*) and given that the market value of JCI's stock was $42.72 on the closing date, September 2, the cost basis of JCI shareholders' shares would range from $35 to $46 per share (see ¶ 157 *supra*), JCI shareholders' *theoretical* § 367(a) taxable gain would be dramatically reduced, making it likely that JCI's 367(b) income would exceed the shareholders' 367(a) gain. Accordingly, JCI could—and should—have chosen to structure the transaction so as to spare the JCI shareholders from being forced to pay capital gains taxes by subjecting JCI to tax under § 367(b), and the Individual Defendants' fiduciary duties to JCI public shareholders required them to so choose.

Id. at ¶169. The plaintiffs assume and theorize and hypothesize—that JCI and Tyco could have reached an agreement to reincorporate the new company in the United States; that JCI could have completed the Adient spin-off before the JCI/Tyco merger; that JCI shares would have had a median price of $40 had

87

the merger been structured to make all the new company's income taxable under the U.S. tax code—but assumptions, theories and hypotheses do not equate to facially plausible allegations of economic loss.

> The amended complaint says that the plaintiffs are seeking
>
> (1) to compel JCI to compute and disclose its estimate of the JCI shareholders' capital gains pursuant to [26 U.S.C.] § 367(a) and JCI's potential tax liability pursuant to [26 U.S.C.] § 367(b) with reasonable certainty; (2) if JCI's shareholders' taxable capital gains are higher than JCI's taxable income, damages or other remedies to compensate JCI's tax paying shareholders for such Inversion/Merger-imposed taxes; (3) damages and other remedies for being deprived of a tax-free spin-off of Adient . . . .

¶59. This wording of the requested relief implies that at the time they filed the amended complaint, the plaintiffs did not know whether the merger was likely to result in a total taxable gain to them that would exceed the total taxable gain to (presumably) the new company. And it is not clear from the amended complaint that if "JCI's taxable income"[21] was less than "JCI shareholders' taxable capital gains,"[22] that would equate to economic loss to the plaintiffs.

A final note on this element: the defendants argued in their written pleadings and at the October 2019 hearing that the plaintiffs filed this lawsuit even though they had accumulated *gains* due to the merger. The defendants imply that for someone who made money from a merger to argue that being taxed on that money constitutes a *loss* makes an absurd and frivolous

---

[21] The pre-merger entity's taxable income? During what period?

[22] During what period? Gains resulting from receiving cash consideration? Gains resulting from increased basis in shares of the new company?

argument. Toward the end of the amended complaint, the plaintiffs included a section titled "Damages." Id. at 165. They alleged the following:

> 292.  The damages suffered by the Minority Subclass are particularly acute. Many Minority Subclass members are either retired or nearing retirement. Many obtained their shares in the course of their JCI employment (or employment by a company acquired by JCI) or inherited their JCI shares from a parent who was employed by JCI. Accordingly, their cost basis is very low—i.e., the capital gain as a percentage of the market value of JCI shares on September 2 was very high. These retirees generally saw their JCI investment as a demonstration of their loyalty to JCI; JCI encouraged its employees to invest in its shares. Dkt. Nos. 16-26-44, 47.

> 293.  For these retirees, their JCI shares were a substantial, if not the major, part of their retirement savings. The JCI dividend was a substantial part of their fixed retirement income. The need to pay the Inversion/Merger-imposed taxes will permanently deprive them of the income attributable to the shares they have been or will be forced to sell to pay such taxes. Id.

> 294.  A provision in the federal income tax laws encouraged employees who invested in their employer's stock in their employer's 401(k) plan, and whose investments were matched by their employer, to hold their shares after retirement in a taxable account, instead of an IRA. Because of their low basis, JCI's history of substantial dividends, their belief in the company for which they or their father or mother worked, and their expectation to pass their JCI shares to their heirs at the stepped-up basis at death, they were reasonably motivated to retain their JCI shares. This financial and tax planning, wholly in accordance with the [Internal Revenue Code] and encouraged by JCI, has been devastatingly disrupted by the JCI Defendants' decision to shift to them JCI's liability for its inversion-imposed taxes.

Id. at ¶¶292-294.

In other words, the plaintiffs assert that not all of the plaintiffs who held their JCI shares in taxable accounts were well-heeled, experienced market players who were wealthy enough to purchase lots of shares of stock in a large, publicly traded company; many earned their shares through hard work or

89

inherited them from those who had earned them that way. They allege that the tax laws gave them an incentive to hold the shares in taxable accounts instead of in individual retirement accounts. They allege that they had good reasons—some emotional, some financial—not to sell their JCI shares. They allege that they banked on the JCI dividends, and the value of the shares, to fund their retirements and their legacies to their children. The amended complaint alleges that some of these plaintiffs sold those JCI shares before the merger for no other reason but to avoid the taxes that they learned would be imposed on the merger consideration. Id. at ¶64(b). It alleges that others sold the shares for no other reason than to obtain more than the $34.88-per-share "substantial[ly] discount[ed]" price set for the merger. Id. It alleges that still others held on to their shares until the merger, then made their elections—cash, JCplc shares or a combination of the two—and were subjected to tax consequences. Id. Finally, it alleges that some of the plaintiffs either, or also, "received the Adient spin-off as of October 21, 2016." Id.

In finding that the plaintiffs have not pleaded loss causation, the court does not take the above allegations lightly. The court does not base its ruling on some belief that the plaintiffs are rich people crying "woe is me" because they have made so much money that they must pay taxes on it. The court comprehends that many of the plaintiffs find themselves, at a critical stage of their lives, in a different financial position than they had anticipated before the merger was agreed upon or consummated—perhaps a worse one. But even those claims to do not plausibly state a claim for economic loss. Each group of

90

plaintiffs save one can state a claim for economic loss only if it can plausibly allege (not hypothesize or speculate) that there was a viable merger option that would have resulted in no tax consequences to the shareholders who held their JCI shares in taxable accounts. And for the group that accepted JCplc shares as consideration, there is the complicating factor of how to compare the consideration the members received with their pre-merger assets. Did they suffer an economic "loss" if the receipt of JCplc shares created no increase in taxable basis? Did they suffer an economic "loss" if the value of the JCplc shares increased in value such that even with increased basis, the plaintiffs still realized gains after taxes? Did they suffer an economic loss if their taxable basis decreased after the merger? At what point is the "loss" or "gain" to be measured?

As the Seventh Circuit has said, the plaintiffs' economic loss allegations are "heavy on hindsight and speculation, [and] light on verifiable fact." Kuebler, 13 F.4th at 647 (quoting Beck, 559 U.S. at 684)). The plaintiffs have failed to plead economic loss.

4. <em>The defendants' remaining arguments are moot.</em>

Count I of the complaint names "the JCI Defendants." Dkt. No. 53 at 170. It defines "the JCI Defendants" as "the Individual Defendants and JCI . . . collectively." Id. at ¶49. It defines the "Individual Defendants" as Molinaroli, Stief, Guyett, Janowski, Abney, Black, Bushman, Conner, Goodman, Joerres, the Lacy Estate, del Valle Perochena and Vergnano. Id. at ¶45.

Count I asserts that each of these defendants "solicited proxies from JCI shareholders for their approval of the Inversion/Merger, including the Merger Agreement, by use of a proxy statement that was false and misleading when published . . . ." Id. at ¶307. It also asserts that "[e]ach of the Individual JCI/JCplc Defendants" consented to being named in the proxy statement as a person who would become a director of the new company. Id. at ¶310. The defendants interpret this last assertion as an allegation that only the Individual JCI/JCplc defendants—defined in the amended complaint as those JCI officers or directors who were going to become officers or directors of the new company, dkt. no. 53 at ¶45—consented to the filing of the proxy statement. Dkt. No. 56 at 33-34. They argue that if the other individual defendants did not consent to the filing of the proxy statement, the plaintiffs could not have stated a claim against them. Id. at 34. The plaintiffs did not respond to this argument and the court believes that the defendants misread the allegation in ¶310 of the amended complaint; it does not say that only the Individual JCI/JCplc defendants consented to the filing of the proxy statement. It says that each of the Individual JCI/JCplc defendants agreed to be named in that statement "as a person who will become a director of the [new] Company." Nonetheless, the defendants' argument that the plaintiffs did not state a Section 14(a) claim against individual defendants is moot because the court has concluded that the plaintiffs have not stated a Section 14(a) claim against any defendant.

Finally, Count I of the amended complaint alleges that "[t]he Individual Defendants, or the Individual JCI/JCplc Defendants, as relevant, were and/or

are controlling persons of JCI/JCplc within the meaning of Exchange Act § 20(a)." Id. at ¶309. Title 15, U.S.C. §78t(a) states that

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

The defendants asserted in the motion to dismiss that because the amended complaint did not state a claim for a violation of Section 14(a) and Rule 14a-9, it could not state a "controlling persons" claim against the individual defendants. Dkt. No. 56 at 34. They also argued that the plaintiffs alleged only that the individual defendants were controlling persons because they either controlled or were officers or directors of JCI and materially participated in the conduct alleged in the complaint, asserting that these bare legal conclusions were not sufficient to state a claim for "controlling person" liability. Id. The plaintiffs disagreed, stating that they had pled that the individual defendants had "both control over JCI and the power to control or determine the terms of the transaction at issue." Dkt. No. 58 at 30. Because the plaintiffs have not stated a Section 14(a)/Rule 14a-9 claim, they cannot state a Section 20(a) "controlling persons" claim and the defendants' argument is moot.

### 5. Conclusion

The plaintiffs have failed to plead the first and second elements of a Section 14(a)/Rule 14a-9 securities fraud claim—material omissions and loss

causation. It would be futile to allow the plaintiffs to amend the complaint a second time to try to cure this defect, because the plaintiffs' allegations are claims of breach of fiduciary duty masquerading as securities fraud claims. The court will grant the defendants' motion to dismiss Count I of the amended complaint with prejudice.

      B.    <u>Count II: Violation of the Taxpayer Bill of Rights II (26 U.S.C. §7434(a))</u>

          1.    *Applicable Law*

Title 26, U.S.C. §7434(a) states that "[i]f any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person so filing such return." The statute "creates a private right of action against anyone who 'willfully files a fraudulent information return with respect to payments purported to be made' to the plaintiff." <u>Cavoto v. Hayes</u>, 634 F.3d 921, 923 (7th Cir. 2011).

Section 7434(f) of the statute defines "information return" as "any statement described in section 6724(d)(1)(A)." That section states that an "information return" is

> any statement of the amount of payments to another person required by—
>
> (i)    section 6041(a) or (b) (relating to certain information at source),
> (ii)    section 6042(a)(1) (relating to payments of dividends),
> (iii)    section 6044(a)(1) (relating to payments of patronage dividends),
> (iv)    section 6049(a) (relating to payments of interest),
> (v)    section 6050A(a) (relating to reporting requirements of certain fishing boat operators),

94

(vi)    section 6050N(a) (relating to payments of royalties),
(vii)    section 6051(d) (relating to information returns with respect to income tax withheld),
(viii)    section 6050R (relating to returns relating to certain purchases of fish), or
(ix)    section 110(d) (relating to qualified lessee construction allowances for short-term leases).

"The types of false 'information returns' for which an injured taxpayer may recover are limited to the nine listed in 26 U.S.C. § 6724(d)(1)(A)." <u>Cavoto</u>, 634 F.3d at 924. To state a claim under §7434, the plaintiff "must allege: (1) Defendant issued an information return; (2) the information return was fraudulent; and (3) Defendant willfully issued such a fraudulent return." <u>DeMario v. Utilivate Technologies, LLC</u>, No. 20-cv-1757, 2020 WL 11231807, at *1 (N.D. Ill. Oct. 2, 2020) (quoting <u>Schmelzer v. Animal Wellness Ctr. of Monee, LLC</u>, No. 18-cv-01253, 2019 WL 4735441, at *2 (N.D. Ill. Sept. 27, 2019)).

2.    *Analysis*

Count II alleges that the defendants had "filed and disseminated, or will file and disseminate,[23] false information returns (e.g., Form 1099)" to inform the IRS of "payments" in the form of shares of JCplc ordinary shares in exchange for shares of JCI common stock made to JCI shareholders in connection with the Inversion and of the consequent tax liability of JCI shareholders. Dkt. No. 53 at ¶¶313, 314. The amended complaint does not

---

[23] It appears that to the extent that it alleged that the defendants would file in the future, or had announced their intention to file in the future, the Forms 1099, this claim was not ripe when the plaintiffs filed the amended complaint. Assuming that it would be ripe now were the court to allow the plaintiffs another opportunity to amend, the court addresses the merits of the claim and concludes that giving the plaintiffs an opportunity to amend would be futile.

specify *which* Form 1099—1099 DIV (dividends and distributions), 1099-MISC (miscellaneous income), 1099-INT (interest income), 1099-NEC (nonemployee compensation). It is not clear, therefore, whether whichever Form 1099 the defendants had stated an intention to file (and by now likely have filed) meets the definition of an "information return" under §7434.

Even if the Forms 1099 the defendants expressed an intention to file (and likely since have filed) met the definition of an "information return," the plaintiffs have not alleged that the returns themselves were fraudulent. They allege that

> the information returns . . . are and will be fraudulent in that JCI and JCplc, in connection with their Inversion/Merger Tax Avoidance Scheme, wrongfully caused taxes owed by them pursuant to [26 U.S.C.] § 367(b) to be shifted to the Minority Subclass pursuant to [26 U.S.C.] § 367(a) and otherwise wrongfully forced the Minority Subclass to pay taxes in violation of Wisconsin law as a result of, *inter alia*, the breach by the Individual Defendants of their fiduciary duties to the Minority Subclass and the aiding and abetting thereof by the Corporate Defendants, entitled the Minority Subclass to bring this action for damages against JCI and JCplc for filing such returns, pursuant to 26 U.S.C. § 7434(a).

Dkt. No. 53 at ¶316.

This count, like Count I, is an attempt to force the square peg of a breach of fiduciary duty claim through the round hole of a 26 U.S.C. §7434 claim. The plaintiffs have not alleged that the defendants were not going to make the payments that they announced they would report on the Forms 1099. Nor have they alleged that the payments the defendants planned to report on the Forms 1099 would fraudulently misstate the source, amounts or recipients of the payments. They allege only that the defendants should not have had reason to

96

file Forms 1099 because they could have acted in such a way as to avoid giving rising to the tax obligations that required the filing of the forms. As Judge Clevert held in <u>Lenz v. Robert W. Baird & Co., Inc.</u>, No. 16-c-0977, 2017 WL 639316, at *6 (E.D. Wis. Feb. 16, 2017), "[w]hether th[e] amount [reported on a Form 1099] was rightly or wrongly distributed does not factor in. The amount was distributed, so the [form] was correct."

The plaintiffs have failed to state a claim for a violation of 26 U.S.C. §7434. The court will grant the defendants' motion to dismiss Count II with prejudice.

C. <u>State-Law Claims</u>

The remaining claims—Counts III through XII—are state-law claims, all relating to the plaintiffs' allegations that the individual defendants breached their fiduciary duty to the plaintiffs by structuring the merger to protect themselves and the new company from tax liability and to shift the tax burden to the plaintiffs.

Under 28 U.S.C. §1367(a), a federal court presiding over a civil case has supplemental jurisdiction over claims that are "so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Even when a district court has supplemental jurisdiction, however, it may decline to exercise that jurisdiction if, among other things, "the claim [over which the court has supplemental jurisdiction] substantially predominates over the claim or claims over which the district court has original jurisdiction." 28 U.S.C.

97

§1367(c).

The Seventh Circuit "presume[s] that a district court will relinquish jurisdiction over supplemental state-law claims when no federal claims remain in advance of trial." Walker v. McArdle, No. 20-3214, 2021 WL 3161829, at *4 (7th Cir. July 27, 2021) (citing RWJ Mgt. Co., Inc. v. BP Products N. Am., 672 F.3d 476, 480 (7th Cir. 2012)). See also, Matthews v. Chambers, 857 F. App'x 244, 246 (7th Cir. 2021) ("Once a district court has dismissed federal claims on the pleadings, it properly relinquishes supplemental jurisdiction over any remaining state-law claims.").

During the October 2019 oral argument on the motion to dismiss, defense counsel argued that "[g]iven Wisconsin's business judgment rule none of the supposed conflicts give rise to a breach and under Seventh Circuit authorities the court can continue to exercise jurisdiction to address this." Dkt. No. 68 at approx. 41:46. Later in the hearing, the court asked defense counsel whether it understood him to be arguing that the court still had the authority to address the breach of fiduciary duty claims if it dismissed the federal claims. Id. at approx. 55:22. Defense counsel responded that the court could continue to exercise jurisdiction over the state-law claims if it was clear that they should be dismissed, citing Sharp Elec. Corp. v. Metro. Life Ins. Co., 578 F.3d 505 (7th Cir. 2009) and Van Harken v. City of Chi., 103 F.3d 1346 (7th Cir. 1997).

In Van Harken, the district court judge ruled on the state claim, even though he had dismissed the federal constitutional claim. Van Harken, 103 F.3d at 1354. The Seventh Circuit concluded that he should not have done so,

98

explaining:

> The general rule is that when as here the federal claim drops out before trial (here *way* before trial), the federal district court should relinquish jurisdiction over the supplemental claim. E.g., *Boyce v. Fernandes*, 77 F.3d 946, 951 (7th Cir. 1996); *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994). The district judge did not do this, his ground being that the due process clause of the Illinois constitution is a mirror image of the federal due process claim [on which the dismissed federal claim had been based]. Of course, this in itself is an interpretation of state law, and the general rule that we have cited is designed to minimize the occasions for federal judges to opine on matters of state law. If, however, an interpretation of state law that knocks out the plaintiff's state claim is obviously correct, the federal judge should put the plaintiff out of his misery then and there, rather than burdening the state courts with a frivolous case. E.g., *Boyce v. Fernandes, supra*, 77 F.3d at 951; *Bowman v. City of Franklin*, 980 F.2d 1104, 1109-10 (7th Cir. 1992). The district judge evidently thought that this case was within this "no brainer" exception to the duty to relinquish federal jurisdiction over the supplemental claim when the main claim drops out before trial.
>
> We reaffirm the propriety of the exception; it is important to judicial economy, which is at the heart of the supplemental jurisdiction. And we acknowledge the broad discretion of district judges in making judgments concerning the retention of supplemental claims. But this case, especially because the supplemental claim is based on a state constitution, does not fall within the exception. The Supreme Court of Illinois has held that the due process clause of the Illinois constitution is not coterminous with that of the federal constitution. . . . From the cases city by the City dealing with specific aspects of due process pertinent to this case, . . . it appears unlikely that the Illinois courts would find a denial of Illinois due process . . . but it is not so unlikely that the plaintiffs should be denied an opportunity to try to persuade them.

Id.

In Sharp, the district court—anticipating that the Seventh Circuit might

disagree with its conclusion that the plaintiff's state-law claims were preempted

by ERISA—"alternatively held that even if [the plaintiff] could amend its state-

99

law counts in such a way as to avoid preemption, the court would decline to exercise supplemental jurisdiction over those claims and dismiss them pursuant to 28 U.S.C. § 1367(c), in light of its dismissal of all claims over which it had original jurisdiction." Sharp Elec. Corp., 578 F.3d at 514. In finding that the district court did not abuse its discretion in declining to exercise jurisdiction, the Seventh Circuit wrote:

> Normally, when "all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." *Wright v. Associated Ins. Cos., Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994). There are three acknowledged exceptions to this rule: when (1) "the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court"; (2) "substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort"; or (3) "when it is absolutely clear how the pendent claims can be decided." *Id.* (internal quotation marks omitted).

> We see no abuse of the district court's discretion here. While it is likely that the statute of limitations has technically run on some, if not all, of [the plaintiff's] state-law claims, there is an Illinois statute that authorizes tolling in these circumstances. . . . In addition, the district court disposed of the federal claims on a motion to dismiss, and so it is difficult to see how "substantial judicial resources" have been committed to this case. See *Davis v. Cook County*, 534 F.3d 650, 654 (7th Cir. 2008). Finally, we are not prepared to say that the proper resolution of the state-law claims is absolutely clear. We conclude, therefore, that the district court did not abuse its discretion in declining to exercise supplement jurisdiction over [the plaintiff's] state law claims.

Id. at 514-15.

The defendants in this case rely on the third exception discussed in Sharp: they assert that it is absolutely clear how the plaintiffs' breach-of-fiduciary claims should be decided, and that the court may exercise its supplemental jurisdiction to resolve those claims despite having dismissed the

100

federal claims. In their written motion to dismiss, the defendants asserted that

> [i]t is settled Wisconsin law that the decision how to structure a transaction, including its tax effects, is left to the business judgment of a company's directors. *Data Key* [*Partners v. Permira Advisers, LLC*, 356 Wis.2d 665, 682 (Wis. 2014)] (quoting *Steven v. Hale-Haas Corp.*, 249 Wis. 205, 221 . . . (1946)) ("The business of a corporation is committed to its officers and directors . . . ."). It is even more settled that actions taken in good faith and "'in the honest belief that [such] decisions were in the best interest of the company'" are protected by Wisconsin's strong business judgment rule. *Id.*, ¶33 (quoting *Reget v. Paige*, . . . 242 Wis.2d 278 . . . ). Plaintiffs have repeatedly conceded that defendants structured the merger "for the benefit of JCI." Compl. ¶¶61, 324. The Court's inquiry should end there.

Dkt. No. 56 at 35-36.

The plaintiffs responded that the *officer* defendants were not protected by the business judgment rule. Dkt. No. 58 at 31. While conceding that Wisconsin's business judgment rule protects directors from liability for damages resulting from a breach of fiduciary duty, the plaintiffs asserted that it does not define either the scope of the duty or what constitutes a breach. Id. They argued that the actions of the director defendants were not protected by the business judgment rule, either because there were applicable exceptions to the rule or because the statute itself did not apply to certain of their actions. Id. at 31-32. The plaintiffs also argued that the fact that the JCI shareholders approved the merger is not relevant to whether the defendants breached their fiduciary duties. Id. at 42.

In their reply brief, the defendants argued that the plaintiffs had not alleged facts showing that one of the exceptions to the business judgment rule applied. Dkt. No. 60 at 19. The defendants relied, both in their original and

reply briefs, on the Wisconsin Supreme Court's decision in <u>Data Key Partners</u> <u>v. Permira Advisers LLC</u>, 356 Wis.2d 665 (Wis. 2014), in which the Supreme Court listed the exceptions to the business judgment rule: "(1) a 'willful failure to deal fairly' with a 'shareholder[] in connection with a matter in which the director has a material conflict of interest'; (2) acts from which 'the director derived an improper personal profit'; or 3) '[w]illful misconduct.'" <u>Data Key</u> <u>Partners</u>, 356 Wis.2d at 682-83 (quoting Wis. Stat. §180.0828(1)(a), (c) and (d)).

The court disagrees that it should exercise its supplemental jurisdiction over the state-law claims in Counts III through XII. The court has concluded that the fiduciary duty and related state-law claims substantially predominate over the claims over which it had original jurisdiction. Under 28 U.S.C. §1367(c), that would have been a reason for the court to decline to exercise supplemental jurisdiction even had it not dismissed the federal causes of action. The Seventh Circuit repeatedly has held—even in <u>Sharp</u> and <u>Van</u> <u>Harken</u>, the cases the defendants cited in support of the court's ability to exercise supplemental jurisdiction after dismissal of the federal causes of action—that the *general* rule is that district courts *should* relinquish jurisdiction over state law claims when they have dismissed all federal claims. Although the court's inordinate and inexcusable delay in ruling on the motion to dismiss means that the statute of limitations likely has run on at least some of the state-law claims, Wisconsin has a tolling statute, Wis. Stat. §893.15, which tolls "the time for commencement of an action on a Wisconsin cause of action" "from the period of commencement of the action in a non-Wisconsin

forum until the time of its final disposition in that forum;" the statute includes "federal courts in this state" in the definition of "a non-Wisconsin forum." Wis. Stat. §893.15(1). Assuming the causes of action the plaintiffs might pursue in state court are the same causes of action that they brought in this federal case, those causes of action do not appear to be time-barred. Between ruling on the motion for injunctive relief and ruling on the motion to dismiss, this court has expended judicial resources on the case, but like the court in Sharp, it is dismissing the federal claims at the pleading stage.

Finally, the court cannot say that it is "absolutely clear" that the plaintiffs have not alleged facts sufficient to state a claim that the actions of the individual defendants were not subject to some exception to Wisconsin's business judgment rule. The plaintiffs have made numerous allegations of conflicts of interest, improper personal profit to JCI insiders, self-dealing and failure to act in the interest of shareholders. Despite the strong protection of the business judgment rule, the court cannot agree that a conclusion that the plaintiffs have failed to state a claim for breach of fiduciary duty (or the related contract, conversion and other state-law claims) is the kind of "no brainer" described by the Van Harken court that requires this court to "put the plaintiffs out of their misery" or that its failure to do so would "burden" the state court with a "frivolous" case.

The court will dismiss Counts III through XII without prejudice, relinquishing its supplemental jurisdiction over those claims.

## VIII.  Remaining Motions

Because the court is dismissing the case, it will dismiss as moot the plaintiffs' motion to modify the PSLRA discovery stay (Dkt. No. 76) and Rule 7(h) motion for leave to serve subpoenas on non-parties (Dkt. No. 81).

## IX.  Conclusion

The court **GRANTS** the defendants' motion to dismiss Counts I and II of the amended complaint and **ORDERS** that those counts are **DISMISSED WITH PREJUDICE**. Dkt. No. 55.

The court **GRANTS** the defendants' motion to dismiss Counts III through XII of the amended complaint but **DECLINES TO EXERCISE** supplemental jurisdiction over those claims and **ORDERS** that those counts are **DISMISSED WITHOUT PREJUDICE**. Dkt. No. 55.

The court **GRANTS** the plaintiffs' Request for Leave to File Supplemental Brief. Dkt. No. 71.

The court **ORDERS** that the Clerk of Court must docket the supplemental brief at Dkt. No. 71-1 as a separate, supplemental brief in opposition to the motion to dismiss.

The court **DENIES AS MOOT** the plaintiffs' motion to modify the PSLRA stay of discovery. Dkt. No. 76.

The court **DENIES AS MOOT** the plaintiffs' Rule 7(h) motion for leave to serve subpoenas on non-parties. Dkt. No. 81.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 3rd day of November, 2021.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**